UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

R2 SOLUTIONS LLC                | DOCKET 4:23-CV-1147
                                |
                                | SEPTEMBER 4, 2024
VS.                             |
                                | 9:02 A.M.
                                |
DATABRICKS, INC.                | SHERMAN, TEXAS

------------------------------------------------------------

VOLUME 1 OF 1, PAGES 1 THROUGH 53

REPORTER'S TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE AMOS L. MAZZANT, III,
UNITED STATES DISTRICT JUDGE

------------------------------------------------------------

APPEARANCES:

FOR THE PLAINTIFF:      CARDER W. BROOKS
                        NELSON BUMGARDNER CONROY PC
                        3131 WEST 7TH STREET, SUITE 300
                        FORT WORTH, TX 76107


FOR THE DEFENDANT:      MICHAEL J. SACKSTEDER
                        FENWICK & WEST LLP - SAN FRANCISCO
                        555 CALIFORNIA STREET, 12TH FLOOR
                        SAN FRANCISCO, CA 94104


COURT REPORTER:         CHRISTINA L. BICKHAM, CRR, RDR
                        FEDERAL OFFICIAL REPORTER
                        101 EAST PECAN
                        SHERMAN, TX 75090



PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

```
 1              (Open court, all parties present.)

 2              THE COURT:  Please be seated.

 3              Okay.  We're here in case 4:23-cv-1147,

 4     R2 Solutions versus Databricks, Inc.

 5              And for the Plaintiff?

 6              MR. SACKSTEDER:  I'm actually the Defendant, your

 7     Honor.

 8              THE COURT:  Oh, I'm sorry.

 9              MR. BROOKS:  Yes, your Honor.  Carder Brooks with

10     Nelson Bumgardner Conroy for the Plaintiff.

11              THE COURT:  And for the Defendant?

12              MR. SACKSTEDER:  Good morning, your Honor.

13     Michael Sacksteder, Fenwick & West, on behalf of

14     Databricks.

15              With me is Neal Hannan, who is a senior director

16     in the legal department at Databricks.

17              THE COURT:  Okay.  Very good.

18              So, we're here on the Defendant's Motion to

19     Transfer Venue to the Northern District of California,

20     which is Docket 20, and Plaintiff's response is 30, and

21     then 35 is the reply.  So if you want to go to the podium.

22              MR. SACKSTEDER:  Sure, your Honor.  Thank you.

23              So, your Honor, this is, I think, the classic case

24     where transfer is justified.

25              THE COURT:  That's what every Defendant says,
```

1  though, in a motion to transfer.  But go ahead.

2         MR. SACKSTEDER:  This time it really is.

3         The Federal Circuit focuses on -- in the words of

4  the *DISH Network* case -- where the center of gravity of the

5  case is, and then it cites a number of other cases --

6  *Samsung*, *Apple*, *Juniper* -- in making that determination.

7  And what they focus on first and most importantly is three

8  words:  the research, design, and development of the

9  patented -- or of the accused functionality and also the

10  research, design, and development of the patented

11  invention.  In this case, both of those factors are

12  squarely and entirely in the Northern District of

13  California, and I believe that's undisputed.

14         The accused functionality relies on an open-source

15  software function called Apache Spark.  That was developed

16  by Reynold Xin, who is now with Databricks and is going to

17  be a witness for Databricks, when he was at the University

18  of California in Berkley.  And then Databricks -- Mr. Xin

19  and other Databricks engineers incorporated that into

20  Databricks' products at their headquarters in San Francisco

21  and in other locations in the Northern District of

22  California.

23         The patented technology was developed at Yahoo! in

24  Sunnyvale, California.  The named inventors of the patent,

25  two of the three reside in California, one of them in the

 1   Northern District, one of them in the Central District.

 2   Both of them are within the subpoena power of the Court.

 3   They are not associated with the Plaintiff R2 in this case,

 4   so they are third parties.  And the third inventor is also

 5   on the West Coast but not in California.

 6        And, finally, regarding the technology, if you

 7   look at the front page of the patent, it is -- it says that

 8   the patented invention purports to enhance the utility of

 9   the MapReduce programming functionality.  That's a

10   functionality that was developed at Google, also in the

11   Northern District of California.  Therein we can have

12   arguments over what the prior art is going to be in regard

13   to invalidity arguments in this case, but it's clear that

14   there are a number of Google or ex-Google witnesses who are

15   knowledgeable about that prior art that came out of the

16   MapReduce program.

17        These factors, the Federal Circuit has repeatedly

18   found, are dispositive as to some of the most important

19   factors in the transfer analysis:  the convenience for

20   willing witnesses, the availability of compulsory process

21   for unwilling witnesses, and the desire in the court system

22   to have local interests adjudicated locally.

23        First, on the convenience of witnesses, the

24   Federal Circuit, in *Juniper Networks,* says that's probably

25   the single most important factor in the transfer analysis.

1    Everybody at Databricks who is likely to testify is in the

2    Northern District of California.  The people from Google

3    relating to the prior art are in the Northern District of

4    California.  One of the three named inventors on the patent

5    is in the Northern District of California; a second is

6    subject to compulsory process in the Central District.

7          Third parties who are -- would be subject to

8    compulsory process include that other named inventor on the

9    asserted patent in this case, and there's been some talk in

10   the briefing about whether they were shown to be unwilling

11   or not.  According to the *DISH Networks* Federal Circuit

12   case, that isn't necessary.  If a third party is not shown

13   to be willing, it is presumed -- that witness is presumed

14   to be unwilling.  So, in this case if it were necessary to

15   subpoena that named inventor, that named inventor -- not

16   only would it be easier for that inventor to travel to the

17   Northern District but would be subject to subpoena power.

18         THE COURT:  But do you know whether -- are they

19   unwilling?  Do you know the answer to that question?

20         MR. SACKSTEDER:  At least one of them, I believe

21   strongly, without disclosing work product, is not likely to

22   be unwilling and is a willing witness.  The other two, I

23   don't know about.

24         Then there's the local-interest factor, and that

25   again weighs heavily in favor of transfer to the Northern

1    District of California.

2         THE COURT:  Well, let me ask about that.  You

3    know, when reading your motion -- I'll confess when I read

4    the motion I was like, okay, this looks like this is a good

5    motion to transfer.  Then I read the response and --

6    because when I look at your motion, there is barely a

7    mention of the Defendant having some presence in the

8    Eastern District and actually here in the Sherman Division

9    in Plano.  You don't really bring that up.

10        So, you have a presence in the state of Texas in

11   the Sherman Division.  And we can talk about that, but I

12   thought it was kind of surprising that it's mentioned maybe

13   twice in the -- in your motion but not in a way to give the

14   Court an indication that you have a significant presence in

15   Texas.

16        MR. SACKSTEDER:  Well, I don't think that

17   Databricks does have a significant presence in Texas --

18        THE COURT:  Well, how many total employees do you

19   have in the state of Texas?

20        MR. SACKSTEDER:  I don't have that number at my

21   fingertips.  I was actually referring to the Eastern

22   District.  There is a -- it's not -- it's been called an

23   operations hub, an operations center.  It's not any of

24   those.  It's a WeWork.  It is a shared office space in

25   Plano where 13 Databricks employees are.  That's what they

 1   call their office.

 2         But none of those employees has anything to do

 3   with research, design, or development of the accused

 4   functionality.  What they do is provide customer support

 5   and what's known in the industry as sales engineering,

 6   somebody who goes out -- you know, first, if you're not a

 7   customer, he goes out and sort of explains the product to

 8   you at a technical level but didn't have anything to do

 9   with design, development, engineering.

