**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| R2 Solutions LLC, | |
| Plaintiff, | Civil Action No. 4:23-cv-01147-ALM |
| v. | Jury Trial Demanded |
| Databricks, Inc., | |
| Defendant. | |

**JOINT MOTION FOR ENTRY OF DISPUTED PROTECTIVE ORDER**

Plaintiff R2 Solutions LLC ("R2") and Defendant Databricks, Inc. ("Databricks) hereby request that the Court resolve a disputed issue as to the protective order to be entered in this case. The parties have met and conferred and have agreed to all aspects of a protective order except for the provision regarding what tools shall be available on the source code review computer. The parties' respective positions are as follows:

**Plaintiff's Position**

The crux of the parties' dispute is whether the protective order should forbid the installation of tools that can compile and execute source code (i.e., turn the code into a form that a computer can run). Databricks believes that such tools should be forbidden. R2 believes that such a restriction is inappropriate for the reasons set forth below.

The parties have abided by the default protective order in this case since its entry on April 9, 2024. *See* ECF 18. On July 16, Databricks served its invalidity contentions and made a document production. Upon inspection, R2 discovered that, with respect to source code, the production included only replicas of open-source code repositories. It included none of Databricks' own source code for the accused instrumentalities, and Databricks did not otherwise make its own source code

available for inspection (and still has not done so).

R2 raised this issue with Databricks on August 6 and requested that Databricks' source code be made available for inspection. On August 16, over four months after the entry of the default protective order, Databricks claimed that it would need to amend the protective order before producing its source code. On August 19, R2 sent Databricks a draft protective order which draws heavily from Judge Gilstrap's typical order and mimics the protective order that this Court entered in *R2 Solutions LLC v. American Airlines, Inc.*, which also involved the patent-in-suit. *See* No. 4:22-cv-00353-ALM, ECF 22 (Oct. 17, 2022). After prodding from R2, Databricks finally returned a redlined version of the draft protective order. Databricks' redline was essentially a re-write, going so far as changing the definitions of the various confidentiality designations, imposing a page limit on source code print outs, unreasonably limiting contiguous lines of source code that may appear in briefing, and expanding the reach of the prosecution bar, among much more.

Nevertheless, in an effort to resolve these disputes amicably, R2 engaged in a protracted back-and-forth with Databricks attempting to reach a workable compromise version. The parties have now been able to agree to all terms of the Protective Order, except for the terms in paragraph 12(g) regarding source code review tools. R2's proposal is attached as Exhibit A, and Databricks' proposal is attached as Exhibit B.

Databricks proposes language that would preclude R2 from implementing software review tools "capable of compiling or executing the code." *See* Ex. B at 8. R2 opposes inclusion of such language. Databricks bears the burden to show good cause as to why such a limitation on discovery should be imposed. *See Saxon Innovations v. Nokia Corp.*, No. 6:07-CV-490, 2008 U.S. Dist. LEXIS 138985, at \*18 (E.D. Tex. Aug. 18, 2008). But it has not, and cannot, demonstrate such good cause, as case law in this District makes clear. *See id*. at \*24-26 (finding that defendants failed to establish good cause and that "Plaintiff [could] use compilers to analyze Defendants' source code.").

Precluding review tools that allow compiling and executing code is arbitrary and unreasonable. As R2 has explained to Databricks multiple times, compiling and executing the code could greatly expedite R2's review efforts. Big data analytics platforms like Databricks' are often gargantuan, and if R2 could compile and execute the code as part of its review efforts, R2 can process mock datasets on the review computer with the accused instrumentalities to fast-track identification of the most relevant portions of the code. This could save hours and thousands of dollars. And allowing R2 to compile and execute the code would not be burdensome for Databricks—to the contrary, Databricks would simply have to install one or two more tools on the stand-alone computer for R2 to accomplish its review.

