**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

R2 Solutions LLC,

        Plaintiff,

v.

Databricks, Inc.,

        Defendant.

Civil Action No. 4:23-cv-01147-ALM

Jury Trial Demanded

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ........................................................................................ 1

II.    OVERVIEW OF THE TECHNOLOGY AT ISSUE .......................................... 1

   A.     '610 Patent .......................................................................................... 1

III.   LEGAL STANDARDS ................................................................................. 3

   A.     General Principles of Claim Construction ................................................. 3

   B.     Plain and Ordinary Meaning ................................................................... 3

   C.     Reading Limitations into the Claims ......................................................... 4

IV.    ARGUMENT .............................................................................................. 5

   A.     "processor and memory that are operable to perform the following operations: … based on the key in common." (Claim 17) ......................................................... 5

   B.     "mapping" / "map" / "mapped" (Claims 1, 17) ........................................ 10

   C.     "reducing" / "reduce" (Claims 1, 17) ..................................................... 11

   D.     "providing each data partition to a selected one of a plurality of mapping functions" (Claims 1, 17) ....................................................................... 13

   E.     "[processing] / [process] the intermediate data for each data group in a manner that is defined to correspond to that data group" (Claims 1, 5, 17, 21) ................... 17

   F.     "schema" (Claims 1, 17) ....................................................................... 18

   G.     "the different schema and corresponding different intermediate data have a key in common" (Claims 1, 17) ....................................................................... 19

V.     CONCLUSION ......................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*3M Innovative Props. Co. v. Tredegar Corp.*,
   725 F.3d 1315 (Fed. Cir. 2013)................................................................................ 4

*Apple Inc. v. Motorola, Inc.*,
   757 F.3d 1286 (Fed. Cir. 2014)................................................................................ 7

*Aylus Networks, Inc. v. Apple Inc.*,
   856 F.3d 1353 (Fed. Cir. 2017)........................................................................... 4, 14

*Cardware Inc. v. Samsung Elecs. Co.*,
   No. 2:22-CV-141-JRG-RSP, 2023 U.S. Dist. LEXIS 148405 (E.D. Tex. Aug. 22, 2023) ...... 16

*Collaborative Agreements, LLC v. Adobe Sys.*,
   No. 15-cv-03853-EMC, 2015 U.S. Dist. LEXIS 161809 (N.D. Cal. Dec. 2, 2015).................. 7

*Comark Communications v. Harris Corp.*,
   156 F.3d 1182 (Fed. Cir. 1998)................................................................................ 4

*Constant v. Advanced Micro-Devices, Inc.*,
   848 F.2d 1560 (Fed. Cir. 1988)................................................................................ 4

*Finjan, Inc. v. Proofpoint, Inc.*,
   No. 13-cv-05808-HSG, 2015 U.S. Dist. LEXIS 162504 (N.D. Cal. Dec. 3, 2015) .................. 7

*Function Media, L.L.C. v. Google Inc.*,
   708 F.3d 1310 (Fed. Cir. 2013)................................................................................ 9

*Intelligent Agency, LLC v. 7-Eleven, Inc.*,
   No. 4:20-CV-0185-ALM, 2022 U.S. Dist. LEXIS 43610 (E.D. Tex. March 11, 2022) ...... 6, 10

*Kara Tech. Inc. v. Stamps.com Inc.*,
   582 F.3d 1341 (Fed. Cir. 2009)................................................................................ 5

*Kroy IP Holdings, LLC v. Safeway, Inc.*,
   No. 2:12-CV-00800-WCB, 2014 WL 3735222 (E.D. Tex. July 28, 2014)................................ 3

*Leibel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004).................................................................................. 5

*Linear Tech. Corp. v. Impala Linear Corp.*,
   379 F.3d 1311 (Fed. Cir. 2004)............................................................................. 7, 9

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996) .................................................................................................. 3

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) .................................................................................... 4

*Masco Corp. v. United States*,
   303 F.3d 1316 (Fed. Cir. 2002) ................................................................................ 6

*Media Rights Techs., Inc. v. Capital One Fin. Corp.*,
   800 F.3d 1366 (Fed. Cir. 2015) ................................................................................ 6

*Medrad, Inc. v. MRI Devices Corp.*,
   401 F.3d 1313 (Fed. Cir. 2005) ................................................................................ 3

*Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*,
   248 F.3d 1303 (Fed. Cir. 2001) .............................................................................. 10

*MV3 Partners LLC v. Roku, Inc.*,
   Civ. No. 6:18-CV-00308-ADA, Dkt. No. 90 (W.D. Tex. Oct. 2, 2019) ................... 3

