# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

R2 SOLUTIONS LLC,

                Plaintiff,

    v.

DATABRICKS, INC.,

                Defendant.

Civil Action No. 4:23-cv-01147-ALM

**JURY TRIAL DEMANDED**

## DEFENDANT'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................................1

II. THE ASSERTED PATENT ..................................................................................1

III. THE DISPUTED CLAIM TERMS AND PHRASES ............................................3

A.  "processor and memory that are operable to perform the following
operations: . . ." ...........................................................................................3

1.  The term "processor and memory that are operable to perform
the following operations: . . ." is purely functional and subject
to § 112, ¶ 6..........................................................................................5

2.  The specification does not disclose structure or an algorithm
clearly linked to the "processor and memory" term, rendering
the term indefinite. .............................................................................12

a.  "partitioning the data of each one of the data groups into
a plurality of data partitions that each have a plurality of
key-value pairs" .............................................................................13

b.  "providing each data partition to a selected one of a
plurality of mapping functions that are each user-
configurable to independently output a plurality of lists
of values for each of a set of keys found in such map
function's corresponding data partition to form
corresponding intermediate data for that data group and
identifiable to that data group" .....................................................15

c.  "reduce the intermediate data for the data groups to at
least one output data group, including processing the
intermediate data for each data group in a manner that is
defined to correspond to that data group so as to result in
a merging of the corresponding different intermediate
data based on the key in common" ................................................17

B.  "mapping" / "map" / "mapped" ................................................................17

C.  "reducing" / "reduce"...............................................................................21

D.  "providing each data partition to a selected one of a plurality of
mapping functions".................................................................................22

E.     "[processing] / [process] the intermediate data for each data group in a manner that is defined to correspond to that data group" .........................26

F.     "schema" ....................................................................................................28

G.     "the different schema and corresponding different intermediate data have a key in common"............................................................................30

IV.    CONCLUSION ..................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*3M Innovative Properties Co. v. Avery Dennison Corp.*,
  350 F.3d 1365 (Fed. Cir. 2003)...........................................................................18

*Advanced Ground Info. Sys., Inc. v. Life360, Inc.*,
  830 F.3d 1341 (Fed. Cir. 2016).............................................................................7

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
  637 F.3d 1324 (Fed. Cir. 2011)...........................................................................26

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014)...........................................................................10

*Aristocrat Techs., Austl. PTY Ltd. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008).......................................................................9, 10

*Aylus Networks, Inc. v. Apple Inc.*,
  856 F.3d 1353 (Fed. Cir. 2017).............................................................23, 26, 27

*Bd. of Regents of the Univ. of Texas Sys. v. BENQ Am. Corp.*,
  533 F.3d 1362 (Fed. Cir. 2008)...........................................................................22

*Collaborative Agreements, LLC v. Adobe Sys.*,
  No. 15-cv-03853-EMC, 2015 U.S. Dist. LEXIS 161809
  (N.D. Cal. Dec. 2, 2015) ....................................................................................10

*Digit. Retail Apps, Inc. v. H-E-B*,
  No. 6-19-cv-00167-ADA, 2020 WL 376664 (W.D. Tex. Jan. 23, 2020)............5, 7

*Finjan, Inc. v. Proofpoint, Inc.*,
  No. 13-cv-05808-HSG, 2015 U.S. Dist. LEXIS 162504
  (N.D. Cal. Dec. 3, 2015). .............................................................................10, 11

*Function Media, LLC v. Google, Inc.*,
  708 F.3d 1310 (Fed. Cir. 2013).......................................................................5, 12

*Garrity Power Servs. LLC v. Samsung Elecs. Co.*,
  No. 2:20-CV-00269-JRG, 2021 WL 3403747 (E.D. Tex. Aug. 4, 2021)...............11

*In re Katz Interactive Call Processing Pat. Litig.*,
  639 F.3d 1303 (Fed. Cir. 2011)........................................................................8, 12

*Intelligent Agency, LLC v. 7-Eleven, Inc.*,
  No. 4:20-CV-0184-ALM, 2022 U.S. Dist. LEXIS 43610
  (E.D. Tex. Mar. 11, 2022)...................................................................................11

*Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*,
    22 F.4th 1369 (Fed. Cir. 2022) ........................................................................29

*Linear Tech. Corp. v. Impala Linear Corp.*,
    379 F.3d 1311 (Fed. Cir. 2004).................................................................9, 10

*MTD Prods. Inc. v. Iancu*,
    933 F.3d 1336 (Fed. Cir. 2019).......................................................................5

*Noah Sys., Inc. v. Intuit Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012).....................................................................12

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005).....................................................................19

*Promptu Sys. Corp. v. Comcast Corp.*,
    92 F.4th 1372 (Fed. Cir. 2024) ................................................................20, 22

*Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*,
    989 F.3d 1002 (Fed. Cir. 2021).......................................................................5

*Schindler Elevator Corp. v. Otis Elevator Co.*,
    593 F.3d 1275 (Fed. Cir. 2010).....................................................................23

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995).......................................................................23

*St. Isidore Research, LLC v. Comerica Inc.*,
    No. 2:15-CV-1390-JRG-RSP, 2016 WL 4988246 (E.D. Tex. Sept. 19, 2016)....................6, 9

*Sulzer Textil A.G. v. Picanol N.V.*,
    358 F.3d 1356 (Fed. Cir. 2004).....................................................................27

*VARTA Microbattery GmbH v. Audio P'ship LLC*,
    No. 2:21-CV-00400-JRG-RSP, 2023 WL 5103113 (E.D. Tex. Aug. 9, 2023) ......................25

*VLSI Tech. v. Intel Corp.*,
    53 F.4th 646 (Fed. Cir. 2022) ................................................................20, 21

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) (en banc)................................................... *passim*

*WSOU Investments LLC v. Google LLC*,
    Nos. 2022-1063, 2022-1065, 2023 WL 6889033 (Fed. Cir. Oct. 19, 2023)........................7, 9

*Wyeth v. Teva Pharms. USA, Inc.*,
    No. 03-CV-1293 (WJM), 2005 WL 2175440 (D.N.J. Sept. 6, 2005).....................................20

**STATUTES**

35 U.S.C. § 112 ¶ 6 .......................................................................................... *passim*

35 U.S.C. § 311(b) ..................................................................................................11

# TABLE OF EXHIBITS[1]

| Exhibit No. | Description |
|:---:|---|
| 1 | Declaration of Dr. Jon B. Weissman ("Weissman Decl.") |
| 2 | Jeffery Dean & Sanjay Ghemawat, "MapReduce: Simplified Data Processing on Large Clusters," OSDI '04: Sixth Symposium on Operating system Design and Implementation, San Francisco, CA, USA (Dec. 2004) ("Dean") |
| 3 | Excerpts of U.S. Patent No. 8,190,610 File History |
| 4 | Hung-Chih Yang, Ali Dasdan, Ruey-Lung Hsiao & D. Stott Parker, "MapReduceMerge: Simplified Relational Data Processing on Large Clusters," SIGMOD '07 Annual Conference, June 12-14-2007, Beijing, China (2007) ("Yang") |
| 5 | Patent Owner Preliminary Response filed in *Databricks, Inc. v. R2 Solutions LLC*, PTAB-IPR2024-00659 ("POPR") |
| 6 | *R2 Solutions LLC v. Walmart Inc.*, No. 4:21-cv-00091, Dkt. 54 (E.D. Tex. Jan. 4, 2022) |
| 7 | Excerpt of "schema" from Microsoft Computer Dictionary (5th ed. 2002) |

---

[1] Exhibits are attached to the Declaration of Vigen Salmastlian in Support of Defendant's Responsive Claim Construction Brief.

## I.    INTRODUCTION

Defendant Databricks, Inc. ("Databricks") submits its Responsive Claim Construction Brief addressing the disputed terms of U.S. Patent No. 8,190,610 (the "'610 patent").

## II.    THE ASSERTED PATENT

The '610 patent generally relates to processing large amounts of data in parallel over a network of distributed computers.  (Ex. 1, Weissman Decl. ¶ 36.)  The patent purports to "enhance[] the utility of the MapReduce programming technology."  ('610 patent at Abstract; *see also id*. at 1:31–33, 1:66–2:2.)  MapReduce was first described in a 2004 paper authored by Jeffrey Dean and Sanjay Ghemawat over two years before the '610 patent filing date.  (Ex. 1, Dean at 1.)  Dean is titled, "MapReduce: Simplified Data Processing on Large Clusters" and is discussed at length in the '610 patent.  ('610 patent, 1:6–27; 1:66–2:67; Figs. 1, 2; Weissman Decl. ¶ 42.)

