# EXHIBIT 1-1

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| R2 SOLUTIONS LLC,<br><br>       Plaintiff,<br><br>  v.<br><br>DATABRICKS, INC.,<br><br>       Defendant. | Civil Action No. 4:23-cv-01147-ALM |

## DECLARATION OF DR. JON B. WEISSMAN

I, Jon B. Weissman, Ph.D., hereby declare as follows:

1.      My name is Jon Weissman. I am at least eighteen years of age. I have personal knowledge of and am competent to testify as to the facts and opinions herein.

2.      I have been asked by Defendant Databricks, Inc. ("Databricks") to provide my expert opinions relating to certain terms and phrases used in the claims of U.S. Patent No. 8,190,610 (the "'610 patent").

3.      This declaration sets forth my opinions on the disputed claim terms of the '610 patent.

## I.      BACKGROUND AND QUALIFICATIONS

4.      In the paragraphs below, I summarize my qualifications. My qualifications are stated more fully in my curriculum vitae, which is attached to this declaration as **Exhibit A**.

5.      I am a Full Professor in the Department of Computer Science & Engineering at the University of Minnesota, where I've been a professor since 1999. In addition to my professorship, I lead the University of Minnesota's Distributed Computing Systems Group. The Distributed

Computing Systems Group is focused on research into distributed and mobile systems, cloud computing, and high-performance computing.

6.      In 1995, I received my *Doctor of Philosophy* degree (Ph.D.) in Computer Science from the University of Virginia.  For my Ph.D. thesis, I developed the first automated scheduling system for parallel and distributed applications across heterogeneous local and wide-area networks.  In 1989, I received my *Master of Science* degree (M.Sc.) in Computer Science from the University of Virginia.  In 1984, I received my *Bachelor of Science* degree (B.Sc.) in Applied Mathematics and Computer Science from Carnegie Mellon University.

7.      Before obtaining my Ph.D. degree, I worked as a software engineer for five years in the early 1990s in the area of distributed systems.  During this time, I was responsible for designing, implementing, and maintaining distributed computing systems where multiple nodes or computers worked together to achieve a common goal.  In this capacity, I helped design and implement a distributed AI framework for knowledge-based business applications. In another project, I designed and implemented a parallel and distributed simulation framework for military and air traffic control applications.

8.      In 1995, after earning my Ph.D., I returned to academia and began my career as a professor. My research has been funded by NASA, the National Science Foundation, the Department of Energy, and the Air Force, and has included the following projects related to distributed computing and distributed data processing:

- Department of Energy ("DOE"), "Making Parallel Computing Easy";

- National Science Foundation, "Collaborative Data Analysis and Visualization";

- Department of Energy ("DOE"), "An Integrated Middleware Framework to Enable Extreme Collaborative Science";

- Army High Performance Computing and Research Center ("AHPCRC"), "Metacomputing: Enabling Technologies and the Virtual Data Grid";

- National Science Foundation ("NSF," "Resource Management for Parallel and Distributed Systems";

- National Science Foundation ("NSF"), "A Framework for Adaptive Grid Services" and

- Air Force Office of Scientific Research ("ASFOSR"), "Telecommunication Networks for Mobile and Distributed Computing and Communications."

9.    I have published over 100 peer-reviewed technical articles, including some awarded or nominated for Best Paper at highly competitive international conferences. Many of my published papers relate to distributed computing and distributed data processing, including, for example, the following:

- "Nebula: Distributed Edge Cloud for Data Intensive Computing," Albert Jonathan, Mathew Ryden, Kwangsung Oh, Abhishek Chandra, and Jon Weissman, *IEEE Transactions on Parallel and Distributed Systems*;

- "TripS: Automated Multi-tiered Data Placement in a Geo-distributed Cloud Environment," Kwangsung Oh, Abhishek Chandra, and Jon Weissman, *10th ACM International Systems and Storage Conference*;

- "Passive Network Performance Estimation for Large-scale, Data-Intensive Computing," Jinoh Kim, Abhishek Chandra, and Jon B. Weissman, *IEEE Transactions on Parallel and Distributed Systems*;

- "DDDAS/ITR: A Data Mining and Exploration Middleware for Grid and Distributed Computing," Jon B. Weissman, Vipin Kumar, Varun Chandola, Eric

Eilertson, Levent Ertoz, Gyorgy Simon, Seonho Kim, and Jinoh Kim, *Workshop on Dynamic Data Driven Application Systems – DDDAS*;

- "Scheduling Parallel Applications in Distributed Networks," Jon B. Weissman and Xin Zhao, *Journal of Cluster Computing*;

- "Adaptive Resource Scheduling for Network Services," Byoung-Dai Lee and Jon B. Weissman, IEEE 3rd International Workshop on Grid Computing;

- "Adaptive Reputation-Based Scheduling on Unreliable Distributed Infrastructures," Jason D. Sonnek, Abhishek Chandra, and Jon B. Weissman, *IEEE Transactions on Parallel and Distributed Systems*;

- "Integrated Scheduling: The Best of Both Worlds," Jon B. Weissman, Darin England, and Lakshman Abburi Rao, *Journal of Parallel and Distributed Computing*;

- "Predicting the Cost and Benefit of Adapting Parallel Applications in Clusters," Jon B. Weissman, *Journal of Parallel and Distributed Computing*; and

- "Optimizing Remote File Access for Parallel and Distributed Network Applications," Jon B. Weissman, Mike Gingras, and Mahesh Marina, *Journal of Parallel and Distributed Computing*.

10.    I am also the coauthor of the "Distributed and Multiprocessing Scheduling" chapter of "*The Computer Science and Engineering Handbook*" (2nd edition 2004). The chapter discusses CPU scheduling in parallel and distributed systems. I examine in the chapter techniques for spreading tasks across several processors of a distributed system. Examples of scheduling criteria in a distributed computing system discussed in the chapter include minimizing cost, minimizing communication delay, giving priority to certain users' processes, and needs for specialized hardware devices.

11.     I have also coauthored publications related to MapReduce, including "Cross-Phase Optimization in MapReduce," in "*Cloud Computing for Data-Intensive Applications*," Springer, 2014.  This book chapter explores the application of MapReduce across widely distributed data and distributed computation resources. The chapter "propose[s] new cross-phase optimization techniques that enable independent MapReduce phases to influence one another" to address the "problem" that "interaction of MapReduce phases becomes pronounced in the presence of heterogeneous network behavior."  (Cross-Phase Optimization at Abstract.)

12.     I also coauthored the MapReduce paper, "Exploring MapReduce Efficiency with Highly-Distributed Data," published in June 2011 in the *Proceedings of the Second International Workshop on MapReduce and Its Applications*.  The paper has been downloaded over 1,200 times from the ACM Digital Library and cited in over 100 other research papers, according to ACM Digital Library and Google Scholar.  The paper explains that conventional single-cluster MapReduce architectures were not suitable when data and computing resources are widely distributed.  The paper examines three different architectural approaches to perform MapReduce jobs on two platforms—PlanetLab and Amazon EC2—and explains that a local architecture performs better in zero-aggregation conditions, while distributed architectures are preferred in high-aggregation and equal-partition conditions.

13.     During my academic appointments at the University of Minnesota, University of Edinburgh National e-Science Center, and University of Texas San Antonio, I taught and continue to routinely teach classes in operating systems and parallel and distributed systems.  These classes focus on parallel computing platforms, parallel applications, and parallel program scheduling.  These parallel computing platforms are used to implement various distributed processing techniques, including, for example MapReduce.

14.     I have also served on the boards of several major journals, including IEEE Transactions on Parallel and Distributed Systems and IEEE Transactions on Computers.  I am the steering committee chair of the ACM International Symposium on High Performance Parallel and Distributed Systems, the premier annual conference for presenting the latest research on the design, implementation, evaluation, and the use of parallel and distributed systems for high-end computing.  I have also served on the program committees of many conferences in the area of distributed computing and distributed data processing, including many Institute of Electrical and Electronic Engineers ("IEEE") International conferences and workshops.  Examples of the program committees include Supercomputing Conference (SC), IEEE International Parallel & Distributed Processing Symposium (IPDPS), and the International Conference on Parallel Processing (ICPP).  I also chaired/co-chaired conferences in the field, including for the International Symposium on High-Performance Parallel and Distributed Computing (HDPC).  As part of my service to the scientific community, I have served on the editorial board of numerous professional journals including, among others, the HPDC 1992-2012 special issue, Journal Frontiers in High Performance Computing, and IEEE Transactions on Parallel and Distributed Systems.

