██████████████████████████

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

R2 SOLUTIONS LLC,

               Plaintiff,

      v.

DATABRICKS, INC.,

               Defendant.

Civil Action No. 4:23-cv-01147-ALM

**JURY TRIAL DEMANDED**

████████████████

## DEFENDANT DATABRICKS, INC.'S OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE CERTAIN EXPERT OPINIONS

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..............................................................................................................1

II.   RELEVANT FACTUAL BACKGROUND......................................................................2

    A.   R2 withheld the infringement theory in Mr. Davis's opening report that requires turning *off* the Photon engine in the Databricks Platform........................................2

    B.   Dr. Macartney's licensing opinions rebut Mr. Bergman's opinions and support Databricks' affirmative license defense ................................................................5

III.  R2 IDENTIFIES NO BASIS TO STRIKE DATABRICKS' PHOTON OPINIONS .........6

    A.   The expert opinions of Dr. Weissman and Dr. Macartney rebut Mr. Davis's new infringement theory that requires turning *off* Photon and fully complies with the parties' source code stipulation directed to Apache Spark ......................................6

    B.   Dr. Weissman's and Dr. Macartney's opinions complied with Rule 26(e) ............8

    C.   Dr. Weissman's and Dr. Macartney's opinions on Photon are reliable ................10

IV.   EXPERT OPINIONS ON RELEVANT LICENSES SHOULD BE ALLOWED............11

    A.   Databricks' expert opinions regarding its license defenses should be allowed .....11

    B.   Databricks' expert opinions on ███████████████ should be allowed .......12

    C.   Non-comparable licenses should be excluded, but if they are not excluded, then Databricks' rebuttal opinions should be allowed ..................................................12

V.    CONCLUSION................................................................................................................13

<!-- black bar -->

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barry v. Medtronic, Inc.*,
No. 1:14-cv-104, 2016 WL 11731493 (E.D. Tex. Sept. 21, 2016).........................................13

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)..................................................................................................................11

*Fractus, S.A. v. Samsung Elec. Co.*,
876 F. Supp. 2d 802 (E.D. Tex. 2012)......................................................................................13

*Harris v. BMW N. Am., LLC*,
No. 4:19-cv-00016-ALM, 2020 WL 7318087 (E.D. Tex. Dec. 11, 2020)..............................10

*Maxell, Ltd. v. Apple Inc.*,
No. 5:19-cv-36, ECF No. 666 (E.D. Tex. Mar. 17, 2021).......................................................13

*R2 Solutions LLC v. Am. Airlines, Inc.*,
No. 4:22-cv- 00353-ALM, 2023 WL 3938862 (E.D. Tex. June 9, 2023)...............................9

*Recursion Software, Inc. v. Double–Take Software, Inc.*,
No. 4:10-cv-403, 2012 WL 1576252 (E.D. Tex. May 4, 2012)...............................................12

*SSL Services v. Citrix Systems*,
940 F. Supp. 2d 480 (E.D. Tex. 2013).................................................................................12, 13

**TABLE OF EXHIBITS[1]**

| No. | Exhibit |
|---|---|
| 1 | Plaintiff's Second Supplemental Disclosure of Asserted Claims and Infringement Contentions, served on January 9, 2025 ("R2 2d Supp. ICs") |
| 2 | Databricks webpage titled "Announcing Photon Public Preview: The Next Generation Query Engine on the Databricks Lakehouse Platform" (Databricks_R2_00087824–Databricks_R2_00087832) ("Announcing Photon Public Preview") |
| 3 | Excerpts of Defendant's Omnibus Supplemental Objections and Responses to Plaintiff R2 Solutions LLC's Interrogatories (Nos. 1-36) ("Omnibus Rog Resp") |
| 4 | Excerpts of Transcript of the December 5, 2024 Deposition of Denny Lee ("Lee Dep.") |
| 5 | Excerpts of Transcript of the December 13, 2024 Deposition of Cody Davis ("C. Davis Dep.") |
| 6 | Excerpts of Transcript of the January 16, 2025 Deposition of Joshua Rosen ("Rosen Dep.") |
| 7 | Excerpts of Transcript of the January 24, 2025 Deposition of Reynold Xin ("Xin Dep.") |
| 8 | Excerpts of the Expert Report of William Davis Concerning Infringement of U.S. Patent No. 8,190,610 ("Davis Rep.") |
| 9 | Excerpts of Transcript of the March 25, 2025 Deposition of William Davis ("Davis Dep. (Day 1)") |
| 10 | Excerpts of Rebuttal Expert Report of Dr. Jon Weissman ("Weissman Rebut. Rep.") |
| 11 | Excerpts of Transcript of the March 26, 2025 Deposition of Dr. Jon Weissman ("Weissman Dep. (Day 2)") |
| 12 | Databricks webpage titled "What is Photon?" (GMacartney_00000892 – GMacartney00000895) ("What is Photon?") |
| 13 | Excerpts of the Expert Report of Gareth Macartney, Ph.D. ("Macartney Rebut. Rep.") |
| 14 | Excerpts of the Expert Report of Jim W. Bergman ("Bergman Rep.") |
| 15 | Plaintiff's Disclosure of Asserted Claims and Infringement Contentions, served on June 21, 2024 ("R2 Orig. ICs") |

