█████████████████████████████

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | |
|---|---|
| R2 SOLUTIONS LLC, | |
| Plaintiff, | Civil Action No. 4:23-cv-01147-ALM |
| v. | **JURY TRIAL DEMANDED** |
| DATABRICKS, INC., | ████████████████████ |
| Defendant. | |

## OPPOSITION OF DEFENDANT DATABRICKS, INC. TO R2'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DATABRICKS' LICENSE DEFENSE BASED ON APACHE CONTRIBUTIONS

███████████████████████

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     DATABRICKS' RESPONSE TO ALLEGED STATEMENT OF ISSUES TO BE DECIDED BY THE COURT ...........................................................................2

III.    DATABRICKS' RESPONSE TO ALLEGED UNDISPUTED FACTS ...........................3

IV.     R2'S UNDISCLOSED STATUTE OF FRAUDS DEFENSE SHOULD BE STRICKEN.............................................................................................................6

V.      THE STATUTE OF FRAUDS DOES NOT PREVENT YAHOO'S GRANT OF PATENT LICENSES UNDER THE APACHE 2.0 LICENSE.........................................7

        A.    The California Statute of Frauds for "Contracts Over a Year" Does Not Apply to the Apache 2.0 License Because It Is Perpetual ......................................7

        B.    Equitable Estoppel Bars the Statute of Frauds......................................10

        C.    Yahoo Employees Licensed the '610 Patent with Actual and Ostensible Authority from Yahoo ......................................................................13

              (i)     *Actual Authority* ...................................................................14

              (ii)    *Ostensible Authority*................................................................16

VI.     UNDER R2'S INFRINGEMENT THEORY, YAHOO'S CONTRIBUTIONS TO APACHE SPARK GRANTED A LICENSE TO THE '610 PATENT ..........................17

VII.    CONCLUSION.....................................................................................................21

████████████████████████

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*All. Marc & Eva Stern Math & Sci. High Sch. v. Pub. Emp. Rels. Bd.*,
  107 Cal. App. 5th 930 (Cal. Ct. App. 2024), *review denied* (Apr. 16, 2025) .......................... 15

*Andreoli v. Youngevity Int'l*,
  3:16-cv-2922, 2021 WL 4943569 (S.D. Cal. Mar. 23, 2021) ................................................... 8

*C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*,
  213 F.3d 474 (9th Cir. 2000) ................................................................................................ 14

*Caplan v. Roberts*,
  506 F.2d 1039 (9th Cir. 1974) ............................................................................................... 13

*Chavez v. Indymac Mortg. Servs.*,
  219 Cal. App. 4th 1052 (2013) .............................................................................................. 10

*Chuck Olsen Co. v. F.P.D.*,
  No. 13-5062, 2014 WL 12258273 (C.D. Cal. Sept. 17, 2014) .............................................. 16

*Crypto Asset Fund, LLC v. OPSkins Grp. Inc.*,
  478 F. Supp. 3d 919 (C.D. Cal. 2020) ................................................................................... 14

*Fibreboard Prods., Inc. v. Townsend*,
  202 F.2d 180 (9th Cir. 1953) ................................................................................................... 8

*Hollywood Foreign Press Ass'n v. Red Zone Cap. Partners II*,
  870 F. Supp. 2d 881 (C.D. Cal. 2012) ....................................................................... 14, 15, 16

*Imperium IP Holdings v. Samsung Elec. Co. (Cayman)*,
  203 F. Supp. 3d 755 (E.D. Tex. 2016) ..................................................................................... 6

*Lamle v. Mattel, Inc.*,
  394 F.3d 1355 (Fed. Cir. 2005) ............................................................................................... 9

*Lennar Mare Island, LLC v. Steadfast Ins. Co.*,
  176 F. Supp. 3d 949 (E.D. Cal. 2016) .................................................................................... 18

*Mytee Prods., Inc. v. H.D. Prods., Inc.*,
  No. 05CV2286, 2007 WL 1813765 (S.D. Cal. June 22, 2007) ............................................ 8, 9

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co.*,
  701 F.2d 95 (9th Cir. 1983) ................................................................................................... 18

*Osmose, Inc. v. Arch Chem., Inc.*,
    No. 2:10cv108, 2010 WL 11451664 (E.D. Va. Aug. 2, 2010) ...................................................9

*Schertzer v. Bank of Am., NA*,
    109 F.4th 1200 (9th Cir. 2024) .............................................................................................19

*Smartflash LLC v. Apple Inc.*,
    No. 6:13-cv-447-448, 2015 WL 660293 (E.D. Tex. 2015) ......................................................21

*Sun Studs, Inc. v. Applied Theory Associates, Inc.*,
    772 F.2d 1557 (Fed. Cir. 1985)..............................................................................................9

*Tukes v. Richard*,
    81 Cal. App. 5th 1 (2022) ......................................................................................................12

**STATUTES**

Cal. Civ. Code § 1624(a)(1)................................................................................................................8

Cal. Civ. Code § 2316......................................................................................................................16

**OTHER AUTHORITIES**

Fed. R. Civ. P. 37.............................................................................................................................6

████████████████████████████

## TABLE OF EXHIBITS[1]

| No. | Exhibit |
|-----|---------|
| 1 | Apache License, Version 2.0, January 2004 (Databricks_R2_00090071-0075) ("Apache 2.0 license") |
| 2 | Apache Individual Contributor License Agreement executed by ██████ ██████ (ASF_R2-DB_0000001-0002) ("████ ICLA") |
| 3 | Apache Individual Contributor License Agreement executed by ██████ (ASF_R2-DB_0000003-0005) ("████ ICLA") |
| 4 | Apache Individual Contributor License Agreement executed by ██████ ██████ (ASF_R2-DB_0000006-0007) ("████ ICLA") |
| 5 | Apache Individual Contributor License Agreement executed by ████ ██████ (ASF_R2-DB_0000008-0010) ("██████ ICLA") |
| 6 | Apache Individual Contributor License Agreement executed by ██████ ██ (ASF_R2-DB_0000011-0013) ("████ ICLA") |
| 7 | Apache Individual Contributor License Agreement executed by ██████ (ASF_R2-DB_0000014-0016) ("████ ICLA") |
| 8 | Apache Individual Contributor License Agreement executed by ██████ (ASF_R2-DB_0000020-0021) ("████ ICLA") |
| 9 | Apache Individual Contributor License Agreement executed by ██████ (ASF_R2-DB_0026655) ("████ ICLA") |
| 10 | Apache Individual Contributor License Agreement executed by ██████ (ASF_R2-DB_0026656-6657) ("████ ICLA") |
| 11 | Excerpts of the Transcript of the March 25, 2025 Deposition of William Davis ("Davis Op. Dep.") |
| 12 | Excerpts of Transcript of the February 13, 2025 Deposition of ██████ ██████ |
| 13 | Excerpts of Transcript of the January 31, 2025 Deposition of ██████ ██████ |

---

[1] Each of the Exhibits listed in this table, Exhibits 1-46, is attached to the Declaration of Vigen Salmastlian.

