IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| R2 Solutions LLC,<br><br>    Plaintiff,<br><br>v.<br><br>Databricks, Inc.,<br><br>    Defendant. | Civil Action No. 4:23-cv-01147-ALM<br><br>Jury Trial Demanded<br><br>█████████████████████████<br>██████████████ |

**PLAINTIFF R2 SOLUTIONS LLC'S OPPOSITION
TO MOTION TO EXCLUDE TESTIMONY OF JIM W. BERGMAN**

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................... 1

II. FACTUAL BACKGROUND.......................................................................................... 1

III. APPLICABLE LAW ....................................................................................................... 4

IV. ARGUMENT................................................................................................................... 5

    A. Mr. Bergman's Analysis Is Properly Apportioned to the '610 Patent. ....................... 5

    B. Mr. Bergman's Opinions Regarding "Advanced Analytics" and "Ease of Programming" Have Substantial Support in the Record............................................. 7

    C. Mr. Bergman Properly Apportioned the Benefits to the '610 Patent. ...................... 10

    D. Databricks' Hadoop-Based Argument Is Premised on Fiction. ................................ 13

# TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014) .............................................................................................. 6

*Blue Spike, LLC v. Huawei Techs. Co. Ltd.*,
  No. 6:13-cv-679, 2016 WL 9286102 (E.D. Tex. Oct. 14, 2016) ............................................. 6

*Cirba Inc. v. VMware, Inc.*,
  No. 19-742, 2020 U.S. Dist. LEXIS 2074 D. Del. Jan.7, 2020) ............................................. 5

*Daedalus Blue, LLC v. Microstrategy Inc.*,
  No. 2:20-CV-551, 2023 U.S. Dist. LEXIS 152932 (E.D. Va., Aug. 28, 2023) .................. 1, 5

*Droplets v. Yahoo! Inc.*,
  No. 12-CV-03733, 2022 U.S. Dist. LEXIS 125284 (N.D. Cal. Jan. 12, 2022) ....................... 7

*Droplets, Inc. v. Yahoo! Inc.*,
  No. 12-CV-03733, 2021 U.S. Dist. LEXIS 259662 (N.D. Cal. Aug. 9, 2021) ......................... 7

*Kovaly v. Wal-Mart Stores Tex., L.L.C.*,
  627 F. App'x 288 (5th Cir. 2015) ............................................................................................ 4

*Longhorn HD LLC v. NetScout Sys.*,
  No. 2:20-CV-00349, 2022 U.S. Dist. LEXIS 55457 (E.D. Tex. Mar 27, 2022) ...................... 6

*McCune v. Graco Children's Prods.*,
  495 F. App'x 535 (5th Cir. 2012) ........................................................................................... 4

*Omnitracs, LLC v. Motive Techs., Inc.*,
  No. 23-cv-05261 (N.D. Cal Feb. 3 2025) ............................................................................... 6

*Personalized Media Communs., LLC v. Apple. Inc.*,
  No. 2:15-cv-01366. 2021 U.S. Dist. LEXIS 31667 (E.D. Tex. Feb. 19. 2021) ....................... 6

*Spex Techs., Inc. v. W. Digit. Corp.*,
  No. SACV 16-01799-JVS(AGRx), 2023 U.S. Dist. LEXIS 190328 (C.D. Cal. Oct. 3, 2023) .. 9

*Su Min Kim v. Am. Honda Motor Co.*,
  86 F.4th 150 (5th Cir. 2023) .................................................................................................... 4

*Summit 6, LLC v. Samsung Elecs. Co.*,
  802 F.3d 1283 (Fed. Cir. 2015) ............................................................................................... 4

*United States v. Hodge*,
  933 F.3d 468 (5th Cir. 2019) ................................................................................................ 4

*VirnetX, Inc. v. Cisco Sys.*,
  767 F.3d 1308 (Fed. Cir. 2014) ............................................................................................ 5

**Rules, Statutes, and Authorities**

Fed. R. Evid. 702 ........................................................................................................................... 4

## I.   INTRODUCTION

Databricks' motion to exclude the damages testimony from Mr. Jim Bergman should be denied. At best, Databricks' arguments go to the weight that should be afforded the testimony, not its admissibility. Databricks makes four arguments, none of which warrant exclusion.