10         And then if you have a problem or if you need help

11   setting up your solution, somebody who might come out and

12   help you out with that.  It's very similar to the Genius

13   Bar at Apple stores, somebody who helps you get things

14   working right on your iPhone but doesn't -- didn't program

15   them, doesn't know how they work internally, or someone at

16   Best Buy who is on the Geek Squad who comes out and sets up

17   your computer but didn't write the software on the

18   computer.

19         So that's the 13 employees out of thousands of

20   Databricks employees worldwide who are in this district.

21         THE COURT:  And that is your only physical

22   presence in the state of Texas, is in Plano; is that

23   correct?

24         MR. SACKSTEDER:  No, that's not correct.  There is

25   also Austin --

 1          THE COURT:  Okay.

 2          MR. SACKSTEDER:  -- I believe.  Is that --

 3          Yeah.  You're right, your Honor.  It's the only

 4   physical presence.  There is -- we don't have any other

 5   office.  There are remote employees, but no remote

 6   employees have anything to do with design, development, or

 7   operation -- design, development, or research of the

 8   accused functionality.

 9          THE COURT:  Well, in terms of the other employees,

10   because you don't know the number that are in the state of

11   Texas, I guess my question is:  Do any of the other

12   employees in Texas have any connection to the Plano

13   facility, whether that's their hub, whether they work

14   remotely or not?

15          MR. SACKSTEDER:  Not to my knowledge, your Honor.

16   It's not a hub; it's an office where a few people go if

17   they need to sit in an office and do work.  And that's all

18   it is.  It's literally a WeWork facility.

19          THE COURT:  And so when you're looking at the

20   local interest, you know, doesn't the Eastern District have

21   an interest in this case?  Because R2 is here as well as

22   you have a presence here as well.

23          MR. SACKSTEDER:  Well, R2 kind of has a presence

24   here, but I think we need to talk about that, but I'll talk

25   about Databricks first.

1        The Federal Circuit has said that the connection

2   for the local-interest factor is not a connection between

3   the party and the venue; it's a connection between the

4   events underlying the case and the venue.

5        And here the events underlying the case are the

6   people who developed Spark in Berkley, the people who put

7   it into Databricks in San Francisco and elsewhere in the

8   Northern District of California.

9        THE COURT:  Couldn't it be infringing acts here in

10  our district?

11       MR. SACKSTEDER:  But if that were the case, there

12  would never be a transfer, your Honor.  That's not the

13  standard.

14       THE COURT:  But wouldn't that go in the reverse,

15  too?  I mean, if there are infringing acts everywhere,

16  is -- under your position, only the Northern District of

17  California could only be the place that every case would

18  have to be brought.  And that can't be the law, can it?

19       MR. SACKSTEDER:  That's not quite what I was

20  saying, I don't think, your Honor.

21       But if a product is distributed nationally and its

22  use is alleged to be an infringing act, then I don't think

23  that can possibly be the standard for determining whether

24  it is in the convenience of the witnesses, whether there's

25  a local interest --

1          THE COURT:  I'm not saying that Northern District

2   of California doesn't have a significant interest.  I'm not

3   saying that at all.  My question is that -- it's a sliding

4   scale.  I'm just saying is -- doesn't the Eastern District

5   also have an interest when you have -- you have a presence

6   here, R2 the Plaintiff has a presence here, and there's

7   infringing acts happening here?

8          So, I'm not saying it's more significant.  I'm

9   just saying it's not -- it's not completely without any

10  connection.

11         MR. SACKSTEDER:  I will agree with that.  It is

12  not without any connection.  But the connections are far,

13  far stronger in the Northern District of California and

14  specifically the connections that the Federal Circuit has

15  identified over and over as being the important

16  connections, the events underlying the claims in the case,

17  which is the research, design, and development of the

18  accused functionality and the development of the patented

19  technology, all of which happened in California, and that's

20  where the witnesses are for all of those matters.  And

21  that's what the Federal Circuit has said.

22         The only thing that R2, I think, has identified as

23  an act that is sort of relevant to the claims in the case

24  is potentially somebody who is providing customer support

25  or field engineering that might constitute inducement.  But

 1   that, again, is not -- one, it's not localized to this

 2   district.  There are far more field engineers and far more

 3   support people in the Northern District of California than

 4   there are here.  I just don't think that the tail of 13

 5   employees at a WeWork who don't do anything to do with

 6   research, design, and development should wag the dog of

 7   where this case should be in this case.

 8           THE COURT:  Well, I understand.  And, again, the

 9   point I was just making is that the Eastern District has an

10   interest and -- I'm not saying it's greater than.  I'm just

11   trying to figure out how do I evaluate that and look at all

12   the factors.  And, of course, that's what the Court will

13   have to do, is go through all the factors.

14           And I understand that's significant, but it's

15   different than there being no interest whatsoever because

16   there are some cases, I think, that it's clear where the

17   only interest is in the other district and there is no

18   local interest at all.  But that's not the case here.

19   Anyways --

20           MR. SACKSTEDER:  I would respectfully --

21           THE COURT:  I'm just trying to figure out how I

22   evaluate that on this scale, you know, so --

23           MR. SACKSTEDER:  No.  I understand, your Honor,

24   and I would just submit that the -- based on what the

25   Federal Circuit looks at, which I feel like I'm repeating

1    that over and over and I'll try not to.  But based on what

2    the Federal Circuit looks at --

3            THE COURT:  I just sat there by designation at the

4    Federal Circuit, but I didn't have any transfer cases.  I

5    had patent cases but not transfer motions.

6            MR. SACKSTEDER:  I wouldn't mind being a fly on

7    that wall but --

8            THE COURT:  Well, I'm not going to go into that,

9    but go ahead.

10           MR. SACKSTEDER:  But in any event, you know,

11   whatever connection Databricks has to the Eastern

12   District -- and it is -- by the way, the cases in the

13   Federal Circuit say you look at the district; you don't

14   look at the whole state.

15           And what very, very small connections there are in

16   the Eastern District are just so far outweighed by the

17   local interest in where the events took place that gave

18   rise to the allegations, not just the accused functionality

19   but also the patented invention which was developed in

20   Sunnyvale, California, in the Northern District.

21           And there are cases -- *Juniper* says that.  *Samsung*

22   says that.  And, you know, there is -- one of the cases

23   said there is no -- this was a Western District case --

24   there is no comparable connection.  It didn't say there is

25   no connection but there is no comparable connection in the

1   transferor district.

2           And I think that that's the way to look at it

3   here, that this is something that just has such a huge

4   connection in the Northern District of California and any

5   connection here is far attenuated, is based on 13

6   employees.

7           And the only real thing they've said we need to

8   have somebody talk about is acts relating to alleged

9   inducement.  And, as I said, there are far more sales

10  engineers and support people in the Northern District of

11  California and there is nothing that has identified

12  anything special about the 13 people who call the WeWork in

13  Plano their home that makes them, you know, sort of more

14  important witnesses than anybody else would be in that line

15  of work.

16          Regarding R2's presence in the district, you know,

17  Federal Circuit in the *FedEx* case found that that was

18  actually -- you know, that was -- I forget the wording

19  exactly but it was -- oh, recent, ephemeral, and an

20  artifact of litigation.

21          And even the person who is supposed to be the

22  president of R2 says he works extensively from his home in

23  Austin and he maintains a business address in the Eastern

24  District.  It doesn't say he works there at all.  It

25  says -- I believe those are the words -- he maintains a

 1  business address.

 2        So I don't think that much credit can be given to

 3  the recently established office -- I think it's in

 4  Frisco -- in the Eastern District.  I just -- you know,

 5  that -- you can't -- the Federal Circuit does not permit

 6  parties to create, you know, sort of avoiding transfer

 7  based on something like that.  And that's in several cases,

 8  and *Juniper*, *Zimmer Holdings*, *FedEx* have all held that.