Databricks has provided three reasons for limiting R2's discovery in this fashion: (1) such provisions are "standard" for Databricks; (2) there is purportedly a security risk in allowing R2 to compile and execute the code; and (3) the code may not compile because (i) only portions of the source code will be made available, and (ii) the one-computer-setup for the source code review may prevent the code (which Databricks says requires multiple servers) from compiling. As to (1), whether a provision is "standard" for Databricks is irrelevant—the question is whether Databricks has shown good cause to limit R2's discovery efforts. Regarding (2), there is no security risk—any compiled/executed code would be confined to the stand-alone, non-networked computer just like all of the un-compiled source code. And as to (3), whether R2 is able to compile the code is R2's problem and does not burden Databricks in any way. *See Saxon Innovations*, 2008 U.S. Dist. LEXIS 138985, at *18 ("[Defendants] claim that compilers will be ineffective in this case because only complete source code files can be compiled and Plaintiff will only be inspecting portions of the source code. This unsupported assertion may turn out to be correct, but at this early stage in the litigation the Court sees no reason to prohibit compilers, especially since any time and money wasted

3

on their use will be at Plaintiff's expense.").[1]

Rather than allow the code to be compiled and executed, Databricks has offered to allow R2 access to a customer-facing version of its platform. This is a wholly inadequate solution—indeed, providing the customer-facing portion of Databricks platform divorced from the executable version of the underlying source code is not a workable compromise and does little to assist R2 in its code review efforts. As explained above, having the compiled/executable version of the code would allow R2's expert to track the processing of mock data sets through the code to more quickly identify the modules, files, and functions germane to the relevant data processing steps. Simply having a customer facing interface may allow R2 to make queries and even generate results, but it would not allow R2 to ascertain which portions of the code are involved with accomplishing the relevant functionality.

At bottom, Databricks is using the protective order issue as a ruse to avoid its discovery obligations and run out the clock. Databricks was obligated to produce its source code almost three months ago and still has not done so, and Databricks only raised the protective order issue after R2 insisted that Databricks abide by the rules. Databricks' gamesmanship has already caused immense delay. The Court should enter R2's proposed protective order (attached as Exhibit A).

**Defendant's Position**

The present dispute centers around R2's request to obtain not only source code in an electronic native format and tools to *review* that code, but also software tools that it can use to *compile and execute* Databricks' source code.[2]  R2's request should be rejected.  Databricks'

---

[1] To be clear, R2 may additionally (or in the alternative) insist that Databricks make an executable copy of the source code available for review. This issue, however, is premature, as Databricks has not yet made its source code available for inspection such that R2 can determine the sufficiency of the production.

[2] R2 also seeks a complete "executable copy of the source code," although notes that this issue "is premature."  (*See supra*, fn 1.)

agreement to produce code in electronic native format allow R2 to use tools for reviewing that code is sufficient for discovery, and its request for *execution* tools not only goes beyond what is required, but it would also be futile, given the inability to use such tools with the "portions of the source code" that R2 acknowledges will be available (*see supra*, at 3).  Databricks thus respectfully submits that the Court deny R2's requests for tools to execute Databricks' highly sensitive source code.[3]

Courts, including in this District, have found that source code in native electronic format is sufficient for purposes of discovery, and there is no requirement for a producing party to provide an environment that would ease the requesting party's evaluation of the code.  *See Kelora Sys., LLC v. Target Corp.*, No. C 10-04947 CW LB, 2011 WL 6000759, at *3 (N.D. Cal. Aug. 29, 2011) (rejecting request for a functional build environment for the source code, finding that the "benefits of making it easier for [plaintiff] to evaluate the Accused Infringers' source code do not outweigh the burdens associated with the proposal"); *Philips N. Am. LLC v. Glob. Med. Imaging, LLC,* 343 F.R.D. 59, 66-67 (N.D. Ill. 2022) (rejecting request to allow the storage of "scripts and data output by those scripts or other [unidentified software] tools" on the source code computer, finding that the "convenience of [the proponent's] expert in speed of review" did not outweigh the possibility of "create[ing] security concerns for extremely valuable source code"); *see also Gree, Inc. v. Supercell Oy.* No. 2:19-cv-00311-JRG-RSP, Dkt. 134 at 1–3 (E.D. Tex. Dec. 17, 2020) (rejecting request for producing party to "build[] a game environment" for the executable file to run correctly, finding that it is "unduly burdensome, especially when [plaintiff] has access to the source code and has had access