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008) ................................................................................ 3

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) .................................................................. 3, 4, 11, 13

*R2 Solutions LLC v. American Airlines, Inc.*,
   Case No. 4:22-cv-00353-ALM, ECF 58 (E.D. Tex. Apr. 3, 2023) ........................... 1

*R2 Solutions LLC v. Walmart Inc.*,
   Case No. 4:21-cv-00091-ALM, ECF 54 (E.D. Tex. Jan. 4, 2022) ...................... 1, 17

*Tech. Props. Ltd. LLC v. Huawei Techs. Co.*,
   849 F.3d 1349 (Fed. Cir. 2017) .............................................................................. 14

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   135 S. Ct. 831 (2015) ................................................................................................ 3

*Thorner v. Sony Computer Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ................................................................................ 4

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997) ................................................................................ 3

*Varta Microbattery GmbH v. Audio P'ship LLC*,
   No. 2:21-CV-00400-JRG-RSP, 2023 U.S. Dist. LEXIS 138991
   (E.D. Tex. Aug. 9, 2023) ............................................................................................... 13, 14, 16

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ............................................................................................... 3, 4

*Watts v. XL Sys., Inc.*,
   232 F.3d 877 (Fed. Cir. 2000) ................................................................................................... 6

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) ............................................................................................ 5, 6

**Rules, Statutes, and Authorities**

35 U.S.C. § 112 .............................................................................................................. 5, 6, 9

35 U.S.C. 282(b) ............................................................................................................... 16

## I.    INTRODUCTION

This case involves one patent: U.S. Patent Nos. 8,190,610 (Ex. 1). R2 Solutions files this opening claim construction brief addressing this patent and its disputed terms and phrases. This Court previously construed terms and phrases from this patent on two different occasions. *See R2 Solutions LLC v. Walmart Inc.*, Case No. 4:21-cv-00091-ALM, ECF 54 (E.D. Tex. Jan. 4, 2022); *R2 Solutions LLC v. American Airlines, Inc.*, Case No. 4:22-cv-00353-ALM, ECF 58 (E.D. Tex. Apr. 3, 2023). The Court's prior orders explicitly address one of the phrases at issue here.

## II.    OVERVIEW OF THE TECHNOLOGY AT ISSUE

### A.    '610 Patent

The '610 patent generally relates to the processing of large sets of data (often known today as "big data"). The claimed inventions provide for more dynamic, customizable, and efficient processing of large data sets over prior art methods. *See, e.g.*, '610 pat. at 2:58–61, 4:18–22. The inventions thus increase efficiency and reduce processor execution time. *See id.* at 2:64–67 (explaining that the claimed invention "can make the processing of the output data more efficient and/or convenient").

Specifically, the '610 patent states that the disclosed inventions "enhance[] the utility of the MapReduce programming methodology." *Id*. at Abstract; *see also id*. at 1:31–33, 1:66–2:2. MapReduce methods consist of a map procedure to filter and/or sort data, and a reduce procedure that "reduces" the data via some type of operation (for example, a counting, frequency determination, or other summary operation). The '610 patent explains that "conventional MapReduce implementations do not have facility to efficiently process data from heterogeneous sources" and that "it is impractical to perform joins over two relational tables that have different schemas." *Id*. at 3:9–20. To solve these problems, the '610 patent discloses inventions where user-configurable mapping functions are applied to data from discrete data sources that can have

different schema, followed by a reduce function on intermediate data based on a common key. As the specification explains:

> [T]he MapReduce concept may be utilized to carry out map processing independently on two or more related datasets (e.g., related by being characterized by a common key) even when the related data sets are heterogeneous with respect to each other, such as data tables organized according to different schema. The intermediate results of the map processing (key/value pairs) for a particular key can be processed together in a single reduce function by applying a different iterator to intermediate values for each group. In this way, operations on the two or more related datasets may be carried out more efficiently or in a way not even possible with the conventional MapReduce architecture.

*Id*. at 8:47–58.

An embodiment is shown below in FIG. 4, with, e.g., map tasks 402 and 404 (with representative tables 302 and 304), partitioned data 406 and 408, and reduce tasks 410 and 412:



The map tasks 402 and 404 operate on two separate data groups, E and D, to produce intermediate data, E' and D'. *Id*. at 3:65–4:13. Each set of intermediate data is identifiable with the data group from which it originated. The intermediate data is partitioned (406 and 408) and subsequently passed to the reduce functions 410 and 412 to merge all of the intermediate data. *Id*. at 4:14–59. The merger results in an output data group that is a useful joinder of the input data groups, such as can be seen in, e.g., Figure 5 at 502.