Both Dean and the '610 patent explain that MapReduce has always involved "two functions: *Map* and *Reduce*."  ('610 patent at 1:1–20; Dean § 2.)  For example, Dean explains that "[u]sers specify a map function that processes a key/value pair to generate a set of intermediate key/value pairs, and a reduce function that merges all intermediate values associated with the same intermediate key."  (Dean, Abstract; *see also id.* § 2.)  The applicants relied on these descriptions of map and reduce in Dean to define "map" and "reduce" in the patent:

> Basically, a "map" function maps key-value pairs to new (intermediate) key-value pairs.  A "reduce" function represents all mapped (intermediate) key-value pairs sharing the same key to a single key-value pair or a list of values.  The "map" and "reduce" functions are typically user-provided.  The map function iterates over a list of independent elements, performing an operation on each element as specified by the map function.  The map function generates intermediate results.  The reduce operation takes these intermediate results via a single iterator and combines elements as specified by the reduce function.

('610 patent, 1:18–28.)

Figure 1 shows "the conventional MapReduce architecture" described by Dean.  (*Id.* at 1:48–49; 2:12–17; Fig. 1 (shown below).)  Data may be "partitioned into an arbitrary grouping of seven partitions 102(1) through 102(7)."  (*Id.* at 2:31–33.)  The partitioned data is then provided to map functions 104(1) through 104(7) that generate intermediate values as key-value pairs 106(1) through 106(7).  (*Id.* at 2:21–24, 2:33–35.)  The intermediate key-value pairs are grouped by key in intermediate partitions 110(k1) through 110(k5).  (*Id.* at 2:36–39.) And "[e]ach reduce function 112(k1) through 112(k5) processes intermediate data from one of the intermediate partitions to generate the corresponding output partitions



114(k1) to 114(k5)," which "combine[] all intermediate values for a particular key and produce[] a set of merged output values for the key."  (*Id.* at 2:35–51.)

The '610 patent claims to "enhance[] the utility of the MapReduce programming methodology" by applying MapReduce to data groups with different schema.  (*Id.* at 1:24–27, 3:48–57.)  It explains that the schema of a data set "includes a set of attributes" and "their properties."  (*Id.* at 3:18–56; Weissman Decl. ¶ 48.)  It also illustrates an example of this in Figure 3 (shown, in part, on right).  Table 302 identifies company employees by department ID in the first column and last name in the second column. While Table 304 also identifies department ID in the first column, it identifies department name in the second column.  ('610 patent, 3:23–



28.)  Because these tables include the different attributes of "employee last name" and "department name," Table 302 has a different schema than Table 304.  (*Id.* at 3:19–25.)

Figure 5 illustrates the purportedly "improved MapReduce architecture." (*Id.* at 1:58–62; Fig. 5 (shown below).)  According to the patent, this Figure shows the use of "map" and "reduce" to process Tables 302 and 304. (*Id.* at 3:18–46, 8:15–24).  The patent treats each table as a separate "data group" and, in step 502, partitions the data groups. (*Id.* at 8:15–24.)  At step 504, each partition is provided to a respective map function that takes



*Fig. 5*

in key-value pairs and produces intermediate key-value pairs organized by even and odd key, as shown in step 506.  (*Id.* at 8:25–31.)  After sorting the intermediate data in step 508, the intermediate data is provided to respective reduce functions that combine all intermediate values sharing the same key.  (*Id.* at 8:31–37.)  The output is either a single key-value pair or a list of values associated with the key.  (*Id.*)  While Figure 5 shows the result of "partitioning," "mapping," and "reducing," the patent does not provide any steps or algorithm to achieve these results.

## III.    THE DISPUTED CLAIM TERMS AND PHRASES

### A.    "processor and memory that are operable to perform the following operations: . . ."

| Term | Databricks' Construction | R2's Construction |
|---|---|---|
| "processor and memory that are operable to perform the following operations:<br><br>partitioning the data of each | Governed by pre-AIA 35 U.S.C. § 112 ¶ 6.<br><br>**Function:** "partitioning the data of each one of the data groups | Plain and ordinary meaning.  No construction needed.<br><br>Not subject to 35 U.S.C. |

| Term | Databricks' Construction | R2's Construction |
|---|---|---|
| one of the data groups into a plurality of data partitions that each have a plurality of key-value pairs and providing each data partition to a selected one of a plurality of mapping functions that are each user-configurable to independently output a plurality of lists of values for each of a set of keys found in such map function's corresponding data partition to form corresponding intermediate data for that data group and identifiable to that data group, wherein the data of a first data group has a different schema than the data of a second data group and the data of the first data group is mapped differently than the data of the second data group so that different lists of values are output for the corresponding different intermediate data, wherein the different schema and corresponding different intermediate data have a key in common; and reduce the intermediate data for the data groups to at least one output data group, including processing the intermediate data for each data group in a manner that is defined to correspond to that data group so as to result in a merging of the corresponding different intermediate data based on the key in common." <br><br> Claim 17 | into a plurality of data partitions that each have a plurality of key-value pairs and providing each data partition to a selected one of a plurality of mapping functions that are each user-configurable to independently output a plurality of lists of values for each of a set of keys found in such map function's corresponding data partition to form corresponding intermediate data for that data group and identifiable to that data group, wherein the data of a first data group has a different schema than the data of a second data group and the data of the first data group is mapped differently than the data of the second data group so that different lists of values are output for the corresponding different intermediate data, wherein the different schema and corresponding different intermediate data have a key in common; and reduce the intermediate data for the data groups to at least one output data group, including processing the intermediate data for each data group in a manner that is defined to correspond to that data group so as to result in a merging of the corresponding different intermediate data based on the key in common." <br><br> **Structure:** Indefinite. | § 112 ¶ 6. <br><br> Not indefinite. |

This term is governed by § 112, ¶ 6 as "processor and memory that are operable to perform the following operations" fails to connote sufficient structure for performing the claimed function. The term is indefinite because the patent discloses no steps or algorithm clearly linked to the term.

Section 112, ¶ 6 limits "functional claiming," the practice of claiming a result without disclosing how to accomplish it. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349-51 (Fed. Cir. 2015) (en banc); *Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1319 (Fed. Cir. 2013). In *Williamson*, the Federal Circuit reinforced the longstanding prohibition against functional claiming: if claims do not identify specific structure or acts sufficient to achieve a claimed result, then the specification must fill the void to limit them to the inventor's specific solution. 792 F.3d at 1350-51. This is true whether the claims recite the phrase "means for" or not. *Id*. at 1349-50.

When evaluating whether § 112, ¶ 6 applies, courts must determine whether the patent "recit[es] a function to be performed rather than [] reciting structure for performing that function." *Id.* at 1347–48. Even if a claim term connotes some generic structure (*e.g.*, a general-purpose computer), it cannot escape § 112, ¶ 6 if that structure cannot perform entirely the recited function. *Id.* at 1348; *Digit. Retail Apps, Inc. v. H-E-B*, No. 6-19-cv-00167-ADA, 2020 WL 376664, at *4 (W.D. Tex. Jan. 23, 2020). Where the claims recite functions performed by black boxes, they are subject to § 112, ¶ 6. *Williamson*, 792 F.3d at 1350–51.

1.      **The term "processor and memory that are operable to perform the following operations: . . ." is purely functional and subject to § 112, ¶ 6.**

The claimed "processor and memory" term is purely functional and subject to § 112, ¶ 6. ('610 patent, claim 17; Weissman Decl. ¶¶ 56–61.) The words "that are operable to perform the following operations" are nonce words that are simply a substitute for the term "means for." *Williamson*, 792 F.3d at 1350–51 ("[g]eneric terms such as 'mechanism,' 'element,' 'device,' and other nonce words . . . reflect nothing more than verbal constructs" and are "tantamount to using the word 'means'"). Courts have also found that similar words, such as "configured to," provide no structure. *MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1343 (Fed. Cir. 2019) ("[T]he claim language reciting what the mechanical control assembly is 'configured to' do is functional."); *Rain*

*Computing, Inc. v. Samsung Elecs. Am., Inc.*, 989 F.3d 1002, 1006 (Fed. Cir. 2021) ("[T]he purely functional claim language reciting what the 'user identification module' is configured to do provides no structure."). For the same reasons, "that operable to perform the following operations" also does not provide structure. (Weissman Decl. ¶ 61.)