15.     In addition, throughout my professional career I have received many awards for my technical contributions in the areas of parallel distributed systems.  As some examples, I am the "Best Paper" nominee for the 2015 IEEE International Conference on Cloud Engineering (IC2E), and "Best Paper" winner for the 2009 IEEE Grid conference.  I received the 1996 Career Award from the National Science Foundation and the 1995 Supercomputing Award for "High-Performance Computing with Legion," Supercomputing Conference (SC).

16.     Over the past two decades, I have served as a technical consultant to many companies and organizations in the fields of edge computing, cloud computing, grid computing,

and scheduling automation software. My work has spanned a wide range of industries. Representative clients include prominent technology companies such as Cisco, Instrumental Inc., Beckman Coulter, Inc., Thompson Reuters, and Avaki Inc., which was later acquired by Oracle. At Thompson Reuters I presented a tutorial on MapReduce.

## II.    MATERIALS CONSIDERED

17.    In forming the opinions set forth in this declaration, I have reviewed the '610 patent, its file history, statements R2 made in IPR2024-00659, and the extrinsic evidence identified by the parties. Additionally, I have drawn on my many years of experience in the field of distributed computing and distributed data processing.

## III.    COMPENSATION AND LACK OF FINANCIAL INTEREST IN THIS LITIGATION

18.    I am being compensated for my time at my usual consulting rate of $800 per hour. This compensation is not contingent upon my performance, the conclusions I reach in my analysis, the outcome of this matter, or any issues involved in or related to this matter. I have no financial interest in Databricks or this litigation.

## IV.    LEVEL OF ORDINARY SKILL IN THE ART

19.    It is my understanding that a patent is to be interpreted based on how it would have been read by a person of "ordinary skill in the art" ("POSITA") at the time of the effective filing date of the relevant application. It is my understanding that there are various factors which may help establish the level of ordinary skill in the art, including: (1) the education level of those working in the field; (2) the sophistication of the technology; (3) the types of problems encountered in the art; (4) the prior art solutions to those problems; and (5) the speed in which innovation are made in the field.

20.    It is my understanding that here, the earliest effective filing date for the '610 patent is October 5, 2006.  I am familiar with the technological field at issue at that time.

21.    The '610 patent generally relates to distributed data processing.  In my opinion  a person of ordinary skill in the relevant art, or POSITA, at the time of the '610 patent's effective filing date would have had at least a bachelor's degree in computer science or a similar field, and at least two years of industry or academic experience in a field related to performing data analytics and/or related data processing tasks, including but not limited to, distributed computing systems and distributed data processing. However, with more experience, less education may be needed, and vice versa.

22.    I am familiar with the knowledge possessed by, and perceptions held by, one of ordinary skill in the art at that time period for the '610 patent, based on my experience, which includes  teaching  undergraduate  and  graduate  students  at  the  University  of  Minnesota,  the University of Edinburgh, and the University of Texas San Antonio, and through my participation in scientific community events in this time frame.

## V.    LEGAL STANDARD

23.    Although I am an expert in the relevant technical field, I am not an attorney and I do not intend to offer opinions on legal issues.  The laws and principles of claim construction and the material in this section have been provided to me by counsel, and my understanding is as follows.

### A.    General Claim Construction Legal Standards

24.    It is my understanding that the claims of a patent define the limits of the patentees' exclusive rights.  To determine the scope of the claimed invention, courts typically construe (or define) claim terms, the meanings of which are disputed by the parties.  It is my understanding that claim terms should generally be given their ordinary and customary meaning as understood by one

of ordinary skill in the art at the time of the invention and after reading the patent and its prosecution history.

25.     Claims must be construed, however, in light of and consistent, with the patent's intrinsic evidence.  Intrinsic evidence includes the claims themselves, the written disclosure in the patent's specification, and the patent's prosecution history, including the prior art that was considered by the United States Patent and Trademark Office ("PTO") as part of the patent's prosecution.

26.     The language of the claims helps guide the construction of claim terms.  The context in which a term is used in the claims can be highly instructive.

27.     The patent specification is the best guide to the meaning of a disputed claim term, beyond the words of the claims themselves.  Embodiments disclosed in the specification help teach and enable those of skill in the art to make and use the invention and are helpful to understanding the meaning of claim terms.  Nevertheless, in most cases, the limitations of preferred embodiments and examples appearing in the specification should not be read into the claims.

28.     In the specification, a patentee may also define his own terms, give a claim term a different meaning than it would otherwise possess, or disclaim or disavow claim scope.  A court may generally presume that a claim term possesses its ordinary meaning.  This presumption, however, does not arise when the patentee acts as his own lexicographer by explicitly defining or re-defining a claim term.  This presumption of ordinary meaning can also be overcome by statements, in the specification or prosecution history of the patent, of clear disclaimer or disavowal of a particular claim scope.

29.     It is my understanding that the specification may also resolve any ambiguity where the ordinary and customary meaning of a claim term lacks sufficient clarity to permit the scope of the claim to be ascertained from the words of the claim alone.

30.     It is my understanding that the prosecution history is another important source of evidence in the claim construction analysis.  The prosecution history is the record of the proceedings before the PTO, including communications between the patentee and the PTO.  The prosecution history can inform the meaning of the claim language by demonstrating how the patentee and the PTO understood the invention and whether the patentee limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.  It is my understanding that a patentee may also define a term during the prosecution of the patent.  The patentee is precluded from recapturing through claim construction specific meanings or claim scope clearly and unambiguously disclaimed or disavowed during the patent's prosecution.

31.     It is my understanding that courts can also consider extrinsic evidence when construing claims.  Extrinsic evidence is any evidence that is extrinsic to the patent itself and its prosecution history.  Examples of extrinsic evidence include technical dictionaries, treatises, and expert testimony.  It is my understanding that extrinsic evidence is less significant than the intrinsic record in determining the meaning of claim language.

**B.      Legal Standards Governing Means-Plus-Function Terms**

32.     It is my understanding that some claim terms can be written in a means-plus-function format.  Construing such claim terms involves two steps.  First, the Court must identify the claimed function.  Second, the Court must identify the structure, if any, disclosed in the specification for performing that function.  It is my understanding that in order to meet the definiteness requirement of 35 U.S.C. § 112[1], the specification must include a disclosure sufficient

---

[1] It is my understanding that while means-plus-function limitations are now governed by § 112(f) rather than § 112, ¶ 6, the substantive requirements of that paragraph have not changed. It is my understanding that the amended statute applies only to patents and applications filed on or after September 16, 2012. Because the '610 patent was filed before September 16, 2012, I will refer to the preamendment paragraph numbers.

for one skilled in the art to understand what structure disclosed in the specification performs the recited function. To determine the structure that corresponds with the recited function, the specification must clearly link or associate a structure with the particular function recited in the claim.

33.  Generally, for claims directed towards computer-implemented inventions, the structure disclosed in the specification must be more than a general-purpose computer or microprocessor. This is because general purpose computers can be programmed to perform different tasks in different ways and such a disclosure would effectively provide no limit on the scope of the claims. Thus, the corresponding structure for a computer-implemented function is not a computer but is a specific algorithm that allows a general-purpose computer or microprocessor to perform the claimed function. An "algorithm" is a fixed step-by-step procedure for accomplishing a given result. A patentee may express the procedural algorithm in any understandable terms including as a mathematical formula, in prose, or as a flow chart. A patentee is not required to produce a listing of source code or a highly detailed description of the algorithm to be used to achieve the claimed function in order to satisfy 35 U.S.C. § 112, ¶ 6. The patentee is required, however, to disclose in the patent specification the algorithm that transforms the general-purpose microprocessor into a special purpose computer which is programmed to perform the algorithm. I am informed that a patent claim is invalid as being indefinite if the specification fails to disclose in sufficient detail an algorithm for programming the computer or microprocessor. There is one limited exception to this general rule—a patent can meet the requirements of § 112, ¶ 6 by reciting only a general-purpose computer or microprocessor (with no corresponding algorithm) if the claimed function can be achieved without any special programming.

34.  It is my understanding that although a claim element that does not contain the term "means" is presumed not to be subject to 35 U.S.C. § 112, ¶ 6, this presumption is overcome where

the term does not connote a sufficiently definite structure to a person of ordinary skill in the art or recites a function without reciting sufficient structure for performing that function. It is my further understanding that certain terms have been explicitly recognized as "nonce" words or verbal constructs that are not recognized as the name of structure and are simply a substitute for the term "means for." While claim language that includes adjectives further defining a generic term can sometimes add sufficient structure to render the claim to be not means-plus-function under 35 U.S.C. § 112, ¶ 6, not just any description or qualification of functional language will suffice. The proper inquiry is whether or not the claim limitation itself, when read in light of the specification, connotes to a person of ordinarily skill in the art definite structure for performing the claimed functions.