---

[1] Each of the exhibits listed in this table, Exhibits 1-17, is attached to the Declaration of Vigen Salmastlian.

| No. | Exhibit |
|-----|---------|
| 16 | Plaintiff's First Supplemental Disclosure of Asserted Claims and Infringement Contentions, served on September 20, 2024 ("R2 1st Supp. ICs") |
| 17 | Excerpts of Plaintiff R2 Solutions LLC's Objections and Responses to Defendant Databricks, Inc.'s Second Set of Requests for Admission, served on December 19, 2024 ("R2 RFA Response") |

## I.     INTRODUCTION

R2's Motion to Strike targets two aspects of Databricks' experts' opinions. First, R2 seeks to strike all Databricks expert opinions (technical and damages) related to Photon—an unaccused Databricks data processing engine made relevant by the recently disclosed opinions of R2's technical expert.  Despite Databricks publicly promoting its use of the Photon engine beginning more than two years before R2 filed this case,[2] R2's infringement allegations accused only Spark, the other engine.  But in his opening expert report, R2's expert Mr. Davis introduced a new infringement theory—concealed throughout fact discovery—in which he *created* code, data sets, and a configuration that required him to *manually turn off Photon* to manipulate the Databricks platform into executing the allegedly infringing functionality.  Databricks' first opportunity to respond was in its rebuttal expert report, in which Dr. Weissman opined that there is no evidence that any user has ever turned off Photon, and that when Photon is left on, it executes unaccused Photon functionality.  R2 now seeks to deprive Databricks of the opportunity to rebut R2's previously concealed infringement theory.  R2 also seeks to prevent Databricks' damages expert Dr. Macartney from opining that uses of Photon, which R2 has not accused of infringement, should be excluded from R2's damages calculation.  As explained below, Databricks' expert opinions comply with the parties' source code stipulation, comply with Rule 26(e), and are reliable.

Second, R2 seeks to strike Dr. Macartney's opinions on *all* "past license agreements."  But R2's expert put past licenses into issue by relying on them as evidence of Yahoo's licensing policies and as support for a running royalty, both of which Dr. Macartney rebutted.  R2 also ignores Dr. Macartney's reliance on ███████████████████████ to the patent-in-suit for Databricks' affirmative license defense.  Thus, the Court should deny R2's motion in full.

---

[2] Databricks announced a Photon public preview on June 17, 2021, more than two years before R2 filed its Complaint on December 28, 2023.  (Ex. 2, Announcing Photon Public Preview.)

## II.    RELEVANT FACTUAL BACKGROUND

### A.    R2 withheld the infringement theory in Mr. Davis's opening report that requires turning *off* the Photon engine in the Databricks Platform

R2 filed suit on December 28, 2023, alleging infringement of U.S. Patent No. 8,190,610 ("the '610 patent").  (Dkt. 1 at 1.)  R2 focused its infringement theories on open-source Apache Spark within the Databricks Data Intelligence Platform ("Databricks platform").  (*See generally id.*)  In its Complaint, R2 accused the "Databricks Data Intelligence Platform/Databricks Lakehouse Platform . . . *that utilize Apache Spark*"[3] (*Id.* at ¶ 7) and R2's claim charts relied on "Apache Spark" as allegedly meeting the requirements of the asserted claims (*Id.* at Exs. 2-3).  The claim charts attached to each of R2's initial, first supplemental, and second supplemental sets of infringement contentions followed this same pattern, accusing only open-source "Apache Spark." (*See generally* Ex. 15, R2 Orig. ICs; Ex. 16, R2 1st Supp. ICs; Ex. 1, R2 2d Supp. ICs.)

The Databricks platform uses two distinct data processing engines: one based on open-source Spark and another internally developed engine called Photon.  (Dkt. 117 at ¶ 11 (citing Ex. 1, Databricks_R2_00091426, 487).)  Photon is a faster "high performance vectorized query engine developed by Databricks" that was publicly launched in September 2021 as part of Databricks Runtime version 9.1.  (Dkt. 85-9 at Ex. H (Li Decl.), ¶ 4; Ex. 10, Weissman Rebut. Rep., ¶ 164; Dkt. 117 at ¶ 13.)  Additionally, there are two versions of the Databricks platform: classic (or non-serverless) compute and serverless compute.  (*Id*. at ¶ 10.)  Classic compute can use either Photon (which is enabled by default) or Spark, while serverless compute uses only Photon, which cannot be turned off.  (Ex. 12, GMacartney_00000892; Ex. 9, Davis Dep. (Day 1), 92:5-19.)