| No. | Exhibit |
|-----|---------|
| 14 | Excerpts of the Expert Report of Jon Weissman Concerning Invalidity of U.S. Patent No. 8,190,610 ("Weissman Op.") |
| 15 | Excerpts of the Transcript of the February 12, 2025 Deposition of Douglass Cutting ("Cutting Dep.") |
| 16 | Archived Apache Spark Webpage Titled "Current Committers" (Databricks_R2_00102767-2769) ("Spark Committer List") |
| 17 | Yahoo Open Source Guide Webpage Titled "Special Recordkeeping for Special Projects" (Databricks_R2_00118512-8514) ("Yahoo Open Source Guide") |
| 18 | Apache Software Foundation Blog Post Titled "The Apache Software Foundation Announces Apache Spark as a Top-Level Project" (Databricks_R2_00097024-7025) ("Apache Spark Press Release") |
| 19 | Yahoo Press Release Titled "Yahoo! Commits to Apache Software Foundation as Platinum Sponsor" (Databricks_R2_00118660-8661) ("Yahoo Press Release") |
| 20 | Yahoo Developer Network Post Titled "The Backstory of Yahoo and Hadoop" (Databricks_R2_00091755-1757) ("Backstory of Yahoo and Hadoop") |
| 21 | Databricks' Initial Disclosures dated July 16, 2024 ("Initial Disclosures") |
| 22 | Excerpts of Databricks' Omnibus Supplemental Objections and Responses to R2's Interrogatories (Nos. 1-36) ("Omnibus Supplemental Responses") |
| 23 | R2's Third Supplemental Objections and Responses to Databricks' Second Set of Interrogatories (No. 25) ("Supp. Resp. to Interrog. 25") |
| 24 | ████████████████████████████████████ |
| 25 | Yahoo Presentation Titled "Hadoop and Spark Join Forces at Yahoo" (Databricks_R2_00096253-6271) ("Hadoop and Spark Join Forces at Yahoo") |
| 26 | Apache Software Foundation Webpage Titled "Frequent Questions About Apache Licensing" (R2_DB_126730-6740) ("Apache FAQ") |
| 27 | Compiled Apache Spark GitHub Webpages Showing Yahoo Employee Contributions (Databricks_R2_00118771-8844) ("Apache Spark Contributions") |
| 28 | Compiled CaffeOnSpark GitHub Webpages Showing Yahoo Employee Contributions (Databricks_R2_00118845-8861) ("CaffeOnSpark Contributions") |

████████████████████████████████████████████████

| No. | Exhibit |
|-----|---------|
| 29 | Excerpts of the Expert Report of Gareth Macartney, Ph.D. ("Macartney Rep.") |
| 30 | Excerpts of the Expert Report of Jim W. Bergman ("Bergman Rep.") |
| 31 | Apache Software Foundation Blog Post Titled "The Apache Software Foundation Celebrates 20 Years of Community-Led Development 'The Apache Way'" ██████████████████ ("Apache Community-Led Development") |
| 32 | Excerpts of Expert Report of William Davis Concerning Infringement of U.S. Patent No. 8,190,610 ("Davis Op.") |
| 33 | Excerpts of the Transcript of the March 27, 2025 Deposition of William Davis ("Davis Rebut. Dep.") |
| 34 | Commit to RDD.scala by █████████ (Databricks_R2_00116703-6712) ("RDD.scala") |
| 35 | Commit to PairRDDFunctions.scala by █████████ (Databricks_R2_00116732-6733) ("PairRDDFunctions.scala") |
| 36 | Commit to ShuffleHandle.scala by █████████ (JWeissman_00006422-6423) ("ShuffleHandle.scala") |
| 37 | Apache Spark File ShuffleExchange.scala (Databricks_R2_00117414-7419) (ShuffleExchange.scala) ("ShuffleExchange.scala") |
| 38 | Excerpts of the Transcript of the March 21, 2025 Deposition of Jon Weissman ("Weissman Dep.") |
| 39 | Commit to ZippedPartitionsRDD.scala by █████████ (Databricks_R2_00098922-8925) ("ZippedPartitionsRDD.scala") |
| 40 | Commit to ZippedRDD.scala by █████████ (Databricks_R2_00098908-8909) ("ZippedRDD.scala") |
| 41 | Commit to DAGScheduler.scala by █████████ (JWeissman_00000110-0126) ("DAGScheduler.scala") |
| 42 | Apache Hadoop Webpage Titled "Apache Hadoop NextGen MapReduce (YARN)" (Databricks_R2_00116132-6133) ("MapReduce 2.0") |
| 43 | Excerpts of infringement contentions served by R2 in *R2 Solutions LLC v. Cloudera, Inc.*, No. 1:23-cv-1205 (W.D. Tex.) (R2_DB_105120, 5218) ("Cloudera Contentions") |

███████████████████████████████████

| No. | Exhibit |
|-----|---------|
| 44 | Excerpts of infringement contentions served by R2 in *R2 Solutions LLC v. JP Morgan Chase & Co.*, No. 21-cv-00174 (E.D. Tex.) (R2_DB_065079, 5087) ("JP Morgan Contentions") |
| 45 | Yahoo Developer Network Blog Post Titled "CaffeOnSpark Open Sourced for Distributed Deep Learning on Big Data Clusters" (Databricks_R2_00118639-8644) ("CaffeOnSpark Open Sourced") |
| 46 | Archived Webpage of CaffeOnSpark GitHub Repository (Databricks_R2_00108087-8088) ("CaffeOnSpark Archive") |

██████████████████████████████████

## I.     INTRODUCTION

R2's motion for summary judgment on Databricks' Apache 2.0 license seeks to dismantle the core principles on which Apache Software Foundation ("ASF") was built.  Over the last thirty years, thousands of contributors, including Fortune 500 companies and individuals, have contributed hundreds of millions of lines of code to more than 350 open-source projects under the Apache 2.0 license, including the Apache Spark project at issue in this case.  This license is the cornerstone of ASF that makes all Apache software free to use, improve upon, and commercialize. Companies and individuals rely on the promise contributors make under this license and collectively work to improve Apache projects, often turning projects such as Apache Spark into industry standards.  For over a decade, ASF has required that a company *either* execute a Corporate Contributor License Agreement ("CCLA") *or* that its employees execute an Individual Contributor License Agreements ("ICLA"), both of which trigger a patent license when a company or its employees contribute to an Apache project under the Apache 2.0 license.

When R2 purchased the '610 patent in 2020 from Excalibur—an entity holding Yahoo patents—R2 agreed ████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████    Indeed, starting in 2006, Yahoo began contributing the technology it developed in the "big data" field, including the MapReduce technology of the '610 patent, to ASF open-source projects under the Apache 2.0 license.  Yahoo's "big data" open-source strategy started with contributing Apache Hadoop to ASF in 2006 and continued with contributing to dozens of related Apache projects, including the accused Apache Spark project.  As ██████ ████████████████████████████████████████████████ testified, Yahoo established clear open source policies in the area of "big data," hired hundreds of engineers with the express purpose of contributing to and improving Apache projects including Spark, approved

employee ICLAs so that employees could contribute to ASF projects under the Apache 2.0 license, published information about Yahoo's Apache open-source contributions on its website, and presented on these contributions at conferences. R2 now seeks to renege on Yahoo's patent licenses triggered by Yahoo's open-source contributions under the Apache 2.0 license.