*First*, Databricks argues that Mr. Bergman's apportionment analysis should be excluded for lack of mathematical precision. Databricks is wrong. What is required is that Mr. Bergman "articulate a methodology, including the facts contributing to his final figure, and distinguish between the technology's infringing and non-infringing features," which he did. *See Daedalus Blue, LLC v. Microstrategy Inc.*, No. 2:20CV551, 2023 U.S. Dist. LEXIS 152932, *22, 24 (E.D. Va., Aug. 28, 2023) (holding Mr. Bergman's apportionment was "reliably achieved and not arbitrary" under highly similar circumstances). *Second*, Databricks contends that Mr. Bergman lacks technical support for attributing "advanced analytics" and "ease of programming" benefits to the '610 patent. This is wrong. R2's technical expert offered detailed technical explanations underpinning Mr. Bergman's opinions. *Third,* Databricks argues that Mr. Bergman did not value, or apportion out, non-patented features in attributing the "performance," "advanced analytics," and "ease of programming" benefits to the '610 patent. Again, this is wrong. Databricks' assertions either ignore the substance of R2's experts' opinions, rely on testimony divorced from context, or amount to pure conjecture. *Fourth*, Databricks suggests, in abbreviated fashion, that Mr. Bergman's opinion should be excluded because it depends on "the unsupported assumption" that prior art Hadoop does not practice the '610 patent. This is false. It is beyond dispute that R2 has fully addressed the validity of the '610 patent over Hadoop.

## II.   FACTUAL BACKGROUND

Mr. Bergman is a highly-regarded economist who has served as an expert and offered

damages opinions in dozens of high value intellectual property matters. Ex. 1, Berg. Rep., at ¶¶ 3-6; Ex. 2, Bergman CV. He holds a Bachelor of Arts in Economics and an MBA from the University of California at Irvine. *Id*. He is also a Chartered Financial Analyst. *Id*.

In performing his analysis, Mr. Bergman utilized two approaches: (1) an income approach, which determines a reasonable royalty by calculating the amount of revenue and/or profit that can be attributable to the patent-in-suit, and (2) a market approach, which assesses existing license agreements comparable to the patent-in-suit. *See* Berg. Rep., ¶¶ 26, 100-165 (income approach analysis), 166-230 (market approach analysis). Mr. Bergman then evaluated each of the *Georgia-Pacific* factors in view of his findings. Ultimately, Mr. Bergman concluded that the reasonable royalty due R2 for Databricks' infringements is ▮▮▮▮, which equates to an implied royalty on infringing sales of ▮▮. *Id*. at ¶¶ 284-289 (and referenced Schedules).

In determining the value of Databricks' use of the '610 patent, Mr. Bergman (1) started with *only* the Databricks functionality that included the patented technology, (2) removed revenue associated with licensed platforms and specific, licensed customers, (3) performed a detailed analysis to credit Databricks for functionality unrelated to Spark features for each of 65 unique SKUs (product iterations) containing the patented functionality, (4) credited Databricks for its incremental costs, (5) apportioned for the value of the '610 patent within Spark, and (6) engaged in a *Georgia-Pacific* analysis to account for any factors not already considered. Databricks' sole complaint is related to step (5).