 9        So, one other point.  You know, the -- and

10  transfer motions, as your Honor knows, sort of turn into

11  battles of the LinkedIn profiles and you get a bunch of

12  submissions of people's LinkedIn profiles which are -- you

13  know, more often than not are probably accurate

14  descriptions of the person's employment.

15        But R2 could have asked for jurisdictional venue

16  discovery.  They sort of made a note at the end of their

17  opposition, but they didn't ask for it.  They could have

18  noticed a deposition of our declarant; they never did.  So

19  I don't think that they can rely on conjecture about what

20  the people in the Plano WeWork do compared to the sworn

21  declaration from an executive of Databricks that is on

22  Databricks' side.

23        A couple of other points.  One, there is a

24  reference to time-to-trial statistics, and that is one that

25  has been raised by R2.  But even if that did weigh in favor

     1   or weigh against transfer, the Federal Circuit has

     2   repeatedly said that when other factors weigh in favor of

     3   transfer or are neutral, then the speed of the transferee

     4   district should not alone outweigh those other factors.

     5   That is the *Juniper* case quoting *Genentech* from 2009, one

     6   of the wellsprings of transfer jurisprudence.

     7         THE COURT:  No, and I understand that.  But, you

     8   know, when you look at the speed to trial, the reality is

     9   the Eastern District gets cases to trial a lot quicker.  I

    10   mean, I just finished my 121st jury trial in less than ten

    11   years on the bench as a District Judge.  Judge Gilstrap

    12   also tries a huge number of cases.  So, we try cases in

    13   this district and despite -- and even my personal docket is

    14   crushing.  I have the highest weighted caseload in the

    15   Eastern District, but we keep moving along and getting

    16   cases to trial within a quicker time frame, and it's a

    17   significant time frame difference.

    18         So, I know it's considered the less important of

    19   the factors, but isn't it one factor that does weigh

    20   against transfer?

    21         MR. SACKSTEDER:  The numbers are what they are,

    22   your Honor, and so, you know -- if there is a factor that

    23   weighs against transfer, I think that's the one.  But I

    24   don't think it weighs heavily against transfer particularly

    25   in this case.  If you look at what the Federal Circuit has

        1   said in multiple cases, again, that where the Plaintiff is

        2   not engaged in the manufacture of products that practice

        3   the asserted patents and does not suggest it's in need of a

        4   quick resolution because its position in the market is

        5   being threatened, there is no indication that a more rapid

        6   resolution in Texas is worthy of important weight.

        7            And I apologize I didn't write down the case that

        8   came from, but it's in one of the Federal Circuit *mandamus*

        9   cases that granted transfer in spite of a District Court's

       10   decision.

       11            R2 is a subsidiary of a publicly held patent

       12   monetization company.  There is no evidence whatsoever that

       13   they have a product in the market and that they are somehow

       14   being harmed by the actions of Databricks.

       15            This is a case where it can go to trial on

       16   whatever court's schedule it ends up in.  And if it goes a

       17   little bit later, then, you know, there are mechanisms for

       18   having the financial data updated to, you know, close to

       19   the trial date, having prejudgment interest and so forth

       20   where that should not be a factor that outweighs all these

       21   other factors that weigh heavily in favor of transfer.

       22            THE COURT:  No, I understand that.  I mean, it

       23   again becomes this issue for the Court, this sliding scale.

       24   We look at all the factors and -- you know, and try to do a

       25   holistic review of all the factors together.  And, you

 1  know, there will be a number of neutral factors.  There

 2  will be some that go for transfer, some against transfer,

 3  and the question is how do you factor that all in there.

 4  And especially, you know, in this district we pride

 5  ourselves on holding people to firm trial dates and getting

 6  cases to trial.

 7          Let me ask you, too, you know, what are your

 8  thoughts on the issue of this Court has been dealing with

 9  this -- you know, there's been a number of these cases

10  filed in this district, in this division.  I believe I've

11  had two *Markman*s in this case -- in the case of R2 but -- I

12  have not gone back to check those other cases, but I assume

13  you have.  And are they similar in terms of the patents and

14  claims being asserted?

15          MR. SACKSTEDER:  The patent asserted here was in

16  the other cases, if I'm recalling correctly.  I believe

17  there were --

18          THE COURT:  Right.  That's my thoughts.  But I'm

19  just saying:  How does that factor into any of this, that

20  the Court has dealt with this?

21          MR. SACKSTEDER:  Well, I think a couple of things.

22  The Federal Circuit when it looks at this factor, it looks

23  at whether the cases are co-pending.  There are no

24  co-pending cases in this district, and I think, very

25  importantly, the only case that is co-pending with this one

 1  currently is in the Western District of Texas against

 2  Cloudera and that's a case that R2 filed in the Western

 3  District of Texas.  R2 has filed -- depending on how you

 4  count them -- either eight or nine other cases outside of

 5  this district, and a number, if not all of those, were

 6  filed after the, sort of, first wave of cases that were

 7  filed before this Court.

 8          I am not saying that your Honor is not, you know,

 9  somewhat familiar with the asserted patent, although there

10  were others in some of the other cases, but I don't think,

11  again, that that is a factor that outweighs the

12  overwhelming factors in other cases, especially where the

13  Plaintiff has elected to sue in other districts.

14          I don't think they mentioned that in their

15  briefing, but they have a case in the Western District.

16  They have cases in the Northern District.  And, so, in this

17  case, you know, your Honor's *Markman* rulings are certainly

18  persuasive but not binding on Databricks as Databricks was

19  not a party to the other cases.

20          It's unclear if those claim terms are likely to be

21  disputed.  I believe in the early discussions there might

22  be some agreement on some of them.  The accused

23  functionality is different from those other cases.  It's

24  based on Apache Spark, but it's Databricks' own

25  implementation of Apache Spark, which is, you know, not the

 1   same as, for instance, Cloudera's or some other party.

 2         So, you know, there is a long string cite of

 3   cases.  About half of those, if you look at them, settled

 4   within a few months, and a couple of them, you're correct,

 5   went to a *Markman* hearing.  But I don't think that that

 6   fact outweighs the fact -- the convenience to the witnesses

 7   who are almost all in the Northern District of California

 8   and the local interest where both the accused functionality

 9   was designed, developed, and researched and where the

10   patented invention was developed and where most of the

11   prior art is.

12         THE COURT:  And let me ask you the issue of all of

13   the documents.  In your briefing it doesn't really indicate

14   what form that is.  Are these hard documents?  Are they all

15   electronic documents?  How are they -- how are the

16   documents kept?

17         MR. SACKSTEDER:  As is usually the case, the

18   majority of documents in this case are going to be

19   electronically maintained.

20         THE COURT:  So -- and that's -- in most of these

21   cases, that's usually what the situation is.

22         So if that's the case, why aren't the documents

23   easily accessible here as could be in the Northern District

24   of California?

25         MR. SACKSTEDER:  Well, I think the Federal Circuit

 1  has addressed that issue as well.  And, you know, we

 2  literally don't have an office except a WeWork office in

 3  Texas.  We have -- Databricks has, you know, offices

 4  elsewhere around the country and around the world, but the

 5  only place that you could access these documents from that

 6  is a WeWork facility, in quotes, would be that WeWork,

 7  which is a shared facility with other people from other

 8  companies.  Not the best place to be, you know, sort of

 9  generating documents that are highly confidential.

10          THE COURT:  The question I'm just really asking is

11  access to the documents could be anywhere.  It could be the

12  Plaintiff's lawyer's office, you know, in terms of

13  production or whatever, or it could be in the Plano WeWork

14  facility.

15          Let me ask this:  Are they cloud-based, or are

16  they all just electronic?