---

[3] Databricks does not concede that this Court is the appropriate venue for this case, or that it should adjudicate the present dispute.  *In re Apple Inc.*, 979 F.3d 1332, 1338–39 (Fed. Cir. 2020) (explaining that "once a party files a transfer motion, disposing of that motion should unquestionably take top priority").  Respectfully, Databricks submits that pursuant to its Motion to Transfer (*see* Dkt 20), the Northern District of California ("the NDCA") is the appropriate forum for case, and the present dispute regarding Databricks' source code—which, pursuant to the parties' agreed protocol, will be loaded onto a computer *in Northern California*, then made available to R2 *in Northern California*—only confirms that the NDCA is the more convenient venue.

to the functionality itself for nearly two years").

Consistent with the cases cited above, this Court should reject R2's requests for tools to execute the code and "process mock datasets" (*see supra*, at 3). R2's only basis for its request is that these tools would purportedly help it "fast-track identification of the most relevant portions of the code" and "could save hours and thousands of dollars" (*see supra*, at 3). But R2 provides no support or any meaningful explanation as to how it would purportedly use the tools for "fast-track identification." Indeed, despite Databricks' requests for R2 to identify the tools it seeks to use, R2 has not done so. Notably, R2 does not contend that such execution tools are necessary for its source code review, because they are not. In other words, R2 is requesting these unidentified tools "merely for the convenience" of its review. This request should be rejected. *Kelora Sys., LLC,* 2011 WL 6000759, at *3 (noting that discovery rules do not require having the producing party undertake burdensome measures "merely for the convenience of the requesting party.").

R2's request should also be rejected as futile. The protective order does not include any provisions under which R2 would be permitted to load "mock datasets" for processing onto the non-networked review computer. Rather, the protective order only provides that R2 may request that "software tools for viewing and searching Source Code Material" be loaded onto the computer and that Databricks may load such software, provided certain conditions are met. (Exhibit A at ¶ 12(g); Exhibit B at ¶ 12(g)) And, as R2 itself acknowledges, "only portions of the source code"—i.e., the portions relating to the elements of aspects that are accused of infringing—"will be made available." (*See supra*, at 3.) Yet executing the code is not possible without an incredibly voluminous amount of source code, which would span features, functionalities and other components of the Databricks platform that are completely irrelevant to any issue in this litigation. Because R2's requested execution tools cannot be used without a voluminous amount of irrelevant code, and because any such request for a voluminous amount of irrelevant code would improperly cause Databricks undue

burden that far outweighs any legitimate benefit to R2, this Court should deny R2's request for execution tools.

Further, R2's attempts to summarily dismiss Databricks' objections should likewise be rejected. R2 argues that its proposal poses no security risk because "any compiled/executed code would be confined to the stand-alone, non-networked computer." Again, however, executing the code in the manner in which it operates in the ordinary course of business would require the computer to be connected to a larger environment, thereby creating a security risk. To the extent R2 seeks to generate evidence from executing the code in a *non-networked* environment, such an attempt would be improper, as such purported evidence would not reflect how the code actually operates in the ordinary course of business. Databricks has offered, in an effort to reconcile this dispute, to provide R2 with access to Databricks' customer environment for the accused instrumentalities. R2 also already has access to, and can readily compile and execute, all code for Apache Spark (an open source project)—which is the only functionality that R2 has accused as infringing. Such access, combined with Databricks' source code in native format, is more than sufficient for R2 to investigate its infringement theories.