## III.    LEGAL STANDARDS

### A.    General Principles of Claim Construction

Claim construction is a legal question for the Court. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 835 (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996)). "When the parties raise an actual dispute regarding the proper scope of [the] … claims, the court, not the jury, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). However, "claim construction is a matter of resolution of disputed meanings and technical scope, not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). It is, thus, unnecessary for the Court to construe terms that are not difficult to understand or that do not have particular technical meanings. *See, e.g., MV3 Partners LLC v. Roku, Inc.*, No. 6:18-CV-00308-ADA, ECF 90 at 6 (W.D. Tex. Oct. 2, 2019) (citing *Kroy IP Holdings, LLC v. Safeway, Inc.*, Case No. 2:12-CV-00800-WCB, 2014 U.S. Dist. LEXIS 102136, at *7-9 (E.D. Tex. July 28, 2014)).

### B.    Plain and Ordinary Meaning

The "words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Importantly, the ordinary meaning of a term is not determined in a vacuum. What matters is the ordinary meaning to a person of ordinary skill in the art ("POSA") in the context of the claimed invention. *See Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term … in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). A POSA is deemed to have read the claim term in the context of the entire patent. *Phillips*, 415 F.3d at 1482. Therefore, to ascertain the meaning of a

claim, the Court must look to the claim, the specification, and the patent's prosecution history. *Id.* at 1314–17.

The "only two exceptions to [the] general rule" that claim terms are construed according to their ordinary meaning are when the patentee (1) acts as his/her own lexicographer, or (2) disavows the full scope of the claim term either in the specification or during prosecution. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). To act as lexicographer, the patentee must "clearly set forth a definition of the disputed claim term" and "clearly express an intent to define the term." *Id.* at 1365. To disavow the full scope of a claim term, the patentee's statements in the specification or prosecution history must represent "a clear disavowal of claim scope." *Id.* at 1366. When "an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013); *see also Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1363 (Fed. Cir. 2017).

## C.    Reading Limitations into the Claims

Claims must also be read "in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)*.* "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582). "'Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)). "[I]t is improper to read limitations from a preferred embodiment described in the

specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Leibel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004); *see also Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.").

## IV.    ARGUMENT

### A.    "processor and memory that are operable to perform the following operations: … based on the key in common." (Claim 17)

| R2 Solutions' Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning. Not subject to 35 U.S.C. § 112, ¶ 6 and not indefinite. See also the proposed constructions for "data group" and "a plurality of mapping functions that are each user-configurable." | Governed by pre-AIA 35 U.S.C. § 112, ¶ 6.<br><br>**Function:** "partitioning … based on the key in common."<br><br>**Structure:** Indefinite. |

The phrase "processor and memory that are operable to perform the following operations: … based on the key in common" (essentially, the entirely of Claim 17) should be given its plain and ordinary meaning. Databricks' only argument regarding this phrase is that it is means-plus-function and the structure is indefinite. But Databricks fails to overcome the presumption that the phrase is not is governed by 35 U.S.C. § 112, ¶ 6, and further fails to establish indefiniteness.

A patent claim may be expressed using functional language. *See* 35 U.S.C. § 112, ¶ 6 (pre-AIA); *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 & n.3 (Fed. Cir. 2015) (en banc in relevant portion). But § 112, ¶ 6 does not apply to all functional claim language. There is a rebuttable presumption that § 112, ¶ 6 does not apply if the term does not use the words "means" or "steps for." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002); *Williamson*,

792 F.3d at 1348. The presumption can be overcome only if Databricks "demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Williamson*, 792 F.3d at 1349 (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000).

In this case, the subject claim does not recite the word "means" or "step for." Therefore, there is a rebuttable presumption that § 112, ¶ 6 does not apply. Databricks cannot rebut the presumption because "the claim language, read in light of the specification, recites sufficiently definite structure" to a POSA. *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) (internal citations omitted). Indeed, a POSA would understand the structure denoted by the disputed phrase for at least five reasons.