The term "processor and memory" likewise fails to connote structure for performing the claimed functions. In *St. Isidore Research, LLC v. Comerica Inc.*, this Court found a similar "processor" term to be subject to § 112, ¶ 6. No. 2:15-CV-1390-JRG-RSP, 2016 WL 4988246, at *14 (E.D. Tex. Sept. 19, 2016). The Court considered two terms: "a processor configured to verify the authenticity of the account access request based on the response" and "a processor configured to identify a second device associated with the account." *Id.* at *14. The Court construed both as governed by § 112, ¶ 6 because "each processor is defined only by the function that it performs" and neither the claims nor specification described "how the processors interact with each other or with the other limitations in the claim to achieve their objectives." *Id.* Specifically, nothing in the patent even "describe[d] or depict[ed] those processors connecting to and interacting with [any] other components." *Id.* As in *St. Isidore*, the "processor and memory" recited here are defined only by the function they "are operable to perform"—partitioning, mapping, and reducing—and the claimed function identifies only results, and not any specific structure for achieving the claimed results. Moreover, nothing in the claims or specification identifies how the "processor and memory" "interact with each other or with other limitations in the claim to achieve their objectives." *Id.* In fact, the claimed "processor and memory" are not identified as part of the claimed function at all. While the last element of the claim requires that "mapping and reducing operations are performed by a distributed system," nothing in the claim identifies how the "processor and memory" communicate or interact with one another, much less a "distributed

system," to achieve the claimed results. ('610 patent, claims 1, 17.) The '610 patent specification offers no further clarity. The specification does not describe or even mention a processor or memory.[2] Thus, the "processor and memory" terms are subject to § 112, ¶ 6. *Digit. Retail*, 2020 WL 376664, at *4–6 (applying § 112, ¶ 6 and finding "first communication module" indefinite where the "patent provide[d] no specific details concerning the [term]").

The Federal Circuit's ruling in *WSOU Investments LLC v. Google LLC* is equally applicable. Nos. 2022-1063, 2022-1065, 2023 WL 6889033, at *3 (Fed. Cir. Oct. 19, 2023). In *WSOU*, the Federal Circuit held that a similar "processor" term—"said processor configured to provide a pre-emptive user output when the sub-set of pixels approaches an edge of the set of available pixels"—invoked § 112, ¶ 6. *Id.* at *4. "Processor" did "not recite sufficiently definite structure" because it was described "so broadly as to generically be any structure that manipulates data." *Id.* The same is true here. As in *WSOU*, "processor and memory" are described so broadly that they refer generically to any structure that processes and stores data. Indeed, the claim identifies "processor" as any generic structure that "process[es] data of a data set" and recites "memory" generically as any structure with storage. ('610 patent, claim 17.) As explained above, the specification fails to cure the claim's deficiencies, as it provides no description of the claimed "processor and memory" *at all*. Because the claimed "processor and memory" "[i]n the context of this claim, this specification, and this specific invention . . . [are] so generically and functionally described," they "fail to convey a sufficiently definite meaning as a name for a structure," and thus, are subject to § 112, ¶ 6. *WSOU*, 2023 WL 6889033, at *4; *see also Advanced Ground Info. Sys., Inc. v. Life360, Inc.*, 830 F.3d 1341, 1345–49 (Fed. Cir. 2016) ("The term 'symbol generator'

---

[2] "Processor" and "memory" appear nowhere in the patent other than the claims. Both are recited in independent claims 17 and 40, and dependent claims 21–26, 28, 30–32, 42, and 44.

7

invokes the application of § 112, ¶ 6 because it fails to describe a sufficient structure and otherwise recites abstract elements 'for' causing actions . . . or elements 'that can' perform functions.").

Defendant's expert, Dr. Jon Weissman, one of ordinary skill in the art at the time of the patent, also confirms that the "processor and memory" term would not connote any specific structure, much less structure for achieving the specific results in the claimed function. (Weissman Decl. ¶ 56.) The claimed function is specialized to perform, in part: (1) "partitioning the data of each one of the data groups into a plurality of data partitions that each have a plurality of key-value pairs"; (2) "providing each data partition to a selected one of a plurality of mapping functions that are each user-configurable to independently output a plurality of lists of values for each of a set of keys found in such map function's corresponding data partition to form corresponding intermediate data for that data group and identifiable to that data group"; and (3) "reduce the intermediate data for the data groups to at least one output data group, including processing the intermediate data for each data group in a manner that is defined to correspond to that data group so as to result in a merging of the corresponding different intermediate data based on the key in common." ('610 patent, claim 17; Weissman Decl. ¶ 56.) Nothing in the claim explains how the "processor and memory" would achieve these results, much less interact with one another to do so. (Weissman Decl. ¶ 56.) And as further discussed in Section III.A.2 below, a generic processor and general-purpose memory could not perform these complex recited functions without specialized programming. (*Id.* at ¶¶ 57–60.) Indeed, a general-purpose computer—which includes the generic processor and memory recited by the claims here—can be structure for only basic computer functions such as "processing," "receiving," and "storing," and not the specialized functions recited by this claim. (*Id.* at ¶¶ 56-60); *In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) ( "processing," "receiving," and "storing" are "coextensive

with . . . a general purpose processor").[3]  And as explained, the specification does not describe the claimed "processor" and "memory" at all, much less explain what specialized programming is required for a processor and memory to perform the claimed function.  There is no evidence to suggest that "processor and memory" here is anything but a black box for achieving the claimed function's results.  *Williamson*, 792 F.3d at 1350.  Just like the functional claim limitations in *WSOU* and *St. Isidore*, the "processor and memory" term here is subject to § 112, ¶ 6.

R2 contends that the "processor and memory" term is not subject to § 112, ¶ 6 because "[t]he entire claim sets out exactly what the processor and memory must do."  (Dkt. 53 ("Op. Br.") at 6.)  But as explained above, the claim is purely functional and recites the *results* of "partitioning," "mapping," and "reducing" without identifying sufficient structure for the entirety of the claimed function.  While R2 and its expert admit the claimed "partitioning," "mapping," and "reducing" must all be done in a "specific way" (*id.*), nothing in the claim provides any such structure, nor does R2 or its expert contend otherwise.  In fact, the recited "processor and memory" are defined functionally by only these claimed results, which in no way identify what processing the "processor" performs to achieve the "partitioning," "mapping," and "reducing," much less how the "processor" relates structurally to or communicates with the recited "memory" to perform the claimed function.  Section 112, ¶ 6 applies in such circumstances.  *WSOU*, 2023 WL 6889033, at *3–4; *St. Isidore*, 2016 WL 4988246, at *14.

Next, R2 relies on *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311 (Fed. Cir. 2004)[4] to argue that the claimed "processor and memory" have sufficiently definite structure

---

[3] *See also Aristocrat Techs., Austl. PTY Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) (where the structure is a "computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm").

[4] R2 also cites a non-precedential decision in *Collaborative Agreements, LLC v. Adobe*

because the claim recites their "objectives and operations." (Op. Br. at 6–7.) But *Linear Tech.* does not apply. There, the court did not address "processor" or "memory." The court addressed a different term, "first circuit," which it found had sufficient structure for the generic circuit function of "monitoring a signal from the output terminal to generate a first feedback signal." *Linear Tech. Corp.*, 379 F.3d at 1320–21. And the court's ruling relied on Linear's expert opining that a POSITA "would have an understanding of, and would be able to draw, structural arrangements of the circuit elements defined by the claims." *Id.* at 1320. Here, R2's expert only identifies examples of generic processors and memory and provides no testimony that a POSITA would have understood how a processor and memory would be arranged, programmed, and communicate with one another to achieve the specialized function of the claim and its claimed results.[5] (Op. Br., Ex. 2 ("Davis Decl.") ¶¶ 39–42.)

R2's remaining cases are also distinguishable. The court in *Apple Inc. v. Motorola, Inc.* found that "heuristics" connoted sufficient structure in part because the specification explained in detail how the claimed heuristics performed the claimed functions. 757 F.3d 1286, 1295, 1301 (Fed. Cir. 2014), *overruled on other grounds*, *Williamson*, 792 F.3d at 1349. By contrast, the specification here does not even mention "processor and memory." In *Finjan, Inc. v. Proofpoint, Inc.*, the "content processor" connoted sufficient structure because the claim recited how the processor "interacts with the invention's other components (the transmitter and receiver), which

---

*Sys.*, which applied the same reasoning as *Linear Tech.* to the "code segment" term at issue in that case, and thus, does not apply to the "processor and memory" term here for the same reasons. No. 15-cv-03853-EMC, 2015 U.S. Dist. LEXIS 161809, at *11–24 (N.D. Cal. Dec. 2, 2015).