### C.    Legal Standards Governing Claim Indefiniteness

35.    It is my understanding that there is a "definiteness requirement" that a patent claim must distinctly claim the subject matter the inventor regards as his invention. It is my understanding that the purpose of this requirement is to make sure that the scope of the claims is clear enough so that the public knows what it can and cannot do without infringing the patent's claims. A claim limitation is indefinite if the claim, when read in light of the specification and the prosecution history, fails to inform with reasonable certainty persons of ordinary skill in the art about the scope of the invention. In other words, the claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art.

## VI.    GENERAL STATE OF THE ART

36.    The '610 patent relates generally to distributed computing, and more specifically to performing MapReduce operations in a distributed system. To provide context for my opinions on the construction of certain terms in the '610 patent, in this section I provide some background information on distributed data processing, distributed computing systems, and MapReduce. All

of the concepts discussed in this section were well known before the earliest priority date for the '610 patent, which is October 5, 2006. For example, distributed data processing and distributed system textbooks used in undergraduate courses taught the concepts below, and I had taught these concepts years before the earliest priority date.

### A.    State of the Art of Relational Processing

37.    Relational processing was not new in 2006. Relational Database Management Systems (RDBMS) employing Structured Query Language (SQL) performed relational processing for years before the '610 patent. (*See* Oracle Database SQL Reference (Ex. B-1) at 1-1 to 1-3.) Relational processing involves processing tables of different schema, for example by executing different functions that processes the different data in each of those tables, producing new tables as a result of that processing, and merging or joining the tables, including over a distributed network. These techniques have been described in numerous textbooks, publications, and journals in the field of relational processing.

38.    Well before the '610 patent, documents describing Microsoft's SQL Server 2005, for example, demonstrated that multiple CPU machines used SQL commands to partition data, process it in parallel, and then combine the results. (*See* Tripp Whitepaper (Ex. B-2) at Databricks_R2_PA00005141 ("Why do you need Partitioning?") ("Large-scale operations across extremely large data sets—typically many million rows—can benefit by performing multiple operations against individual subsets in parallel. . . . This allows SQL Server 2005 to more effectively use multiple- CPU machines.").) Partitioning is the database process that divides large tables into multiple smaller parts. By partitioning a large table into smaller, individual tables, queries that access only a fraction of the data can run faster because they have less data to scan. The primary goal of partitioning is to aid in maintenance of large tables and to reduce the overall

response time by reading and loading less data for particular SQL operations. (*Id.* at Databricks_R2_PA00005141, -5145.)

39. SQL Server 2005 could also process data sets with different schema like the "Orders" and "OrderDetails" tables reproduced below:



**Figure 3: Storage Aligned Tables**

(*Id.* at Databricks_R2_PA00005145, Fig. 3.) In this example, the orders table could identify the customer order numbers whereas order details may identify the items each customer purchased. SQL Server 2005 was capable of processing and joining the data from these different tables, including partitioning the data as shown in the image above.

40. The Tripp Whitepaper also provides an example of how data may be partitioned. "The first step in partitioning tables . . . is to define the data on which the partition is 'keyed.'" (*Id.* at Databricks_R2_PA00005146.) The partitioning key is a set of one or more columns in the table. (*Id.*) A partition function defines how the rows of a table are mapped to a set of partitions based on the values of a certain column. The figure below shows one possible example of the steps for creating a partitioned table:



**Figure 11: Steps to Create a Partitioned Table or Index**

(*Id.* at Databricks_R2_PA00005148, Fig. 11.)

41.    The first step may be to determine whether an object, like a table, should be partitioned.  Generally, Tripp recommends partitioning large tables, because partitioning adds administrative overhead that outweighs its benefits for small tables.  The next step may be to determine a partitioning key and the number of partitions for the data.  After that, one or more filegroups can be created to store and separate the data.  Filegroups "place a partitioned table on multiple files for better IO balancing."  (*Id.* at Databricks_R2_PA00005149.)  Then, a partition function and a partition scheme may be created.  As Tripp explains, "[o]nce you have created a partition function you must associate it with a partition scheme to direct the partitions to specific filegroups."  (*Id.* at Databricks_R2_PA00005151.)  After both the partition function and partition scheme are defined, a partition table may be defined to take advantage of them.  "The table defines which "scheme" should be used and the scheme defines the function."  (*Id.*)

**B.    History of MapReduce**

42.    As the '610 patent explains, MapReduce refers to a well-known and preexisting programming methodology for processing "parallel computations over distributed (typically, very large) data sets." ('610 patent, 1:6-27.)  In 2004, Jeffrey Dean and Sanjay Ghemawat published a

paper while working at Google that described MapReduce as a programming methodology for processing big data sets in a parallel, distributed computing environment. (Dean & Ghemawat (Ex. B-3) ("Dean").) The paper was presented at the 6th Symposium on Operating Systems Design and Implementation (OSDI). (*Id.*)

43.    As the name suggests, the MapReduce methodology includes two steps: a map function and a reduce function. (Ex. B-3 at 2.) The map function "written by the user, takes an input pair and produces a set of intermediate key/value pairs" that "group[] together all intermediate values associated with the same intermediate key." (*Id.*) Dean provides examples of key/value pairs, including a word count example where the word is the key and each instance of the word in a document is the value. (*Id.*)

44.    The reduce function "also written by the user, accepts an intermediate key *I* and a set of values for that key" and "merges together these values." (*Id.*) The intermediate values are supplied to the user's reduce function via an iterator. (*Id.*) An iterator simply reads in the data and calls the reduce function for each item. Dean's "implementation of MapReduce runs on a large cluster of commodity machines," and "often on several thousand machines." (*Id.* at 1, 7.)

45.    According to Dean, one of Google's "most significant uses of MapReduce" by 2004 was using it to index webpages for Google's web search service. (*Id.* at 10-11 (Section 6.1).) The indexing process ran "as a sequence of five to ten MapReduce operations," and considered "as input a large set of documents that have been retrieved by [Google's] crawling system," where "[t]he raw contents for these documents are more than 20 terabytes of data." (*Id.* at 11.) Dean places no limitation on the type of input data and contemplates processing "large collection[s] of documents," including websites and logs from the Internet. (*See id.* at 2, 10-11.) Dean also discloses a MapReduce library that provides "support for reading input data in several different formats. For example, 'text' mode input treats each line as a key/value pair . . . [e]ach input type

implementation knows how to split itself into meaningful ranges for processing as separate map tasks (e.g., text mode's range splitting ensures that range splits occur only at line boundaries)." (*Id*. at 6-7 (Section 4.4).)

## VII. THE '610 PATENT

46.    I provide below a brief summary of the '610 patent.  The '610 patent is directed to an "enhanced" form of MapReduce.  ('610 patent at Abstract, 1:31-44.)  But the patent concedes that the actual change is not an enhancement of MapReduce, but a different treatment of inputs: "[t]he inventors have realized that, by treating an input data set as a plurality of grouped sets of key/value pairs, the utility of the MapReduce programming methodology may be enhanced."  (*Id.* at 1:66-2:8, 1:31-41, Abstract.)  In other words, the patent specifies a plurality of "data groups" with different schema that are processed by MapReduce.

47.    The claimed idea of the '610 patent can be understood with reference to Fig. 5, below.



('610 patent at Fig. 5.)

48.     The data groups in Figure 5 are the Employee Table (top of step 502) and Department table (bottom of step 502).  The two tables share a common key, the DeptID, enumerated 31, 33, 34, and 35 in the tables.  (*See* '610 patent at 8:15-24.)  But the tables have different schema because each table has a different "set of attributes (such as DeptID, LastName, DeptName) and their properties (such as their data types: integer DeptID, string LastName, string DeptName)."  (*Id.* at 3:37-41.)  In Figure 5, the Employee table schema identifies department IDs and employee names, whereas the All Department table schema identifies department IDs and department names.  These tables serve as input data to various map functions shown in step 504.  The figure shows that data in the tables is partitioned before transmitting the portioned data to the various map function, but the specification never describes how this partitioning occurs, and how this is done in the case of multiple data groups.  For example, after partitioning is somehow

completed, the Smith, Jones, and Robinson entries at the top of the Employee table are provided to a first map function, and the Jasper, Stone, and Rosen entries are provided to a second map function.