While R2 was aware of Photon before this case and even included a Photon excerpt from the Databricks website in the Complaint, R2 made the strategic decision to *drop* and *not accuse*

---

[3] Unless otherwise noted, all emphasis is added.

Photon in its infringement contentions.  (*See* Dkt. 1 at ¶ 40 (excerpt identifying "Photon").) Nevertheless, Databricks went above and beyond its discovery obligations and over nine months ago produced more than 400 technical documents spanning 4,800 pages describing Photon. Multiple Databricks witnesses deposed in this case also testified about Photon and explained how it works.  (Ex. 4, Lee Dep., 56:12-24, 57:5-21, 64:17-25 (explaining Photon and differentiating it from Spark); *see also* Ex. 5, C. Davis Dep., 32:16-33:19, 35:2-8, 139:3-6; Ex. 6, Rosen Dep., 147:7-149:1; Ex. 7, Xin Dep., 88:17-21.)  Despite this extensive discovery, R2 conceded in its motion to compel briefing that it *chose* to "not identify Photon in its contentions." (Dkt. 87 at 3.)

During discovery, R2 requested and Databricks produced the internal version of certain open-source Apache Spark files implemented by the Databricks Spark engine, and R2 briefly requested production of Photon code.  (Dkt. 85 at 7-8.)  But then on December 19, 2024, at R2's request, the parties agreed to and filed a source code stipulation regarding the accused Apache Spark code, and R2 dropped its request for any additional code, including Photon.  (Dkt. 73 at 1.)

Because R2 focused its case on Spark, Databricks produced all source code for Apache Spark during fact discovery.  (Dkt. 92-1 at ¶ 2.)  Databricks' interrogatory responses addressed R2's disclosed infringement theories, which only related to Apache Spark.  As one example, R2's infringement contentions accused a broad set of open-source Spark operators without any explanation of how those operators were allegedly used by any Databricks user. (*See, e.g.*, Ex. 1, R2 2d Supp. ICs).  Databricks' non-infringement interrogatory response explained, in part, that "R2 has not shown that Databricks, or any customer, has ever actually performed each and every step of the method claims."  (Ex. 3, Omnibus Rog Resp at 66.)  R2 never supplemented its infringement contentions to identify any theory in which the accused Spark functionality was used by any Databricks user because, as explained in Databricks' motion for summary judgment of non-infringement, no such evidence exists in this case.  (Dkt. 117 at 1, 11-14.)

3

But in its opening expert report, R2 disclosed a new infringement theory. R2's technical expert Mr. Davis *created* his own data sets, *created* his own data processing code, and *assumed numerous conditions* in his accused configuration of the Databricks platform, including manually turning *off* the Photon data processing engine. (Dkt. 117 at 11-13; *see also* Ex. 8, Davis Rep., Apps. E-H (providing created code and data sets); Ex. 9, Davis Dep. (Day 1), 18:15-19 (testifying he "created data sets that [he] ran together with [his] [S]park 3.5.1 data processing software"), 88:20-89:1 (confirming the user must "disable [P]hoton to be infringing").) Mr. Davis did this to force the Databricks platform into a configuration that—when executing his *created* code on his *created* data sets—bypasses the default Photon engine and uses a join strategy called "Sort Merge Join." (Dkt. 117 at 11-13; Ex. 9, Davis Dep. (Day 1), 90:1-7.) Although R2 and Mr. Davis had already concocted this new theory before the February 13, 2025 close of fact discovery, R2 concealed Mr. Davis's created code, data sets, and configuration of the Databricks platform until his opening report. (Ex. 9, Davis Dep. (Day 1), 95:3-96:2 (testifying that at least by "January 23" he had tested his infringement theory and learned that "[P]hoton was enabled by default").)

Databricks' first opportunity to respond to Mr. Davis's new infringement theory was in Dr. Weissman's rebuttal report. Dr. Weissman opined that Mr. Davis's new theory is flawed because: (1) Mr. Davis failed to show that any Databricks user has ever turned off Photon (Ex. 10, Weissman Rebut. Rep., ¶¶ 213-215, 230); (2) Databricks serverless compute cannot infringe because Photon is on by default and cannot be turned off (*id.* at ¶ 120); and (3) when Photon is left on, it replaces the accused "Sort Merge Join" with Photon functionality for which Mr. Davis has no infringement opinion (*id.* at ¶¶ 69-71; Ex. 9, Davis Dep. (Day 1), 96:15-17). Moreover, Dr. Weissman's Photon opinions were based on his testing of *Mr. Davis's created data sets, code, and configuration of the Databricks platform*, admissions in Mr. Davis's report, depositions, and Photon documents produced months the before close of discovery. (Ex. 10, Weissman Rebut., ¶¶ 61-83, Apps. A-P.)