As discussed below, contrary to R2's argument, the Statute of Frauds does not apply, and even if it did, Yahoo's employees acted with Yahoo's authority in entering the Apache-required ICLAs that bound Yahoo to the terms of the Apache 2.0 license. This evidence, at a minimum, creates a genuine dispute of fact that precludes summary judgment. Moreover, R2's requested relief—a holding that that Yahoo employees' open-source contributions did not trigger the Apache 2.0 license absent an express writing approving each and every employee contribution—would result in unconscionable harm. It would expose nearly all companies and individual users of Apache open-source projects to patent lawsuits, which would negate the purpose of ASF and the safe harbor the Apache license provides for development and use of open-source Apache projects.

R2's attempt to minimize Yahoo's contributions to Apache Spark also fails. (Mot. at 17.) Yahoo made hundreds of contributions to Apache Spark, including to the very functionality R2 relies on for infringement, and the Apache 2.0 license should therefore apply.

## II.    DATABRICKS' RESPONSE TO ALLEGED STATEMENT OF ISSUES TO BE DECIDED BY THE COURT

1.    The issue to be decided by the Court is whether R2 has proven that no genuine issue of material fact exists that Yahoo did not approve employee ICLAs and contributions to Apache Spark in writing, that the Statute of Frauds renders any Yahoo patent grant under the Apache 2.0 license unenforceable, that equitable estoppel does not bar the Statute of Frauds, and that Yahoo employees did not act with Yahoo's authority in entering ICLAs and the Apache 2.0 license.

2.    The issue to be decided by the Court is whether R2 has proven that no genuine issue

█████████████████████████████████████

of material fact exists that Yahoo's contributions in combination with Apache Spark do not "necessarily infringe" the '610 patent, in view of R2's theory that Apache Spark infringes.

## III.    DATABRICKS' RESPONSE TO ALLEGED UNDISPUTED FACTS

Databricks does not dispute paragraphs 1-12, 14-19, 21, 22, and 26-29 for purposes of this motion.  Databricks disputes paragraph 13 because a Licensor is *any* "copyright owner or entity authorized" to grant the License, which in this case includes Yahoo.  And Yahoo together with and through its employees are the "Contributor(s)" under the Apache 2.0 license.  Databricks disputes paragraphs 13 and 20 as R2 partially quotes defined Apache 2.0 license terms.  Databricks disputes paragraph 23 as none of the language R2 quotes is part of any operative Apache agreement, including the Apache 2.0 license, CCLAs, or ICLAs.  Databricks disputes paragraph 24 because its technical expert, Dr. Weissman, identified additional Yahoo employees with signed ICLAs that contributed to Apache Spark, including, for example, ███████ and ████████. (Ex. 14, Weissman Op., ¶ 996; Ex. 9-10, ████ and ████████ ICLAs, ASF_R2-DB_0026655-57.)

Databricks disputes paragraph 25 because at least ████████ a Yahoo engineer that was hired to manage Yahoo's internal open-source Apache Spark team, testified that he received written approval for his Apache-required ICLA to contribute to Apache Spark. (Ex. 13, ████ ██ at 236:18-237:6, 219:2-220:1.)  Databricks further disputes paragraph 25 because Yahoo employees acted with authority to bind Yahoo (and R2 as its successor).  (*See* Section V.C, *infra*.) Yahoo hired "hundreds of engineers who contributed [to] Open Source," including on a dedicated "Spark team." (Ex. 12, ████████ at 33:19-34:10.)  Yahoo hired engineers such as ████████ ████████████████ with the purpose of contributing to open-source Apache Spark. (*Id.* at 26:5-19, 15:1-24.)  ████████ testified that "ever since Spark became an open source project" he "contributed to [the] project on behalf of Yahoo." (Ex. 13, ████████ 17:22-18:5.)  And ██ ████ confirmed that "all of ████████ contributions [to Apache Spark] would have been

approved and encouraged by Yahoo." (Ex. 12, ██████. at 74:7-13; *see also id.* at 74:15-75:13 (confirming the same for ████████ contributions to Apache Spark).)

Yahoo also granted its employees authority to enter into ICLAs and contribute to Apache open-source projects under the Apache 2.0 license by establishing clear open-source policies in the field of "big data" including Apache Spark. (Ex. 14, Weissman Op., ¶¶ 995-97, 1024.) Yahoo published an "Open Source Guide" on its "GitHub" webpage stating that Yahoo was actively contributing to over a *dozen* Apache projects, including "Spark," recognized that "Apache requires contributors to sign CLAs" and confirmed it had "dozens of active participant[s]" including "employees [serving as] Project Management Committee (PMC) members, chairs, or committers." (Ex. 17, Yahoo Open Source Guide, Databricks_R2_00118512.) As ██████ testified, Yahoo developed "zones of operation" for its open-source activities, "big data was a very well-known zone of operation," Yahoo "absolutely wanted" its "big data technology to be in the Open Source community," and Yahoo "never denied" an employee request to contribute to Apache Spark. (Ex. 12, ██████ at 23:22-24:6, 129:10-17.) ██████ confirmed that this "Yahoo! open-source policy…was [] commonly known and understood by Yahoo! employees," was "communicated as part of onboarding to teams" that worked on Apache projects, and was "communicated by management" to Yahoo employees. (Ex. 13, ██████. at 166:2-20.) Moreover, ██████ maintained a "list" of approved contributors, including for employees "hired specifically to work on [Apache] projects" such as ██████████ "whose job was to contribute to Apache Spark." (Ex. 12, ██████. at 24:7-26:18.) For "big data" such as Apache Spark, Yahoo responded to employee contribution requests by saying "great, go for it." (*Id.* at 84:6-14; *see also id.* at 128:10-23 (Yahoo employee contributions to "big data" and Apache Spark had a "green light with a…hit the accelerator" because Yahoo "need[ed] this space for [it] to grow),

126:16-20 (Yahoo had a "low bar to approve employee contributions" to Apache Spark).) By contrast, for "search" and "ad related technologies, Yahoo avoided contributing to Open Source projects in those spaces because they wanted "patent protection." (*Id.* at 83:22-84:5.)

Yahoo also publicized its commitment to Apache open-source projects, including Spark. (Ex. 14, Weissman Op., ¶¶ 998-1024, 1183-1192.) Yahoo sent its engineers to conferences to promote Yahoo's open-source strategy and organically recruit new hires for Yahoo's open-source teams. (Ex. 12, ███████ at 8:15-17; 25:13-21.) Yahoo encouraged employees to serve as "Project Management Committee" members on Apache projects so that Yahoo had "influence over [] features" and "could help steer the decisions and how the open source project moved forward." (Ex. 13, ███████ at 43:19-44:13.) In fact, with Yahoo's encouragement, ███████ served as a PMC member for the Apache Spark project and was listed as a "Yahoo!" committer on the Apache Spark project website. (*Id.* at 43:6-17; Ex. 16, Spark Committer List, Databricks_R2_00102767.) And Yahoo's leadership touted in press releases its "leading role in evolving…big-data technologies, including Spark" by making "significant contributions to the development of Spark." (Ex. 18, Apache Spark Press Release, Databricks_R2_00097024.) Mr. Cutting—a former Yahoo employee, founder of Apache Hadoop, and Board Member of ASF— testified that "press releases by Yahoo embracing Apache" and "donations by Yahoo to Apache" were examples of Yahoo of providing "written endorsements and support of Apache's mission [] and use of its license." (Ex. 15, Cutting Dep. at 137:12-15; Ex. 19, Yahoo Press Release, Databricks_R2_00118660 (announcing platinum sponsorship of ASF).)