With regard to step (5), Mr. Bergman considered meaningful information and data. This includes (i) the report of R2's technical expert, Bill Davis, (ii) detailed discussions with Mr. Davis, (iii) Databricks' customer testimonials, (iv) industry studies regarding the performance benefits of Spark compared to Hadoop (the next best alternative), and (v) Apache surveys regarding the

2

importance of Spark features to Spark customers. Berg. Rep., ¶¶ 152-164. The relevant discussions with Mr. Davis involved elucidation of the key benefits of the '610 patent. *See*, *e.g.*, *id*. at ¶¶ 152-154, 160. Those benefits were ultimately treated in Mr. Davis's own expert report (*see* Ex. 3, Davis Rep., ¶¶ 50-65, 236-239), and informed Mr. Bergman's assessment of the studies and surveys. *See* Ex. 4, Berg. Depo., 70:4-75:10, 112:24-117:4, 150:2-13, 116:25-117:4, 145:14-146:11, 180:16-181:21, 192:2-194:1. Mr. Davis also informed Mr. Bergman as to Hadoop being the next best alternative to Spark. *See* Berg. Rep., ¶ 107; Berg. Depo, 114:19-117:4.[1] This discussion facilitated Mr. Bergman's assessment of Databricks' customer testimonials extolling the importance of Spark and its benefits over Hadoop. *See* Berg. Rep. at ¶ 155; Berg. Depo., 181:1-21.

Armed with ample information concerning the technical features and benefits of the '610 patent and its relative impact on Spark's capabilities, Mr. Bergman evaluated the aforementioned industry studies and Apache surveys to further inform his apportionment figure, the most critical of which were conducted and published at or near the time of the hypothetical negotiation. *See id*. at ¶¶ 156-162. For example, in a 2016 study entitled, "Comparative study between Hadoop and Spark based on Hibench benchmarks," the authors found that the execution time on Spark was significantly better than that of Hadoop. This was especially true for Spark join functions—material to the '610 patent and at issue in this case—that outperformed Hadoop by 85%. *Id*. at ¶ 156. As for the surveys, they were conducted by the Apache Foundation (the purveyor of Spark) in 2015 and 2016 and produced by Databricks in this case. *Id*. at ¶¶ 158-159. Those surveys found performance to be the most important aspect of Spark. This correlates with the Hibench benchmark study and Mr. Bergman's discussions with Mr. Davis. *See*, *e.g.*, Berg. Depo., 182:2-186:22. The

---

[1] Hadoop is mentioned for simplicity of reference, but as confirmed by Mr. Bergman at his deposition, the next best alternative is not necessarily Hadoop; rather, it is "a system that has the performance and scalability of a system like Hadoop." Berg. Depo., 116:25-117:4.

survey also tested six other features. *See* Berg. Rep., ¶ 161. Of those, Mr. Davis informed Mr. Bergman of the "but for" importance of the '610 patent to "advanced analytics" and "ease of programming." *Id*. at ¶ 160; Berg. Depo., 160:4-25.

With the '610 patent linked substantially to three of the seven features tested in the surveys (performance, advanced analytics, and ease of programming), Mr. Bergman normalized the values of the features through equal weighting. *See id*. at ¶ 161. The resulting calculations revealed that the three features tied to the '610 patent comprised 54% to 56% of the total Spark feature benefits. *Id*. at ¶ 162. This established an apportionment ceiling, from which Mr. Bergman's expertise led him to conclude that "a reasonable and conservative apportionment to the value of the '610 patent with the overall Spark functionality is 25%." *Id*. at ¶ 163; *see also* Berg. Depo., 182:2-186:22.

### III.  APPLICABLE LAW

Under *Daubert* and its progeny, a district court's inquiry into admissibility is "flexible." *Su Min Kim v. Am. Honda Motor Co.*, 86 F.4th 150, 160 (5th Cir. 2023). "The district court must [simply] ensure under Fed. R. Evid. 702 that expert opinion testimony 'rests on a reliable foundation and is relevant to the task at hand.'" *McCune v. Graco Children's Prods.*, 495 F. App'x 535, 539 (5th Cir. 2012). To this end, a district court's gatekeeping role in evaluating proffered expert testimony is "not substitute for the adversarial system." *Kovaly v. Wal-Mart Stores Tex., L.L.C.*, 627 F. App'x 288, 290 (5th Cir. 2015). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *United States v. Hodge*, 933 F.3d 468, 477 (5th Cir. 2019). Indeed, "the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015).