17          MR. SACKSTEDER:  I'm not sure I know the answer to

18  that, your Honor.  I don't think that they are the highest

19  confidentiality material, source code that is confidential

20  source code.  There's open-source source code, and then

21  there's confidential source code.  I doubt that that is

22  stored on the cloud because it is, you know, the crown

23  jewels of any technology company.

24          In any event, that source code -- and my friend

25  over here is currently negotiating with one of my

9/4/2024 Motion Hearing

1    colleagues about the production of source code and the

2    circumstances for review, typically that it would be in our

3    office in California -- is where source code review

4    typically occurs, is at the owner of the source code's

5    outside counsel's office.  And we don't have an office in

6    Texas.

7            So, your Honor, if you don't have any other

8    questions, I would just say that I think the most important

9    factors -- what the Federal Circuit has identified as the

10   most important factors, including convenience for the

11   witnesses, local interest, et cetera, those all weigh so

12   heavily in favor of transfer that even if there are one or

13   two that are neutral or weigh lightly against transfer, I

14   think that transfer is still really the mandated outcome.

15           THE COURT:  And let me just ask you one other

16   question before you sit down.  Since we're dealing with a

17   situation where we don't really have any known unwilling

18   witnesses that you know for sure at this point -- other

19   than I know you argued the case law says that you presume

20   they are unwilling.  But since we don't know that and in

21   terms of the witnesses, do you have any idea what witnesses

22   you would actually use at trial?

23           MR. SACKSTEDER:  We will almost certainly use some

24   developers of the -- we would use at least one named

25   inventor who, again, is not associated with R2.  One of

1  those named inventors is in the Northern District of

2  California.  The other one is in the Central District of

3  California.  That might well require a subpoena for trial

4  testimony.

5        There are the developers from the MapReduce

6  functionality and the prior art related to those.  They are

7  in the Northern District of California.

8        And, again, the --

9        THE COURT:  So, how many witnesses do you think

10  that you will actually use?  I mean --

11        MR. SACKSTEDER:  Based on my experience --

12        THE COURT:  -- my experience is in --

13        MR. SACKSTEDER:  -- trying patent cases --

14        THE COURT:  -- patent trials there aren't a huge

15  number of witnesses typically in this category.  Usually

16  the inventor testifies.  There may be one witness, you

17  know, or two for development, but it's really a battle of

18  experts at trial.

19        MR. SACKSTEDER:  No, I understand, your Honor.

20  I've done a few patent trials and --

21        THE COURT:  I'm sure you have.

22        MR. SACKSTEDER:  And they have -- typically, it's

23  ten or fewer, I'd say.  You know, I'm not -- don't hold me

24  to that because that's a -- that's an off-the-cuff

25  estimate, but your Honor would know as well as I.

```
 1            THE COURT:  Okay.  Thank you.

 2            MR. SACKSTEDER:  Thank you, your Honor.

 3            THE COURT:  Response?

 4            MR. BROOKS:  Good morning, your Honor.

 5            THE COURT:  Good morning.

 6            MR. BROOKS:  I think you stated it perfectly

 7 earlier when you said that it requires -- or this analysis

 8 for the venue transfer requires a holistic view and it's a

 9 sliding scale.  And the fact of the matter is that there

10 are three factors out of the eight that are potentially

11 used in the analysis that weigh against transfer, and the

12 remaining five are neutral.

13            It seems that Databricks concedes that the Court

14 congestion weighs against transfer.  I think it is -- you

15 know, as you stated earlier, it's clearly faster to

16 trial --

17            THE COURT:  I think he concedes that at least it

18 slightly favors transfer.  I don't think he went as far as

19 maybe you're asserting.  But he also pointed out that the

20 Federal Circuit has said, you know, that is -- that

21 congestion is a lesser factor in the analysis.

22            So I do agree that it's significant time

23 difference, but isn't that -- especially considering R2

24 doesn't manufacture, the delay in a trial isn't going to

25 impact R2 in any way, is it?
```

1            MR. BROOKS:  Well, your Honor, I'll say that as

2    far as whether or not the factor is given significantly

3    less weight, I think that the -- the way that the Federal

4    Circuit has worded it is that that factor cannot be

5    dispositive when other factors weigh in favor of transfer.

6    But there are a lot of recent cases out of the Fifth

7    Circuit, including *In re Clarke* and the *In re Community* --

8    *Chamber of Commerce* case, that actually, you know -- and

9    *Planned Parenthood* as well.  Both allow the District Court

10   to consider their own docket efficiencies and recognize

11   that that is okay.

12            And as far as the continued harm, while R2 may not

13   be in the business of manufacturing products, the continued

14   infringements and its inability to, you know, prevent those

15   from occurring in order to assert its rights, those are

16   continued harm to R2.

17            And so, you know, the speed to trial in this case,

18   this is not a situation where the -- you know, the

19   statistics show some sort of, you know, negligible

20   difference.  We're talking, you know, years -- over a year,

21   at least a year and a half from the statistics that you can

22   pull and, as you mentioned, you know, the Eastern District

23   of Texas does proceed to trial a lot quicker.

24            And that's not the only one, your Honor, and while

25   that may not be a dispositive element or dispositive factor

1  when you consider the rest of the factors in conjunction,

2  it is one of the factors.

3          And, you know, further -- and you mentioned this

4  earlier -- is about the local interest that Texas has.  And

5  I know that Databricks has focused heavily on that it's

6  about the events and not about the parties' connections to

7  the venue.  But *In re Clarke*, *Chamber of Commerce, Planned*

8  *Parenthood*, I believe, all have referred to the proxies

9  that are considered for determining whether the events that

10  give rise to the suit, you know, have occurred in a

11  particular district.  And the three proxies that they look

12  at are the injury -- the location of the injury, the

13  location of the witnesses, and the location of the

14  Plaintiff.

15          And there is absolutely injury in this district,

16  your Honor.  That was alleged in R2's Complaint.  It's

17  cited -- I believe it's paragraphs 5 through 7 of the

18  Complaint.  Maybe it's 7 through 9.  I can check the

19  briefing.

20          The witnesses that we've identified, your Honor --

21  and this answers an earlier question you had about how many

22  employees Databricks has in Texas.  But there are 300-plus

23  employees for Databricks in Texas, at least according to

24  LinkedIn.  And the ones that we were able to identify

25  specifically to DFW was 112 from the briefing, and there

1    were 25 that specifically listed their location as Plano.

2          Now, I understand that Databricks' declarant,

3    Mr. Taneja, said, you know, that there is 13 employees

4    assigned to work from the Plano office.  What's important

5    is that Databricks hasn't ever said that there is only 13

6    people that work in the Plano office.  All they have stated

7    is that there are 13 people assigned to work there.

8          But in response to the motion, R2 laid out 20

9    different witnesses in a declaration as well as attaching

10   their LinkedIn profiles and explained the exact type of

11   relevant knowledge that each one would have, which

12   included, most notably, of Apache Spark which Databricks

13   has, by their own words, said is the heart of this case.

14   And all of the individuals that R2 identified, all have

15   knowledge of Apache Spark.

16         There is a gentleman that says his location is in

17   Plano that actually provides certification courses on

18   Apache Spark and teaches people who want to know more about

19   how to program an Apache Spark, how to do those things.

20         And even more notably than that is Databricks'

21   director of technical solutions and global director for

22   Spark solutions is located in DFW and the only

23   brick-and-mortar location -- office location is in Plano.

24         So, there is absolutely a location of witnesses

25   here, and R2 has actually gone through and identified 20

1  potential witnesses by name.  Databricks has only

2  identified two in the Northern District of California by

3  name, and that's Mr. Xin and that's Dave Conte, who I

4  believe is the CFO.

5       And for all of Databricks' allegations that

6  there's, you know, 800 engineers in ND California, ND Cal,

7  and that there is all of these people that might have

8  knowledge, they haven't identified any of them

9  specifically.  But R2 has actually walked through, found

10  relevant individuals, and explained what sort of knowledge

11  they would have that's relevant to R2's case.