Finally, Databricks notes that R2 makes a number of unfounded accusations and statements in this Motion. (*See supra*, at 1–2.) While they are unrelated to the present dispute and this Court need not resolve them, Databricks takes this opportunity to correct the record. First, R2 suggests that Databricks has not complied with its obligation to produce source code under LCR 3-4(a). That is incorrect. On July 16, 2024, Databricks produced source code "sufficient to show the operation of any aspects or elements of" Apache Spark—again, the only accused instrumentality identified in R2's initial infringement contentions. Second, R2 appears to take issue with the fact that Databricks proposed revisions to R2's initial proposed protective order. But Databricks' revisions were reasonable and standard, and R2 itself acknowledges that the Parties worked together to reach a

7

"compromise version" on all but the currently disputed provision regarding software tools.  Indeed, Chief Judge Gilstrap entered a Protective Order in another case with modifications very similar to those that Databricks proposed here, including Databricks' proposed language for paragraph 12(g) that is the subject of this dispute.  (*See Byteweavr, LLC v. Databricks, Inc.*, No. 2-24-cv-00162-JRG-RSP Dkt. 32 at 8–9 (E.D. Tex. June 30, 2024)).

For all the reasons discussed above, Databricks respectfully requests that the Court enter Databricks' proposed protective order (Exhibit B).

Dated: October 16, 2024                                    Respectfully submitted,

/s/ Edward R. Nelson III
EDWARD R. NELSON III
State Bar No. 00797142
ed@nelbum.com
BRENT N. BUMGARDNER
State Bar No. 00795272
brent@nelbum.com
CHRISTOPHER G. GRANAGHAN
State Bar No. 24078585
chris@nelbum.com
JOHN P. MURPHY
State Bar No. 24056024
murphy@nelbum.com
CARDER W. BROOKS
State Bar No. 24105536
carder@nelbum.com
**NELSON BUMGARDNER CONROY PC**
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
817.377.9111

**COUNSEL FOR PLAINTIFF**
**R2 SOLUTIONS LLC**

8

Dated: October 16, 2024

*/s/ Jessica M. Kaempf*
Michael J. Sacksteder
CA Bar No. 191605 (Admitted E.D. Texas)
Email: msacksteder@fenwick.com
Gregory Sefian
CA Bar No. 341802 (Admitted Pro Hac Vice)
Email: gsefian@fenwick.com
Su Li
CA Bar No. 339374 (Admitted Pro Hac Vice)
Email: sli@fenwick.com
**FENWICK & WEST LLP**
555 California Street, 12th Floor
San Francisco, California 94104
Telephone: 415.875.2300
Facsimile: 415.281.1350

Vigen Salmastlian
CA Bar No. 276846 (Admitted E.D. Texas)
Email: vsalmastlian@fenwick.com
**FENWICK & WEST LLP**
801 California Street,
Mountain View, CA 94041
Telephone: 650.988.8500
Facsimile: 650.938.5200
Jessica M. Kaempf
WA Bar No. 51666 (Admitted E.D. Texas)
Email: jkaempf@fenwick.com Jonathan G.
Tamimi
WA Bar No. 54858 (Admitted E.D. Texas)
Email: jtamimi@fenwick.com
**FENWICK & WEST LLP**
401 Union Street, 5th Floor
Seattle, WA 98101
Telephone: 206.389.4510
Facsimile: 206.389.4511

*Attorneys for Defendant Databricks, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically in compliance

with Local Rule CV-5(a). Therefore, this document was served on all counsel on October 16, 2024.

*/s/ Edward R. Nelson III*

9

## CERTIFICATE OF CONFERENCE

I hereby certify that counsel for Plaintiff and counsel for Defendant conferred regarding the relief sought by this motion and that this motion is unopposed.

*/s/ Edward R. Nelson III*