First, the claim itself outlines the "objectives" of the processor and memory recited in the claim and how the processor and memory "operate[] within the context of the claimed invention." *Intelligent Agency, LLC v. 7-Eleven, Inc.*, No. 4:20-CV-0185-ALM, 2022 U.S. Dist. LEXIS 43610, at *39 (E.D. Tex. March 11, 2022). The entire claim sets out exactly what the processor and memory must do. For example, and as Mr. Bill Davis (an expert in "computer information security, distributed analytical systems for network detection and response platforms, and enterprise dataflow management for indexing and search") explains, "It is clear from the claim that the processor and memory must, for example, partition data in a specific way, provide partitions to mapping functions to create intermediate data in a specific way, and reduce the intermediate data via processing that corresponds to the data groups in a specific way. This explains how the 'processor' and 'memory' operate within the context of the claimed invention, denoting sufficient structure to a POSITA." Ex. 2 ("Davis Decl."), ¶¶ 1, 38-39. Thus, the claim language itself provides sufficiently definite structure to one of skill in the art. *Linear Tech. Corp. v. Impala Linear*

*Corp.*, 379 F.3d 1311, 1319-21 (Fed. Cir. 2004) (finding "circuit [for performing a function]" to be sufficiently definite structure because the claim recited the "objectives and operations" of the circuit); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1295, 1301 (Fed. Cir. 2014) (finding "heuristic [for performing a function]" to be sufficiently definite structure because the patent claim described the operation and objectives of the heuristic); *Collaborative Agreements, LLC v. Adobe Sys.*, No. 15-cv-03853-EMC, 2015 U.S. Dist. LEXIS 161809, at *11-*24 (N.D. Cal. Dec. 2, 2015) (determining "code segment [for performing a function]" to be sufficiently definite structure because the claim described the operation of the code segment); *Finjan, Inc. v. Proofpoint, Inc.*, No. 13-cv-05808-HSG, 2015 U.S. Dist. LEXIS 162504, at *31-*32 (N.D. Cal. Dec. 3, 2015) (determining "processor [for performing a function]" to be sufficiently definite structure because the claim described how the processor functions with the other claim components).

Second, the specification extensively discusses a prior art reference that identifies specific types (even brand names) of processors and memory that could be used in MapReduce programming (which is what the '610 patent aims to improve). *See* Ex. E to Davis Decl. at 3 ("For example, one implementation may be suitable for a small shared-memory machine, another for a large NUMA multi-processor, and yet another for an even larger collection of networked machines."; "Machines are typically dual-processor x86 processors running Linux, with 2-4 GB of memory per machine."); 4 ("The intermediate key/value pairs produced by the Map function are buffered in memory."; "If the amount of intermediate data is too large to fit in memory, an external sort is used."); 8 ("Each machine had two 2GHz Intel Xeon processors with Hyper-Threading enabled, 4GB of memory, two 160GB IDE disks, and a gigabit Ethernet link."); 11 ("We run on commodity processors to which a small number of disks are directly connected instead of running directly on disk controller processors, but the general approach is similar.").

Such discussion demonstrates "processor" and "memory" have well-understood and definite structures to a POSA. *See* Davis Decl., ¶ 40.

Third, Databricks' expert in the concluded IPR proceeding demonstrated his understanding of "processor" and "memory" in his declaration supporting Databricks' petition. Indeed, Dr. Lin likened a processor and memory discussed in a prior art reference to the processor and memory discussed in Claim 17; he also discussed a prior art "exemplary computer system" which included processing units and memory. *See* Ex. C to Davis Decl., ¶¶ 154, 84; Davis Decl., ¶ 41. In other words, Databricks understood processor and memory structures during the IPR, but apparently does not understand them now. *Id.*, ¶ 41.[1]

Fourth, prior art cited during prosecution of the '610 patent includes ample discussion of both processors and memory. *See, e.g.*, Ex. G to Davis Decl. at 6:43-51 ("Processor 110 performs computation and control functions of computer system 100, and comprises a suitable central processing unit (CPU). Processor 10 may comprise a single integrated circuit, such as a microprocessor, or may comprise any suitable number of integrated circuit devices and/or circuit boards working in cooperation to accomplish the functions of a processor. Processor 110 suitably executes object-oriented computer programs within main memory 120."); 7:26-41 ("It should be understood that for purposes of this application, in memory 120 is used in its broadest sense, and can include Dynamic Random Access Memory (DRAM), Static RAM (SRAM), flash memory, cache memory, etc. While not explicitly shown in FIG. 1, memory 120 may be a single type of memory component or may be composed of many different types of memory components. For example, memory 120 and CPU 110 may be distributed across several different computers that

---

[1] It bears mention that neither Databricks nor its expert asserted that this phrase required construction during IPR and, instead, accorded the phrase its plain and ordinary meaning. *See* Ex. C to Davis Decl., ¶ 66.

collectively comprise system 100. It should also be understood that programs in memory 120 can include any and all forms of computer programs, including Source code, intermediate code, machine code, and any other representation of a computer program."); Ex. H to Davis Decl., ¶ 61; Davis Decl., ¶ 42. Again, this demonstrates that "processor" and "memory" were, and are, readily understood structures. *Id*., ¶ 42.