[5] The Federal Circuit also clarified "the proper inquiry . . . is to 'look at the *disclosure* of the patent and determine if one of skill in the art would have understood that *disclosure* to encompass software [to perform the function] and been able to implement such a program, not simply whether one of skill in the art would have been able to write such a software program." *Aristocrat Techs.*, 521 F.3d at 1338. The uncontroverted testimony of Dr. Weissman confirms that no such software exists in the '610 patent, and R2's expert, Dr. Davis, does not contend otherwise.

informs the term's structural character." No. 13-cv-05808-HSG, 2015 U.S. Dist. LEXIS 162504, at *31–32 (N.D. Cal. Dec. 3, 2015). Here there are no other structures recited in the claim or described in the specification, nothing in the patent identifies how the claimed "processor and memory" "interact," and nothing in the patent "informs the term's structural character." *Id.* And in *Intelligent Agency, LLC v. 7-Eleven, Inc.*, the claim not only recited the "objectives of the 'agent-user matching algorithm,'" but also "how the algorithm operates within the context of the claimed invention." No. 4:20-CV-0184-ALM, 2022 U.S. Dist. LEXIS 43610, at *39 (E.D. Tex. Mar. 11, 2022). No such algorithm exists in the claims or specification here.

R2 also argues that the claimed "processor and memory" connote sufficient structure because generic processors and memory are described in Dean, in prior art cited during the prosecution, and in dictionaries.[6] (Op. Br. at 7–9 (identifying a generic "NUMA multi-processor" "x86 processors," and "Xeon processors," and generic "DRAM" and "SRAM" memory).) These prior art processors and memory do not provide structure because they describe nothing more than generic processors and memory and the generic functions they perform. Because a generic processor and memory can only provide structure for their generic functions like accessing, storing, and retrieving data, they cannot provide structure for the specialized function here. *In re Katz*, 639 F.3d at 1316. Indeed, Dean explains that specialized programming is required to perform

---

[6] R2's suggestion that the term is not subject to § 112, ¶ 6 because Databricks' IPR expert understood the meaning of "processor and memory" is wrong. Databricks' IPR expert explained how the *prior art* disclosed claim 17 of the '610 patent. That analysis does not suggest that either claim 17 or the specification identify sufficient structure. Databricks' IPR expert did not address indefiniteness of this term as that argument is not permitted in IPR. 35 U.S.C. § 311(b) (IPR petitioner may rely "only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications"). And an IPR does not limit the claim constructions a party can propose as part of district court case. *Garrity Power Servs. LLC v. Samsung Elecs. Co.*, No. 2:20-CV-00269-JRG, 2021 WL 3403747, at *11 (E.D. Tex. Aug. 4, 2021) ("absence of a proposed construction in IPR" did not "preclude[] an accused infringer from proposing a construction in litigation.").

the map and reduce functions that form the basis of the claimed functionality.  (Dean at 1 ("MapReduce is a *programming model*"), 2 (discussing the "*Programming Model*"), 6.)  For the same reasons, R2's dictionary definitions of "processor" and "memory" are inapposite as they do not identify structure for the specialized function recited in the claim.  And while R2 suggests that "programs in memory [] can include any and all forms of computer programs," neither R2 nor its expert identifies any computer program or software in the '610 patent as purported structure for the recited function.  (Op. Br. at 8–9.)  R2 cannot show that the claimed "processor and memory" connote sufficient structure.

### 2. The specification does not disclose structure or an algorithm clearly linked to the "processor and memory" term, rendering the term indefinite.

Claim 17 of the '610 patent requires that the "processor and memory [] are operable to perform" the entirety of the claimed function.  ('610 patent, claim 17.)  As Dr. Weissman confirms, the claim describes the "processor and memory" solely by reference to its function, and the function cannot be performed by a general-purpose processor and memory without special programming.  (Weissman Decl. ¶¶ 56–60.)  Because this term is subject to § 112, ¶ 6, the specification must disclose an algorithm clearly linked to the entirety of the claimed function, or the term is indefinite.  *Williamson*, 792 F.3d at 1352. And as R2 admits, "[w]hen dealing with a 'special-purpose computer-implemented means-plus-function limitation'" as here, the Federal Circuit "require[s] the specification to disclose the algorithm for performing the function."  (Op. Br. at 9 (citing *Function Media*, 708 F.3d at 1317).)  And where the claimed function recites multiple aspects "any algorithm must, therefore, address [all] aspects of this functional language." *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1314 (Fed. Cir. 2012) (citing *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005) (requiring disclosure of "all structure that actually performs the recited function")).  But fatally, the

specification provides no algorithm clearly linked to *any* of the "partitioning," "mapping," or "reducing" in the claimed function. As explained below and in Dr. Weissman's uncontroverted testimony,[7] the patent at best repeats each claimed result without any algorithm for achieving them.

> a.  **"partitioning the data of each one of the data groups into a plurality of data partitions that each have a plurality of key-value pairs"**

The specification provides no steps or algorithm for the claimed "partitioning." (Weissman Decl. ¶¶ 63–72.) As Dr. Weissman explained, the claimed "partitioning" is neither simple nor straightforward. (*Id.* at ¶ 58.) To perform the function, there would need to be an algorithm that determines what are the keys and what are the values that make up each "key-value pair," because a data group does not identify them. (*Id.*) There would also need to be an algorithm that determines the number of partitions to create, determines which key-value pairs to write in each partition, and ensures the data of the data group is divided across the partitions in a way that results in a "plurality of key-value pairs" included in "each" partition. (*Id.*) The patent does not provide any such algorithm or steps, nor does it explain how a processor and memory would be programmed to achieve the claimed "partitioning."

In fact, the specification repeatedly refers to the *result* of "partitioning" at a high level of generality without any steps or algorithm for achieving the result. (Weissman Decl. ¶¶ 63–72.) For example, in the '610 patent's description of Dean's conventional MapReduce architecture shown in Figure 1, the patent discloses that "the input data set 102 is partitioned into an *arbitrary* grouping of seven partitions," which are then provided as an input to corresponding map functions. ('610 patent, 2:31–35 (emphasis added).) Arbitrarily partitioning data is not what the claim

---

[7] At no point during the claim construction disclosure process or in the Joint Claim Construction and Prehearing Statement did R2 identify *any* structure at all for the "processor and memory" claim term in the event that § 112, ¶ 6 applies. (Dkt. No. 51-1, Ex. A.)

requires, nor does it identify any steps or algorithm for the recited partitioning. (Weissman Decl. ¶¶ 64, 65.) The patent's description of the purported invention fares no better, as the patent repeatedly discloses that "partitioning" happens without ever explaining how it is done. (*See, e.g.*, '610 patent, 3:48–50 ("the input, intermediate and output data sets *are partitioned* into a set of data groups" (emphasis added)); 8:24–37 (disclosing "partitioning into even-keyed records and odd-keyed records" as "one of many possible partitioning functions"); *see also* Weissman Decl. ¶¶ 69, 71.) The '610 patent figures likewise show only the *result* of "partitioning," without showing corresponding steps or an algorithm for achieving it. ('610 patent, Figs. 1–5.) And the remaining high-level references to "partitioning" in the '610 patent do not even apply to the claimed function, which requires the recited partitioning to occur *before* the recited map and reduce functions, and *before* any intermediate data is formed. (*Compare* '610 patent, claim 17, *with* 2:36–42 (disclosing the result of "partition[ing] the intermediate results" and "corresponding output partitions"); 2:56–64 (disclosing the result that "map functions 104 are partitioned into a user-configurable number of map tasks" and "reduce functions are partitioned into a user-configurable number of reduce tasks"); 4:63–5:4 (disclosing the result that the "partitioning operation partitions the intermediate data"). *See also* Weissman Decl. ¶¶ 66, 68, 70.) None of these disclosures identify any steps or algorithm for "partitioning," much less any way of achieving the partitioning result recited by the claim. (Weissman Decl. ¶¶ 63–72.) Because the '610 patent discloses no steps or algorithm clearly linked to the recited "partitioning," this term is indefinite.[8]  *Williamson*, 792 F.3d at 1352.