49.     Each map function receives the input data and performs an unspecified mapping function.  As described in the specification, mapping involves processing key/value pairs to generate intermediate key/value pairs. (*Id.* at 1:17-18, 2:49-58.)  But the specification does not identify what specific processing is performed by any of the map functions.  The only examples of map functions in the specification simply identify the inputs and resulting outputs without any explanation of the steps or processing for achieving those results. (*See, e.g.*, *id.* at 4:45-46; 6:27-34.)  In Figure 5, the keys are the DeptID and the values are either the employee names or department names.  After the unspecified mapping functions are performed, the resulting intermediate data is shown in step 506.

50.     After sorting the intermediate data in step 508, the sorted intermediate data is sent to one of two unspecified reduce functions.  Each function combines all intermediate data values sharing the same key into a single key-value pair or a list of values associated with the key. (*Id.* at 1:18-20 and 2:49-51.)  The specification notes that the reduce function can process the intermediate data for each input data group in a way that is defined to correspond to that data group, the specification never describes how this is done.  The specification does not identify what specific processing is performed by any of the reduce functions.  The only examples of reduce functions in the specification simply identify the inputs and resulting outputs without any explanation of the steps or processing for achieving those results. (*See, e.g.*, *id.* 4:53-54; 6:40-65; 7:64-65.)  In fact, the only pseudocode provided for reduce functions simply identifies how different iterators may access and read in data from the different employee and department data groups but does not otherwise provide any explanation of the steps or processing performed on the

data as part of any reduce function.  (*Id.* at 6:40-65; *see also id.* at 3:60-61 (describing "*iterator[]* (useable within reduce functions to *access intermediate data*)").)[2]

51.     Step 512 of Figures 5 shows the result of the reduce functions.  The first reduce function somehow outputs for "AllEvenKeys"—i.e., departments with an even number—the department number, employee name, and department name.  And the second reduce function provides a similar output for "AllOddKeys."  Figure 4 illustrates a similar process as Figure 5. And Figure 3 illustrates the result of mapping and reducing the employee and department tables to a single table, rather than two tables as shown in Figure 5.

## VIII.    THE DISPUTED MEANS-PLUS-FUNCTION CLAIM TERM OF THE '610 PATENT

52.     I have been asked to provide an opinion as to whether certain language recited in claim 17 of the '610 patent would have been understood by a person of ordinary skill in the art at the time to connote sufficient structure for performing the function recited in the claim by a "processor and memory."  I was also asked to provide an opinion as to what structure, if any, that the '610 patent specification discloses as clearly linked to or associated with performing the recited function.  I provide my opinion on each of these issues in my discussion of the term below.

53.     As a preliminary matter, the parties agree that the preamble of claim 17 is limiting. I apply this agreed construction in my analysis.

54.     Claim 17 of the '610 patent recites, in part, the following:

> A computer system including a plurality of computing devices, the computer system configured to process data of a data set, wherein the data set comprises a plurality of data groups, the computer system comprises at least one processor and memory that are operable to perform the following operations:
>
> partitioning the data of each one of the data groups into a plurality of data partitions that each have a plurality of key-value pairs and providing each

---

[2] Unless otherwise noted, all emphasis is added.

data partition to a selected one of a plurality of mapping functions that are each user-configurable to independently output a plurality of lists of values for each of a set of keys found in such map function's corresponding data partition to form corresponding intermediate data for that data group and identifiable to that data group,

wherein the data of a first data group has a different schema than the data of a second data group and the data of the first data group is mapped differently than the data of the second data group so that different lists of values are output for the corresponding different intermediate data, wherein the different schema and corresponding different intermediate data have a key in common; and

reduce the intermediate data for the data groups to at least one output data group, including processing the intermediate data for each data group in a manner that is defined to correspond to that data group so as to result in a merging of the corresponding different intermediate data based on the key in common.

('610 patent, claim 17.)

55.    The excerpt above shows that the claim requires a "processor and memory" (shown in red)—that are operable to perform the function (shown in blue): "partitioning the data of each one of the data groups into a plurality of data partitions that each have a plurality of key-value pairs and providing each data partition to a selected one of a plurality of mapping functions that are each user-configurable to independently output a plurality of lists of values for each of a set of keys found in such map function's corresponding data partition to form corresponding intermediate data for that data group and identifiable to that data group, wherein the data of a first data group has a different schema than the data of a second data group and the data of the first data group is mapped differently than the data of the second data group so that different lists of values are output for the corresponding different intermediate data, wherein the different schema and corresponding different intermediate data have a key in common; and reduce the intermediate data for the data groups to at least one output data group, including processing the intermediate data for each data group in a manner that is defined to correspond to that data group so as to result in a merging of

the corresponding different intermediate data based on the key in common."  ('610 patent, claim 17.)

56.    In my opinion, the term "processor and memory" would not have been understood by a POSITA to connote sufficiently definite structure for performing the claimed function.  A generic "processor" and "memory" cannot be the structure for performing the specialized functions recited by the claim.  The claimed function is specialized, requiring, in part, the following three steps:  (1) "partitioning the data of each one of the data groups into a plurality of data partitions that each have a plurality of key-value pairs," (2) "providing each data partition to a selected one of a plurality of mapping functions that are each user-configurable to independently output a plurality of lists of values for each of a set of keys found in such map function's corresponding data partition to form corresponding intermediate data for that data group and identifiable to that data group," and (3) "reduce the intermediate data for the data groups to at least one output data group, including processing the intermediate data for each data group in a manner that is defined to correspond to that data group so as to result in a merging of the corresponding different intermediate data based on the key in common." (*Id.*)  As R2 itself has admitted, this function is specialized and requires a novel architecture:

> "Thus, the '610 patent provides a clear technological improvement to existing MapReduce systems via *a novel MapReduce architecture where mapping and reducing functions can be applied to data from heterogeneous data sources (i.e., data sources having different schema)* to accomplish the merger of heterogeneous data based on a key in common among the heterogeneous data."

(IPR2024-00659, Paper No. 13 at 12.)

57.     In my opinion, and as R2 acknowledges, a POSITA would not have understood that the specialized steps of the claim could be performed by a general-purpose processor and memory.  And the specification provides no guidance to a POSITA as to what specialized

processing is required for a processor and memory to perform the claimed function. That is because the specification never describes how a "processor" and "memory" perform the claimed function at all. Indeed, the specification never even uses the terms "processor" or "memory." And the qualifier "that are operable" does not provide any additional identification of structure that performs the claimed function. The words "that are operable to" are nothing more than nonce words that are simply a substitute for the term "means for." The claim simply does not connote a sufficiently definite structure to a POSITA. Nor does the claim recite a function with sufficient structure for performing that function.

58.    Indeed, solving the problem of "partitioning the data of each one of the data groups into a plurality of data partitions that each have a plurality of key-value pairs" is neither simple nor straightforward. It is not a trivial matter of simply taking in a data set and arbitrarily dividing the data set into various parts using a processor and memory. To perform the function of "partitioning the data of each one of the data groups into a plurality of data partitions that each have a plurality of key-value pairs," there would first need to be a way of determining what the keys are and what the values are that make up each key-value pair. Each key would need to serve as a unique identifier for a data set, and the value would need to be data included in the data set. There would need to be an algorithm that determines the key-value pairs to write in each partition. An algorithm would also be required to ensure that data is divided across the partitions in a way that results in a plurality of key-value pairs included in each partition. As part of the partitioning process, an algorithm would also need to determine the number of partitions to create, where each partition included a plurality of the key-value pairs.

59.    Similarly, solving the problem of "providing each data partition to a selected one of a plurality of mapping functions that are each user-configurable to independently output a plurality of lists of values for each of a set of keys found in such map function's corresponding

data partition to form corresponding intermediate data for that data group and identifiable to that data group" is neither simple nor straightforward.  It is not a trivial matter of each map function receiving a data partition and outputting intermediate data using a processor and memory.  To perform the function there would first have to be a way for a user to configure mapping functions in different ways to process the different input data groups as recited in the claim.  An algorithm must enable a user to configure the map function to perform the claimed functionality.  And that functionality is not trivial.  In particular, the algorithm would need to allow a user to define the unique functionality of each map function, including, configuring the map function to output a plurality of lists of values for each of a set of keys found in the map function's corresponding data partition to form corresponding intermediate data, and configuring the map function to output intermediate data in a way that identifies the data group partition from which the intermediate data originated.  That means there would need to be an algorithm that allows this configuration of map functions.  While the patent describes that "the partitioning operation after the mapping phase is generalized such that it has a configurable operation with two modes" ('610 patent at 4:60-5:4), both modes are disclosed purely in a functional way, with no algorithm that describes how a processor and memory would perform either of them.