R2's purportedly "relevant case history" misstates the above facts and stoops to inflammatory accusations. (Op. Br. at 1-2.) But the Photon issue resulted from R2's choice to conceal Mr. Davis's infringement theory during fact discovery, including his created code, data sets, and configuration that required turning *off* Photon. If R2 had complied with its disclosure obligations, Databricks would have responded to this theory in its interrogatory responses.

### B.  Dr. Macartney's licensing opinions rebut Mr. Bergman's opinions and support Databricks' affirmative license defense

The opening report of R2's damages expert Mr. Bergman chronicles the licensing history for the '610 patent and ▮▮▮▮▮▮▮▮▮▮ (Ex. 14, Bergman Rep., ¶¶ 169-226), but concludes all past licenses are non-comparable and "not informative as to the hypothetical negotiation" (*id.* at ¶¶ 170, 185, 201-02, 216, 226). Mr. Bergman nevertheless opines that ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* at ¶ 171; *see also id.* at ¶ 173.) Moreover, Mr. Bergman relies on all licenses by ▮▮▮▮▮▮▮▮▮▮ to support a running royalty. (*Id.* at ¶ 282.)

Dr. Macartney's rebuttal report considers all the same licenses put at issue by Mr. Bergman and rebuts his opinions. Dr. Macartney opined that the licenses do not demonstrate ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ (*Id.* at ¶¶ 206-10.) Dr. Macartney also opined that the licenses do not support a running royalty. (*Id.*) And in support of Databricks' licensing affirmative defense, Dr. Macartney analyzed licenses to ▮▮▮▮▮▮▮▮▮▮▮ for the '610 patent (among many others) that cover the accused Databricks platform. (*Id.* at ¶¶ 200-03.)[4]



---

[4] While R2 seeks to exclude Dr. Macartney's opinions on *all* past licenses, R2 attempts to preserve Dr. Macartney's opinions regarding this licensing defense. (Dkt. 115-9 at ¶¶ 200-03.)

## III.    R2 IDENTIFIES NO BASIS TO STRIKE DATABRICKS' PHOTON OPINIONS

### A.    The expert opinions of Dr. Weissman and Dr. Macartney rebut Mr. Davis's new infringement theory that requires turning *off* Photon and fully complies with the parties' source code stipulation directed to Apache Spark

R2's argument mischaracterizes the parties' source code stipulation and ignores the fact that Databricks' experts properly discuss Photon to rebut opinions asserted in R2's opening expert reports.  (Op. Br. at 4-5.)  In reality, R2 seeks to exclude discussion of Photon Databricks' technical expert Dr. Weissman discovered a crucial error in Mr. Davis's newly concocted infringement theory first disclosed in his opening report, which, among other issues, *requires* a Databricks user to *manually turn off* the Photon engine.  (Dkt. 117 at 11-13; Ex. 9, Davis Dep. (Day 1), 90:1-7.)  Mr. Davis conceded however that he "doesn't know whether any Databricks user turns off the default [P]hoton functionality" because he has no idea "what customers do or don't do."  (Ex. 9, Davis Dep. (Day 1), 116:6-11; 117:19-23.)  And as Mr. Davis further admitted, when Photon is on—which is the default for classic compute and is always the case for serverless compute—it "results in executing a [P]hoton shuffled hash join and not the Spark sort-merge join that [Mr. Davis] relied on for infringement."  (Ex. 9, Davis Dep. (Day 1), 89:8-14; *see also id.* at 94:12-17; 89:16-90:7; Ex. 10, Weissman Rebut. Rep., ¶¶ 67, 69-71.)  Faced with no evidence of a direct infringer, R2 tries to exclude all Photon opinions in an effort to save its case.  R2 does this by misreading the parties' stipulation and mischaracterizes Databricks' expert opinions.

As a preliminary matter, Databricks complied with the source code stipulation.  It requires:

> [F]or the purposes of this litigation, **the open-source Apache Spark source code files** identified in R2's Supplemental Infringement Contentions **is representative of Databricks' corresponding internal Apache Spark source code files** in the Databricks Data Intelligence Platform. Databricks agrees that **R2 is entitled to treat such open-source Apache Spark source code files as if it is Databricks' own source code** for the purposes of R2's allegations of infringement in this case. Databricks agrees that it will not use the fact that R2 relies on such open-source Apache Spark source

6

> code files, as opposed to Databricks' proprietary code files, to make its infringement allegations as the basis for any defense . . . .