Moreover, Yahoo's extensive contributions to Apache open-source projects yielded significant benefits to its business. Yahoo was able to: "recruit[] world class scientists"; encourage other companies to use and improve open-source projects by adding features that Yahoo did not

need to build itself; encourage collaboration between companies on projects like Apache Spark, which turned these projects into "industry standards" and helped Yahoo "avoid[] obsolescence"; and improve its reputation by garnering "good will from doing good." (Ex. 14, Weissman Op., ¶¶ 1001-1008; Ex. 20, Backstory of Yahoo and Hadoop, Databricks_R2_00091756; Ex. 12, ████████ at 51:13-58:18; Ex. 13, ████████ at 158:17-165:11.)

## IV. R2'S UNDISCLOSED STATUTE OF FRAUDS DEFENSE SHOULD BE STRICKEN

R2 forfeited its ability to raise the Statute of Frauds by withholding it during discovery. (Mot. at 14.) R2 had notice of Databricks' Apache license defense by July 17, 2024, as Databricks included it in its initial disclosures, and provided numerous responses to R2 interrogatories explaining the basis for this defense. (Ex. 21, Initial Disclosures at 3; Ex. 22, Omnibus Supplemental Responses at 130-31, 145-148, 152-155.) Databricks also served an interrogatory requesting that R2 identify "the full factual and legal basis for [its] contention" "whether or not the Apache 2.0 License extends a license to the '610 patent that covers the accused products"—i.e., Apache Spark. (Ex. 23, Supp. Resp. to Interrog. 25.) R2 *never* responded that the California Statute of Frauds purportedly bars the Apache 2.0 license. (*Id.* at 4.) Databricks' first opportunity to respond to R2's Statute of Frauds argument is in this opposition, and thus, the argument is untimely, improper, and should be stricken. If R2 had met its disclosure obligation, Databricks would have conducted additional discovery, and would have included additional analysis in its expert reports addressing this issue. *Imperium IP Holdings v. Samsung Elec. Co. (Cayman)*, 203 F. Supp. 3d 755, 760 (E.D. Tex. 2016) (affirmative defense was waived where respondent "was not [afforded] sufficient time to respond to the defense" and "to take discovery on the specific issue"); Fed. R. Civ. P. 37.

██████████████████████████████████████████

## V.    THE STATUTE OF FRAUDS DOES NOT PREVENT YAHOO'S GRANT OF PATENT LICENSES UNDER THE APACHE 2.0 LICENSE

### A.    The California Statute of Frauds[2] for "Contracts Over a Year" Does Not Apply to the Apache 2.0 License Because It Is Perpetual

There is no dispute that R2's purchase of the '610 patent ███████████████

████████████████████████████████████████████████████████████

███████ ███████████████████████████████████████  R2 argues that the Statute

of Frauds renders ██████████████ unenforceable because allegedly "there is no evidence

that the Apache 2.0 license or the Apache ICLAs were ever signed by Yahoo."  (Mot. at 16.)

As a preliminary matter, R2 ignores testimony by Yahoo employees that Yahoo's OSPO

approved employee contributions in writing.  Specifically, ████████████ a Yahoo engineer

that led Yahoo's open-source Apache Spark team and contributed to Apache Spark, testified that

he not only received "verbal approval from [his] manager and everybody in the team" but that he

also "*sent* [his] CLA to…the head of the open source program office, *and got confirmation back*

that it was okay to send to Apache."  (Ex. 13, ███████ at 236:18-237:6.)  In fact, ███████

testified that his ICLA was approved by "email."  (*Id.* at 219:2-220:10.)  Moreover, ███████

"*job* was to contribute to Open Source Spark."  (Ex. 12, ████████ at 26:5-8; Ex. 13, ███████

███ at 19:21-20:21.)  █████████████████████████████ corroborated this

testimony.  (Ex. 12, ████████ at 15:10-14; *see also id.* at 74:7-13 (contributions that ███████

███ made to Apache Spark were "approved and encouraged by Yahoo").)  Yahoo also

encouraged ████████ to serve as an Apache Spark PMC member, so that Yahoo could have

"influence over [] features" and "could help steer…how the open source project moved forward."

(Ex. 13, ████████. at 43:19-44:13.)  And ████████ was identified as a "Yahoo!" committer

---

[2] R2 contends that California law applies to the interpretation of the Apache 2.0 license agreement. (Mot. at 11-13.)  Databricks applies California law for purposes of responding to this motion.

on the Apache Spark project website. (Ex. 16, Spark Committer List, Databricks_R2_00102767.) Thus, there is a dispute of fact of *how* Yahoo approved contributions, which a jury must resolve.

While the California Statute of Frauds ordinarily covers an agreement "that by its terms is not to be performed within a year from the making thereof," the rule applies only where "*by its terms* it is *impossible* for performance in the [year-long] period." *Andreoli v. Youngevity Int'l*, 3:16-cv-2922, 2021 WL 4943569, at *4 (S.D. Cal. Mar. 23, 2021) (quoting *Mytee Prods., Inc. v. H.D. Prods., Inc.*, No. 05CV2286, 2007 WL 1813765, at *5 (S.D. Cal. June 22, 2007 (internal quotations omitted, emphasis in original)); Cal. Civ. Code § 1624(a)(1). The Statute of Frauds is "literally and narrowly interpreted" and "*the slightest possibility that it can be fully performed within one year*" is sufficient to satisfy the doctrine. *Mytee*, 2007 WL 1813765 at *5. Moreover, the Statute of Frauds does not apply where "the period of performance is *indefinite*." *Andreoli*, 2021 WL 4943569 at *4 (emphasis in original) (quoting *Mytee*, 2007 WL 1813765 at *5); *see also Fibreboard Prods., Inc. v. Townsend*, 202 F.2d 180, 183 (9th Cir. 1953) ("an oral contract for 'permanent employment' or of other indefinite duration does not come within the Statute").

The *Mytee* case is instructive. Mytee argued that the Statute of Frauds barred an oral license for use of its trademark. 2007 WL 1813765 at *5. The court denied summary judgment because there was "a genuine issue of fact as to whether the alleged oral license was for an indefinite period." *Id.* "[A]lthough the parties anticipated defendants' use of the Mytee trademark would be about a year, '[Mytee] put no express time limit or other limitations' on defendants' use of the Mytee trademark," meaning that plaintiff's period of performance was indefinite. *Id.* Mytee therefore "failed to demonstrate…the oral agreement [was] barred by the statute of frauds." *Id.*

As in *Mytee*, R2 cannot show that the Apache 2.0 license and Yahoo employee ICLAs are barred by the Statute of Frauds, because the period of performance is indefinite. (Ex. 1, Apache

████████████████████████████████

2.0 License, Databricks_R2_00090072.)  As R2 admitted, "the Apache 2.0 license and Apache ICLAs both grant a '*perpetual*' and 'irrevocable' license to any patent claims within their scope." (Mot. at 14.)  Because perpetual licenses have "no express time limit or other limitations," they are indefinite and not subject to the Statute of Frauds.  *Mytee*, 2007 WL 1813765 at *5.