## IV. ARGUMENT

### A. Mr. Bergman's Analysis Is Properly Apportioned to the '610 Patent.

Mr. Bergman performed a fulsome and admissible apportionment of the value of the '610 patent within the Spark incremental profit, as discussed above. Databricks does not contest by its motion his incremental profit calculations or the underlying methodology. *See* ECF 119 at 1-2. Rather, Databricks takes issue with his subsequent apportionment to the footprint of the patented invention, arguing that he provided "no quantitative basis" for his proportional value. *Id*. at 2. But regardless of whether Mr. Bergman's analysis involved a precise mathematical underpinning, such is not legally required. *See VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014) ("[W]e have never required absolute precision in this task; on the contrary, it is well-understood that this process may involve some degree of approximation and uncertainty."). Indeed, Mr. Bergam has performed similar analyses on numerous occasions without issue. For instance, in *Daedalus*, he based his apportionment value on discussions with the plaintiff's technical expert, analysis of non-infringing alternatives, and documents produced by the defendant. *Daedalus*, 2023 U.S. Dist. LEXIS at *22. Though he did not attribute specific values to factors he identified in growing his apportionment to 20%, the court "decline[d] to find that Bergman plucked the apportionment number out of thin air," finding his methodology and discussion to be sound. *Id*. at *24.[2] Further, in *Longhorn HD*, Judge Payne blessed Mr. Bergman's reliance on discussion with the technical expert, stating, "Mr. Bergman may rely on Dr. Kia's opinion about the technical importance of the patent-in-suit to support [his] apportionment analysis." *Longhorn HD LLC v. NetScout Sys*., No.

---

[2] Similarly, in *Cirba Inc. v. VMware, Inc*., No. 19-742, 2020 U.S. Dist. LEXIS 2074, *5 (D. Del. Jan.7, 2020), the court held that "Mr. Bergman establishes a logical methodology to arrive at his DRS apportionment number," noting that "[s]ome degree of approximation in expert testimony is permitted."

2:20-CV-00349, 2022 U.S. Dist. LEXIS 55457, *9 (E.D. Tex. Mar 27, 2022).[3] Accordingly, Judge Payne held that "Defendant's argument that Mr. Bergman arbitrarily opined on the 50% apportionment is misplaced," adding (as is the case here) that the defendant "had the opportunity to probe the content and substance" of the expert discussion via deposition." *Id*. at *10.[4]

In its motion, Databricks explores Judge Clark's *Blue Spike* opinion (which is not a Bergman case) principally for the notion that there was "too great an analytical gap" between survey data the expert considered and his ultimate apportionment factor. *Blue Spike, LLC v. Huawei Techs. Co. Ltd*., No. 6:13-cv-679, 2016 WL 9286102, *4 (E.D. Tex. Oct. 14, 2016). The issue was that the surveys referred to "fingerprint scanning security" and "data security and privacy" with no indication that either was directed to the digital watermarking technology at issue. *Id*. at *3. With apparently no explanation as to how digital watermarking fits into either of those buckets, Judge Clark held the expert's apportionment "excludable" but subject to rehabilitation through supplementation. *Id*. at *4. In Mr. Bergman's case, there is ample information connecting the benefits and features of the '610 patent to Spark's "performance," "advanced analytics," and "ease of programming" features. *See* Section II.B., above (and further discussion in Sections IV.B. and IV.C., below). It bears mention that Databricks does not contest in its motion the technical support linking the '610 patent to Spark's enhanced performance benefit. *See* ECF 119 at 7-8.

Finally, Databricks attempts to disparage Mr. Bergman's analysis by referencing an

---

[3] *See also Personalized Media Communs., LLC v. Apple. Inc*., No. 2:15-cv-01366. 2021 U.S. Dist. LEXIS 31667, *10 (E.D. Tex. Feb. 19. 2021) (citing *Apple Inc. v. Motorola, Inc*., 757 F.3d 1286, 1321 (Fed. Cir. 2014) ("Experts routinely rely upon other experts hired by the party they represent for expertise outside of their field.")).