12       THE COURT:  In terms of those witnesses, are those

13  willing witnesses or unwilling witnesses?

14       MR. BROOKS:  Well, your Honor, the ones that I'm

15  referring to are the Databricks employees, as far as we

16  understand it.  And, so, I understand that they would be

17  included under the willing witnesses as being party

18  witnesses.

19       And, so, it's -- you know, this actually -- this

20  goes to the injury as well.  And the reason that this

21  matters is that, you know, the witnesses that were

22  identified, many of them -- and as Databricks has

23  explained -- are in what they call customer support.  But

24  these are field engineers.  Many of them are field

25  engineers, and they are the key people that explain to

1   Databricks' customers how to integrate Databricks' accused

2   instrumentalities with the customers' data.

3        So, these are not -- this is not a call center.

4   This is not, you know, an area where, you know, Databricks

5   just handles returns.  These people are helping customers

6   integrate Databricks' accused instrumentalities with their

7   data.  That's why each one of these individuals that R2

8   identified has an engineering title, because they need it.

9   And every single one of them that we identified in our

10  declaration actually talks about the Spark knowledge that

11  they have.  And, again, that's at the heart of this case.

12       And the fact that these people are, you know, the

13  key employees at Databricks that are involved with customer

14  support, are involved with, you know, setting these -- you

15  know, setting up these systems for their customers, that

16  goes directly to the heart of R2's induced infringement

17  claim, your Honor.  I mean, it requires a level of

18  direction, and the director of, apparently, customer

19  support, which is the global director for Spark solutions

20  and the director of technical solutions for all of

21  Databricks, is located in DFW.  And it follows that that is

22  their hub for customer support and hub for inducing their

23  customers to infringe on R2's patents by use of the

24  Databricks instrumentalities.

25       And so that would be the injury and the witness,

 1      your Honor, and then the third --

 2              THE COURT:  So, let me make sure I understand.

 3      What infringement are you alleging is happening here in the

 4      Eastern District?

 5              MR. BROOKS:  Well, your Honor, so in the Complaint

 6      we discussed the direct infringement that goes on either

 7      via Databricks creating the product, testing the product

 8      here, or running the product for their customers within the

 9      Eastern District.

10              And so there is some discovery that's still needed

11      to determine exactly how Databricks does what they do.  One

12      way that they could do it is actually set up a product and

13      run it for their customers.  So, they could have their

14      accused instrumentalities be hooked up with customer data

15      and actually run the analysis for them.  Another way would

16      be to set up something for their customers maybe on

17      premises for the customer.

18              And those are two different ways that we alleged,

19      your Honor.  One is via direct infringement where

20      Databricks runs the accused instrumentalities themselves,

21      and the other would be induced where they are having the

22      customer run it in an infringing manner with a particular

23      level of direction and control on how to run those

24      instrumentalities.

25              And so that goes to the injury and the witness as

1  far as the proxies for where the events occur, your Honor,

2  and the third one is the Plaintiff.  Databricks talked

3  about how, you know, the Plaintiff R2 Solutions doesn't

4  really have a location here, and that's just not true, your

5  Honor.  You know, R2 was formed in 2016 and has maintained

6  a place of business here the entire time.  And the

7  president, Craig Yudell, said he works from his residence

8  in Austin.  He lives in Austin, and so there is a

9  connection here.  And all of R2's documents are here.

10 They're here in Texas.

11          THE COURT:  And what -- are they electronic as

12 well?

13          MR. BROOKS:  Yes, your Honor.  They are

14 electronic.  There are some physical copies at Counsel's

15 office.  There are no physical copies in California, which

16 Mr. Yudell declared -- or attested to.

17          And, your Honor, the third thing that favors --

18          THE COURT:  What about all of the documents are in

19 California for the Defense?

20          MR. BROOKS:  Well, your Honor, they actually

21 haven't been very clear about that.  So they have never

22 alleged, throughout any of the briefing, that there's

23 physical documents that are only in California and not in

24 Plano.  They actually steered very clear of that issue.

25 They had an opportunity to address it in reply and did not.

1    They haven't said the source code is there.  They haven't

2    said that there's physical copies of documents there.  All

3    they have said is that Reynold Xin is a key custodian of

4    documents that are primarily generated at the location in

5    California.  But where the documents are primarily

6    generated, while it's relevant, is not the only

7    consideration.

8          They don't say that only Dr. Xin has access to

9    those documents.  They haven't said that only Dr. Xin

10   maintains those documents.  All they have said is that he

11   is a key custodian.  But there are many key custodians,

12   such as the director of technical solutions for Spark, and

13   he would be a key custodian of such documents.  He would

14   need them in order to perform his duties of informing

15   Databricks' customers on how to run Databricks' accused

16   instrumentalities with their data.

17         And so as far as the other -- the other factor

18   that weighs against transfer, your Honor, would include the

19   practical problems.  And you mentioned earlier about this

20   case -- or this Court having heard cases involving the

21   patent-in-suit.  That's absolutely true.  There's been 16

22   previous cases in this Court, all dealing with the '610

23   patent.  Every accused instrumentality in that case dealt

24   with, to one degree or another, Apache Spark, which is a

25   functionality that is at the heart of this case, as

     1   Databricks said.

     2          So there is absolutely a level of practical -- or

     3   practicality in keeping the case here, and the Federal

     4   Circuit has recognized that prior -- that, you know, prior

     5   experience with a particular patent in litigation is

     6   absolutely fairly considered in a transfer analysis, and

     7   that's the *In re EMC* case, I believe, your Honor.  And so

     8   it is absolutely one of the other factors that weighs

     9   against transfer in this case.

    10          And, your Honor, the remaining five factors are

    11   neutral.  There are two that the parties --

    12          THE COURT:  Well, let's make sure.  So I

    13   understand, you said three factors in your mind weigh

    14   against transfer.  Make sure I understand the third one

    15   that you are asserting.  The congestion and prior

    16   experience -- what was the other one that you are

    17   asserting?

    18          MR. BROOKS:  Certainly, your Honor.  I apologize.

    19   The court congestion issue weighs against transfer.  The

    20   second is Texas' local interest, which is determined by

    21   those three proxies that go to the events that give rise to

    22   the suit.

    23          THE COURT:  Okay.  But, you know, my questioning

    24   of opposing counsel on this issue of local interest --

    25   again, it's a sliding scale, but clearly they have a

1  significant interest, do they not, in the Northern District

2  of California?

3          MR. BROOKS:  Your Honor --

4          THE COURT:  In terms of the center of the universe

5  of this case -- and the question is, yes, East Texas has an

6  interest as well.  I agree with that as well.  But it does

7  seem that this would not be -- it just seems that it's

8  hard -- it seems hard for me to say that this factor favors

9  not transferring.

10         But the question is how I factor that in, so give

11  me your best argument on why truly this -- they don't win

12  out on the local interest in terms of how that -- where

13  that factor should end up at.

14         MR. BROOKS:  Sure, your Honor.

15         So, the first thing is I do not dispute that

16  ND Cal has an interest.  Okay?  So, I think that's -- I

17  don't think that is disputable.  Databricks has a

18  headquarters there, and they clearly have employees there.

19  I mean, there is no doubt there.  The founder is based

20  there.  R2 isn't disputing any of those facts.

21         But the Fifth Circuit case law says you look at

22  the events that give rise to the suit and gives those three

23  proxies that we discussed to determine what are the events

24  that give rise to the suit.  And that includes the injury,

25  the witnesses -- the location of the injury, the location

1   of the witnesses, and the location of the Plaintiff.