Finally, both "processor" and "memory" have dictionary definitions pre-dating the '610 patent, which "plainly indicate" that these terms denote structure. *See* Ex. I to Davis Decl.; Davis Decl., ¶ 44; *see also Linear Tech. Corp.*, 379 F.3d at 1320 ("Technical dictionaries, which are evidence of the understandings of persons of skill in the technical arts, plainly indicate that the term 'circuit' connotes structure.") (internal citations omitted). In short, Databricks' position[2] that the claim does not connote sufficient structure to a POSA is wrong.

Even if the Court deems § 112, ¶ 6 applicable, the claim would not be indefinite because the specification provides sufficient structure. *See Function Media, L.L.C. v. Google Inc.*, 708 F.3d 1310, 1317 (Fed. Cir. 2013) (if a term is found to be a means-plus-function term, "the specification must contain sufficient descriptive text by which a person of skill in the field of the invention would know and understand what structure corresponds to the means limitation") ("When dealing with a 'special purpose computer-implemented means-plus-function limitation,' we require the specification to disclose the algorithm for performing the function.") (internal citations omitted). Figures 4 and 5 and the accompanying discussions at column 3, line 35 through column 8, line 15 and column 8, lines 15 through 57 set out algorithms that perform the functions recited by Claim

---

[2] Databricks' arguments regarding the disputed limitation are found in the Declaration of Dr. Jon B. Weissman, which Databricks served concurrently with the filing of the parties' Joint Claim Construction and Prehearing Statement. Dr. Weissman's declaration is attached hereto as Exhibit 3.

17. Each of these figures and their accompanying explanations walk through an embodiment of the claimed functions in detail. These algorithms are undoubtedly "corresponding structure[s]" that the specification "clearly links or associates" with the "function recited in" Claim 17. *Intelligent Agency*, No. 4:20-CV-0185-ALM, 2022 U.S. Dist. LEXIS 43610, at *14 (quoting *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001) (internal quotation marks omitted).

The Court should thus reject Databricks' argument that the disputed phrase is means-plus-function and accord it plain and ordinary meaning. In the alternative, if the Court were to find that the disputed phrase is subject to § 112, ¶ 6, the Court should find the phrase not indefinite because structure is found in at least Figures 4 and 5 and the accompanying discussion.

### B.    "mapping" / "map" / "mapped" (Claims 1, 17)

| R2 Solutions' Construction | Defendant's Construction |
| --- | --- |
| Plain and ordinary meaning. | "[processing] / [process] / [processed] key/value pairs to generate intermediate key/value pairs" |

The terms "mapping"/ "map" / "mapped" should be given their plain and ordinary meanings. The claims themselves elucidate exactly what these terms mean, requiring that the mapping functions are "each user-configurable to independently output a plurality of lists of values for each of a set of keys found in such map function's corresponding data partition to form corresponding intermediate data for that data group and identifiable to that data group." In other words, the claims explain what the mapping functions do and the mapping that they perform. The claims are also consistent with the specification, which is replete with examples demonstrating what mapping functions are and what they do. *See* '610 pat. at Abstract; 2:1-42; 3:48-57; 6:18-35; 7:36-8:58; FIG. 1 (and related text); FIG. 2 (and related text); FIG. 3 (and related text); FIG. 4 (and related text); FIG. 5 (and related text). No constructions are needed in light of the claim

language.

Databricks' proposed constructions are nonsensical. The terms "mapping" and "map" are used almost exclusively as adjectives to describe a particular function (i.e., "mapping *function*" and "map *function*"). Conversely, Databricks' constructions treat the terms as verbs. Supplanting the disputed terms with Databricks' proposed constructions would, thus, lead to illiterate claim limitations (e.g., "*mapping* function" would be mutated to "*processing key/value pairs to generate intermediate key/value pairs* function") that make little sense.

Setting aside the incongruity of Databricks' proposal, its construction would render the plain claim language inconsequential—indeed, the claims specify that the partitions input to the mapping functions have key-value pairs, and that the mapping functions output "a plurality of lists of values for each of a set of keys … to form corresponding intermediate data." These features are already recited in the claims; yet Databricks seeks to include them in the constructions. Allowing Databricks its constructions, and accepting Databricks' constructions, renders the claim language impermissibly superfluous. *See*, *e.g.*, *Phillips*, 415 F.3d at 1314-17. The Court should reject Databricks' constructions and give "mapping"/ "map" / "mapped" their plain and ordinary meanings.