For the first time during the claim construction process, R2 alleges in its opening brief that "Figures 4 and 5 and the accompanying discussions at column 3, line 35 through column 8 line 15

---

[8] Patentee added this limitation during prosecution to overcome a prior art rejection. (Ex. 3 at 14.) This obtained allowance, but the patent fails to describe how to perform the claimed step.

and column 8, lines 15 through 57 set out algorithms that perform the functions recited by Claim 17" without any further explanation whatsoever.  (Op. Br. at 9–10.)  The Court should disregard this conclusory and belated claim construction argument, which also finds no support in the declaration submitted by R2's expert Dr. Davis.  Regardless, as explained above, none of these cited disclosures provide any steps or algorithm for the claimed "partitioning," much less how such partitioning would be performed by the "processor and memory" recited by the claims.

> **b.**     **"providing each data partition to a selected one of a plurality of mapping functions that are each user-configurable to independently output a plurality of lists of values for each of a set of keys found in such map function's corresponding data partition to form corresponding intermediate data for that data group and identifiable to that data group"**

The specification provides no steps or algorithm for this claimed "map" functionality.  (Weissman Decl. ¶¶ 73–84.)  As Dr. Weissman explained, the recited "map" requires an algorithm that would enable a user to define the unique functionality of each map function, including configuring the map function to output a plurality of lists of values for each of a set of keys found in the map function's corresponding data partition to form corresponding intermediate data.  (*Id.* at ¶ 59.)  The algorithm would need to enable user-configurable map functions to track the key-value pairs in the intermediate data to understand which pairs correspond to which original data groups.  (*Id.* at ¶¶ 59, 84.)  The specification fails to provide any such algorithm or steps, nor does it explain how a processor and memory would be programmed to perform this "map" functionality.

The specification instead repeatedly refers to the result of "map" at a high level without any steps or algorithm for achieving the result.  (*Id.* at ¶¶ 73–84.)  The patent first describes prior art map functions in Dean's conventional MapReduce architecture as taking in "key-value pairs" and somehow "performing an operation" on "a list of independent elements" to generate "intermediate results" in the form of "new (intermediate) key-value pairs."  ('610 patent at 1:17–

15

25.)  This provides no specifics on the steps or algorithm that would execute on the claimed "processor and memory" to enable a user to configure a conventional "map" function, much less in the specific way the claim requires.  (Weissman Decl. ¶ 75.)  The '610 patent's disclosure of the purported invention fares no better, repeatedly describing "map" by its inputs and outputs, and without ever identifying any steps or algorithm for the specific "map" functionality required by the claim.  (*See, e.g.*, '610 patent, 3:50–52 ("With the partitioning into groups, it is likely that map functions corresponding to each group are different."); 3:65–4:1 ("Referring now to FIG. 4, each of the map tasks 402 and 404 are configured to operate on separate data groups, where each of the separate data groups is characterized by its own schema."); *see also* Weissman Decl. ¶ 77.)  The '610 patent figures similarly show only the result of "map."  ('610 patent, Figs. 1–5.)  And the remaining "map" disclosures in the specification are pseudocode that describe the results of "map" by its inputs and outputs, and again, without any steps or algorithm for achieving them.  (*See, e.g.*, '610 patent, 4:40-50 ("for a particular group identified with a group_id, the map function processes each input key/value pair and produces one or more intermediate key/value pairs"); 7:45 ("map('emp', 34, 'Smith')"); 7:55 ("map('dept, 34, 'Clerical')"); 2:29 ("map (in_key, in_value) → list (out_key, intermediate_value"); *see also* Weissman Decl. ¶¶ 77–83.)

The lack of any steps or algorithm is not surprising given that the '610 patent repeatedly states that map functions "are typically user-provided."  ('610 patent, 1:20–21; *see also id.* at 4:39–40; 6:8–10.)  This term is therefore indefinite because the '610 patent discloses no algorithm clearly linked to the "map" functionality recited by the claim.[9]  *Williamson*, 792 F.3d at 1352.

---

[9] While R2 vaguely identifies Figures 4 and 5 and the entirety of the accompanying disclosure as a purported algorithm for the first time in its opening brief and without any supporting testimony from its expert (Op. Br. at 9), none of these disclosures provide any steps or algorithm for the claimed "mapping" as discussed above.

c.    **"reduce the intermediate data for the data groups to at least one output data group, including processing the intermediate data for each data group in a manner that is defined to correspond to that data group so as to result in a merging of the corresponding different intermediate data based on the key in common"**

The specification provides no steps or algorithm for this claimed "reduce." (Weissman Decl. ¶¶ 85–97.) As Dr. Weissman explained, the recited "reduce" would require an algorithm that could determine that the key-value pairs in the intermediate data originated from a particular data group, include reduce functionality that is defined to correspond to each specific data group, and merge the corresponding different intermediate data based on the key in common. (*Id.* at ¶ 60.) But the specification fails to explain how a processor and memory would be programmed to perform this functionality. Instead, it repeatedly refers to the *result* of "reducing" without any steps or algorithm for achieving the result. (*Id.* at ¶¶ 85–97.) As it does for "mapping," the '610 patent describes and illustrates "reduce" by its inputs and outputs and proclaims that "reducing" happens without ever explaining how it is done. (*Id.*, ¶¶ 86–94; '610 patent, Figs. 1–5.) The pseudocode likewise describes "reduce" by its results. (Weissman Decl. ¶¶ 92–94.) And the '610 patent repeatedly acknowledges that reduce functions are "typically user-provided." ('610 patent, 1:20–21; *see also id.* at 4:39–40; 6:8–10.) Because the '610 patent discloses no algorithm clearly linked to the recited "reduce" function, this term is indefinite.[10]  *Williamson*, 792 F.3d at 1352.

B.    **"mapping" / "map" / "mapped"**

| Term | Databricks' Construction | R2's Construction |
|---|---|---|
| "mapping" / "map" / "mapped"<br><br>Claims 1, 17 | "[processing] / [process] / [processed] key/value pairs to generate intermediate key/value pairs" | Plain and ordinary meaning. No construction necessary. |

---

[10] Again, R2's belated, unsupported, and vague identification of Figures 4 and 5 and the entire corresponding disclosure fails for the reasons discussed above. (Op. Br. at 9.)

Because the applicants acted as their own lexicographer, and the claims and specification confirm that special meaning, "map" should be construed as "[processing]/[process]/[processed] key/value pairs to generate intermediate key/value pairs."[11]  *See 3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003) ("[A] definition of a claim term in the specification will prevail over a term's ordinary meaning if the patentee has acted as his own lexicographer and clearly set forth a different definition.").

The '610 patent expressly defines the term "map" in the Background section: "Basically, a 'map' function maps key-value pairs to new (intermediate) key-value pairs."  ('610 patent, 1:17–18.)  The specification further clarifies that "[t]he map function *generates* intermediate results." (*Id.* at 1:24–25 (emphasis added).)  And the patent repeatedly describes "map" as "*process[ing]* input key/value pairs and produc[ing] a set of intermediate pairs."  (*Id.* at 2:21–23; *see also id.* at Abstract, 1:34, 1:37, 2:2, 2:5, 4:49, 8:47, 8:53 (each describing "map" as involving "processing").) Databricks' proposed construction therefore captures the applicants' express definition of "map," including the various grammatical permutations of "map" used in the claims.[12]  Moreover, the applicants' definition of "map" is no surprise given that they recycled the definition from the seminal 2004 Dean paper that first described MapReduce.  In fact, Dean defines "map" the same way: "Users specify a *map* function that processes a key/value pair to generate a set of intermediate key/value pairs . . . ."  (Dean at Abstract. (emphasis in original).)  And the '610 patent's Background section credits the Dean paper before extending Dean's definition of "map" to the

---

[11] R2 complains that the patent's definition of "map" cannot be correct because it defines "map" as a verb and the claims use the term as an adjective in "map[ping] function."  The applicants' lexicography presents no conflict.  A POSITA and juror would reasonably understand that the plain meaning of "map[ping] function" read in light of the clear definition of "map" is a "function for [processing]/[to process] key/value pairs to generate intermediate key/value pairs."

[12] It is also consistent with a POSITA's understanding.  (Weisman Decl. ¶¶ 99–102.)

applicants' usage of the term in the '610 patent.[13] ('610 patent, 1:6–17.)