60.    Solving the problem of "reduc[ing] the intermediate data for the data groups to at least one output data group, including processing the intermediate data for each data group in a manner that is defined to correspond to that data group so as to result in a merging of the corresponding different intermediate data based on the key in common" also is neither simple nor straightforward.  It is not a trivial matter of simply taking in intermediate data from the different mapping functions and arbitrarily combining the data into one or more output data groups using a processor and memory.  To perform the function, there would need to be a reduce algorithm that is defined to correspond to each data group.  That means there would need to be a way to determine

that the key-value pairs in the intermediate data—i.e., the data provided to the reduce function—originated from a particular data group.  And the algorithm would need to include reduce functionality that is defined to correspond to each specific data group from which the different intermediate data originated.  In other words, the reduce functionality would be different depending on the data group.  This is not trivial and would require many definitions to account for each particular type of input data group and the different types of reduce processing that may be needed to merge intermediate data from these different data groups based on a common key.  While the patent describes that "the reduce function has a configurable operation with three modes" ('610 patent at 5:40-47), each mode is disclosed purely in a functional way, with no algorithm that describes how a processor and memory would perform either of them.

61.    Thus, it is my opinion that the term "processor and memory that are operable to perform the following operations" does not recite structure sufficient to perform the claimed function.  Accordingly, to satisfy the definiteness requirement, it is my understanding that the specification must disclose structure—in this case, an algorithm—clearly linked to the recited function.

62.    I examined the '610 patent for an algorithm expressed in any form, including pseudocode, mathematical formulas, prose, flow charts, and the like.  I did not locate any operative algorithm clearly linked to performing the steps of the claimed function.  Below, I discuss each of the three steps of the claimed function identified above.

A.    **"partitioning the data of each one of the data groups into a plurality of data partitions that each have a plurality of key-value pairs"**

63.    The claimed function requires, in part, "partitioning the data of each one of the data groups into a plurality of data partitions that each have a plurality of key-value pairs."  ('610 patent, claim 17.)  As recited in the claim, the partitioning is performed on data groups, "wherein the data

of a first data group has a different schema than the data of a second data group." (*Id.*)  And the resulting "data partitions [] each have a plurality of key-value pairs." (*Id.*)  Thus, the claim recites not just any type of partitioning, but a specific partitioning of data groups that have different schema into data partitions that each have a plurality of key-value pairs.

64.    The specification provides no algorithm explaining *how* to partition data as claimed.  The specification first describes the "conventional MapReduce architecture" shown in Fig. 1 below.



(*Id.* at Fig. 1.)

65.    With reference to Fig. 1, the specification discloses that "the input data set 102 is partitioned into an arbitrary grouping of seven partitions 102(1) through 102(7)." (*Id.* at 2:31-35.) The specification further discloses that "[e]ach partition is provided to the corresponding invocation of the map function, which has seven invocations 104(1) through 104(7)." (*Id.*)  These

conclusory descriptions only identify the end result that data is partitioned without explaining to a POSITA *how* the partitioning is performed, much less in the way the claim requires.

66.    Next, the specification discloses that the prior art Group by Key functionality 108 in Fig. 1 "partitions the intermediate results by out_key, and the intermediate partitions **110**(k**1**) to **110**(k**5**) are provided to the corresponding reduce functions **112**(k**1**) to **112**(k**5**), respectively." (*Id.* at 2:36-39.)  Then "each reduce function **112**(k**1**) to **112**(k**5**) processes intermediate data from one of the intermediate partitions **110**(k**1**) to **110**(k**5**) to generate the corresponding output partitions **114**(k**1**) to **114**(k**5**)."  (*Id.* at 2:39-42.)  This disclosure also fails to describe any structure, steps, or algorithm identifying how the partitioning is performed, including within the Group by Key and reduce operations.

67.    Fig. 2, reproduced below, illustrates a parallel implementation of the conventional MapReduce architecture shown in Fig. 1.



*Fig. 2*

(*Id.* at Fig. 2.)

68.    The specification again concludes that "the map functions 104 are partitioned into a user-configurable number of map tasks 202 a, 202 b and 202 c (here, three map tasks)." (*Id.* at 2:56-58.)  But like the implementation of Fig. 1, the patent simply discloses the end result that partitioned data is provided to the map functions with no explanation how the data is partitioned. The patent repeatedly refers to the result of partitioning without any further explanation.  (*See id.* at 2:58-64 ("Similarly, the reduce functions are partitioned into a user-configurable number of reduce tasks 208a and 208b (here, two reduce tasks).  Each map task 202 a, 202 b, and 202 c includes a partitioning function 206 a, 206 b and 206 c, respectively, that partitions the intermediate data across the reduce tasks 208 a and 208 b."); *id.* at 3:1-6 ("Although not shown in FIGS. 1 and 2, the partitioned data can go through a configurable, intermediate step in which a 'combiner' function is called.  A combiner function is similar to a reduce function with the following difference: a combiner runs after a mapper and performs a partial merging on each partition before they are transferred to a reducer.").)  These disclosures again fail to describe any structure, steps, or algorithm identifying how the required partitioning is performed.

69.    The patent's description of the purported invention with respect to Figures 4 and 5 fares no better.  In describing Fig. 4, reproduced below, the specification discloses that "[i]n the improved MapReduce architecture . . . the input, intermediate and output data sets are partitioned into a set of data groups." (*Id.* at 3:48-50.)  The specification further discloses that:

> [w]ith the partitioning into groups, it is likely that map functions corresponding to each group are different; data sets within the same group are characterized by the same schema; and data sets within different groups are characterized by different schemas it is also likely that map functions corresponding to each group are the same; data sets within all the groups are the same. In general, partitioning the data sets into data groups enables a mechanism to associate (group) identifiers with data sets, map functions and iterators (useable within reduce functions to access intermediate data) and, also, to produce output data sets with (group) identifiers."

(*Id.* at 3:50-64.)  These portions of the patent again conclude that partitioning is performed and describes the benefits of partitioning, but do not explain to a POSITA any structure, steps, or algorithm identifying how the claimed partitioning is performed.



Fig. 4

(*Id.* at Fig. 4.)

70.    Next, the specification describes a "partitioning operation *after* the mapping phase" as including two modes:

> In the partitioning mode **1**, the partitioning operation partitions the intermediate data into R partitions, where R is the number of reduce tasks. Each key/value pair goes to only one of the partitions. This is similar to what is done by the conventional MapReduce.

> In the partitioning mode **2**, it still partitions the intermediate data into R partitions but each key/value pair can go to a plurality of the partitions. In this mode, it is likely that the pairs will go to all the partitions.

(*Id.* at 4:63-5:4.)  But these descriptions still offer no algorithm or structure for performing the partitioning.  Moreover, partitioning data *after* performing mapping cannot provide the required structure for the partitioning requirements of claim 17.  Indeed, the claim requires that "partitioning the data of each one of the data groups" is performed before the claimed mapping and reducing operations.  (*Id.*, claim 17.)  Thus, the patent does not provide any structure, steps, or algorithm explaining how to perform the claimed partitioning before

"providing each data partition to a selected one of a plurality of mapping functions" as required by the claim. (*Id.*)[3]

71.    The patent's description of Fig. 5 suffers from the same flaws. The patent again describes the result of partitioning, without disclosing any corresponding structure, steps, or algorithm to perform the partitioning required by the claim:

> The portion 506 of FIG. 5 includes the intermediate results of applying the map functions followed by the partitioning into even-keyed records and odd-keyed records. This partitioning function is just one of many possible partitioning functions. The intermediate results within the portion 506 are analogous to the boxes labeled E′ and D′ within map tasks 402 and 404 in FIG. 4. The intermediate results within the portion 508 in FIG. 5 are analogous to the partitioned results 406 and 408 in FIG. 4. In FIG. 5, the partitioning results are sorted into even-keyed records 509 a and odd-keyed records 509 b. The sorted partitioned results within portion 508 are provided to reduce functions within the portion 510, and the portion 512 includes the result Employee and Department table 306.

(*Id.* at 8:24-37.)

---

[3] *See also, e.g.*, '610 patent, 2:36-42 (referring to the result of partitioning as part of the Group by Key functionality 108 and reduce functions 112 of Fig. 1); *id.* at 3:1-6 (disclosing that "partitioned data can go through a configurable, intermediate step in which a 'combiner' function is called . . . and performs a partial merging on each partition before they are transferred to a reducer"); *id.* at 4:63-5:4 (disclosing that "[i]n the partitioning mode 1, the partitioning operation partitions the intermediate data into R partitions, where R is the number of reduce tasks. Each key/value pair goes to only one of the partitions. . . . In the partitioning mode 2, it still partitions the intermediate data into R partitions but each key/value pair can go to a plurality of the partitions").