(Dkt. 73 at 1.)  Here, Dr. Weissman relied on the same Apache Spark source code as R2's expert, Mr. Davis.  (*See, e.g.*, Ex. 10, Weissman Rebut. Rep., ¶¶ 63-64.)  And Dr. Weissman *never* opined that open-source Apache Spark source code does not represent Databricks' internal Spark code.

R2 latches on to the language that Databricks "will not use the fact that R2 relies on such open-source Apache Spark source code files, *as opposed to Databricks' proprietary code files*, to make its infringement allegations as the basis for any defense in this action."  (Op. Br. at 5; Dkt. 73 at 1.)  But the stipulation makes clear that "Databricks' proprietary code files" refers to "Databricks' corresponding internal Apache Spark source code files"—the express purpose of the stipulation. (Dkt. 73 at 1.)  Of numerous Databricks platform features, the stipulation does not refer to any other than Spark, much less Photon.  If it did, Databricks would not have agreed to it.[5]  The parties' stipulation regarding accused Spark code does not prevent Databricks' experts from opining that unaccused Photon functionality is properly excluded from R2's Spark-based infringement case.

Regardless, even if this stipulation extended beyond Apache Spark source code, Databricks' experts did not refer to "Databricks proprietary *code files* . . . as the basis for its defense." (Dkt. 73 at 1.)  Dr. Weissman's rebuttal opinions regarding Photon were based on (1) testing of Mr. Davis's created code, created data sets, and created configuration of the Databricks platform, and (2) publicly available documents produced over nine months ago.  (*See, e.g.*, Ex. 10, Weissman Rebut. Rep., ¶¶ 63-64, 451-452.)  Thus, R2's bare accusations that "Databricks'

---

[5] R2 originally proposed a broader stipulation that Databricks rejected—that "the open-source Apache Spark source code (including that produced by Databricks in this action) *is representative of all relevant versions of the source code for the Accused Instrumentalities*."  (Dkt. 106-5.) Databricks did not agree to this overbroad language because, as Databricks' documents make clear, Spark is one small part of the Databricks platform, and thus, cannot represent the entire platform.

*proprietary code* (Photon)" is improperly referenced "over two-hundred times" by Dr. Weissman and "over one-hundred times" by Dr. Macartney are wrong. (Op. Br. at 4.) Dr. Weissman referenced Photon as an unaccused functionality in order to show that Mr. Davis's code does not prove infringement, and as R2 admits, Dr. Macartney's opinions simply "eliminate Photon-related offerings from R2's damages analysis." (Op. Br. at 5.) This is an obvious result given Mr. Davis has no opinion that Photon infringes. (Ex. 9, Davis Dep. (Day 1), 88:7-12, 96:15-17.)

In short, the basis for Databricks' Photon-related defense is not that R2 "relies on such open-source Apache Spark source code files, as opposed to Databricks' proprietary code files, to make its infringement allegations," which the stipulation prohibits. (Dkt. 73 at 1.) It is instead that, like the vast majority of the Databricks platform features, R2 does not accuse Photon of infringement and has failed to prove infringement by Spark.

### B.    Dr. Weissman's and Dr. Macartney's opinions complied with Rule 26(e)

R2 errs when it argues that "Drs. Weissman's and Macartney's Photon opinions were not disclosed in discovery and should be stricken." (Op. Br. at 6.) "Infringement contentions serve the critical function of defining the scope of discovery," and Databricks' interrogatory responses responded to the infringement theories R2 disclosed, which focused on only Spark.[6] (*See generally*

---

[6] R2's Interrogatory No. 2 requested a description of how "each Accused Instrumentality" "performs the functions identified in R2's Infringement Contentions." (Ex. 3, Omnibus Rog Resp., 10.) Databricks explained in detail how the Databricks platform performs the accused Spark functionality. (*See id.* at 11-13.) Similarly, R2's Interrogatory No. 7 requested Databricks' "non-infring[ement]" contentions for "each Accused Instrumentality," and Databricks' detailed response identified why the accused Apache Spark functionality does not infringe. (*Id.* at 32-33; *see generally id.* at 33-92.) R2 contends that Databricks' response to Interrogatory No. 2 "contradicts" Dr. Weissman's opinions because Databricks did not mention Photon in explaining that "[t]he Databricks platform runs Apache Spark workloads." (Op. Br. at 6-7.) Nothing is contradictory about Databricks' response. The Databricks platform does run Spark as Databricks explained. (Ex. 3, Omnibus Rog Resp., 12.) And while R2 argues that its Interrogatory Nos. 2 and 7 "requir[ed] explanation of any position Databricks might take regarding Photon" (Op. Br. at 6-7), neither mention Photon, much less require an explanation of unaccused functionality. Databricks cannot be expected to divine that R2 would introduce a new infringement theory in its

Ex. 15, R2 Orig. ICs; Ex. 16, R2 1st Supp. ICs; Ex. 1, R2 2d Supp. ICs.)  *R2 Solutions LLC v. Am. Airlines, Inc.*, No. 4:22-cv- 00353-ALM, 2023 WL 3938862, at *3 (E.D. Tex. June 9, 2023).