To the extent R2 argues that the license period is definite because the '610 patent expires in 2029, this argument should be rejected.  The Apache Grant of Patent License applies to "those patent claims licensable by such Contributor"—meaning that the duration of the license is not tied to the '610 patent alone, but rather, applies to *any and all* patent claims licensable by the contributor, which inherently has an indefinite scope.[3]    (Ex. 1, Apache 2.0 License, Databricks_R2_00090072.)  And as ASF explains, the patent grant term is indefinite because "licensable patent claims include those that you acquire in the future, as long as they read on your original contribution as made at the original time."  (Ex. 26, Apache FAQ, R2_DB_126736.)

To the extent that R2 argues that performance of the Apache 2.0 license and ICLAs within a year was "impossible," that creates a dispute of fact.  The license could include patents that expire within a year, and thus, there is a at least "the slightest possibility that [the license] can be fully performed within one year."  Additionally, Yahoo employees such as ████████ and ████ ████████ actually made dozens of contributions to Apache Spark under the Apache 2.0 license

---

[3] R2's reliance on *Sun Studs, Inc. v. Applied Theory Associates, Inc.* is misplaced.  772 F.2d 1557, 1562-63 (Fed. Cir. 1985).  There, the patent license "extend[ed] for the terms of *the patents*…and thus *by its own terms* [was] not capable of performance within one year."  *Id.*  Here, the Apache 2.0 license applies to any "patent claims licensable" by a contributor, making the license term inherently indefinite.  (Ex. 1, Apache 2.0 License, Databricks_R2_00090072.)  The other cases R2 cites are similarly inapposite because the terms of those agreements provided a definite duration for performance.  *Lamle v. Mattel, Inc.*, 394 F.3d 1355, 1361 (Fed. Cir. 2005) ("alleged oral agreement for a three year license"); *Osmose, Inc. v. Arch Chem., Inc.*, No. 2:10cv108, 2010 WL 11451664, at *1 (E.D. Va. Aug. 2, 2010) (addressing a dispute over a "multi-year patent licensing agreement" for specific patents "during settlement negotiations").

████████████████████████████████

within a year of receiving Yahoo approval and executing their ICLAs.  (Exs. 5, 7, ████

and ████ ICLAs, ASF_R2-DB_0000008-10, 14-16; Ex. 27, Apache Spark Contributions,

Databricks_R2_00118781-8844.)

### B.    Equitable Estoppel Bars the Statute of Frauds

A party is estopped from asserting the Statute of Frauds "where an *unconscionable injury*

would result from denying enforcement after [the other] party has been induced to make a serious

change of position in reliance on the contract *or* where *unjust enrichment* would result if a party

who has received the benefits of the other's performance were allowed to invoke the statute."

*Chavez v. Indymac Mortg. Servs.*, 219 Cal. App. 4th 1052, 1058 (2013) (emphasis added).

Equitable estoppel applies where (1) a promisor is apprised of the facts; (2) the promisor

knowingly intends their conduct be acted upon, or acts such that the promisee has a right to believe

it was so intended; (3) the promisee is ignorant of the true state of facts; and (4) the promisee relies

upon the conduct to their injury.  *Id.*  As Dr. Weissman explains at length in his opening report,

Yahoo established a clear open-source policy in the area of "big data," approved contributions to

Apache Spark under this policy, and extensively published about its policies and contributions.

The open-source community relied on Yahoo's actions.  (Ex. 14, Weissman Op., ¶¶ 993-1013.)

Thus, estoppel applies.

First, Yahoo as the promisor was apprised of the scope of the Apache 2.0 license and the

implication of contributing under the license.  Yahoo understood that "by contributing to the

Apache Open Source Spark project that it would be granting to the Open Source community *a*

*license to its patents that covered Spark.*"[4]  (Ex. 12, ████ at 20:20-25; *see also id.* at 72:2-

5 ("we understood that once we're touching Spark…we are in with our—our copyright license and

---

[4] Unless otherwise noted, all emphasis is added.

██████████████████████████████████████████

the—and patent grants"), 65:9-17.)    And with that awareness, Yahoo not only approved contributions to Apache Spark between 2010 and 2016, but even hired Yahoo engineers such as ███████████████████████████████ to a dedicated Yahoo Apache Spark team with the specific purpose of contributing to Apache Spark.  (*Id.* at 15:1-24, 26:5-18, 33:19-34:10.) Yahoo also built an Open Source Program Office to "simplify" the process of approving Yahoo employee ICLAs and open-source contributions.  (*Id.* at 125:4-10, 126:11-20 (testifying "*Apache Spark* [is] an example of an Open Source project Yahoo was contributing to before 2016 that *had a low bar to approve employee contributions*").)  Yahoo did this because it "believe[d] in the ethos of contributing" to open source, "funded activities in Open Source in the world of Apache" and "wanted to be known for being part of seeing those ecosystems grow." (*Id.* at 40:16-41:13.)  And Yahoo's leadership gained this recognition by extensively publishing about its open-source commitment and contributions—including to Apache Spark—on the Yahoo Developer Network blog, creating podcasts, and speaking at external conferences and events, including at the White House.  (Ex. 14, Weissman Op., ¶¶ 1009-1013.)  Yahoo also published an "Open Source Guide" confirming that Yahoo was actively contributing to over a *dozen* Apache projects, including "Spark," recognized that "Apache requires contributors to sign CLAs" and confirmed it had "employees [serving as] Project Management Committee (PMC) members, chairs, or committers." (Ex. 17, Yahoo Open Source Guide, Databricks_R2_00118512.)    And ████████████████ Distinguished Architect at Yahoo, said 'Yahoo has played a leading role in evolving…big-data technologies, including Spark…[and] made *significant contributions to the development of Spark*." (Ex. 18, Apache Spark Press Release, Databricks_R2_00097024.)

Second, Dr. Weissman opined that Yahoo intended for the open-source community, including Databricks, to act on Yahoo's open-source contributions.  (Ex. 14, Weissman Op.,

¶¶ 1001-08.)  As Yahoo explained in a publication, Yahoo's open-source contributions provided numerous benefits, including recruiting world class scientists that were attracted to open source, encouraging the open-source community to develop and improve open-source projects that Yahoo contributed to, avoiding obsolescence by encouraging widespread adoption of Apache projects as industry standards, and developing good will and a positive reputation from its open-source activities.  (*Id.*; *see also* Ex. 20, Backstory of Yahoo and Hadoop, Databricks_R2_00091755-1756; Ex. 12, ███████ at 51:13-58:18; Ex. 13, ███████ at 158:9-165:11.)  Third, the open-source community, including Databricks, was unaware whether Yahoo approved its employees' open-source contributions orally or in writing.  Finally, Databricks and many other companies relied on Yahoo's open-source representations to their injury.  Indeed, Databricks has invested significant resources in the development and implementation of Apache Spark, and Databricks has suffered financial harm as a result of defending against R2's claim that open-source Apache Spark infringes the licensed '610 patent.  *Tukes v. Richard*, 81 Cal. App. 5th 1, 26 (2022) ("allegations of substantial investment made by the [promisee] in reliance on the [promisor's] promise— whether in time, effort, or money—may permit the trier of fact to consider a claim of estoppel").