[4] *See also* Ex. 5, *Omnitracs, LLC v. Motive Techs., Inc*., No. 23-cv-05261, Order Denying Daubert Motion at 10 (N.D. Cal Feb. 3 2025) ("Bergman's opinions on the importance of various features to customers are admissible. He primarily draws from Dr. Wicker's opinions about the technical importance of various features, which is sufficiently reliable for the reasons explained above. He also independently analyzed market evidence of the importance of those features to customers.").

instance where a district court excluded certain of his testimony. *See Droplets v. Yahoo! Inc.*, No. 12-CV-03733, 2022 U.S. Dist. LEXIS 125284 (N.D. Cal. Jan. 12, 2022). The suggestion is that Mr. Bergman's analysis here suffers the "same analytical gap" and should be excluded. ECF 119 at 7. The reliance on *Droplets*, however, is misleading. In *Droplets*, Nordstrom moved to exclude Mr. Bergman on improper apportionment (like what Databricks argues here). But that part of its motion was denied. *See id*. at *8-9. Instead, the exclusion involved the bargaining split, which is a post-apportionment step (that Databricks did not challenge). *See id*. at *8-10. Even then, though the court excluded Mr. Bergam vis-à-vis Nordstrom, it did not exclude him for Yahoo (who also sought a bargaining split exclusion). *See Droplets, Inc. v. Yahoo! Inc.*, No. 12-CV-03733, 2021 U.S. Dist. LEXIS 259662, **16, 23-27 (N.D. Cal. Aug. 9, 2021). This means it was not a flaw in his analysis generally (as Databricks intimates); rather, the facts and circumstances simply did not justify the split at issue. The correctness of the court's assessment notwithstanding, the holding does not translate to this case where there is plenty of evidence (Mr. Davis, HiBench benchmarks analysis, survey data, etc.) substantiating the value of the patented technology beyond 25%.

Distilled to its essence, Databricks insists on a legal standard—akin to mathematical precision—beyond what is required for admissibility. Mr. Bergman's analysis is well within the Federal Circuit's, and this Court's, guidance, and the jury should be allowed to consider it.

      **B.**      **Mr. Bergman's Opinions Regarding "Advanced Analytics" and "Ease of Programming" Have Substantial Support in the Record.**

Databricks argues that Mr. Bergman's apportionment analysis should be excluded because it "lacks any technical support for his assumptions that 'advanced analytics' and 'ease of programming' are benefits of the '610 patent." ECF 119 at 8. But this ignores the substance of Mr. Bergman's and Mr. Davis's reports. Indeed, Mr. Bergman explicitly states in his report that "[w]ith regard to advanced analytics, it is my understanding that the '610 patent provides for the efficient

7

operation of heterogeneous data sets, the lack of which would impact a customer's ability to provide more advanced analytics on their data sets." Berg. Rep., ¶ 160. This is amply supported by Mr. Davis. His "Limitations of MapReduce" section explains how traditional MapReduce could not efficiently process and join data with different schema (i.e., homogenous data). His "The Importance of Joins Over Different Schema" section explains that such operations with heterogenous data are "*fundamental analytic operation[s] in data processing systems*." (emphasis added). His "The '610 Patent Describes an Improvement to MapReduce" section explains exactly how the patent enables efficient operations on heterogenous data sets. And his "Importance of R2's Inventions to Databricks" section explains exactly how the inventions of the '610 patent provide "performance, scalability, and reliability benefits" to users like Databricks. *See* Davis Rep., ¶¶ 50-65, 236-239 (emphasis added). In other words, Mr. Davis offers copious technical explanations that directly support Mr. Bergman's opinion that the '610 patent benefits Spark advanced analytics by providing for "the efficient operation of heterogenous data sets." *See id*. at ¶ 160.