2          What I -- we discussed earlier about the injury

3   being both in the direct infringement and the induced

4   infringement.  Both show that there is a center of gravity

5   in this case -- to use the vernacular from the *DISH Network*

6   case -- that there is a center of gravity in this case from

7   the infringements that have occurred here.

8          Second thing is the witnesses.  Again, you know,

9   R2 identified 300-plus Databricks employees in Texas.  Many

10  of those --

11         THE COURT:  Let's talk about the injury, though,

12  first.  So, is the injury -- would that be true that injury

13  would be anywhere in the country, would it not?  So -- I'm

14  just trying to figure out how does that comport with how we

15  look at this analysis, because it means that -- in looking

16  at where the injury happened, you can allege anywhere in

17  the country.

18         MR. BROOKS:  So, your Honor, I would agree.  I

19  would agree that if this was -- if this was limited to

20  Databricks' direct infringements, then I would agree with

21  you that the interest would actually -- in that regard

22  would be neutral across the two jurisdictions because then,

23  you know, the nonparty citizens in California would have

24  just as much of an interest in resolving this dispute about

25  Databricks' infringements there that the nonparty, you

 1   know, citizens in Texas would have an interest in resolving

 2   any dispute about infringements that occur in ED Tex.

 3          But what is unique to Texas, and I think is

 4   actually something that came out in Databricks' reply

 5   briefing, was that this concept of customer support is what

 6   all of these Texas employees are somehow or purportedly

 7   related to.  And the customer support which is, again,

 8   directing customers on how to use the accused

 9   instrumentalities, that is a critical piece of R2's induced

10   infringement claim.

11          And that's not a Northern District of California

12   issue; the director of those efforts is in Texas.  So,

13   that, by itself, weighs that in favor when normally if it

14   was just direct infringement it would be, you know, kind of

15   a wash across the board of who would have an interest.  But

16   in this particular case, Texas is Databricks' hub of those

17   efforts, so Texas has an even higher interest than it would

18   be if we were just looking at Databricks' direct

19   infringements across the country.  And so I think that's

20   one particularly important piece.

21          And the second one is the location of the

22   Plaintiff.  So, Data -- you know, for all of the, you know,

23   misgivings that Databricks has about R2 being located here,

24   it does have an office in Frisco and, you know, its

25   president works extensively from Austin and maintains a

1  business address in Frisco, and all of our evidence is in

2  Texas.

3       So with those two things and with the witnesses

4  that we were able -- or that we identified by name and by

5  the knowledge that they had, I think all of those things

6  weigh greatly in favor of transfer.

7       And, again, on the witnesses issue, what I think

8  is particularly important is that R2 identified 20-plus

9  witnesses with relevant knowledge.  Databricks identified

10 only two, which is Dr. Xin and Dave Conte.  And a lot of

11 the cases that Defendants have cited, including *In re*

12 *Juniper* -- and there was also the -- I believe it was the

13 *Jawbone* case, your Honor.  In both of those cases, the

14 difference -- one of the key differences between that case

15 and the one here, or those cases, is that the Defendants

16 actually identified multiple technical witnesses by name.

17 In the *Jawbone* case, I believe they identified -- Amazon

18 identified 11 people -- 11 technical witnesses by name, job

19 title, and what they were expected to be able to testify to

20 with respect to accused functionality.

21      And something similar was in *Juniper* as well.  I

22 believe in *Juniper* that the -- that Juniper had identified

23 11 different technical witnesses by name.

24      But that hasn't occurred here.  Databricks has

25 just kind of referred generically to its engineers in

1  California without giving us any names of who those people

2  might be or giving the Court any way to truly balance

3  whether or not there is an equal amount of, you know,

4  potentially relevant testimony that could be gained from

5  ND Cal versus ED Tex.

6         THE COURT:  And looking at the witnesses you might

7  call, can you give me an indication which -- I mean, I'm

8  not going to hold you to any of this -- but in terms of how

9  many of these people you think you would actually call at

10 trial?

11        MR. BROOKS:  Sure.  So, I think the primary one is

12 Databricks' director of technical solutions, so that's

13 Mr. Ramanathan, I believe.  So, there was some confusion on

14 the names.  His LinkedIn profile says that it's -- I think

15 it's Varatharajan, and I think Databricks has said that

16 it's Mr. Ramanathan.  And so he would actually be someone

17 we would talk to.

18        THE COURT:  After the hearing, can you give those

19 spellings to my court reporter?

20        MR. BROOKS:  Yes.  I believe it's -- oh, you said

21 after the hearing?

22        THE COURT:  After the hearing.

23        MR. BROOKS:  Absolutely.  I can definitely do

24 that.

25        So, he would be a primary one, your Honor.  You

1    know, I think that this -- I believe his name is Howard Wu.

2    He gives -- he's the one that gives the certification

3    courses on Spark.  That's what he says in his LinkedIn

4    profile.  Be interested to know what he teaches.  That

5    would go directly to the heart of the induced infringement

6    claim and -- you know, to what extent he teaches customers.

7            There is a few other ones in -- let me see if I

8    can find my declaration.  In that declaration it talks

9    about the -- there are several of these people that do

10   customer use cases and consider themselves to be subject

11   matter experts.  And if there is a customer use case, that

12   would be absolutely relevant to R2's induced infringement

13   claim.

14           And so I can give you a couple names here, which

15   would include Cody Austin Davis.  He leads the data

16   warehousing subject matter expert group, and he's in the

17   DFW metroplex.

18           There's a -- there would be -- I think it's Mathan

19   Pillai, and he is -- he would have knowledge of the

20   Databricks platform.  He's an expert in the field as well,

21   per his LinkedIn, and he would have customer use cases in

22   inducement.

23           I mean, those are three examples.  And if you look

24   at -- that's kind of the point, your Honor, is that, you

25   know, R2 went through and looked at these people carefully

1    and determined that they had relevant knowledge and

2    explained what that knowledge was.

3           But in response, Databricks just said, well, we've

4    got 800 engineers in ND Cal and, you know, therefore, this

5    is -- you know, the availability of willing witnesses is,

6    you know, clearly in ND Cal.  But they haven't given us a

7    single name except for Reynold Xin and Dave Conte, the

8    founder and the CFO.  That's all they've given us.

9           So, I think that for that reason, that each one of

10   the proxies that goes towards where the events that

11   occurred that give rise -- each one of those proxies is

12   satisfied and weighs in R2's favor.

13          And then real quickly, your Honor, we talked about

14   the practical problems would be the third factor that

15   weighs against transfer.  So that's court congestion,

16   Texas' local interest, and the practical problems of

17   keeping the case in the Eastern District.

18          So, the remaining five factors, your Honor, are

19   neutral.  The two public factors, neither party asserts.

20   They just remain neutral.  Neither party disputes that.

21          And we touched on this somewhat, your Honor, but

22   just to kind of recap.  On the ease of access to sources of

23   proof, you know, again, Databricks hasn't alleged that

24   there is any physical documents that are only in California

25   versus in Texas.

1          THE COURT:  What does the Court do with that?

2    Essentially, both sides -- they are all electronic, so how

3    do I evaluate that?

4          MR. BROOKS:  Well, your Honor, I would say

5    neutral.  That was one of the -- one of the primary points

6    of our argument is that, you know, in other cases before

7    this Court, you know, and in other courts the Defendants

8    are really clear to say, "Well, all of our source code is

9    located on a server that's in this district.  That's where

10   we keep it" or, you know, "We have all of these highly

11   confidential documents that we don't put in the cloud that

12   are in this district."