### C.    "reducing" / "reduce" (Claims 1, 17)

| R2 Solutions' Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning. | "[combining] / [combine] all intermediate data values sharing the same key into a single key-value pair or a list of values associated with the key" |

The terms "reducing" / "reduce" need no construction and should be afforded their plain and ordinary meanings. Like the terms "mapping"/ "map" / "mapped", "reducing" / "reduce" are

explained in the claims and discussed throughout the specification. Databricks' proposal is confusing and unnecessary.

As with "mapping" / "map" / "mapped", the claims already define what "reducing" is. For example, the full limitation in claim 1 reads: "reducing the intermediate data for the data groups to at least one output data group, including processing the intermediate data for each data group in a manner that is defined to correspond to that data group, so as to result in a merging of the corresponding different intermediate data based on the key in common." Claim 17 has near-identical language. Thus, the claims explain what the reducing does (e.g., converts intermediate data to at least one output data group), how it is accomplished (e.g., processing in a data-group specific manner), and what the practical result is (e.g., merging of the intermediate data based on the common key). There is no reason to construe terms that are exhaustively defined in the claims themselves. Furthermore, reducing is thoroughly discussed in the specification, and no POSA would be confused as to its meaning in light thereof. *See* '610 pat. at Abstract; 2:19-51; 4:4-59; 5:40-6:17; 6:18-7:35; 7:61-8:14; FIG. 1 (and related text); FIG. 2 (and related text); FIG. 3 (and related text); FIG. 4 (and related text); FIG. 5 (and related text).

Databricks' proposal does nothing to add clarity. Its constructions use two dozen words to restate claim language and would require further construction. What does it mean to "combine" values sharing the same key into a single key-value pair? Are the original values themselves lost because they're combined together? Does the key remain the same, or are two keys "combined" to make a different key? What does it mean to "combine" the values into a list of values associated with the same keys? And are the values maintained, or are they combined? The confusion is compounded because dependent claims 9 and 26 explicitly add a "combine task" to the reducers, but Databricks' construction already requires that the reducing phase in the independent claims

"combine." Does Databricks' proposal supplant the functionality required by claims 9 and 26? It is unclear and may also violate principles of claim differentiation. *See*, *e.g.*, *Phillips*, 415 F.3d at 1314-17. In short, Databricks' proposal raises many more questions than it answers.

The claims themselves explain the terms, and the specification discusses the terms exhaustively. There is simply no reason to use two-dozen words when one will do. The Court should afford the terms their plain and ordinary meaning.

D.    **"providing each data partition to a selected one of a plurality of mapping functions" (Claims 1, 17)**

| R2 Solutions' Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning. | "providing each data partition to one of a plurality of different mapping functions where the mapping function is selected for a partition based on the data group the partition originated from" |

The term "providing each data partition to a selected one of a plurality of mapping functions" should be given its plain and ordinary meaning. Databricks' proposal seeks to improperly narrow the claim to a single embodiment that mandates that "the mapping function is selected for a partition based on the data group the partition originated from." It appears that Databricks' only justification for this construction is a single statement that R2 made during the IPR proceeding. But the language that Databricks relies upon is not disclaimer. Moreover, Databricks' proposal is confusing and grammatically inaccurate.

 "To disavow or disclaim the full scope of a claim term, the patentee's statements … must amount to a 'clear and unmistakable' surrender" of claim scope. *Varta Microbattery GmbH v. Audio P'ship LLC*, No. 2:21-CV-00400-JRG-RSP, 2023 U.S. Dist. LEXIS 138991, at *6 (E.D. Tex. Aug. 9, 2023) (internal citations omitted). Disclaimer can be found, for example, if the patentee makes "expressions of manifest exclusion or restriction, representing a clear disavowal

of claim scope." *Id*. (internal citations omitted). But when a statement is ambiguous or amenable to multiple reasonable interpretations, "it cannot rise to the level of clear and mistakable disclaimer." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1361-63 (Fed. Cir. 2017) (internal citations omitted); *see also Tech. Props. Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1357-58 (Fed. Cir. 2017) (internal citations omitted). Statements are not considered in a vacuum, but rather in the context of the entire prosecution history. *Tech. Props.*, 849 F.3d at 1357-58 (internal citations omitted).

During the IPR, R2 stated as follows (with the purported disclaimer italicized):

"As discussed above, the '610 patent claims a stem-to-stern augmentation to MapReduce, requiring specialized data structures ('data groups') at the front-end configured to be merged together via selective dissemination amongst and processing by a collection of mapping and reducing functions within the enhanced MapReduce architecture. ***This in turn requires the mapping functions to be specialized*** *so that they can be 'selected' for a partition based on the 'data group' the partition originated from and map the partitions 'differently' based on 'data group' to form 'corresponding intermediate data.'*"

Ex. 4 (hereinafter, "POPR") at 36 (emphasis added).