Databricks' construction is also consistent with the use of the term in the claims and the specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315-16 (Fed. Cir. 2005) (when the patentee's definition is consistent with the claims and specification, "[i]n such cases, the inventor's lexicography governs"). As R2 admits, the claims recite that "mapping functions" take in "a plurality of key-value pairs" and "output a plurality of lists of values for each of a set of keys . . . to form corresponding intermediate data." ('610 patent, claims. 1, 17; *see also* Op. Br. at 11.) And the specification explains in the context of Figure 4 that "the map function processes each input key/value pair and produces one or more intermediate key/value pairs." ('610 patent, 4:49–50; *see also id.* at 2:4–5 ("[t]he intermediate results of the map processing (key/value pairs)"; 8:52–53 (same).) Thus, Databricks' proposal is correct.

Moreover, the need to construe this specialized, technical term consistent with the applicants' lexicography is underscored by R2's interpretation of the "plain and ordinary meaning." R2 reveals for the first time in its opening brief that it believes the plain meaning of "map" is to "filter and/or sort data." (Op. Br. at 1 ("MapReduce methods consist of a map procedure to filter and/or sort data").) This, however, is inconsistent with the applicants' own definition of the term and the usage of the term in the claims and specification. In fact, nothing in the patent describes "map" as a "filter and/or sort" of data.[14] The patent does not mention "filter" at all. And the only context in which "sort" is used is as a part of the later "reducing" function,

---

[13] A 2007 paper written by the '610 patent inventors also applies the same definition. (Ex. 4, Yang ("a *map* function to process input key/value pairs and generate intermediate key/values").)

[14] Nor do standard dictionaries define "map" in such a way. (*See* Online Merriam-Webster Dictionary (defining "map" as "to assign (something, such as a set or an element) in a mathematical or exact correspondence" or "to be assigned in a relation or connection"), *available at* https://www.merriam-webster.com/dictionary/map (*last accessed* November 11, 2024).

and not the "mapping" function.  For example, dependent claims 9 and 26, which depend from claims 1 and 17, recite that "at least some of the *reducers* include a *sort*, group-by-key and combine task." ('610 patent, claims 9, 26.)  And the specification repeatedly discloses that sorting is at best a byproduct of "reduce," not "map." (*Id.* at 2:64–65 ("Each *reduce* task 206*a* and 206*b* includes a *sort* and group-by-key task"); 8:1–14 (explaining that "[t]he *sorting* happens in both the conventional MapReduce and the improved MapReduce" as a "side effect" of the *reduce* function); 5:61-63 ("This [*reduce*] mode helps implement a join with an arbitrary predicate . . . because it can implement the *sort*-merge join.").)  Thus, R2's attempt to redefine map under the guise of plain meaning is not only inconsistent with the claims and specification, but it will create jury confusion about the meaning of this technical term. *Promptu Sys. Corp. v. Comcast Corp.*, 92 F.4th 1372, 1381 (Fed. Cir. 2024) (a construction "should help resolve, not add to, uncertainty in the understanding the finder of fact is to use in applying a claim term").

R2 argues that Databricks' construction would "render[] the claim language impermissibly superfluous." (Op. Br. at 11.)  But as explained above, it is consistent with the definition of "map" in the patent and the usage of "map" in the claims and specification.  Courts have found that under similar circumstances the patentee's lexicography governs. *VLSI Tech. v. Intel Corp.*, 53 F.4th 646, 652–53 (Fed. Cir. 2022) (holding that the proper construction of a term was the definition provided in the specification despite the risk of redundancy because "intrinsic evidence makes it clear that the 'redundant' construction is correct"); *Wyeth v. Teva Pharms. USA, Inc.*, No. 03-CV-1293 (WJM), 2005 WL 2175440, at *7 (D.N.J. Sept. 6, 2005) ("Although this may make . . . certain claim limitations superfluous, that result is inevitable and inescapable in a case such as this where the patentees act as their own lexicographers.").  The Court should adopt Databricks' proposal.

### C.    "reducing" / "reduce"

| Term | Databricks' Construction | R2's Construction |
|------|-------------------------|-------------------|
| "reducing" / "reduce"<br><br>Claims 1, 17 | "[merging] / [merge][15] all intermediate data values sharing the same key into a single key-value pair or a list of values associated with the key | Plain and ordinary meaning.  No construction necessary. |

Like "map," the applicants acted as their own lexicographer by defining the term "reduce": "A 'reduce' function represents all mapped (intermediate) key-value pairs sharing the same key to a single key-value pair or a list of values."  ('610 patent, 1:18–20.)  The specification further discloses that "[t]he reduce function combines all intermediate values for a particular key and produces a set of merged output values for the key."  (*Id.* at 2:49–51.)  Databricks' construction captures the applicants' lexicography and is consistent with how a POSITA would have understood this term.  (Weisman Decl. ¶¶ 104–107.)  Moreover, as R2 admits, Databricks' construction is consistent with the use of the term in the claims, which recite that "reducing the intermediate data . . . result[s] in a merging of the corresponding different intermediate data based on the key in common."[16]  ('610 patent, claims 1, 17; Op. Br. at 12.)  *See Philips*, 415 F.3d at 1315–16.

R2 argues that Databricks' construction is improper because "the claims already define what 'reducing' is."  (Op. Br. at 12.)  But where, as here, the proposed construction is based on lexicography, it governs. *VLSI Tech.*, 53 F.4th at 652–53.  Moreover, the need to construe "reduce" is underscored by R2's understanding of the "plain and ordinary meaning"—that "a reduce procedure . . . 'reduces' the data via some type of operation (for example, a counting, frequency determination, or other summary operation)."  (Op. Br. at 1.)  Nothing in the patent describes

---

[15] While the patent refers to "reduce" as "combin[ing]," Databricks has amended its proposed construction by replacing "combining/combine" with "merging/merge" to resolve the "confusion" R2 identified for the first time in its opening brief.  (Op. Br. at 11–12.)

[16] And like "map," the applicants' lexicography is derived from the Dean paper, which describes "reduce" as a "function that merges all intermediate values associated with the same intermediate key." ('610 patent, 1:6–17; Dean at Abstract.)

"reduce" as a "reduce of data via some type of operation," and R2 identifies no corresponding support.    Moreover, the examples R2 identifies—such as "counting" and "frequency determination"—are examples of how MapReduce may be *applied.*  These are not examples of what "reduce" is.  (Dean at 2-3 (describing MapReduce applications to "counting" and "URL access frequency").)  R2's own confusion about the meaning of "reduce" confirms a jury also will not understand this technical term if "plain and ordinary meaning" is applied.  *Promptu Sys.*, 92 F.4th at 1381.  Databricks' proposal should be adopted.

### D.  "providing each data partition to a selected one of a plurality of mapping functions"

| Term | Databricks' Construction | R2's Construction |
|---|---|---|
| "providing each data partition to a selected one of a plurality of mapping functions"  Claims 1, 17 | "providing each data partition to one of a plurality of different mapping functions where each[17] mapping function is selected for a partition based on the data group the partition originated from" | Plain and ordinary meaning.  No construction necessary. |

Databricks' construction of "providing each data partition to a selected one of a plurality of mapping functions" is required by R2's clear prosecution history disclaimer during '610 patent IPR proceedings.  Because R2 repeatedly, clearly, and unequivocally stated that the "claims require" the mapping function to be "selected for a partition based on the data group the partition originated from," (Op. Br. at 16–17.) R2 cannot recapture the claim scope it expressly disavowed.

The law on prosecution history disclaimer is well-established.  "By distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover." *Bd. of Regents of the Univ. of Texas Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1373 (Fed. Cir. 2008).  As a result, a patent owner "is not entitled to any interpretation that is disclaimed during

---

[17] Databricks has amended its proposed construction to replace "the" with "each" in light of R2's argument that Databricks' construction is "grammatically flawed."  (Op. Br. at 16-17.)  R2 never communicated this objection during the claim construction meet-and-confer process.

prosecution." *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1285 (Fed. Cir. 2010). This ensures that "[c]laims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed. Cir. 1995). And the Federal Circuit has made clear that this doctrine applies equally to a patentee's statements in IPR proceedings. *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017) ("Because an IPR proceeding involves reexamination of an earlier administrative grant of a patent, it follows that statements made by a patent owner during an IPR proceeding can be considered during claim construction and relied upon to support a finding of prosecution disclaimer.")