(*Id.* at Fig. 5.)

72.    Thus, it is my opinion that no operative algorithm is clearly linked to performing the first step of the claimed function: "partitioning the data of each one of the data groups into a plurality of data partitions that each have a plurality of key-value pairs." (*Id.*, claim 17.)  Merely directing a POSITA to partition data, without more, is not an algorithm that is clearly linked to performing the required partitioning function of the claim.  In fact, the patent fails to disclose how *any* partitioning is performed.  As I explained above, the specification does not identify any steps or algorithm that would: determine the key-value pairs to write in each partition; ensure that data is divided across the partitions in a way that results in a plurality of key-value pairs in each partition; and determine the number of partitions to create, so that each partition always includes a plurality of the key-value pairs.

**B.** **"providing each data partition to a selected one of a plurality of mapping functions that are each user-configurable to independently output a plurality of lists of values for each of a set of keys found in such map function's corresponding data partition to form corresponding intermediate data for that data group and identifiable to that data group"**

73.     The second step of the claimed function requires "providing each data partition to a selected one of a plurality of mapping functions that are each user-configurable to independently output a plurality of lists of values for each of a set of keys found in such map function's corresponding data partition to form corresponding intermediate data for that data group." ('610 patent, claim 17.)

74.     The specification provides no description of *any* structure, steps or algorithm that allows a map function to be configured by the user, much less in a way that performs each recited step of this function.

75.     The specification, at best, generically suggests that a map function can be configured by a user, without disclosing any steps or algorithm that would enable a user to configure any map function, much less in the way the claim requires.  The background of the invention first generally describes a map function as it was understood in the prior art: "Basically, a 'map' function maps key-value pairs to new (intermediate) key-value pairs. . . . The 'map' and 'reduce' functions are typically user-provided. The map function iterates over a list of independent elements, performing an operation on each element as specified by the map function. The map function generates intermediate results." (*Id.* at 1:17-25.)  This disclosure acknowledges that map functions "are typically user-provided" and somehow "perform[] an operation" on "a list of independent elements" to "generate[] intermediate results."  But this disclosure offers no specifics on the steps or algorithm that would execute on the claimed processor and memory to enable a user to configure a map function, much less in a way that does any of the operations performed by the map function.  Nor does it describe any steps or algorithm that enables a user to configure a

map function that forms the "plurality of lists of values" that are the output of the map function. (*Id.*, claim 17.)

76.    The remainder of the patent repeats similar high-level descriptions that map functions can be user-configurable without any corresponding structure, steps, or algorithm that would execute on a process and memory to enable a user to configure the map functions to perform the function recited by the claim.  For example, the patent discloses that in the prior art MapReduce methodology of Fig. 1, "[t]he programmer specifies a map function that processes input key/value pairs and produces a set of intermediate pairs 106(1) through 106(7).  Such a map function is specified as follows:  map (in_key, in_value) → list (out_key, intermediate_value)." (*Id.* at 2:21-29.)  While the patent describes the inputs and outputs—an input key and input value pair and an output list with an output key and intermediate value pair—it does not describe any steps or algorithm enabling a user to configure a map function at all.  There is no identification of any steps or algorithm that would be executed on a processor and memory to enable a user to configure a map function to receive the claimed data partition, output a plurality of lists of values for each of a set of keys found in such map function's corresponding data partition, and/or form corresponding intermediate data for a data group that is identifiable to that data group.

77.    The rest of the specification fares no better.  While the specification describes the purported "improved MapReduce," it fails to describe any steps or algorithm that is clearly linked to the claimed user-configurable map functions.  Instead, the specification states what a map function can do without explaining the steps or algorithm that would need to execute on the claimed processor and memory to enable a user to configure the map function as the claim requires. (*See id.* at 3:50-52 ("With the partitioning into groups, it is likely that map functions corresponding to each group are different."); *id.* at 3:65-4:1 ("Referring now to FIG. 4, each of the map tasks 402 and 404 are configured to operate on separate data groups, where each of the separate data groups

33

is characterized by its own schema."); *id.* at 5:11-15 ("In the improved MapReduce, one possible implementation can map each employee to only one reducer but it can map each department to every reducer. In another possible implementation, it can map each employee to only one reducer and it may not map the departments at all."); *id.* at 8:47-52 ("As discussed, then, the MapReduce concept may be utilized to carry out map processing independently on two or more related datasets (e.g., related by being characterized by a common key) even when the related data sets are heterogeneous with respect to each other, such as data tables organized according to different schema.").)  And while the specification states that a user can configure the map function in the "improved MapReduce," it provides no steps or algorithm for configuring map functions at all. (*See id.* at 8:25-27 ("The portion 506 of FIG. 5 includes the intermediate results of applying the map functions followed by the partitioning into even-keyed records and odd-keyed records."); *id.* at 4:39-40 ("As discussed above, a user/programmer typically provides map and reduce functions."); *id.* at 6:8-10 ("In the improved MapReduce, the map and reduce functions can be provided by the application developers or users.").)

78.    The pseudocode disclosed in the specification likewise fails to identify any steps or algorithm for configuring the claimed map functions in the way the claim requires.  The patent first provides the following pseudocode:

```
Map(group_id, in_key, in_value) → (group_id,
    list(out_key, intermediate_value))
```

(*Id*. at 4:45-46.)

79.    The specification explains that this map function is somehow configured to process, "for a particular group identified with a group_id, the map function processes each input key/value

pair and produces one or more intermediate key/value pairs." (*Id.* at 4:48-50.) But this pseudocode does not show how to configure a map function to perform each step recited in the claim.

80.    The same is true for the map function pseudocode that supposedly shows how to map the Employee table 302 and the Department table 304 shown in Fig. 3, below.



**Fig. 3**

(*Id.* at Fig. 3.)

81.    The pseudocode, shown below, names variables of a pre-configured map function and identifies a desired output that is emitted: "(group, DeptID, val)."

```
map(string group, string key, string val) {
    // group: "emp" or "dept"
    // key: DeptID
    // val: LastName for "emp", DeptName for "dept"
    DeptID = key;
    emit_to_group(group, DeptID, val);
}
```

(*Id*. at 6:28-35.)  This high-level code is purely functional.  It fails to disclose to a POSITA the steps or algorithm that would need to execute on a processor and memory to allow a user to configure any map function in the way the claim requires, including how to configure the map function to form the "plurality of lists of values" that are the output of the map function.

82.    The examples of "calls" to a map function, shown below, offer even less detail.

map("emp", 34, "Smith")

(*Id*. at 7:45.)

map("dept", 34, "Clerical")

(*Id*. at 7:55.)

83.    According to the specification, the first call "results in the data '34 Smith' being emitted into files with an 'emp' extension. The 'emp' extension identifies the data with the 'emp' group."  (*Id*. at 7:49-50.)  And the second call supposedly "results in the data '34 Clerical' being emitted into files with a 'dept' extension."  (*Id*. at 7:58-59.)  But again, these disclosures only describe a result without providing the steps or algorithm executing on a processor and memory to enable a user to configure map functions to perform the required steps of the claim.

84.    Thus, it is my opinion that no operative algorithm is clearly linked to performing the second step of the claimed function: "providing each data partition to a selected one of a plurality of mapping functions that are each user-configurable to independently output a plurality of lists of values for each of a set of keys found in such map function's corresponding data partition to form corresponding intermediate data for that data group and identifiable to that data group." (*Id*., claim 17.)  Merely directing a POSITA to configure a processor and memory to allow user-configurable map functions, without more, is not an algorithm that is clearly linked to performing

the required map function of the claim.  As I explained above, the specification does not identify

any steps or algorithm that would execute on a processor and memory to: enable a user to configure

mapping functions in different ways to process the different input data groups as recited in the

claim; enable a user to define the unique functionality of each map function; and enable user-

configurable map functions to output intermediate data in a way that somehow identifies the data

group partition from which the intermediate data originated, and track the key-value pairs in the

intermediate data to understand which pairs correspond to which original data groups.

C.    **"reduce the intermediate data for the data groups to at least one output data group, including processing the intermediate data for each data group in a manner that is defined to correspond to that data group so as to result in a merging of the corresponding different intermediate data based on the key in common"**

85.    The third step of the claimed function recites: "reduce the intermediate data for the

data groups to at least one output data group, including processing the intermediate data for each

data group in a manner that is defined to correspond to that data group so as to result in a merging

of the corresponding different intermediate data based on the key in common."  (*Id.*)  The patent

discloses no algorithm for performing the claimed reduce step.