Critically, R2 withheld during fact discovery the infringement theory Mr. Davis created for his opening report.  As explained above, Mr. Davis's new theory alleged that his created code, with Photon disabled, caused the Databricks platform to use an allegedly infringing "Sort Merge Join" strategy to join his created data sets.   While R2's infringement contentions included references to "join" and "Sort Merge Join," R2 concealed (1) Mr. Davis's created code; (2) Mr. Davis's created data sets; (3) Mr. Davis's created configuration of the Databricks platform with Photon disabled; and (4) that his created code, with Photon *turned off*, will use "Sort Merge Join" to join Mr. Davis's created data sets.  Indeed, R2's infringement contentions never even mentioned Photon.  Nor did they indicate that turning Photon *off* was a gating condition to R2's entire infringement theory.  And as Mr. Davis testified, he had already concocted this new theory weeks before the February 13, 2025 close of fact discovery and was well aware that it required turning *off* Photon.  (Ex. 9, Davis Dep. (Day 1), 95:3-96:2.)

Thus, all four Rule 37(c) factors that R2 cites weigh in Databricks' favor.  (Op. Br. at 7.) First, Mr. Davis's new theory opened the door to the Photon issue, and Databricks' first opportunity to respond was in Dr. Weissman's rebuttal report.  Second, turning off Photon is an essential condition to R2's infringement theory, and discussing that fact is essential to Databricks' defense to that theory.   Third, excluding Dr. Weissman's Photon opinions would be highly prejudicial to Databricks.  It would allow R2 to present Mr. Davis's infringement theory at trial without the jury knowing the critical fact that it requires turning *off* Photon, that there is no evidence any user has ever turned off Photon as Mr. Davis did, and that, with Photon *on*, Mr.

---

opening expert report that requires turning Photon off, nor must Databricks explain why every unaccused Databricks functionality does not infringe.

Davis's theory does not result in the Databricks platform performing the allegedly infringing functionality. Finally, there is no need for a continuance because R2 put Photon into issue, Databricks' rebuttal reports responded, and R2's technical expert provided extensive testimony about his infringement theory in his deposition. Thus, the Court should deny R2's motion to strike.

### C.    Dr. Weissman's and Dr. Macartney's opinions on Photon are reliable

Dr. Weissman's and Dr. Macartney's opinions on Photon are reliable under Fed. R. Evid. 702. Dr. Weissman relied on testing of the Databricks platform and public documents produced during fact discovery to conclude that "Photon runs by default" in Databricks classic compute and cannot be turned off in serverless compute. (Ex. 10, Weissman Rebut. Rep., ¶¶ 63-71, 120, 213.) Public documents further confirm that when Photon is on, it replaces the allegedly infringing Spark "Sort Merge Join" strategy with a Photon Shuffle Hash Join strategy for which Mr. Davis has no infringement opinion.[7] (Ex. 12, GMacartney_00000892.) Moreover, Dr. Weissman confirmed these facts through his testing of the Databricks platform (Ex. 10, Weissman Rebut. Rep., ¶¶ 69-71), and Mr. Davis testified that each of Dr. Weissman's opinions regarding Photon were correct. (*See, e.g.*, Ex. 9 (Davis Dep. (Day 1), 88:7-12; 89:8-14; 90:1-7; 92:5-15; 102:4-8.) Dr. Weissman's opinions are therefore reliable. *Harris v. BMW N. Am., LLC*, No. 4:19-cv-00016-ALM, 2020 WL 7318087, at *4 (E.D. Tex. Dec. 11, 2020) (finding expert "utilized a reliable methodology in reaching his conclusion—namely, coupling his experience and knowledge with a review of various

---

[7] R2 argues that Dr. Weissman's Photon opinions are "*per-se* unreliable and should be excluded" because he has "no opinion whether Photon infringes the '610 patent." (Op. Br. at 8-9.) But it is R2's burden to allege Photon infringes. And Mr. Davis testified he has no infringement opinion for Photon, including Photon's Shuffle Hash Join strategy. (Ex. 9, Davis Dep. (Day 1), 96:15-17). Moreover, Dr. Weissman repeatedly testified the unaccused Photon Shuffle Hash Join uses non-infringing elements like "Attribute ID" that Dr. Weissman addressed with respect to Mr. Davis's Spark infringement theory. (Ex. 11, Weissman Dep. (Day 2), 23:4-24:3, 29:7-30:5.) Thus, Dr. Weissman reliably concluded "Photon executes unaccused and non-infringing Photon functionality." (Ex. 10, Weissman Rebut. Rep., ¶ 214.)