Moreover, unconscionable injury would result if R2 were permitted to invoke the Statute of Frauds after Yahoo and hundreds of its employees expended significant time and resources over the course of many years to establish Yahoo's open-source policies, extensively contribute to dozens of Apache projects including Apache Spark under those policies, and thereby convince the open-source community to reasonably rely on Yahoo's actions under the Apache 2.0 license. Today, Databricks and thousands of other companies, including 80% of the Fortune 500, use Apache Spark on the shared understanding that it is open source, and that all contributors have granted licenses to their patents that cover the project.  (Ex. 29, Macartney Rep., ¶ 31, 51, 64; Ex.

██████████████████████████████████████████████

30, Bergman Rep., ¶ 83.)  Looking beyond Apache Spark, applying the Statute of Frauds to void approved employee ICLAs and contributions, simply because there is not a written company approval for each employee ICLA and contribution, would destabilize the entire open-source policy that underlies 30 years of Apache projects, and the open-source community's reliance on the Apache 2.0 license.  (Ex. 31, Apache Community-Led Development█████████████████

███)  Indeed, Apache agreements have always included the option of *either* executing a Corporate Contributor License Agreement *or* allowing a company's employees to execute ICLAs as Yahoo did here.  (Ex. 14, Weissman Op., ¶¶ 995-97.)  R2's assertion that the Statue of Frauds renders ICLAs unenforceable would expose companies and individuals to widespread liability for patent infringement and negate the safe harbor created by the Apache 2.0 license.[5]  The time and cost Databricks continues to expend defending this action is just a small fraction of the unconscionable injury and unjust enrichment that applying the Statute of Frauds would set in motion.  This Court should therefore find that R2 is estopped from asserting the Statute of Frauds.  At the very least, "estoppel is a question for the trier of fact," and the above disputed facts preclude summary judgment.  *Caplan v. Roberts*, 506 F.2d 1039, 1042 (9th Cir. 1974).

### C.    Yahoo Employees Licensed the '610 Patent with Actual and Ostensible Authority from Yahoo

---

[5] Yahoo anticipated the harm that could result from patent lawsuits targeting open-source projects and actively worked to prevent this reality.  ████████████ testified that Yahoo's open-source strategy often involved filing patents *before* making open-source contributions so that it was clear Yahoo's contributions granted the open-source community a license to those patents.  (Ex. 12, ████████ at 130:2-21.)  Thus, it is not surprising that Yahoo never filed a lawsuit alleging that Apache Spark or any other open-source project it contributed to infringes its patents.  (Ex. 13, ████████ at 100:1-101:17; *see also* Ex. 12, ████████ at 67:9-18 ("There isn't a scenario where Yahoo would have sued an Open Source project…that would be like throwing a stone into the well that you drink from."); Ex. 15, Cutting Dep. at 126:4-13.)  And as ████████ testified, "it would be fundamentally unfair for Yahoo to make these projects publicly available for free, wait for companies to adopt them as industry standards, then sue them for patent infringement." (Ex. 13, ████████ at 163:22-164:6; *see also* Ex. 15, Cutting Dep. at 126:14-127:7 (testifying that would have been a "scandal" and "duplicitous behavior")

███████████████████████████████

Even if the Statute of Frauds applies (and it does not), that doctrine is satisfied by written agreements of Yahoo's agents—i.e., the ICLAs executed by Yahoo employees.  "Under California law, an agent can enter a binding contract on behalf of its principal through actual or ostensible authority."  *Crypto Asset Fund, LLC v. OPSkins Grp. Inc.*, 478 F. Supp. 3d 919, 926 (C.D. Cal. 2020).   Here, Yahoo specifically hired, compensated, and designated employees to make contributions to Apache Spark—including ████████████████████████████ ███████████████████████████████████████ ████████████.  (Exs. 2-10, Yahoo ICLAs.)  These employees signed the Apache-required ICLA, which includes an express Grant of Patent License of all patents licensable by "the copyright owner *or legal entity authorized by the copyright owner* that is making this Agreement with the Foundation."  (*Id.*)  And each of these Yahoo employees represented that they were "legally entitled to grant the above license" whether through Yahoo's "permission to make Contributions on [Yahoo's] behalf," or because Yahoo "waived such rights." (*Id.*)  Yahoo is therefore bound by the Apache 2.0 License Grant because its employees had both actual and ostensible authority to enter into these agreements.  Moreover, "the extent of an agent's authority is a question of fact and should not be decided on summary judgment."  *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000).

**(i)**   *Actual Authority*

An agent has actual authority to bind their principal where the "principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess" such authority.  *Hollywood Foreign Press Ass'n v. Red Zone Cap. Partners II*, 870 F. Supp. 2d 881, 928 (C.D. Cal. 2012) (citing Cal. Civ. Code § 2316; *Tomerlin v. Canadian Indem. Co.,* 61 Cal.2d 638, 644, 39 Cal.Rptr. 731, 394 P.2d 571 (1964)). "Because an actual agent is employed by the principal, the primary inquiry…is whether the agent was acting within the

scope of his or her authority." *All. Marc & Eva Stern Math & Sci. High Sch. v. Pub. Emp. Rels. Bd.*, 107 Cal. App. 5th 930, 967 (Cal. Ct. App. 2024), *review denied* (Apr. 16, 2025).

Yahoo intentionally conferred on its employees actual authority to contribute to open-source projects including Apache Spark, and to execute the required ICLA that triggered the Apache 2.0 license. Indeed, Yahoo senior leadership at the time understood the terms of the Apache 2.0 license and that allowing employee contributions to Apache Spark would "grant[] to the Open Source community a license to [Yahoo] patents that covered Spark." (Ex. 12, ███ ███ at 20:20-25; *see also id.* at 128:10-23.) And with that understanding, Yahoo employed engineers like ████ and ██████ to "contribut[e] to Open Source Spark," and further approved the Apache-required ICLAs so they could contribute to Apache Spark on Yahoo's behalf under the Apache 2.0 license. (*Id.* at 15:1-24; *see also id.* at 26:5-18 (same); Ex. 13, ███ ███ at 236:18-237:14 (testifying his and his colleagues' Apache Spark contributions were approved by Yahoo's "head of the open source program office" "and *got confirmation back* that it was okay to send [the ICLA] to Apache").) Indeed, as ██████ testified, it was his job at Yahoo to contribute to Apache Spark, and Yahoo leadership expressly directed him to do so. (Ex. 13, ██████ at 208:20-209:17.) Moreover, each Yahoo employee that executed an Apache ICLA attested in those agreements that they had the authority to bind Yahoo—meaning that Yahoo employees undoubtedly had authority to make open-source contributions and thereby license Yahoo patents. (Exs. 2-10, Yahoo ICLAs.) R2 cannot now renege on Yahoo's commitment by calling into question whether Yahoo signed an agreement because it was Yahoo's responsibility as a principal to exercise ordinary care in establishing the actual authority possessed by its agents. *HFPA*, 870 F. Supp. 2d at 928. Thus, there is a material dispute of fact whether Yahoo is bound by either "intentionally, or by want of ordinary care, allow[ing]" its employees to believe they

15

████████████████████████████████████

possessed the actual authority to bind Yahoo under the Apache 2.0 license.  Cal. Civ. Code § 2316.