Likewise, Mr. Bergman explains that "[a]s for ease of programming, I understand that, but for the '610 patent, the join API and SQL queries in Spark would not work as reliably, which would impact how data needs to be modeled and loaded in order to work." Berg. Rep., ¶ 160. Again, this is thoroughly supported by the same sections of Mr. Davis's report discussed above. As a specific example, Mr. Davis addresses how the "*reliability*" of join queries is hindered by the reduce-side join "bottleneck" of pre-'610 MapReduce because it "can lead to load imbalance, memory overload, data skew and out of memory errors." Davis Rep., ¶¶ 236-237 (emphasis added). Mr. Davis then explains exactly how this issue is solved by the claims of the '610 patent. *See id.*, ¶¶ 238-239; *see also* ¶¶ 50-65, 236, 239. Again, Mr. Davis opines on the exact technical underpinning of Mr. Bergman's positions regarding "ease of programming."

8

Databricks makes three doomed points. First, Databricks alleges that Mr. Bergman's opinions are unsupported because R2's Mr. Davis did not use the words "advanced analytics" or "ease of programming" in his report. ECF 119 at 8. This is a red herring—regardless of whether Mr. Davis used the exact words, his opinions support Mr. Bergman's, as explained above. Second, Databricks alleges that Mr. Davis "unambiguously confirmed … that he provided no opinion regarding whether the '610 patent claims an improvement to advanced analytics or ease of programming." *Id*. But this misstates the relevant question. The question is not whether *Mr. Davis* gave such an opinion; rather, the question is whether *Mr. Bergman's* opinion exhibits adequate technical support from Mr. Davis, which it does. And, in any event, Databricks simply cherry-picks deposition excerpts and ignores various, other relevant testimony. *See*, *e.g.*, Ex. 6, Davis Depo., 234:3-236:2 (A: "I do think advanced analytics could benefit from the '610") (Q: "You did not provide any opinion that a benefit of the '610 patent is advanced analytics; correct?" A: "I think I did say that."); 236:25-238:13 (A: "I would say that … the '610 patent makes programming easier."). Finally, Databricks alleges that Mr. Bergman's "private, undisclosed conversations with Mr. Davis" cannot "save" Mr. Bergman's opinions. ECF 119 at 8.[5] This is wrong. Those conversations were not "undisclosed." They were referenced throughout Mr. Bergman's report, and Databricks deposed both experts about them. Moreover, Mr. Davis's report provides exhaustive technical explanations that underlie Mr. Bergman's opinions, and there is nothing improper about Mr. Bergman referencing conversations with Mr. Davis in which Mr. Davis

---

[5] Databricks' reliance on the *SPEX* case is misplaced—there, the technical expert's supplemental opinion did not explain how a new set of asserted claims "implicate[d] the same accused product features and functions as the previously asserted claims." *Spex Techs., Inc. v. W. Digit. Corp.*, No. SACV 16-01799-JVS(AGRx), 2023 U.S. Dist. LEXIS 190328, at *12 (C.D. Cal. Oct. 3, 2023). There is no similar issue here, as Mr. Davis addressed the benefits provided by the asserted claims, and Mr. Bergman performed an apportionment analysis premised on those technical opinions.

explained the technical opinions from his report to facilitate Mr. Bergman's understanding.