13         But that didn't happen here so -- Databricks has

14   just said that, well, a key custodian, which is Dr. Xin, is

15   in California, but that doesn't actually go to the ease of

16   access to proof.  While custodians are certainly important,

17   a key custodian being there does not tip the balance.  And

18   they had an opportunity in reply to explain clearly that

19   they had physical documents or source code located in

20   California, and they didn't do that.

21         And so I think that the ease of access to, you

22   know, sources of proof is neutral.  I mean, exactly like

23   you said, it's all electronic.  And I'm, you know, blanking

24   on the exact case name, but I think it was -- I believe it

25   might have been *Planned Parenthood* that talked about how,

 1  you know, if it's all electronic, then you give it less

 2  weight anyway.  But even if it had weight, it would be

 3  neutral in this case.

 4          The second one, your Honor, is compulsory process.

 5  So, on the compulsory process fact, Databricks has really

 6  identified two buckets of individuals.  One is the

 7  inventors of the patents, and the second one is potential

 8  prior art witnesses.

 9          So, R2 doesn't dispute that the inventors would be

10  relevant witnesses or could be relevant witnesses and

11  doesn't dispute that they are in the Northern District of

12  California or somewhere in California, doesn't dispute

13  whatever location Databricks, you know, attributed to them

14  from their LinkedIn profiles, by the way.  Doesn't dispute

15  that.

16          But the potential prior art witnesses, that's too

17  ephemeral.  So, they have pointed to these PTAB

18  proceedings, these IPR proceedings and said, well, you

19  know, all of these different references -- so, it's Pike,

20  Chowdhuri, and MacLeod -- all of these are -- all of the

21  inventors on these patents would be relevant prior art

22  witnesses and they are all located in California; ergo,

23  this factor weighs in favor of transfer.

24          But I think it bears mentioning that, you know,

25  first of all, at the time that this was filed invalidity

1    contentions had not been filed in this case.  So, any of

2    this -- you know, this speculation about what prior art

3    might be included in the invalidity contentions is just

4    that, speculation.

5          And there is the *Lionra* case, which I believe is

6    Exhibit 31 to our response, that actually talks about that

7    specific issue and says, you know, if you were to let

8    Defendants say, well, this is all prior art and it could be

9    relevant, then it would just open the door to -- you know,

10   about all of this prior art with inventors in the

11   transferee district of choice being, you know, put up as

12   potential prior art for the sole purpose of weighing this

13   factor in favor of transfer.  So, I think that that is all

14   very speculative.

15         But then, secondly, you know, even if you could

16   use the PTAB proceedings as, you know, kind of a litmus

17   test of what prior art could be relevant, it bears

18   mentioning that the Databricks and Cloudera IPRs were both

19   denied in reasoned decisions.  And the PTAB found that

20   there wasn't a reasonable likelihood that those references

21   and any of the grounds that were asserted would be likely

22   to render any of the challenged claims, which include every

23   claim in the '610 patent, from being a -- or for being

24   unpatentable.  So, all of those prior art combinations

25   failed.

```
 1              And as far as why the factor is neutral, your
 2   Honor, I think that that -- you know, all of those things
 3   go to why the weight of Databricks' evidence on that point
 4   is slim.  But then R2 has also identified another, you
 5   know, potentially unwilling witness.  R2 hasn't gone
 6   through the -- you know, hasn't asked him if he would be
 7   willing to attend.  And Databricks didn't do either.  So,
 8   in any event, the factor is given less weight because
 9   neither party has said that they are unwilling.  But R2 has
10   also identified a highly relevant witness that's Paul
11   Reidy.  He was the owner of R2.  He was the owner of
12   Excalibur, did all of these deals, was -- he was a witness
13   on all of these things.  He was in charge of the portfolio
14   and owned the portfolio through these companies.
15              And so, you know, R2 has put forth a witness that
16   is potentially unwilling, and Databricks has put forth two
17   witnesses, I believe -- I believe it's two of the
18   inventors -- and then all of these speculative witnesses
19   that there is no way, at the time of filing this, to know
20   whether or not they would be relevant witnesses or not.
21              And then the fifth neutral factor -- but the third
22   that we discussed because the other two were undisputed --
23   is the cost of willing witnesses.  So, this kind of goes
24   back to the discussion we had earlier about Texas' local
25   interest and how you gauge that, and it goes to the
```

 1    witnesses.

 2           So, again, R2 identified 20 witnesses as -- and

 3    identified the specific knowledge that R2 believes that

 4    they have from their LinkedIn profiles that would be

 5    relevant to the case; Databricks has identified two.  So

 6    it's Dr. Xin and Dave Conte.  No one else has been

 7    identified by name.

 8           And, you know, again, Databricks kind of makes

 9    this reference to these 800 California engineers, but

10    there's 300 in Texas, 300 employees.  Now, you know, it's

11    unclear exactly how many of those are engineers, but a

12    significant number of them have engineering titles and they

13    have, you know, engineering jobs.  They're solutions

14    architects.  You know, they're -- "field engineer" is in

15    their title.  So, there is a significant number of

16    witnesses located in Texas, and R2 actually identified them

17    by name, and Databricks did not.

18           So, your Honor, I think that -- one other point on

19    something that opposing counsel said about whether we

20    requested venue discovery.  So, I think in this case, you

21    know -- and contrary to, you know, Mr. Sacksteder's claim,

22    I don't think this is a classic case where transfer is

23    warranted.  I think that -- as you said, I think at first

24    brush -- or at first blush it seemed like a decent

25    argument.  But when you dig into the actual facts of what

 1    Databricks' presence are in Texas and all of the

 2    potentially relevant actions that they conduct from Texas,

 3    including the induced infringement issues, I think that it

 4    becomes clear that this is not that classic case.

 5            And, you know, to the extent that your Honor would

 6    be inclined to grant the transfer motion, then I would make

 7    a formal request on the record if -- you know, if the

 8    request at the end of the response wasn't enough, that you

 9    give us a chance to conduct venue discovery.

10            I mean, the declarations that were put forth by

11    Mr. Taneja on both of these instances were very carefully

12    worded:  Who was assigned to work where?  What does

13    "customer support" mean?

14            I mean, there are all of these kind of

15    not-on-point facts that these declarations put forth that

16    kind of just -- you know, they just muddy the waters as to

17    what Databricks is really doing in Texas.

18            So, if we had a chance to conduct some discovery

19    and determine, you know, what's going on at the Plano

20    office, what the Plano engineers are doing, you know, that

21    would, I think, be helpful and would be something that

22    would be warranted in this case.

23            So with that, your Honor, unless you have any

24    questions, I can sit down.

25            THE COURT:  Thank you.

```
 1              Would you like to respond?

 2              MR. SACKSTEDER:  Thank you, your Honor.

 3              THE COURT:  Just turn your mic on.

 4              And let me just -- I want to follow up, and then

 5    you can respond on the issue of the documents so -- or the

 6    ease of access to those documents.

 7              So, I presume that the source code is on your

 8    servers in the Northern District of California somewhere?

 9              MR. SACKSTEDER:  I'm not sure that's correct, your

10    Honor.  I believe it may be in some kind of cloud storage,

11    but it is accessed/downloaded to a stand-alone computer in

12    the Northern District of California, which is where it will

13    be reviewed.

14              THE COURT:  And then what do you think -- where

15    are the other relevant documents at that are not source

16    code?  Are those probably in the cloud or --

17              MR. SACKSTEDER:  Some of them -- a large number of

18    them are either on the cloud or on individual servers.

19    There might be some that are actually notebooks.  Remember

20    we have inventors on both sides here.  So, you know,

21    sometimes inventors keep -- and we haven't yet sought

22    discovery from Yahoo!, but we are going to, regarding

23    written notes concerning the development of the technique

24    that's claimed in the asserted patent and also written --

25    you know, written documentation that might exist at
```

 1  Databricks or at Yahoo! at least.

 2          So I'm not going to say that everything is

 3  electronic, but as your Honor knows, you know, most

 4  documents typically are electronic.  And while the Federal

 5  Circuit has repeatedly said that you don't just ignore this

 6  factor, it is -- does not get as heavy weight as a lot of

 7  the other factors because of the fact that, you know, a lot

 8  of documents these days are fairly easily available

 9  electronically.  But that doesn't outweigh the other

10  factors.