This is not clear and unmistakable disclaimer mandating that mapping functions be "selected for a partition based on the data group the partition originated from" for two reasons. First, Databricks misreads the statement and misinterprets what R2 said is "required." As demonstrated by the bolded portion of the passage above, R2 was simply explaining that the "enhanced MapReduce architecture … ***requires the mapping functions to be specialized***," not that the mapping functions are required to be selected for partitions based on data group. This alone should end the inquiry.

Second, the language that Databricks selected was exemplary and intended only to provide helpful explanation. It was not a "manifest exclusion or restriction" of other selection mechanisms that "represent[s] a clear disavowal of claim scope." *Varta*, 2023 U.S. Dist. LEXIS 138991, at *6

(internal citations omitted). The statement, untethered to any explicit claim limitation, appears shortly after the section header, "The Petition Does Not Demonstrate That The Challenged Claims Are Unpatentable," as part of a general summary of certain enhancements that Databricks' prior art did not disclose. *See* POPR at 35-37 (stating "These features are not disclosed by Pike or Chowdhuri" directly after the subject passage). And prior to this section, R2 dedicated approximately a dozen pages to explaining the '610 patent and its claims (*see* POPR at 2-15) and explicitly addressing the disputed limitation (*see id*. at 13-14). Nowhere in the explanation did R2 remotely suggest that the disputed limitation should be so narrow as Databricks suggests.[3] Had R2 intended to surrender claim scope, it would have done so in the portion of the POPR that actually discussed the meaning of the claims, not in a one-off, introductory paragraph prefacing a response to Databricks' improper characterizations of prior art.

Furthermore, the disputed limitation was *explicitly addressed* in the body of R2's arguments, and there, R2 *did not* argue that the scope of the disputed limitation should be anything other than plain and ordinary meaning. *See* POPR at 62-63. Indeed, implicitly applying the plain and ordinary meaning of the limitation, R2 argued that "Chowdhuri teaches providing pieces of each data table to every hash join function, not 'providing each data partition to a selected one of a plurality of map functions.'" *Id*. at 63. Absent from this argument is *any* narrowing of claim scope, let alone a clear and unmistakable disavowal.

Finally, the lack of disclaimer is evident from the Board's decision denying Databricks'

---

[3] There, R2 explained that "… the resulting partitions are provided to 'a selected one of a plurality of mapping functions' such that 'the data of the first data group is mapped differently than the data of the second data group' … This requires that the architecture differentiates between 'data groups' at the mapping phase to obtain 'intermediate data' on a per-'data group' basis, which avoids jumbling of data having different schemas into the same map and thus eliminating the usefulness of the reducing phase." POPR at 13-14.

IPR petition. In the parties' Joint Claim Construction and Prehearing Statement, Databricks identified page 46 of the Board's decision as supporting its construction. *See* ECF 51-2 at 5. But this excerpt does not discuss the disputed limitation or its scope at all; rather it simply recognizes that the Chowdhuri reference fails to teach "data groups." *See* Ex. 5 at 46. That the Board did not even consider R2's purported "disclaimer" in its 50-page, reasoned decision reflects that R2 did not clearly and unmistakably surrender claim scope. In fact, the Board explicitly "construe[d] claim terms using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b) … In this context, claim terms are generally given their ordinary and customary meaning." *See* Ex. 5 at 15-16. The Board only deviated from plain and ordinary meaning for a single term, "data groups," which both parties agreed should be construed. *See id*. The fact that the Board gave the disputed limitation its plain and ordinary meaning despite R2's purported "disclaimer" buttresses the fact that R2 did not surrender scope. *See Varta*, 2023 U.S. Dist. LEXIS 138991, at *10 (explicitly noting that "the PTAB was able to determine whether to institute trial without expressly construing any claims" in finding that the patentee did not disclaim scope during IPR) (internal citations omitted); *see also Cardware Inc. v. Samsung Elecs. Co.*, No. 2:22-CV-141-JRG-RSP, 2023 U.S. Dist. LEXIS 148405, at *17-18 (E.D. Tex. Aug. 22, 2023) (explaining it to be "of note" that the Board applied the ordinary and customary meaning of the disputed limitation in finding no disclaimer).

Putting aside disclaimer issues, Databricks' proposed construction is grammatically flawed. The tail-end of Databricks' proposal appears to provide for only a single mapping function and a single partition, stating "*the mapping function* is selected for *a partition* based on the data group *the partition* originated from." But the claims recite multiple partitions and multiple mapping functions, and "each data partition" is provided to "a selected one of a plurality of

mapping functions." Databricks' construction improperly reads out the other mapping function(s) and other partition(s) and should not be adopted.