The *Aylus* case is instructive. There, the defendant filed two IPR petitions challenging the asserted patent, and the patentee filed a preliminary response in both proceedings. 856 F.3d at 1362. As part of those responses, the patentee disclaimed claim scope by identifying when "CP logic" (or control point logic) and "CPP logic" (or control point proxy logic) are, or are not, invoked. Specifically, the patentee argued that when "'the MS and MR are both in communication with the UE via a local wireless network,' then *only* 'the CPP [logic] is invoked to negotiate media content delivery between the MS and the MR.'" *Id.* In other words, the patentee made clear that in the stated circumstances, "only the CPP logic is invoked," and not the CP logic. *Id.* The Federal Circuit affirmed the district court's finding that the patentee's statements represented "an unequivocal and unambiguous disavowal of the CP logic's invocation." *Id.* at 1363.

Here, just as in *Aylus*, R2 made several statements in its POPR during an IPR proceeding that constitute unequivocal, unambiguous disclaimer. As R2 acknowledges in its brief, R2 stated:

> As discussed above, ***the '610 patent claims*** a stem-to-stern augmentation to MapReduce, requiring specialized data structures ('data groups') at the front-end configured to be merged together via selective dissemination amongst and processing by a collection of mapping and reducing functions within the enhanced MapReduce

23

architecture. ***This in turn requires the mapping functions to be specialized so that they can be 'selected' for a partition based on the 'data group' the partition originated from*** and map the partitions 'differently' based on 'data group' to form 'corresponding intermediate data.' It also requires a reducing phase configured to distinguish the "intermediate data" based on the parent "data groups" to effectuate specialized processing on a per-"data group" basis. ***These enhancements are reflected as requirements of each independent claim.*** See Ex. 1026. Claims 17 and 40 mirror the requirements of Claims 1 and 33, respectively. See id. ***These features are not disclosed by Pike or Chowdhuri***. . . .

(Ex. 5, POPR at 36) (emphasis modified and quote extended to include additional disclaimer language).) As shown above, R2 argued that the claims "*require[] the mapping functions to be specialized so that they can be 'selected' for a partition based on the 'data group' the partition originated from.*" (*Id.*)[18] R2 then concluded by reaffirming that "*[t]hese enhancements are reflected as requirements of each independent claim*" and relied on precisely "*these features*" of the claim to distinguish the Pike and Chowdhuri prior art. (*Id.*) R2's statements clearly and unmistakably disclaimed mapping functions other than those selected for a partition based on the data group the partition originated from.[19] It cannot now recapture the claim scope it disclaimed.

R2 makes several arguments in an effort to avoid disclaimer, none of which have merit. R2 argues that it was "simply explaining that the 'enhanced MapReduce architecture . . . *requires*

_____

[18] R2 made the same argument in co-pending case *R2 Solutions LLC v. Cloudera, Inc.*, No. 1:23-cv-01205-RP (W.D. Tex.). In its opposition to Cloudera's motion to dismiss, R2 argued "[c]laim 1 also includes specialized mapping functions *that are 'selected' for a partition based on the 'data group' the partition originated from*." Dkt. 41 at 15 (Oct. 2, 2024).

[19] While R2's statements amount to a clear and unmistakable disclaimer, R2 did not stop there. R2 relied on its disclaimer to argue that prior art did not select mapping functions based on the data group the data originated from. (Ex. 5, POPR at 65 ("Chowdhuri . . . is different from the '610 patent, which employs 'data groups' that *specialized map* and reduce *functions* can use to *delineate between data . . . that originated from one group as compared to another*") (emphasis added); *id.* at 57-58 ("There is no disclosure in Chowdhuri of any sort of 'identifier (table name or otherwise) being, e.g., passed to specific functions to guide *group-specific processing* as in the '610 patent.") (emphasis added); *id.* at 38 ("Pike is not disclosed as identifying the data that comes from that file such that the programming architecture can accomplish specific processing based on the file name"); *id.* at 56 ("Pike does not disclose "application-specific operators designed to use an input file name to identify data from that file and adjust processing accordingly.").)

*the mapping functions to be specialized*,' not that the mapping functions are required to be selected for partitions based on data group." (Op. Br. at 14.) But this belies R2's express arguments that the claimed mapping functions are specialized so "that they can be 'selected' for a partition based on the 'data group' the partition originated from." (Ex. 5, POPR at 36.) And R2 confirmed in the same paragraph that this, in fact, is "a requirement of each independent claim" that is "not disclosed by Pike or Chowdhuri." (*Id.*)

Next, R2 states that its IPR statements were "exemplary and intended only to provide helpful explanation." (Op. Br. at 14–15.) But R2 identifies nothing in its IPR statements that suggest they were "exemplary." As explained above, R2 clearly, unmistakably, and repeatedly stated that every independent claim requires that the map function is "'selected' for a partition based on the 'data group' the partition originated from." (Ex. 5, POPR at 36.) And R2 repeatedly made this same argument in both the in IPR proceedings related to the '610 patent (*see supra*, at 23-24) and the *Cloudera* district court litigation (*see supra*, at fn. 18).[20]

Next, R2 claims that it "did not argue that the scope of the disputed limitation should be anything other than plain and ordinary meaning" and "[h]ad R2 intended to surrender claim scope, it would have done so in the portion of the POPR that actually discussed the meaning of the claims." (Op. Br. at 15.) R2's arguments have no basis in law. Indeed, all statements made in IPR are part of the prosecution history, and nothing requires that a disclaimer appear in a specific

---

[20] R2's reliance on *Varta* is misplaced. (Op. Br. at 14–15.) There, the court found that the patentee's IPR statements contained language such as "possible," "example," and "preferred," and thus "fail[ed] to unequivocally and unambiguously" constitute disclaimer. *VARTA Microbattery GmbH v. Audio P'ship LLC*, No. 2:21-CV-00400-JRG-RSP, 2023 WL 5103113, at *4 (E.D. Tex. Aug. 9, 2023). Here, R2's statements in the IPR do not reflect mere possibilities, examples, or preferences. R2 has repeatedly identified what the *claim* requires—before both the PTAB and district court—and unequivocally stated that the *claimed* mapping functions are "specialized so that they can be 'selected' for a partition based on the 'data group' the partition originated from."

part of a patent owner's response. *Aylus*, 856 F.3d at 1360. R2 cannot arbitrarily disregard the IPR statements it relied on to save the '610 patent, but are now inconvenient for its present case.

Next, R2 argues that the Board's decision supports the lack of disclaimer because it applied "plain and ordinary meaning" for every term other than "data groups" and "did not even consider R2's purported 'disclaimer' in its 50-page, reasoned decision." (Op. Br. at 16.) But courts do not require that the Board rely on the limiting statements for disclaimer to apply. *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011) (disclaimer applies regardless of examiner agreement because the statements "still inform the proper construction of the term").[21]

Because R2 repeatedly, clearly, and unequivocally argued that every independent claim requires "providing each data partition to one of a plurality of different mapping functions *where the mapping function is selected for a partition based on the data group the partition originated from*," this Court should adopt Databricks' construction, consistent with R2's disclaimer.

**E.    "[processing] / [process] the intermediate data for each data group in a manner that is defined to correspond to that data group"**

| Term | Databricks' Construction | R2's Construction |
|---|---|---|
| "[processing] / [process] the intermediate data for each data group in a manner that is defined to correspond to that data group" <br><br> Claims 1, 5, 17, 21 | "[processing] / [process] the intermediate data for each data group in a manner that is defined to correspond to the data group from which the intermediate data originated" | Plain and ordinary meaning. No construction necessary. |

The disputed phrase, "processing the intermediate data for each data group in a manner that is defined to correspond to that data group," should be construed to clarify "*that* data group" refers to the "data group from which the intermediate data originated." R2 interpreted "that data

---

[21] Regardless, R2's suggestion that the Board did not rely on R2's disclaimer is wrong. (Op. Br., Ex. 5 at 30 (finding that the patent requires that "[t]he 'data group' identifiers . . . allow[] a programmer to program and execute MapReduce functions that correspond to a particular 'data group'"); *id.* at 45–46 (finding Chowdhuri did not "guide processing [of] the data in a way that corresponds and is identifiable to a particular data table"); *see also, id.* at 30.

group" in the exact same way in its IPR POPR and does not dispute that Databricks' proposed construction is, in fact, correct and consistent with the claim. Because there is no legitimate dispute, the Court should adopt Databricks' proposed construction.