86.    Like the map functions discussed above, the specification discloses only generic

reduce functions by its inputs and outputs, provides generic descriptions of those reduce functions,

and discloses high-level pseudocode that do not show how to "process[] the intermediate data for

each data group in a manner that is defined to correspond to that data group so as to result in a

merging of the corresponding different intermediate data based on the key in common," as claimed.

(*Id.*)

87.    In the "Background" section, the patent first explains that "[a] 'reduce' function

represents all mapped (intermediate) key-value pairs sharing the same key to a single key-value

pair or a list of values.  The 'map' and 'reduce' functions are typically user-provided. . . . The

reduce operation takes these intermediate results via a single iterator and combines elements as specified by the reduce function." (*Id*. at 1:18-27.) The specification repeatedly provides similar high-level disclosures of the prior art reduce functions. (*See, e.g.*, *id*. at 2:39-42 ("Each reduce function 112(k1) to 112(k5) processes intermediate data from one of the intermediate partitions 110(k1) to 110(k5) to generate the corresponding output partitions 114(k1) to 114(k5).").) And the "Background" provides the following example of a reduce function that somehow "combines all intermediate values for a particular key and produces a set of merged output values for the key": "reduce (out_key, list(intermediate_value)) → list(out_value)" (*id*. at 2:46-51). None of these disclosures provides any steps or algorithm showing how to process the intermediate data of a data group in a manner that is defined to correspond to a data group. Nor does it explain how to merge corresponding different intermediate data based on the key in common.

88.    While the specification discloses that "the reduce functions are partitioned into a user-configurable number of reduce tasks 208 a and 208 b" it simply discloses the results of "a partitioning function 206 a, 206 b and 206 c, respectively, that partitions the intermediate data across the reduce tasks 208 a and 208 b" and "[e]ach reduce task 206 a and 206 b includes a sort and group-by-key task 210 a and 210 b, respectively, which can make the processing of the output data more efficient and/or convenient." (*Id*. at 2:59-67.) These disclosures simply identify the result that prior art reduce functions reduce intermediate data to output data, without providing any steps or algorithm explaining how to do so. They provide no steps or algorithm explaining how to (1) process the intermediate data for each data group in a manner that is *defined* to correspond to that data group, or (2) merge the corresponding different intermediate data based on the key in common, as the claim requires.

89.    The same is true for the patent's description of reduce functions in the purported invention. The specification discloses that "a reduce function may be specified as follows:

Reduce(list(group_id,list(out_key,intermediate_value)))→list(out_value)." (*Id*. at 4:51-55.) But again, this pseudocode only identifies inputs and an output without any description of the innerworkings of the reduce function at all. According to the specification, this "reduce function" somehow "merges all intermediate data over all groups" and uses "Iterators specific to a particular group . . . to iterate over that group's intermediate data." (*Id*. at 4:56-58.) But proclaiming that this reduce function merges intermediate data of different data groups without any structure, steps, or algorithm describing the reduce function does not explain to a POSITA what structure performs the reduce functions required by the claim. And while the specification describes "iterators" that can iterate over a particular group's data, the patent explains that an iterator is nothing more than a function that "access[es] intermediate data." (*Id*. at 3:61.) None of these disclosures provides any steps or algorithm showing how the reduce function actually merges the intermediate data. Nor does it provide any steps or algorithm showing how the reduce function processes the intermediate data for each data group in a manner that is defined to correspond to that data group.

90.     Next, the specification discloses three modes of reduce operation in the "improved MapReduce" architecture:

> In the reduce mode 1, the records input to a reduce function through the group iterators carry or share the same key. If there is no record in a group that has the same key, the corresponding iterator is null. This mode helps implement an equijoin, a join over equal keys, efficiently. For example, it can produce the "Employee and Department" table 306 by equijoining the "Employee" table 302 and the "Department" table 204 [*sic*].

> In the reduce mode 2, the records input to a reduce function through the group iterators need not carry the same key. The input records are the ones pointed to by the group iterators when the reduce function is invoked. The reduce function controls the manner in which keys, values, and iterators are used. This mode helps implement a join with an arbitrary predicate (such as comparisons) because it can implement the sort-merge join. For example, this mode together with the partitioning mode 2 can even implement the cross product of the employees and departments in FIG. 3.

In the reduce mode 3, the records input to a reduce function through the group iterators need not carry the same key as in the reduce mode 2. In addition, those of some groups need not even come from the intermediate data when the reduce function is invoked. They can come from data local to the reduce function or data shared by other reduce functions. For example, this mode can implement the cross product of the employees and departments in FIG. 3. To do that, the departments data can be accessed by every reduce function.

(*Id*. at 5:48-6:7.)

91.     The disclosure related to each reduce mode suffers from the same deficiencies discussed above: each reduce mode is described by its results without explaining how the result is accomplished, much less in the way the claim requires. And while the description of the above reduce modes refer to the use of "group iterators," the patent explains that these iterators simply provide "records" as an "input to a reduce function"; they do not perform any of the operations required by the claimed reduce function. (*Id*. at 5:56-57; 5:66-67.) Thus, none of the above described reduce modes provide any steps or algorithm explaining how to (1) process the intermediate data for each data group in a manner that is defined to correspond to that data group, or (2) merge the corresponding different intermediate data based on the key in common, as claimed.

92.     Next, the patent describes pseudocode that purports to show how to perform reduce mode 1.

```
reduce(hashtable iterators) {
    // iterators: one iterator for "emp", another for "dept"
    DeptID = iterators.get_key( );
    emp_iter = iterators["emp"].get_iter( );
    dept_iter = iterators["dept"].get_iter( );
    for each LastName in emp_iter do {
        for each DeptName in dept_iter do {
            emit_to_group("emp_dept", DeptID, (LastName,
            DeptName));
        }
    }
}
```

(*Id*. at 6:39-49.)

93.    But, this pseudocode is devoid of any steps or algorithm describing how a reduce function performs the claimed steps of processing the intermediate data for each data group in a manner that is *defined* to correspond to that data group and merging the corresponding different intermediate data based on the key in common.  Instead, it identifies iterators that somehow provide "emp" and "dept" data as inputs to a "reduce function," which somehow produces the "emit_to_group()" output.  The same is true for the remaining pseudocode provided in the specification.

```
reduce(hashtable iterators) {
    // iterators: one iterator for "emp", another for "dept"
    DeptID = iterators.get_key( );
    emp_iter = iterators["emp"].get_iter( );
    dept_iter = iterators["dept"].get_iter( );
    if (emp_iter is not null and dept_iter is not null) then {
        for each LastName in emp_iter do {
            for each DeptName in dept_iter do {
                emit_to_group("emp_dept", DeptID, (LastName,
                DeptName));
            }
        }
    }
```

```
    else if (emp_iter is not null and dept_iter is null) then {
        // null iterator handling for left and full outer joins
        for each LastName in emp_iter do {
            emit_to_group("emp_dept", DeptID, (LastName, null));
        }
    }
    else if (emp_iter is null and dept_iter is not null) then {
        // null iterator handling for right and full outer joins
        for each DeptName in dept_iter do {
            emit_to_group("emp_dept", DeptID, (null, DeptName));
        }
    }
    else {
        // both iterations being null can be a warning or an error
    }
}
```

(*Id*. at 6:56-7:16.)

94.    According to the patent, the pseudocode above is for reduce functions that "produce output data set with the 'emp_dept' group identifier from intermediate data sets with the 'emp' and 'dept' group identifiers." (*Id*. at 7:19-23.)  The code includes if/else statements for undefined "null iterators" that "are handled in reduce functions in the way that the programmer desires." (*Id*. at 8:43-44.)  None of these disclosures provides any steps or algorithm showing how any reduce function merges the intermediate data based on a common key, as claimed.  (*See id.*, claim 17.) Nor do they provide any steps or algorithm showing how any reduce function processes, the intermediate data for each data group in a manner that is defined to correspond to that data group. (*Id.*)

95.    Thus, it is my opinion that no operative algorithm is clearly linked to performing the third step of the claimed function: "reduce the intermediate data for the data groups to at least one output data group, including processing the intermediate data for each data group in a manner that is defined to correspond to that data group so as to result in a merging of the corresponding different intermediate data based on the key in common." (*Id.*)  Merely directing a POSITA to reduce intermediate data to output data, without more, is not an algorithm that is clearly linked to performing the required reduce function of the claim.  In fact, the patent fails to disclose how *any* reduce function is performed.  As I explained above, the specification does not identify any steps or reduce algorithm that:  includes reduce functionality that is defined to correspond to each specific data group from which the different intermediate data originated, which would require many definitions to account for each particular type of input data group and the different types of reduce processing that may be needed to merge intermediate data from these different data groups based on a common key; determines that the key-value pairs in the intermediate data originated

from a particular data group; and outputs data that merges or combines the different intermediate data based on a key in common.