internal documents"). Dr. Macartney in turn properly relied on Dr. Weissman's opinions to conclude that revenues from use of Photon should be excluded from any damages calculation. (*See* Ex. 13, Macartney Rebut. Rep., ¶¶ 13, 146, 192-197). At trial, R2 can "present[] contrary evidence" and "[v]igorous[ly] cross-examin[e]" Databricks' experts, but no basis exists to strike these opinions. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993).

## IV.    EXPERT OPINIONS ON RELEVANT LICENSES SHOULD BE ALLOWED

As both parties' experts have done in their reports, the licenses should be addressed in three categories: (1) licenses to ███████████████████████████ (2) licenses by Yahoo; and (3) licenses by R2 and Excalibur.[8]

### A.    Databricks' expert opinions regarding its license defenses should be allowed

First, Dr. Macartney identifies licenses to ████████████████████ ████████████████████ (Ex. 13, Macartney Rebut. Rep., ¶¶ 61, 123, 200-03.) These licenses are relevant regardless of their comparability. As explained in Databricks' motion for summary judgment, these licenses form the basis of an affirmative defense to infringement.[9] (Dkt. 120.) For example, R2 admitted that ████████████████████

████████████████████

████████████████████ (Ex. 17, R2 RFA Response, 5.) And notably, while R2's motion implicates *all* "its predecessors' licenses," Exhibit 9 to R2's motion to strike highlights the opinions it seeks to exclude but does *not* highlight Dr. Macartney's opinions that carve out damages from ████████████████████

---

[8] R2 only identifies past *licenses*. R2 makes no mention of and thus does not move to strike testimony regarding the ████████████████████. (Ex. 13, Macartney Rebut. Rep., ¶ 6, 92, 112.) Even if it did, this testimony is independently relevant to Databricks' licensing affirmative defense because ████████████████████.

[9] R2 has also cross-moved for summary judgment on the licensing defense (Dkt. 114), thus implicitly recognizing the independent relevance of these licenses.

███████████████████████████ (Dkt. 115-9 at ¶¶ 200-03.)  Given the relevance of these licenses

and lack of basis to do so, the challenged opinions should not be excluded.[10]

**B.    Databricks' expert opinions on ████████████ should be allowed**

Second, both parties' experts opine on ████████████████  Databricks'

expert's opinions are relevant to ███████████████ as the hypothetical negotiator.  Past

licenses may be properly considered, regardless of comparability, "to establish the licensing

policies and concerns of the [hypothetical licensor], and the competitive position of the parties."

*SSL Services v. Citrix Systems*, 940 F. Supp. 2d 480, 489-90 (E.D. Tex. 2013).

R2's own expert opines that while the ███████████ are "non-comparable," they

nonetheless "demonstrate ████████████████████████" (Ex.

14, Bergman Rep., ¶ 173.)  Dr. Macartney explains in his rebuttal report that Mr. Bergman's

opinion is incorrect, as the █████████ do not mention the asserted '610 patent at all and instead

demonstrate █████████████████████ (Ex. 13, Macartney Rebut. Rep.,

¶ 209.)  Dr. Macartney's opinions should be permitted, at a minimum, to rebut R2's expert's

reliance on and unsupported inferences based on these licenses.  *See Recursion Software, Inc. v.*

*Double–Take Software, Inc.*, No. 4:10-cv-403, 2012 WL 1576252, at *5 (E.D. Tex. May 4, 2012).

**C.    Non-comparable licenses should be excluded, but if they are not excluded, then Databricks' rebuttal opinions should be allowed**

Finally, both parties' experts identify past licenses granted by ███████████ (beyond

those relating to Databricks' affirmative licensing defense).[11]   Like the █████████, Mr.

---

[10]  While R2's damages expert purportedly excludes ████████████ from his
calculations (Ex. 14, Bergman Rep, ¶¶ 123-34), he relies on ███████ customer stories to
support the alleged benefits of the '610 patent.  (*Id.* ¶ 155 (identifying ████████
customers).)  Because R2 puts ████████ at issue, Databricks is further entitled to refer to
███████ in rebuttal.  (*Id.* ¶¶ 123-24.)
[11]  The ████████████████████ that are the subject of this section include those licenses with

Bergman opines that the ███████████ licenses are non-comparable.  (Ex. 14, Bergman Rep., ¶¶ 202, 206, 217.)  However, these licenses differ in that they do not involve ██████ or demonstrate its ████████ and are not comparable or otherwise relevant.  Thus, the Court should exclude them and any corresponding expert testimony from trial.  *SSL Services*, 940 F. Supp. 2d at 489.[12]