**(ii)**    *Ostensible Authority*

An agent has ostensible authority if its "principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess" such authority.  *HFPA*, 870 F. Supp. 2d at 929 (quoting Cal. Civ. Code § 2317).  Ostensible authority requires "conduct by the *principal* which causes a third party to reasonably believe that the agent has authority."  *Id.*  *Chuck Olsen Co. v. F.P.D.* is instructive.  No. 13-5062, 2014 WL 12558273 (C.D. Cal. Sept. 17, 2014).  There, the court found that an employee had ostensible authority to enter transactions even though the employee "admitted that he was acting outside the scope of his actual authority when he purchased [] 29 truckloads of table grapes."  *Id.* at *4.  Because the employer "held [the agent] out as one of its agents to the government and to the public" and the employee had a "decade-long history of purchasing produce for [the employer]" it was "reasonable for [the third party] to believe that the scope of [the employee's] authority extended to the purchase of table grapes for [the employer]."  *Id.* at *5.

As explained in Section III, the overwhelming evidence shows that Yahoo employees acted with ostensible authority to bind Yahoo under the Apache 2.0 license.  First, Yahoo made clear to the open-source community that its employees were acting as its agents.  Yahoo published an "Open Source Guide" on its "GitHub" webpage stating that Yahoo was actively contributing to over a *dozen* Apache projects, including "Spark" and confirmed it had "dozens of active participant[s]" including "employees [serving as] Project Management Committee (PMC) members, chairs, or committers."  (Ex. 17, Yahoo Open Source Guide, Databricks_R2_00118512.)  With Yahoo's encouragement, ████████ served as a PMC member for the Apache Spark project and was listed as a *"Yahoo!" committer* on the Apache Spark project website.  (Ex. 13, ████████ ████ 43:6-17; Ex. 16, Spark Committer List, Databricks_R2_00102767.)  Additionally, Yahoo

16

published articles and gave presentations about its "significant contributions to the development of Apache Spark." (Ex. 18, Apache Spark Press Release, Databricks_R2_00097024; *see also* Ex. 25, Hadoop and Spark Join Forces at Yahoo, Databricks_R2_00096265.) And Yahoo publicized the benefits it realized from its open-source strategy. (Ex. 14, Weissman Op., ¶¶ 1001-08.) Second, Yahoo's internal policies communicated to its employees that they were acting as Yahoo's agents when contributing to Apache open-source projects. Yahoo established the clear open-source policy that "big data" technology—which included Apache Spark—was an approved "zone of operation" for open-source contributions. (Ex. 12, ███████ at 23:22-24:6). This open-source policy was "commonly known and understood by Yahoo! employees." (Ex. 13, ███ ███ at 166:2-20), and Yahoo "never denied" open-source contributions to Apache Spark. (Ex. 12, ███████. at 129:10-17.) In fact, Yahoo created a dedicated Apache Spark team and hired employees such as ███████████████ with the purpose of contributing to Apache Spark. (*Id.* at 26:5-19, 15:1-24; Ex. 13, ███████ at 17:22-18:5.) Yahoo's OSPO also approved employee ICLAs and contributions to Apache Spark. (Ex. 13, ███████ at 236:18-237:6, 219:2-220:10.)

## VI.    UNDER R2'S INFRINGEMENT THEORY, YAHOO'S CONTRIBUTIONS TO APACHE SPARK GRANTED A LICENSE TO THE '610 PATENT

The Apache 2.0 license grants a patent license "to those patent claims licensable by such Contributor that are necessarily infringed by their Contribution(s) alone *or* by combination of their Contribution(s) with the Work to which such Contribution(s) was submitted." (Ex. 1, Apache 2.0 License, Databricks_R2_00090072.) In other words, under the first category, the Apache 2.0 license grants a patent license if a party's "Contribution(s) alone" "necessarily infringe" a party's licensable patent claims. But the second category is broader. Under the second category, a patent license is triggered if the contribution(s) "by combination…with the Work" "necessarily infringe."

███████████████████████████████████████████████

The Apache 2.0 license does not require any specific split between what portion of the "infringe[ment]" is a result of the "contributions" as opposed to the existing functionality in the underlying "work." In fact, the second category of the Apache 2.0 license is broad enough that it will result in granting a license to a party's patents that cover the underlying work when a party contributes to the work. ████████████████████████████, testified that Yahoo leadership and Yahoo legal understood and intended[6] "that when Yahoo contributed to an Open Source project like Spark" under the Apache 2.0 license, it "was granting a license to Yahoo patents that covered [] Spark." (Ex. 12, ████████ . at 65:9-66:11.)

Yahoo granted all users of Apache Spark a license to the '610 patent under the second category of the Apache 2.0 license. (Ex. 14, Weissman Op., ¶ 1080.) R2 alleges in this case that Apache Spark versions 1.4 through versions 3.5.1 allegedly infringe the asserted claims. (Ex. 32, Davis Op., ¶¶ 124, 129.) And Databricks technical expert, Dr. Weissman, cited hundreds of Yahoo contributions to Apache Spark versions 1.4 through 2.0 during the time that Yahoo owned the '610 patent. (Ex. 14, Weissman Op., ¶¶ 1183-88; *see also id.* at ¶¶ 1078-1182.) Indeed, as explained below, ██████████████████████ were Yahoo employees on Yahoo's internal open-source Apache Spark team that made significant contributions to Apache Spark including to YARN (MapReduce 2.0), RDDs, shuffle, ZippedPartitions, DAGScheduler, and others. Thus, under R2's

---

[6] In fact, Yahoo contributed to open-source projects under the Apache 2.0 license with the purpose of licensing its patent rights that covered the underlying work "to make sure that no one else could assert the patent against the community." (Ex. 12, ████████ at 85:18-86:3.) Yahoo also shared this policy with its engineers and the open-source community. (*Id.* at 130:9-21.) Such evidence showing Yahoo's intent supports that R2's proposed interpretation is wrong. To the extent the Court nonetheless finds the license language is reasonably susceptible to more than one interpretation, this issue raises a "genuine dispute of material fact inappropriate for resolution on summary judgment." *Lennar Mare Island, LLC v. Steadfast Ins. Co.,* 176 F. Supp. 3d 949, 964 (E.D. Cal. 2016); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983) ("ambiguity in a contract raises a question of intent, which is a question of fact precluding summary judgment.").

██████████████████████████████████████████

own infringement theory, Yahoo's hundreds of contributions to Apache Spark in combination with the work—i.e., the allegedly infringing Apache Spark functionality that R2 accuses in this case—granted all users of Apache Spark a license to the '610 patent.

R2 cannot successfully argue that Databricks needs evidence that "a ***contribution*** made by Yahoo or one of its employees [] ***necessarily infringed*** any claim of the '610 patent." (Mot. at 17.) In other words, R2 asserts incorrectly that a "contribution" alone must "necessarily infringe[]." As discussed above, the Apache 2.0 license's patent grant can be triggered by either "contributions alone" or "combination of [] Contribution(s) with the Work." R2's interpretation cannot be correct as it eliminates the second category. *Schertzer v. Bank of Am., NA*, 109 F.4th 1200, 1209 (9th Cir. 2024) (an interpretation must "give[] effect to all provisions of the contract" and not "render[] part of the writing superfluous, useless or inexplicable"). R2 also argues that "the contribution, when combined with the work to which the contribution is submitted" must "***cause***[] infringement." (Mot. at 17.) But the Apache 2.0 license does not require "causation."