### C. Mr. Bergman Properly Apportioned the Benefits to the '610 Patent.

Databricks argues also that "Mr. Bergman's analysis should further be excluded because he fails to apportion the non-patented features relating to 'performance,' 'advanced analytics,' and 'ease of programming,'" concluding that Mr. Bergman "relies on broad terms that *undoubtedly* incorporate consumers' value for non-patented features and thus necessarily fails to apportion for the value of the patented feature." ECF 119 at 9 (emphasis added). But this argument is unsupported by any evidence and belied by both Mr. Davis's and Mr. Bergman's reports. As discussed above, Mr. Davis explained the technical features outlined by the asserted claims and how such features achieve substantial benefits over traditional MapReduce (i.e., Hadoop). *See* Davis Rep., ¶¶50-65, 236-239. Mr. Bergman then utilized the technical underpinnings (among other things) to "determine the value of the '610 patent within the Spark incremental profit," attributing just three of the seven Spark benefits to the '610 patent in accordance with Mr. Davis's opinions and their discussions. *See* Berg. Rep., ¶¶ 152-165; *see also* Berg. Depo., 182:2-186:22. More specifically, "by equal weighting and normalizing the [survey] responses," Mr. Bergman observed that "the 'performance' feature alone makes up roughly 20% of the total responses." Berg. Rep., ¶ 162. Then "[a]dding 'advanced analytics' to 'performance' makes up between 36% and 39% of the total, [and] [a]dding 'ease of programming' to 'advanced analytics' and 'performance' makes up between 54% and 56% of the total." *Id*. As discussed previously in Section II.B., this analysis established an apportionment ceiling leading Mr. Bergman to conclude that a reasonable apportionment to the value of the patent to the overall Spark functionality is 25%. *Id*. at ¶ 163. In other words, the 25% amount reasonably accounts for some aspect of each benefit but implicitly acknowledges that the patent is not the sole contributor. The 25% amount is, then,

fully supported by the significant number of customer stories and industry studies describing the benefits over the next best alternative. *See* Berg. Depo., 185:4-186:10.

In its motion, Databricks resorts to spin and artificial context in its attempt to impugn Mr. Davis's deposition testimony. As to the "performance" benefit, Databricks points to sound bites from Mr. Davis to suggest that "in-memory computing and non-accused join strategies" are non-patented features that Mr. Bergman failed to apportion out. ECF 119 at 9. But Mr. Davis did not say that the '610 patent "does not disclose any improvement to 'in memory computing.'" *Id*. Rather, he merely agreed with the questioning attorney that the '610 patent does not disclose an "improvement related to writing data to disk as opposed to holding data in memory," which is not the same thing. Davis Depo. at 197:14-18. In fact, contrary to Databricks' point, Mr. Davis's report explicitly addresses how traditional MapReduce (which the '610 patent improves) suffered several memory-related shortcomings (e.g., "memory overload" and "out-of-memory errors"), and how Spark's Sort Merge Join (which practices the asserted claims) "overcomes the limitations of other join approaches and is more efficient for large datasets, particularly when attempting to join more data than can fit into memory on a single machine." *See* Davis Rep., ¶¶ 57, 78; *see also* ¶¶ 142 (explaining that DataFrame partitions are created in memory as part of the infringement analysis), 237-238 (explaining that the reduce-side join bottleneck leads to, for example, memory issues, which is solved by the "'data group' driven framework" of the '610 patent). Put another way, Mr. Davis provided explicit technical support for Mr. Bergman attributing Spark's "performance" enhancements, including "in memory computing," to the '610 patent. Berg. Rep., ¶ 37.

Likewise, Databricks contorts Mr. Davis's testimony in alleging he somehow confirmed that "R2 does not even accuse all uses of 'sort merge join' of infringement" (as if that somehow would render Mr. Bergman's analysis unreliable). *See* ECF 119 at 9. But Mr. Davis said only that

11

the accused platform infringes when it "executes join operations between two different data sets which share a key in common" under certain, common conditions—such as the accused sort merge join. Davis Depo at 264:24-265:7; *see also* Davis Rep., ¶ 130. It is, then, this "join functionality [i.e. sort merge join] … [that] is *fundamental* to any data analytics system." Davis Rep. ¶ 132 (emphasis added); *see also* ¶¶ 50-65, 236-239. In other words, it is Spark's enhanced performance of such "fundamental" join functionality (as compared, e.g., to Hadoop) that is the core of R2's infringement allegations, and Mr. Bergman's attribution of Spark's performance benefits to the '610 is, thus, reasonable regardless of whether Spark executes other types of joins or not.