11          THE COURT:  I understand.  Okay.  Go ahead.  I

12  just --

13          MR. SACKSTEDER:  So, I wanted to address the

14  three -- what I understood to be the three factors that

15  Counsel said are the ones that weigh against transfer and

16  then some I think he identified as neutral which I don't

17  think are neutral at all.

18          So, the one -- the local-interest factor -- and I

19  understand focusing on Fifth Circuit cases, but those cases

20  are applied in the patent context exclusively by the

21  Federal Circuit.  And the Federal Circuit has not looked at

22  the location where the infringement is alleged to have

23  occurred largely, I think, because that is everywhere, as

24  we discussed earlier.

25          It looks at -- and, again, I hate to keep using

 1  these words -- where the accused functionality was

 2  researched, designed, and developed, and that is

 3  unquestionably in the Northern District of California.

 4  Also where the patented inventions was invented, also

 5  unquestionably in the Northern District of California.  And

 6  that is what really creates the local interest in the

 7  Northern District.  I don't think there is anything that

 8  outweighs that even a little bit based on what the Federal

 9  Circuit case law has said over and over.

10        One thing about the -- oh, the witnesses that were

11  identified, you know, we haven't made a final decision on

12  who is going to be our -- who are going to be our trial

13  witnesses.  I'm sure that Mr. Xin will be a trial witness.

14        But it isn't that we haven't named other people.

15  In our opening declaration, paragraph 7 identifies the team

16  that cofounded Databricks.  It mentions Mr. Xin and also a

17  number of other people, and it discusses people -- the

18  named inventors.  You know, our briefing discusses, you

19  know, the prior art.

20        And a couple of points about the IPR's impact on

21  the prior art.  There are -- one, the denial of the IPR,

22  which was filed by Cloudera and then joined by Databricks,

23  that was an institution decision, a decision not to

24  institute the IPR.  So, it contains no -- it carries with

25  it no estoppel effect, statutory estoppel effect on what

1  prior art grounds can be raised in a District Court

2  proceeding subsequent to that decision.

3         So, it is entirely possible -- you know, we didn't

4  control the arguments in the IPR.  It's entirely possible

5  that Databricks could raise those references again and

6  hopefully make better arguments and clearer arguments

7  regarding them.  Hopefully.

8         So it's not like we're precluded from relying on

9  those prior art witnesses.

10        There is also system prior art which you can't

11 even raise in an IPR.  So, to the extent that any prior art

12 is a system or a product, that would be something that's

13 entirely new, and that's something where there are prior

14 art witnesses, again, at Google and elsewhere, that would

15 likely be relied on.

16        Again, I can't say for sure which witnesses are

17 going to be testifying, but one thing I do know is we were

18 sitting there while Counsel was speaking and there are lots

19 and lots of directors at Databricks, and above those there

20 are senior directors.  So, I think the conjecture that a

21 particular named individual is somehow the focus of how

22 Spark is implemented in the Databricks system is just not

23 accurate, and the people who are the witnesses with the

24 most knowledge are those that we've identified and those

25 that are in the Northern District of California.

1           Regarding -- back -- I guess this is on the

2    local-interest factor.  But regarding the suite of offices

3    that R2 shares with some other companies, apparently -- and

4    Counsel said that Databricks has misgivings about that.

5    It's not just Databricks; the Federal Circuit had

6    misgivings about that in the *FedEx* case and specifically

7    referring to that as being kind of an ephemeral thing and

8    for purposes of litigation.  So, I don't think that is

9    anything that should be considered in the analysis of the

10   local interest in the outcome.

11          One other thing.  None of the employees, again --

12   and it's gotten a little confusing.  None of the employees

13   who works in the Eastern District of Texas is an engineer,

14   is a member of the engineering department.  The naming gets

15   confusing because there is a thing called a field engineer

16   which is like Best Buy's Geek Squad.  But nobody in the

17   Eastern District is an engineer, and you are supposed to

18   look at the district, not the whole state.  There are a

19   total -- by our count, there is a total of six engineers in

20   the entire state of Texas.  There are far, far, far more

21   than that in the Northern District of California.

22          Excuse me one second, your Honor.  I think I left

23   a page of notes over here.

24          THE COURT:  That's fine.

25          MR. SACKSTEDER:  So, regarding the time-to-trial

     1  factor, again, Federal Circuit says that that shouldn't be

     2  counted heavily, particularly when there are other heavily

     3  counted factors, when the Plaintiff doesn't have a product,

     4  isn't being hurt in the marketplace, and can recover

     5  whatever it is entitled to recover ultimately via damages

     6  at trial.

     7          Another point:  I don't think that R2 can make too

     8  much of an argument about wanting to get to trial fast

     9  because they could have sued us a lot earlier, too.  They

    10  filed -- as mentioned, they filed 16 cases in this court

    11  and they filed eight or nine cases in other courts before

    12  they got around to filing a lawsuit against Databricks, and

    13  Databricks doesn't make its connection to Spark a secret.

    14          And I believe we did submit, in our declaration,

    15  evidence that there is no one in either engineering or

    16  research and development in this district.  Again, there is

    17  so much in the Northern District of California.  There is

    18  the accused functionality being researched, designed, and

    19  developed; the inventors -- two of the three inventors are

    20  within subpoena power of the Northern District; and the

    21  prior art.

    22          So, we think that to the extent that there is some

    23  way to -- for instance, the court-congestion factor, we

    24  think that is -- those factors are strongly outweighed by

    25  the factors -- the local-interest factor, the convenience

 1   to willing witnesses, the availability of evidence, and the

 2   availability of process for witnesses to come to trial.

 3           THE COURT:  Well, thank you.

 4           MR. SACKSTEDER:  Thank you, your Honor.

 5           THE COURT:  Did you want to have the last word?

 6           MR. BROOKS:  If you'd permit me, your Honor, but

 7   not necessary if you wouldn't like that.

 8           THE COURT:  No, that's -- is there anything else

 9   you want to add?  That's --

10           MR. BROOKS:  The only thing, your Honor -- I don't

11   have to go to the --

12           THE COURT:  You can just do it from there.  That's

13   fine.

14           MR. BROOKS:  Yeah.  So, one thing, your Honor, is

15   that opposing counsel just stated that, you know, there is

16   only six engineers in Texas.  But they didn't ever submit a

17   declaration or anything else saying that, and they had an

18   opportunity in response to tell us exactly where we got it

19   wrong.  They could have said, "No, we only have these

20   people in Texas.  We don't have any engineers."  And they

21   just -- they didn't say that, your Honor.  And so that's

22   the only thing I'll point out is that's not in the record.

23           THE COURT:  Well, thank you.

24           Well, I enjoyed the argument.  I'll take the

25   matter under advisement and, you know, try to do something

1   relatively quickly.  Again, the busy nature of the Court.

2   But I think this was helpful to the Court.  I don't know

3   what I'm going to do yet, so --

4          And then if you didn't have a chance to meet,

5   Lyell Anderson is my patent clerk, and he just started

6   shortly.  My new clerks just started recently, so if you

7   wanted to say hi to him.

8          And we'll be in recess.  Thank y'all.

9          (Proceedings concluded, 10:11 a.m.)

10  COURT REPORTER'S CERTIFICATION

11         I HEREBY CERTIFY THAT ON THIS DATE, SEPTEMBER 5,

12  2024, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD

13  OF PROCEEDINGS.

14         ___/s/_____
            CHRISTINA L. BICKHAM, CRR, RDR

15

16

17

18

19

20

21

22

23

24

25