Because there is no disclaimer, the disputed phrase should be afforded its plain and ordinary meaning. The plain language of the claims simply necessitates that each partition be provided "to a selected one of a plurality of mapping functions," as opposed to multiple partitions going to a single mapping function. This is made clear throughout the specification. *See, e.g.*, '610 pat. at Figs. 4, 5. No construction is necessary.

**E.    "[processing] / [process] the intermediate data for each data group in a manner that is defined to correspond to that data group" (Claims 1, 5, 17, 21)**

| R2 Solutions' Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning. | "[processing] / [process] the intermediate data for each data group in a manner that is defined to correspond to the data group from which the intermediate data originated" |

As this Court previously found, the phrases "[processing] / [process] the intermediate data for each data group in a manner that is defined to correspond to that data group" should be given their plain and ordinary meanings. *See R2 Solutions LLC v. Walmart Inc.*, Case No. 4:21-cv-00091-ALM, ECF 54 at 27-29 (E.D. Tex. Jan. 4, 2022). Databricks' construction is unnecessary and simply uses more words to describe what the limitation already concisely says. Indeed, Databricks' proposal simply replaces "that data group" with "the data group from which the intermediate data originated," which is simply unnecessary. The term "that data group" is a reference to "each data group" that appears just a few words earlier. And the claims are already clear that the data of "each data group" is partitioned into a plurality of partitions and each partition is then provided to a mapping function to form "intermediate data for that data group and identifiable to that data

group." Databricks' construction is superfluous and should not be adopted. No construction of this phrase is necessary.

### F.    "schema" (Claims 1, 17)

| R2 Solutions' Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning. | "a set of attributes (such as DeptID, LastName, DeptName) and their properties (such as their data types: integer DeptID, string LastName, string DeptName)" |

The term "schema" should be afforded its plain and ordinary meaning. "Schema" is a readily-understandable term that all POSAs know, and the specification is rife with disclosure that would enable a POSA, and the jury, to understand the term's meaning within the patent's context— the specification even provides explicit examples of data of different schema. *See, e.g.*, '610 pat. at 3:19-4:3; 6:8-17; 8:46-58; FIG. 3 (and related text); FIG. 5 (and related text). "Schema" of data is simply the framework or attributes of the data, e.g., the fields that can be filled for a particular data entry. The best analogy is an Excel spreadsheet with the fields specified at the top, where each data entry on each row would have some value (or none) input into each field—the data's "schema" is, e.g., the fields that can be filled for each row, and this can be different from one spreadsheet to another.

Databricks' proposed construction is an obvious attempt to narrow the meaning of the term to a single embodiment. While the "set of attributes" language is innocuous enough, the remainder of Databricks' proposal goes much too far. It requires "attributes … *and their properties*" and includes examples of what "attributes" and "properties" can be. While this language comes from the specification (*id*. at 3:37-41), it is not lexicography. Indeed, it is simply offered to explain a single embodiment. Importing examples and constraints into the term is confusing, unnecessary,

and impermissibly limiting, particularly when the plain meaning of the term is evident from the context provided by the specification. No construction of this term is necessary.

G.    **"the different schema and corresponding different intermediate data have a key in common" (Claims 1, 17)**

The parties agree that the phrase "the different schema and corresponding different intermediate data have a key in common" should be construed to mean "the different data group schemas have a key in common with the corresponding different intermediate data."

## V.    CONCLUSION

For the foregoing reasons, R2 respectfully requests that this Court adopt R2's constructions as proposed herein.

Dated: October 29, 2024                    Respectfully submitted,

                                           */s/ Edward R. Nelson III*
                                           EDWARD R. NELSON, III
                                           STATE BAR NO. 00797142
                                           BRENT N. BUMGARDNER
                                           STATE BAR NO. 00795272
                                           CHRISTOPHER G. GRANAGHAN
                                           STATE BAR NO. 24078585
                                           JOHN P. MURPHY
                                           STATE BAR NO. 24056024
                                           CARDER W. BROOKS
                                           STATE BAR NO. 24105536

                                           NELSON BUMGARDNER CONROY PC
                                           3131 West 7th Street, Suite 300
                                           Fort Worth, Texas 76107
                                           817.377.9111 (telephone)
                                           ed@nelbum.com
                                           brent@nelbum.com
                                           chris@nelbum.com
                                           murphy@nelbum.com
                                           carder@nelbum.com

                                           **COUNSEL FOR PLAINTIFF**
                                           **R2 SOLUTIONS LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been delivered to all counsel of record on this the 29th day of October, 2024.

*/s/ Edward R. Nelson III*