Per the Federal Circuit, district courts must give "the jury guidance that 'can be understood and given effect by the jury'" and "instruct the jury on the meanings to be attributed to all disputed terms used in the claims in suit so that the jury will be able to 'intelligently determine the questions presented.'" *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004). Here, Databricks' construction clarifies "*that* data group" is "the data group *from which the intermediate data originated*." As shown below, the claim language immediately preceding the disputed phrase references two data groups with different schema and an "output data group":

> wherein the data of a ***first data group has a different schema than the data of a second data group***. . .

> reducing the intermediate data for the ***data groups*** to at least one ***output data group***, including processing the intermediate data ***for each data group*** in a manner that is defined to correspond to ***that data group***, so as to result in a merging of the corresponding different intermediate data based on the key in common . . .

('610 patent, claim 1 (emphases added); *see also id.*, claim 17.) Databricks' construction makes clear that the "processing [of] the intermediate data for each data group in a manner that is defined to correspond to *that* data group" refers to "the data group *from which the intermediate data originated*," and not the second "data group" with the different schema or the "output data group."

Moreover, Databricks' construction comes directly from R2's POPR, in which R2 repeatedly argued that the claims require reducing "'in a manner that is defined to correspond' to the 'data groups' *from which the 'intermediate data' originated*." (Ex. 5, POPR at 55); *see also id.* at 13 ("the MapReduce architecture can use specialized processing based on the 'data group' *from which the data being reduced originated*."); *Aylus*, 856 F.3d 1353.

While R2 objects to Databricks' construction, it does not dispute that R2 itself interpreted "*that* data group" in the exact same way in its IPR response, nor does it dispute that Databricks' proposal is consistent with the language of the claims. R2 merely argues that construing the term is "unnecessary" and "superfluous," but provides no coherent explanation as to why. In fact, R2 decided the same clarification was necessary as part of its IPR response. (Op. Br. at 17–18.)

R2 also argues that this Court "previously found" that this term "should be given their plain and ordinary meanings." (Op. Br. at 17.) But in the cited decision from *R2 Solutions LLC v. Walmart Inc.*, No. 4:21-cv-00091, the term at issue here was part of a larger term for which neither party sought to clarify the meaning of "*that* data group." Ex. 6 at 27–29. And the Court did not have before it R2's May 22, 2024 IPR statements expressly clarifying the meaning of "*that* data group" consistent with Databrick's proposed construction. Because the claims refer to at least three different data groups and "*that* data group" is ambiguous in the context of the claims, construing "that data group" consistent with the parties' agreed clarification will clarify the scope of the claims for the jury. Thus, the Court should adopt Databricks' proposed construction.

F.    **"schema"**

| Term | Databricks' Construction | R2's Construction |
|---|---|---|
| "schema"<br><br>Claims 1, 17 | "a set of attributes (such as DeptID, LastName, DeptName) and their properties (such as their data types: integer DeptID, string LastName, string DeptName)" | Plain and ordinary meaning. No construction necessary. |

R2 agrees that "schema" includes at least "a set of attributes" and does not dispute that "DeptID, LastName, and DeptName" are in fact examples of such attributes. (Op. Br. at 18.) The only dispute is whether "schema" further includes those attributes' properties.

The applicants of the '610 patent attempted to distinguish conventional MapReduce as described in the Dean paper from the "improved MapReduce" described by the '610 patent (*see* '610 patent, 1:55, 1:59) because conventional MapReduce purportedly could not apply to data

groups with different schema (*see id.* at 3:15–20).  Thus, the concept of different schemas goes to the heart of the applicants' purported invention.  To explain how the '610 patent's improved MapReduce is different, the '610 patent defines "schema" in the context of the tables of Figure 3.

The applicants defined "schema" as follows:

> It is noted that the schema of each data set, such as the FIG. 3 relational tables, includes a set of attributes (such as DeptID, LastName, DeptName) and their properties (such as their data types: integer DeptID, string LastName, string DeptName).

(*Id.* at 3:37–41.)  Applicants relied on this to explain how Table 302 has a different schema than Table 304.  Specifically, while these tables both include "DeptID," they have the different attributes of LastName and DeptName.  (*See id.* at 3:19–28.)  But the patent also makes clear that the schemas would also be different if only the properties of these attributes were different.  (*See id.* at 3:37–41.)  For example, the different types of properties could include data that is an "integer" (*i.e.*, a number) or a "string" (*i.e.,* text).  (*Id.*)  The patent then relies on this definition of schema to explain how the "improved MapReduce" is purportedly able to apply MapReduce to data groups with different schema.  (*See, e.g.*, *id.* at 3:9–34, 3:35–62, 8:14–58; *see also id.* at Figs. 4 and 5.)[22]

Moreover, Databricks' construction is supported by extrinsic evidence.  The Microsoft Computer Dictionary provides that "[a] schema defines aspects of the database, such as *attributes (fields) and domains and parameters of the attributes*."  (*See* Ex. 7 (emphasis added).)  While R2 disagrees that "schema" includes the attributes' properties, R2's analogy to an Excel spreadsheet

---

[22] R2 argues that the applicants' definition of "schema" is limited to only a single embodiment.  But, as explained above, the patent uses Figure 3 to define what a "schema" is and illustrate how the improved MapReduce is purportedly different from conventional MapReduce based on this definition.  The claim must be construed consistent with a patentee's definition, regardless of whether that definition is in the context of an embodiment.  *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1376-79 (Fed. Cir. 2022).

implicitly reflects the definition in the patent and this dictionary definition. Indeed, where the attributes are the "fields that can be filled for a particular data entry" as R2 asserts (Op. Br. at 18), their properties would be whether they contain, for example, an integer or a string of characters.

R2's "plain and ordinary meaning" underscores the need to construe this technical term. R2 only argues that the plain meaning of "schema" is a "framework," and even equates "framework" with "attribute." (Op. Br. at 18 ("'Schema' of data is simply the framework or attributes of the data . . . .").) But nothing in the patent describes "schema" as a "framework." The term "framework" does not appear in the patent at all. Moreover, "schema" and "attribute" are not interchangeable terms. An "attribute" is one of the aspects of a "schema" as confirmed by the patent and extrinsic evidence. R2's "plain and ordinary meaning" would only confuse the jury about the meaning of this technical term. Because Databricks' proposal is consistent with the definition and usage of "schema" in the patent and extrinsic evidence, it should be adopted.

### G.    "the different schema and corresponding different intermediate data have a key in common"

| Term | Databricks' Construction | R2's Construction |
|---|---|---|
| "the different schema and corresponding different intermediate data have a key in common"<br><br>Claims 1, 17 | "the different data group schemas have a key in common with the corresponding different intermediate data" | Plain and ordinary meaning. No construction necessary. |

R2 agrees to Databricks' proposed construction, which resolves the dispute related to this term. (Op. Br. at 19.) Thus, the Court should adopt the parties' agreed construction.

## IV.    CONCLUSION

For the foregoing reasons, the Court should adopt Databricks' proposed constructions and indefiniteness positions.

Dated: November 12, 2024

Respectfully submitted,

_/s/ Vigen Salmastlian_
Michael J. Sacksteder
CA Bar No. 191605 (Admitted E.D. Texas)
Email: msacksteder@fenwick.com
Gregory Sefian
CA Bar No. 341802 (Admitted _Pro Hac Vice_)
Email: gsefian@fenwick.com
**FENWICK & WEST LLP**
555 California Street, 12th Floor
San Francisco, California 94104
Telephone:    415.875.2300
Facsimile:    415.281.1350

Vigen Salmastlian
CA Bar No. 276846 (Admitted E.D. Texas)
Email: vsalmastlian@fenwick.com
**FENWICK & WEST LLP**
801 California Street,
Mountain View, CA 94041
Telephone:    650.988.8500
Facsimile:    650.938.5200

Dargaye Churnet
CA Bar No. 303659 (Admitted E.D. Texas)
Email: dchurnet@fenwick.com
**FENWICK & WEST LLP**
730 Arizona Avenue, 1st Floor
Santa Monica, CA 90401
Telephone:    310.434.5400
Facsimile:    650.938.5200

Jessica M. Kaempf
WA Bar No. 51666 (Admitted E.D. Texas)
Email: jkaempf@fenwick.com
**FENWICK & WEST LLP**
401 Union Street, 5th Floor
Seattle, WA 98101
Telephone:    206.389.4510
Facsimile:    206.389.4511

_Attorneys for Defendant_
_Databricks, Inc._

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who consented to electronic service are being served with a copy of this document via electronic mail per Local Rule CV-5 on November 12, 2024.

*/s/ Vigen Salmastlian*
Vigen Salmastlian