96.     I understand that R2 contends that the disputed means-plus-function claim term of claim 17 should not be construed and has therefore not identified any algorithm linked to the claimed function for this term.  I also understand that R2 intends to use expert testimony to explain and discuss any claim terms that are subject to 35 U.S.C. § 112 ¶ 6.  I reserve the right to respond to arguments of R2 and its expert(s), including William Davis, as to the meaning of this term and whether it is indefinite.

97.     I understand that R2 contends that this term should not be construed and has therefore not identified any algorithm linked to the claimed function for this term.   I also understand that R2 intends to use expert testimony to explain and discuss any claim terms that are subject to 35 U.S.C. § 112 ¶ 6.  I reserve the right to respond to arguments of R2 and its expert(s), including William Davis, as to the meaning of this term and whether it is indefinite.

IX.    **OTHER DISPUTED CLAIM TERMS**

A.    **"mapping" / "map" / "mapped"**

98.     The terms "mapping," "map" and mapped" are each recited in asserted claims 1 and 17 of the '610 patent.

99.     I understand that Databricks has proposed that these terms be construed as "[processing] / [process] / [processed] key/value pairs to generate intermediate key/value pairs." In my opinion, this proposed construction aligns with how a POSITA would have understood the plain meaning of this term, read in light of the specification, as of the priority date of the '610 patent.

100.    The specification repeatedly refers to "map" consistent with Databricks' proposed construction.  The Background of the patent defines a "'map' function" as "map[ping] key-value

43

pairs to new (intermediate) key-value pairs" just as Databricks proposes in its construction. (*See* '610 patent at 1:17-18.) The patent then goes on to explain how a map function works. "The map function iterates over a list *[sic]* of independent elements, performing an operation on each element as specified by the map function" and the result is that "[t]he map function *generates* intermediate results." (*Id.* at 1:22-25.) Thus, Databricks' proposal describing mapping as "generat[ing] intermediate key-value pairs" is consistent with the patent specification. (*See also id.* at 2:21-31 ("The programmer specifies a map function that processes input key/value pairs and produces a set of intermediate pairs 106(1) through 106 (7).").) Additionally, the high-level pseudocode for map functions in the specification confirm Databricks' proposed construction, as each map function takes in key-value pairs and generates as an output of intermediate key-value pairs. (*Id.* at 2:28 ("map (in_key, in_value) → list(out_key, intermediate_value)."); 4:45-46 ("Map (group_id, in_key, in_value) → (group_id, list(out_key, intermediate_value)".) Thus, as the patent repeatedly confirms, a "map function processes each input key/value pair and produces [i.e., generates] one or more intermediate key/value pairs" as in Databricks' proposed construction. (*Id.* at 4:48-50.)

101.    Databricks' proposed construction is also consistent with how "map" is described in the 2004 Google paper that introduced the concept of "map" in the context of distributed database processing. (*See* Dean (Ex. B-3).) Dean first explains that, in MapReduce, "[u]sers specify a *map* function that *processes a key/value pair to generate a set of intermediate key/value pairs*." (*Id.* at 1 (first emphasis in original).) Dean then confirms that "map" has the same meaning in the implementation discussed in the publication: "*Map*, written by the user, takes an input pair and produces a set of *intermediate* key/value pairs." (*Id.* at 2 (emphasis in original).) These disclosures in the 2004 Google paper on MapReduce confirm that Databricks' proposed construction of "map" is correct.

102.    Thus, a POSITA would have understood that the various tenses of "map" in the '610 patent claims refer to processing key/value pairs to generate intermediate key/value pairs.

**B.    "reducing" / "reduce"**

103.    The terms "reducing" and "reduce" are both recited in asserted claims 1 and 17 of the '610 patent.

104.    I understand that Databricks has proposed that these terms be construed as "[combining] / [combine] all intermediate data values sharing the same key into a single key-value pair or a list of values associated with the key."  In my opinion, this proposed construction aligns with how a POSITA would have understood the plain meaning of this term, read in light of the specification, as of the priority date of the '610 patent.

105.    The specification repeatedly refers to "reduce" consistent with Databricks' proposed construction.  The Background of the patent defines a "'reduce' function" as "map[ping] (intermediate) key-value pairs sharing the same key to a single key-value pair or a list of values," consistent with Databrick's proposal.  (*See* '610 patent at 1:18-20.)  The patent further explains that "[t]he reduce function *combines* all intermediate values for a particular key and produces a set of merged output values for the key, usually just one."  (*Id.* at 2:49-51.)  Thus, Databricks' proposed construction of reducing as "combining all intermediate data values sharing the same key into a single key-value pair or a list of values associated with the key" is consistent with the patent specification.  (*See also id.* at 2:39-48 ("Each reduce function 112(k1) to 112(k5) processes intermediate data from one of the intermediate partitions 110(k1) to 110(k5) to generate the corresponding output partitions 114(k1) to 114(k5).").)  Additionally, the example of a reduce function in the specification confirms Databricks' proposed construction, as it combines intermediate values by "out_key" and outputs a list of "out_value" associated with that key.  (*Id.* at 2:46 ("reduce (out_key, list(intermediate value)) → list(out_value)").)

106.    Databricks' proposed construction is also consistent with how "reduce" is described in Dean, which introduced the concept of "reduce" in the context of distributed database processing.  Dean explains that, in MapReduce, "a *reduce* function [] merges all intermediate values associated with the same intermediate key."  (Ex. B-3 at 1.)  Dean further explains that "[t]he *Reduce* function, also written by the user, accepts an intermediate key *I* and a set of values for that key" and "merges together these values to form a possibly smaller set of values."  (*Id.* at 2 (emphasis in original).)  These disclosures in the 2004 Google paper on MapReduce confirm that Databricks' proposed construction of "reduce" is correct.

107.    Thus, a POSITA would have understood that the various tenses of "reduce" in the '610 patent claims refer to combining all intermediate data values sharing the same key into a single key-value pair or a list of values associated with the key.

### C.    "schema"

108.    The term "schema" is recited in asserted claims 1 and 17 of the '610 patent.

109.    I understand that Databricks has proposed that these terms be construed as "a set of attributes (such as DeptID, LastName, DeptName) and their properties (such as their data types: integer DeptID, string LastName, string DeptName)."  In my opinion, this proposed construction aligns with how a POSITA would have understood the plain meaning of this term, read in light of the specification, as of the priority date of the '610 patent.

110.    The specification describes "schema" consistent with Databricks' proposed construction.  Specifically, the specification explains that "schema of each data set . . . includes a set of attributes (such as DeptID, LastName, DeptName) and their properties (such as their data types: integer DeptID, string LastName, string DeptName)."  (*See* '610 patent at 3:37-47.)  This proposed construction of schema is also consistent with how the term is used in the specification to describe how "data sets within different groups are characterized by different schemas." (*Id.* at

3:53-55.)  For example, the '610 patent identifies each of the Employee table 302 and the
Department table 304 of Fig. 3 as a "separate data group[] [that] is characterized by its own
schema."  (*Id.* at 3:65-4:3.)  These tables have different schema because the employee table has
the different attribute of employee name ("EmpName"), whereas the department table has the
different attribute of department name ("DeptName").  (*Id.* at Fig. 3.)  And as Databricks' proposed
construction specifies, the different schema of different data groups can further be characterized
by different data types such as integers or strings.  This is consistent with how a person of ordinary
skill in the art would have understood "schema" at the time of the '610 patent, including based on
the usage of the term in the field at the time.

111.    Thus, a POSITA would have understood that "schema" in the '610 patent claims
refers to a set of attributes (such as DeptID, LastName, DeptName) and their properties (such as
their data types: integer DeptID, string LastName, string DeptName).

112.    The opinions in this declaration are based on information and material available to
me at the present time.  My work on this matter is ongoing.  As I examine additional materials and
perform further analyses, I reserve the right to revise and supplement my opinions and this
declaration.

I, Jon B. Weissman, do hereby declare and state, under penalty of perjury, that all statement made in this declaration are true, or I believe them to be true based on information and belief.  This declaration was executed on September 13, 2024, in <u>854 Holly Ave, St Paul MN 55104</u>.


_____

Jon B. Weissman