But if it is allowed, the Court should not exclude Dr. Macartney's rebuttal testimony.  *See* Order at 4, *Maxell, Ltd. v. Apple Inc.*, No. 5:19-cv-36, ECF No. 666 (E.D. Tex. Mar. 17, 2021) (excluding expert opinion regarding non-comparable licenses unless other party opens the door).  As in *Maxel*, Mr. Bergman's reliance despite the licenses' admitted non-comparability carries a high risk of prejudice and juror confusion.  If allowed at all, Databricks' expert should be permitted to provide context that ███████████████████ and were "magnitudes lower than Mr. Bergman's ████████ damages."[13]  (Ex. 13, Macartney Rebut. Rep., ¶ 210; *see also Fractus, S.A. v. Samsung Elec. Co.*, 876 F. Supp. 2d 802, 841 (E.D. Tex. 2012); *Barry v. Medtronic, Inc.*, No. 1:14-cv-104, 2016 WL 11731493 (E.D. Tex. Sept. 21, 2016).)

## V.   CONCLUSION

For the foregoing reasons, Databricks respectfully requests that the Court deny Plaintiff's motion to strike certain expert opinions.

███████████████████████ (Ex. 14, Bergman Rep., Schedule 9.)

[12] In an attempt to resolve R2's motion, Databricks offered for the parties to mutually withdraw reliance on these licenses.  R2 refused unless Databricks also stipulated to exclude █████. ████ Databricks could not agree to R2's counter because ██████████ is separately relevant to Databricks' defense as discussed in Section IV.A.

[13] This reasoning applies equally to the license agreements with Yahoo and the agreements relevant to Databricks' licensing affirmative defense.  To the extent R2 introduces *any* licensing agreement, Databricks is entitled to rebut such testimony with appropriate context, including, for example, the consideration paid and circumstances in which the agreement was reached.

Dated: May 1, 2025

Respectfully submitted,

*/s/ Vigen Salmastlian*

Michael J. Sacksteder
CA Bar No. 191605 (Admitted E.D. Texas)
Email: msacksteder@fenwick.com
Gregory Sefian
CA Bar No. 341802 (Admitted *Pro Hac Vice*)
Email: gsefian@fenwick.com
S. Emma Lee
CA Bar No. 344074 (Admitted *Pro Hac Vice*)
Email: emma.lee@fenwick.com
**FENWICK & WEST LLP**
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone:    415.875.2300
Facsimile:    415.281.1350

Vigen Salmastlian
CA Bar No. 276846 (Admitted E.D. Texas)
Email: vsalmastlian@fenwick.com
**FENWICK & WEST LLP**
801 California Street,
Mountain View, CA 94041
Telephone:    650.988.8500
Facsimile:    650.938.5200

Jessica M. Kaempf
WA Bar No. 51666 (Admitted E.D. Texas)
Email: jkaempf@fenwick.com
Jonathan G. Tamimi
WA Bar No. 54858 (Admitted E.D. Texas)
Email: jtamimi@fenwick.com
**FENWICK & WEST LLP**
401 Union Street, 5th Floor
Seattle, WA 98101
Telephone:    206.389.4510
Facsimile:    206.389.4511

Dargaye Churnet
CA Bar No. 303659 (Admitted E.D. Texas)
Email: dchurnet@fenwick.com
**FENWICK & WEST LLP**
730 Arizona Ave, 1st Floor
Santa Monica, CA 90401
Telephone:    310.434.5400

14

Jennifer Truelove
Texas Bar No. 24012906
Email: jtruelove@mckoolsmith.com
**MCKOOL SMITH P.C.**
104 E. Houston Street, Suite 300
Marshall, TX 75670
Telephone: 903.923.9000
Facsimile: 903.923.9099

Derron R. Dacus
Texas Bar No. 00790553
Email: ddacus@dacusfirm.com
**THE DACUS FIRM, P.C.**
821 ESE Loop 32, Suite 430
Tyler, Texas 75701
Telephone: 903.705.1117

*Attorneys for Defendant*
*Databricks, Inc.*

## CERTIFICATE OF AUTHORIZATION TO SEAL

Pursuant to Local Rule CV-5(a)(7)(B) that I am authorized to file the foregoing document under seal pursuant to Protective Order (Dkt. 61) because this document references Designated Material.

*/s/ Vigen Salmastlian*
Vigen Salmastlian


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 1, 2025, a true and correct copy of the above and foregoing document has been served on all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.  Additionally, I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of these documents via electronic mail per Local Rule CV-5.

*/s/ Vigen Salmastlian*
Vigen Salmastlian