Regardless, Yahoo also contributed functionality that R2's technical expert has alleged "necessarily infringes," and thus, "causes infringement" of the asserted claims. (*See, e.g.*, Ex. 14, Weissman Op., ¶¶ 1083, 1110, 1145, 1183-92.) For example, Mr. Davis alleges that "Spark's RDD abstraction naturally divides data into partitions" (Ex. 32, Davis Op., ¶ 74; Ex. 33, Davis Rebut. Dep. at 173:4-11); and ████████████ contributed to Spark's RDD functionality. (Ex. 34, RDD.scala, Databricks_R2_00116703-6712; Ex. 35, PairRDDFunctions.scala, Databricks_R2_00116732-6733.) As another example, Mr. Davis alleges that ShuffleExchangeExec[7] meets claim elements 1[A], 1[D], and 1[E] (Ex. 32, Davis Op., ¶¶ 150,

---

[7] Additionally, Yahoo employee ████████████ contributed to ShuffleHandle.scala, which is used by **ShuffleExchangeExec**. (Ex. 36, ShuffleHandle.scala, JWeissman_00006422-6423.) Indeed, ████████ commit states that ShuffleHandle.scala is an "opaque handle to a

████████████████████████████████████████████

162, 168); and ██████████ testified in deposition that he contributed to "shuffle" functionality in Spark. (Ex. 13, ██████████. at 224:18-22.) Mr. Davis further alleges that SortMergeJoinExec meets claim element 1[E] (Ex. 32, Davis Op., ¶ 168); and ██████████ contributed to files used in executing SortMergeJoinExec, including ZippedRDD and ZippedPartitionsRDD. (Ex. 38, Weissman Dep. at 159:5-17, 161:2-15; Ex. 39, ZippedPartitionsRDD.scala, Databricks_R2_00098922; Ex. 40, ZippedRDD.scala, Databricks_R2_00098908.) In fact, Mr. Davis conceded that ZippedPartitionsRDD was "used as part of the sort processing" that he accuses of infringement. (Ex. 11, Davis Op. Dep. at 176:16-19.) As another example, Mr. Davis alleges the DAGScheduler meets claim element 1[F] (Ex. 32, Davis Op., ¶¶ 175-76); and ████ ██████████ contributed to this scheduler. (Ex. 41, DAGScheduler.scala, JWeissman_00000110-0126.)

Yahoo's contributions of YARN to Apache Spark also triggered a licensed to the '610 patent. (Ex. 14, Weissman Op., ¶¶ 1193-1997.) As ██████████ explained, YARN is the improved resource management functionality for Apache Hadoop and is known as MapReduce 2.0. (Ex. 13, ██████████ at 57:10-58:4; *see also* Ex. 42, MapReduce 2.0, Databricks_R2_00116132.) ████ ██████████ further testified that Yahoo contributed YARN, or MapReduce 2.0, to Apache Spark. (Ex. 13, ██████████ at 238:12-17.) R2's technical expert does not dispute that Yahoo contributed this functionality. (Ex. 33, Davis Rebut. Dep. at 182:22-183:1.) And in at least R2's cases against JPMorgan and Cloudera, R2 asserted that YARN meets elements 1[PRE], 1[D], and 17[PRE] of the asserted claims. (Ex. 43, Cloudera Contentions, R2_DB_105120, 5218; Ex. 44, JP Morgan Contentions, R2_DB_065079, 5087.) Thus, based on own R2's own allegations, Yahoo's

---

shuffle, used by a ShuffleManager to pass information about it to tasks" and ShuffleManager is implemented by ShuffleExchangeExec. (*Id.*; *see also* Ex. 37, ShuffleExchangeExec.scala, Databricks_R2_001171414-7419 (lines 162-191 implementing ShuffleManager).)

contribution of YARN to Apache Spark "necessarily infringe" the '610 patent.

As another example, Yahoo granted a license to the '610 patent by contributing a project called "CaffeOnSpark" under the Apache 2.0 license. (Ex. 14, Weissman Op., ¶¶ 1200-05; Ex. 45, CaffeOnSpark Open Sourced, Databricks_R2_00118644.)  The CaffeOnSpark project combined the *entirety* of Apache Spark with open-source software called Caffe to "bring[] deep learning to…Spark clusters." (Ex. 46, CaffeOnSpark Archive, Databricks_R2_00108087.)  As ███████ explained "CaffeOnSpark…wouldn't work without the underlying Apache Spark functionality." (Ex. 13, ███████ at 71:5-8.)  Moreover, CaffeOnSpark implemented the same versions of Spark that R2 accuses of infringement, including versions 1.4 through 2.0. (Ex. 28, CaffeOnSpark Contributions, Databricks_R2_00118847.)  Thus, by contributing the *entirety* of Spark to open source as part of CaffeOnSpark—including the allegedly infringing functionality—Yahoo granted a license to at least the '610 patent under R2's infringement theory.

Because there are material disputes of fact, the Court should deny summary judgment. *Smartflash LLC v. Apple Inc.*, No. 6:13-cv-447-448, 2015 WL 660293, at *6-*7 (E.D. Tex. 2015) (denying summary judgment because "differences in expert opinion…are for the trier of fact").

## VII.    CONCLUSION

For the foregoing reasons, Databricks requests that the Court deny R2's motion.

████████████████████████████████

Dated: May 1, 2025

Respectfully submitted,

/s/ Vigen Salmastlian
Michael J. Sacksteder
CA Bar No. 191605 (Admitted E.D. Texas)
Email: msacksteder@fenwick.com
Gregory Sefian
CA Bar No. 341802 (Admitted *Pro Hac Vice*)
Email: gsefian@fenwick.com
S. Emma Lee
CA Bar No. 344074 (Admitted *Pro Hac Vice*)
Email: emma.lee@fenwick.com
**FENWICK & WEST LLP**
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone:    415.875.2300
Facsimile:    415.281.1350

Dargaye Churnet
CA Bar No. 303659 (Admitted E.D. Texas)
Email: dchurnet@fenwick.com
**FENWICK & WEST LLP**
730 Arizona Ave, 1st Floor
Santa Monica, CA 90401
Telephone:    310.434.5400
Facsimile:    650.938.5200

Vigen Salmastlian
CA Bar No. 276846 (Admitted E.D. Texas)
Email: vsalmastlian@fenwick.com
**FENWICK & WEST LLP**
801 California Street,
Mountain View, CA 94041
Telephone:    650.988.8500
Facsimile:    650.938.5200

Jessica M. Kaempf
WA Bar No. 51666 (Admitted E.D. Texas)
Email: jkaempf@fenwick.com
Jonathan G. Tamimi
WA Bar No. 54858 (Admitted E.D. Texas)
Email: jtamimi@fenwick.com
**FENWICK & WEST LLP**
401 Union Street, 5th Floor
Seattle, WA 98101
Telephone:     206.389.4510
Facsimile:     206.389.4511

*Attorneys for Defendant
Databricks Inc.*

███████████████████████████████████

**CERTIFICATE OF AUTHORIZATION TO SEAL**

Pursuant to Local Rule CV-5(a)(7)(B), I am authorized to file the foregoing document under seal pursuant to Protective Order (Dkt. 61) because this document references Designated Material.

*/s/ Vigen Salmastlian*
Vigen Salmastlian

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via electronic mail per Local Rule CV-5 on May 1, 2025.

*/s/ Vigen Salmastlian*
Vigen Salmastlian