Regarding the "advanced analytics" benefit, Databricks cites generally to the 2015 Spark survey and asserts that "advanced analytics" "refers to Spark's MLib [sic] and Graphx libraries." ECF 119 at 10. But this is wrong. The survey does not equate "advanced analytics" with "MLlib + GraphX." The closest the survey comes to relating MLlib and Graphx to "advanced analytics" is the graph on page 13, which identifies "MLlib + GraphX" as "Spark Components Used in Production" under the larger umbrella of "Advanced Analytics." *See* ECF 119-12 at 13. This only means that MLlib + GraphX are software tools related to Spark "advanced analytics." But per Mr. Bergman, the '610 patent's provision of "efficient operation of heterogeneous data sets" is what enables customers to perform "advanced analytics on their data sets," regardless of the software tool. Berg. Rep., ¶ 160. This proposition is amply supported by Mr. Davis's report explaining that the infringing join functionality is "fundamental to any data analytics system" and something that "users almost always need" in order to "arrive at a comprehensive final dataset." Davis Rep., ¶ 132. In other words, the fundamental join functionality (which infringes, when executed by Spark) underlies any and all analytics systems, including specific software tools associated with "advanced analytics." *Id.*; *see also* ¶¶ 50-65, 236-239. It is thus irrelevant whether Mr. Davis

12

discussed "MLlib + GraphX" by name in his report. His opinion directly buttresses Mr. Bergman's.

Lastly, Databricks says that "ease of programming" includes "'high-level APIs in multiple languages' that makes programming easier" and that Mr. Davis confirmed the '610 patent "does not claim such improvements." ECF 119 at 10. The real point, however, is that "but for the '610 patent, the join API and SQL queries in Spark"—regardless of the programming language—"would not work as reliably, which would impact how data needs to be modeled and loaded in order to work." Berg. Rep., ¶ 160; *see also* Davis Rep., ¶¶ 236-239. This is the heart of Spark's ease of programming benefit. Databricks has offered no contrary evidence or opinion.

D.     **Databricks' Hadoop-Based Argument Is Premised on Fiction.**

Databricks concludes its motion by suggesting, in abbreviated fashion, that Mr. Bergman's opinion should be excluded "because it depends on the unsupported assumption that Hadoop does not practice the claims of the '610 patent." ECF 119 at 10. This is completely false. Though Databricks asserts that Hadoop invalidates the '610 patent, it is indisputable that R2 has fully addressed the validity of the '610 patent over Hadoop via Mr. Davis and his expert reports. *See* Davis Rep., ¶¶ 41-65, 236-239; *see also* Ex. 7, Davis Rebut., ¶¶ 54-104. Databricks also suggests that R2's preliminary contentions in unrelated matters undermine Mr. Bergman's analysis. This is equally false. Databricks assessment of R2's contentions is a gimmick. The mere fact that preliminary charting references Hadoop as a MapReduce product bearing some relevance to a particular party's proprietary big data analytics system—without having assessed the party's actual, proprietary implementation of its system—is not any sort of indication that Hadoop practices the '610 patent. *See*, *e.g.*, Davis Rebut., ¶¶ 85-87. Hadoop either practices the patent, or it does not. If not, then it is perfectly suited to Mr. Bergman's apportionment analysis.

For all of the foregoing reasons, the Court should deny Databricks' motion.

| | |
|---|---|
| Dated: May 1, 2025 | Respectfully Submitted, |

By: /s/ Edward R. Nelson III
Edward R. Nelson III
State Bar No. 00797142
Christopher G. Granaghan
State Bar No. 24078585
John P. Murphy
State Bar No. 24056024
Carder W. Brooks
State Bar No. 24105536
NELSON BUMGARDNER CONROY PC
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
817.377.9111
ed@nelbum.com
chris@nelbum.com
murphy@nelbum.com
carder@nelbum.com

COUNSEL FOR
PLAINTIFF R2 SOLUTIONS LLC

### CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2025, a true and correct copy of the foregoing document was served via electronic mail upon all counsel of record.

/s/ Edward R. Nelson III

### CERTIFICATE OF AUTHORIZATION

I hereby certify that under local rule CV-5(a)(7), the foregoing document is filed under seal pursuant to the Court's Protective Order entered in this matter.

/s/ Edward R. Nelson III