████████████████████████████

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| R2 Solutions LLC, | Civil Action No. 4:23-cv-01147-ALM |
| Plaintiff, | |
| v. | Jury Trial Demanded |
| | ████████████████████ |
| Databricks, Inc., | |
| Defendant. | |

**PLAINTIFF R2 SOLUTIONS LLC'S
RESPONSE IN OPPOSITION TO DATABRICKS'
MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT**

██████████████████████████████

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ....................................................................................... 1

II.   RESPONSE TO DATABRICKS' STATEMENT OF ISSUES ......................................... 2

III.  RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS ..................... 2

IV.   ARGUMENT ............................................................................................... 4

    A.    Fact Issues Exist Regarding Whether Serverless Compute Infringes. ....................... 4

        1.    Databricks' Photon arguments should be stricken. ............................................. 4

        2.    Serverless compute infringes because it runs Databricks Runtime.................... 7

    B.    Fact Issues Exist Regarding Whether Databricks and/or Its Customers Directly Infringe Claims 1 and 5. ............................................................................................. 8

        1.    The Databricks platform practices each element of the infringing methods.... 10

        2.    Databricks itself performs each element of the infringing methods using the Databricks platform. ........................................................................................... 11

    C.    Fact Issues Exist Regarding Whether Databricks Directly Infringes Claims 17 and 21. ................................................................................................... 13

    D.    Fact Issues Exist Regarding Whether the Accused Instrumentalities Include "data groups." ............................................................................................................. 17

    E.    Fact Issues Exist Regarding Whether the Accused Instrumentalities Include "mapping functions" That Are "selected for a partition based on the data group the partition originated from." ................................................................................ 19

    F.    Fact Issues Exist Regarding Whether the Accused Instrumentalities Practice the Claimed "reducing" Limitation. ............................................................................. 20

V.    CONCLUSION................................................................................................ 21

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*,
  501 F.3d 1307 (Fed. Cir. 2007) ............................................................................... 13

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
  797 F.3d 1020 (Fed. Cir. 2015) ............................................................... 9, 11, 12, 13

*Centillion Data Sys., LLC v. Qwest Communs. Int'l*,
  631 F.3d 1279 (Fed. Cir. 2011) ....................................................................... 14, 16, 17

*CenTrak, Inc. v. Sonitor Techs., Inc.*,
  915 F.3d 1360 (Fed. Cir. 2019) ............................................................................... 15

*Fintiv, Inc. v. Apple Inc.*,
  No. 1:21-cv-896-ADA, 2023 WL 4237356 (W.D. Tex. June 28, 2023) .................................. 7

*Garrett v. TP-Link Research Am. Corp.*,
  No. 20-cv-03491-SI, 2020 U.S. Dist. LEXIS 221775 (N.D. Cal. Nov. 23, 2020) ................... 15

*Hilgraeve Corp. v. Symantec Corp.*,
  265 F.3d 1336 (Fed. Cir. 2001) ................................................................................. 8

*Lifetime Indus., Inc. v. Trim-Lok, Inc.*,
  869 F.3d 1372 (Fed. Cir. 2017) ............................................................................... 15

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301, (Fed. Cir. 2009) ............................................................................... 9

*Vita-Mix Corp. v. Basic Holding, Inc.*,
  581 F.3d 1317 (Fed. Cir. 2009) ............................................................................... 9

**Rules, Statutes, and Authorities**

Fed. R. Civ. P. 26(e) ............................................................................................ 1, 6

Fed. R. Civ. P. 37(c) ............................................................................................ 6

████████████████████████████████████

## TABLE OF EXHIBITS[1]

| No. | Exhibit |
|-----|---------|
| 1 | Excerpts of Databricks' Omnibus Supplemental Objections and Responses to R2's Interrogatories |
| 2 | Databricks webpage titled "Databricks Runtime" (Databricks_R2_00053472-74) |
| 3 | Databricks webpage titled "Databricks Runtime release notes versions and compatibility" (Databricks_R2_00090685-93) |
| 4 | Excerpts of Transcript of the January 16, 2025 Deposition of Joshua Rosen ("Rosen Depo.") |
| 5 | Excerpts of Transcript of the January 24, 2025 Deposition of Reynold Xin, Ph.D. ("Xin Depo.") |
| 6 | Databricks webpage titled "Databricks Product SKU groups" (R2_DB_126422-38) |
| 7 | Databricks webpage titled "Databricks architecture overview" (Databricks_R2_00008397-99) |
| 8 | Excerpts of ████████████████████████████ |
| 9 | Excerpts of Sworn Expert Report of William Davis Concerning Infringement of U.S. Patent No. 8,190,610 |
| 10 | Databricks document titled ████████████ (Databricks_R2_00114118) |
| 11 | Databricks document titled ████████████ Databricks_R2_00119262) |
| 12 | Email correspondence between counsel for R2 and counsel for Databricks from January 29, 2025 until February 3, 2025 |
| 13 | Excerpts of R2's Third Supplemental Objections and Responses to Databricks First Set of Interrogatories |
| 14 | Excerpts of the Transcript of the March 25, 2025 Deposition of Bill Davis ("Davis Depo. Day 1") |
| 15 | Excerpts of the Transcript of the January 8, 2025 Deposition of George Sirois ██ |
| 16 | Excerpts of the Transcript of the January 15, 2025 Deposition of Vinod Viswanath ████████ |
| 17 | Declaration of Manoj Rawat ████████ (R2_DB_126573) |

---

[1] Each of the exhibits listed in this table, Exhibits 1-25, is attached to the Declaration of Carder W. Brooks.

████████████████████████████████

| 18 | Excerpts of the Transcript of the December 13, 2024 Deposition of Cody Austin Davis ("C. Davis Depo.") |
|----|----|
| 19 | Excerpts of the Transcript of the February 11, 2025 Deposition of Giri Ramanathan ("Ramanathan Depo.") |
| 20 | Excerpts of Rebuttal Expert Report of Dr. Jon Weissman |
| 21 | Databricks webpage titled "Connect to serverless compute" (Databricks_R2_00008509-12) |
| 22 | Excerpts of the Transcript of the February 12, 2025 Deposition of John Winkenbach ("Winkenbach Depo.") |
| 23 | ████████████████████████████████ |
| 24 | Databricks webpage titled "Master Cloud Services Agreement" (Databricks_R2_00094642-66) |
| 25 | Excerpts of the Transcript of the February 11, 2025 Deposition of Jason Pohl ("Pohl Depo.") |

## I.    INTRODUCTION

All six grounds of Databricks' Motion for Summary Judgment of Non-Infringement fail. *First*, Databricks' position that serverless compute cannot infringe because it runs (unproduced) Photon code, not Apache Spark code, must be stricken because it violates the parties' Joint Stipulation (ECF 73) and Rule 26(e), as R2 has already briefed for this Court (*see* Motion to Compel (ECF 82) and Motion to Strike (ECF 115)). Nevertheless, fact issues preclude summary judgment because the core software component of serverless compute infringes.

*Second*, there is substantial evidence that Databricks directly infringes the asserted method claims by performing each step in both serverless compute and classic compute. Moreover, even if the Court finds that Databricks does not perform every step, there is evidence that Databricks infringes because it directs and controls relevant acts.

*Third*, there can be no doubt that R2 has put forth significant evidence that Databricks makes, uses, and sells infringing systems, and all of Databricks' points to the contrary ignore the evidence of record.

*Fourth*, Databricks is simply wrong that R2 cannot show that the Databricks platform meets the "data group" limitations. R2's expert addressed this at length in his report, and Databricks' argument to the contrary is based on a contrived interpretation of his opinions.

*Fifth*, whether the Databricks platform meets the "where each mapping function is selected for a partition based on the data group the partition originated from" limitation is a fact issue, and Databricks' arguments amount to improper claim construction.

*Sixth*, R2 has shown that "reducing" in the Databricks platform includes "processing the intermediate data for each data group in a manner that is defined to correspond to the data group from which the intermediate data originated." Databricks' points to the contrary again amount to misconstructions of relevant claim terms.

1

## II.     RESPONSE TO DATABRICKS' STATEMENT OF ISSUES

Databricks' statement of issues distorts the relevant questions. The issues are as follows:

1.     Whether there is a genuine dispute of material fact that Databricks' serverless compute infringes any asserted claim.

2.     Whether there is a genuine dispute of material fact that Databricks, or its customers, directly infringe asserted method claims.

3.     Whether there is a genuine dispute of material fact that Databricks' classic compute directly infringes asserted system claims.

4.     Whether there is a genuine dispute of material fact that the Databricks platform meets the "data group" limitations.

5.     Whether there is a genuine dispute of material fact that the Databricks platform meets the "selected one a plurality of mapping functions" limitations.

6.     Whether there is a genuine dispute of material fact that the Databricks platform meets the "processing the intermediate data for each data group in a manner that is defined to correspond to the data group from which the intermediate data originated" limitations.

## III.     RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     R2 does not dispute the facts that Databricks sets forth in paragraphs 7-8 of its motion, but the remainder of Databricks' "undisputed facts" section twists the record and misstates key facts.

2.     During discovery, Databricks represented to R2 that Apache Spark is the only relevant functionality within the accused platform. This is set forth at length in R2's pending Motion to Compel (ECF 82) and Motion to Strike (ECF 115). Databricks' representations resulted in the parties' Joint Stipulation Regarding Source Code, in which Databricks agreed that (1) open-source Apache Spark code files are representative of its own internal versions of Spark files, (2)

R2 is entitled to rely on open-source Apache Spark code for its infringement case, and (3) Databricks would not use R2's reliance on open-source code files, as opposed to Databricks' proprietary code files, as the basis for any defense. *See* ECF 73.

3.     Before serving its rebuttal expert reports, Databricks had never before alleged that serverless compute could not infringe because its runs Photon code (as opposed to Apache Spark code). It had also never alleged that classic compute does not infringe when Photon is turned on. Photon is not even mentioned anywhere in Databricks' interrogatory responses. Rather, Databricks explained that the Databricks platform runs Apache Spark, not Photon. Ex. 1 at 12.

4.     Databricks Runtime is the portion of the Databricks platform that includes Apache Spark. Ex. 2; Ex. 3; Ex. 4 (Rosen Depo.) at 22:2-20. Databricks Runtime is implemented in both Databricks' classic compute and serverless compute offerings. Ex. 4 (Rosen Depo.), 83:5-84:8; Ex. 5 (Xin Depo.), 230:25-231:11, 248:17-249:4; Ex. 6. In classic compute, users request that Databricks make a "compute plane" for them by deploying the Databricks platform to the users' own cloud environments. Ex. 4 (Rosen Depo.), 14:19-15:17, 58:8-64:10, 115:23-122:8; Ex. 5 (Xin Depo.), 171:11-17, 187:14-17; Ex. 7; Ex. 8 at Annex 1. To interact with the compute plane, users transmit queries to Databricks' "control plane" software, which is indisputably controlled entirely by Databricks and maintains proprietary communication linkages with one or more compute planes. *Id*. To invoke functionality in a compute plane, Databricks packages user queries within the control plane, identifies which compute plane to invoke, and transmits the packaged query over the corresponding proprietary communication linkage to activate the appropriate compute plane. *Id*. In serverless compute, "the compute resources are managed by Databricks" entirely, meaning that the Databricks platform runs on Databricks' own cloud environment. Mot. at 6.

5.     R2's technical expert, Mr. Bill Davis, opines that his analysis applies to Databricks'

products that include Databricks Runtime and that Databricks infringes via both classic and serverless compute. Ex. 9 (Davis Op.), ¶¶ 36, 227-228. In his report, Mr. Davis notes the Court's constructions of claim terms at multiple locations (*see, e.g., id.* at ¶¶ 116-117, 135, 146, 167), and he cites myriad evidence to support his opinions, including source code, testimony, and documents (*see generally id.*). He states that "infringing functionality is evident from how the Databricks platform executes join operations between two different data groups which share a key in common when" three conditions are met. *Id.* at ¶ 130. He explains in his report why "such conditions are almost always met" and that "join functionality" under those conditions is "fundamental to any data analytics system." *Id.* at ¶¶ 131-132. Mr. Davis then demonstrates how the Databricks platform meets each and every element of the asserted claims. *Id.* at ¶¶ 133-195.

## IV.    ARGUMENT

### A.    Fact Issues Exist Regarding Whether Serverless Compute Infringes.

Databricks alleges two reasons why its serverless compute offerings do not infringe. It says serverless compute cannot infringe because it runs (unproduced) Photon code rather than the Apache Spark code that Databricks produced in this case (and R2 analyzed, accordingly). It also says that R2's expert "speculat[es]" in his report and presents no evidence that serverless compute infringes. Mot. at 9-10. Both points fail.

#### 1.    Databricks' Photon arguments should be stricken.

R2 has addressed Databricks' untenable Photon-based arguments extensively in its pending Motion to Strike. *See* ECF 115, 1-8; *see also* ECF 82 (Motion to Compel). The same arguments apply here. First, using unproduced Photon defensively violates the parties' Joint Stipulation Regarding Source Code (ECF 73). Second, the Photon non-infringement theory was not disclosed in discovery.

Through the Joint Stipulation, Databricks garnered R2's agreement to forego additional

source code discovery by agreeing that it would not "use the fact that R2 relies on such [produced] open-source Apache Spark source code files, as opposed to Databricks' proprietary code files, to make its infringement allegations as the basis for any defense in this action." ECF 73. Databricks' argument here flouts this agreement. Tellingly, Databricks avoids any mention of this provision in its summary judgment motion, while pretending that R2 "misinterpret[ed]" the Stipulation in advising Mr. Davis on what code to analyze. Mot. at 10. But this twists the factual record and exposes Databricks' machinations for what they are—blatant discovery gamesmanship. Databricks produced Apache Spark code as its own, told R2 there was no other relevant code, stipulated that R2 could use the produced open-source code for its infringement case, and promised not to bring a "gotcha" argument based on proprietary code it shielded through subterfuge. *See* ECF 73; ECF 115 at 1-8; ECF 82. Despite its promise, Databricks makes that "gotcha" argument and feigns innocence, hoping its discovery games and violation of the Stipulation are overlooked by the Court.

Beyond its promise to forego reliance on its proprietary code, Databricks' Photon-based arguments offend other aspects of the Stipulation. Databricks stipulated that the open-source Apache Spark code is representative of its own internal Spark code. ECF 73. But it tacitly admits in its motion that this is untrue—that its internal Apache Spark files do not operate like open-source Spark. Mot. at 10. Indeed, while it is undisputed that Photon uses Apache Spark files to run,[2] Databricks now posits that *open-source* Apache Spark functionality in those files does not execute when Photon is engaged. *See id.* (collecting purported evidence that Photon functionality

---

[2] *See, e.g.*, Ex. 4 (Rosen Depo.), 147:18-149:1 (explaining integration of Photon and Spark which "require modifications to files that originate from Spark in order to achieve linkages to plug it in to call into and out of the Photon code"); Ex. 5 (Xin Depo.), 232:16-234:19 (discussing changes to Spark files made "to support Photon").

replaces Spark functionality when Photon is on). Put another way, Databricks' internal Spark files *invoke different functionality* as compared to open-source Apache Spark when Photon is on. How can it be said, then, that open-source Apache Spark is representative of Databricks' internal version of Spark? The two code bases function differently, at least according to Databricks. This runs afoul of the Stipulation, and the Court should decline to entertain Databricks' motion on this point.

In addition to violating the parties' Stipulation, Databricks never disclosed this Photon-based non-infringement position in discovery. R2 asked Databricks, point-blank, how the accused platform works and what its non-infringement positions are. Ex. 1 at 10, 32-33. Databricks represented unequivocally that the accused platform, whether classic or serverless, runs Apache Spark, not Photon. *Id.* at 12. Databricks never disclosed until rebuttal reports its non-infringement theory that the functionality R2 identified (accomplished with the code that Databricks produced) does not run in serverless compute at all, or in classic compute when Photon is engaged. *Id.* at 33-92. This violates Rule 26(e) and should be stricken under Rule 37(c), as set forth in R2's pending Motion to Strike. ECF 115 at 1-6; *see also* ECF 82 at 1-8; ECF 87 at 1-4.

To the extent Databricks would argue that it was not obligated to disclose this position because R2 "did not disclose any infringement theory based on serverless compute in its infringement contentions," such is disingenuous. Mot. at 9, n.5. R2's infringement contentions did not specifically identify serverless *or* classic compute—R2 simply identified the Databricks Data Intelligence Platform, which is offered via both classic and serverless mechanisms. Databricks certainly understood both classic and serverless to be implicated, as it produced information for both in discovery. *See generally* Ex. 10, Ex. 11. And R2 specifically identified serverless offerings in email discussions with Databricks, which Databricks acknowledged and responded to with document productions. Ex. 12 at 1, 3. In fact, Databricks put forth *other* non-infringement positions

██████████████████████████████████████

for serverless compute, but it failed to identify this one. *See* Ex. 1 at 70-73, 81, 90 (████

██████████████████████████████████████

████████████████████████████). And, finally, R2 explicitly identified

serverless compute and related infringement theories in response to Databricks' interrogatories.

Ex. 13 at 4-5. In summary, Databricks knew serverless compute to be implicated and should have

disclosed the subject non-infringement theory from the outset. Its failure to do so requires that its

argument here be struck under Rule 37(e). *See* ECF 115 at 1-8; *see also* ECF 82 at 1-8; ECF 87 at

1-4.

## 2. Serverless compute infringes because it runs Databricks Runtime.

Databricks ignores the record in alleging that R2's evidence of serverless compute's

infringement "is insufficient as a matter of law." Mot. at 10. It is undisputed that Databricks'

serverless compute offerings include Databricks Runtime. Ex. 4 (Rosen Depo.), 83:5-84:8; Ex. 5

(Xin Depo.), 230:25-231:11, 248:17-249:4; Ex. 6. And Mr. Davis explicitly analyzes "products

that include Databricks Runtime." Davis Op., ¶ 36. Indeed, in his report, Mr. Davis provides pages

of technical analysis explaining how Databricks Runtime practices each and every limitation of

the asserted claims. *Id*. at ¶¶ 133-195. He explains exactly the way in which Databricks infringes

via serverless compute, e.g., via practicing the claimed method with serverless compute and

making the claimed system by creating serverless compute clusters, among other things. *See id.*, ¶

227-235. To say that "Mr. Davis did not map serverless compute to any asserted claim" is clearly

wrong. Mot. at 9. Mr. Davis gave an entire report on why Databricks Runtime, the core software

in Databricks' classic and serverless offerings, infringes. He is not "speculating," rendering *Fintiv*

inapposite. *See* Mot. at 10 (quoting *Fintiv, Inc. v. Apple Inc.*, No. 1:21-cv-896-ADA, 2023 WL

4237356, at *3-5 (W.D. Tex. June 28, 2023)); *see also Hilgraeve Corp. v. Symantec Corp.*, 265

F.3d 1336, 1343 (Fed. Cir. 2001) ("[I]n determining whether a product claim is infringed, we have held that an accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of non-infringing modes of operation.").

Databricks also cherry-picks testimony from Mr. Davis to make its argument, ignoring key context. In response to the question, "So you don't have any infringement opinion based on Databricks serverless compute; correct?", Mr. Davis testified, "As I understand, from testimony and depositions, that the serverless product includes the Databricks platform, and serverless is basically Databricks. So from that perspective, I believe that the analysis I did on the Databricks platform provided also applies to the serverless case." Ex. 14 (Davis Depo. Day 1), 46:12-21; *see also* 265:9-266:14 (explaining how Databricks infringes via serverless compute), 266:21-22 (A: "I tested the Databricks runtime."), 266:23-267:3 (A: "My understanding was that Databricks serverless runs on the Databricks runtime."). Mr. Davis's understanding is consistent with Databricks' interrogatory responses and substantial deposition testimony in this case. Ex. 1 at 12 (explaining that the "Databricks platform" (agnostic as to classic or serverless) runs Apache Spark), 167 (explaining that Databricks Runtime includes Spark); Ex. 4 (Rosen Depo.), 83:5-84:8; Ex. 5 (Xin Depo.), 230:25-231:11, 248:17-249:4; Ex. 6. In summary, that Mr. Davis did extensive testing with a classic, as opposed to a serverless, cluster is entirely reasonable, because the discovery in this case unequivocally demonstrates that both implement Databricks Runtime. At the very least, this raises a fact issue that precludes summary judgment.

## B.    Fact Issues Exist Regarding Whether Databricks and/or Its Customers Directly Infringe Claims 1 and 5.

Databricks asserts there is "no evidence of a direct infringer" of the asserted method claims. Mot. at 11. This is wrong. Mr. Davis explains in his report exactly how the accused platform performs infringing methods. *See* Davis Op., ¶¶ 134-184. For every method step, he identifies an

operation performed by the Databricks platform, as opposed to by a user, demonstrating that "all steps of the claimed method[s] are performed by or attributable to a single entity."[3] *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015). He then explains how Databricks directly infringes the method claims via serverless compute and classic compute. *See id.* at ¶ 227. All of these opinions are supported by significant evidence, which is cited in Mr. Davis's report and which he identified in his deposition. *See id.* at ¶¶ 227, 233; *see also* Ex. 14 (Davis Depo. Day 1), 263:7-264:22. But Databricks ignores this evidence and manufacturers its own legal standard.

At bottom, Databricks' two-pronged position is that: (1) Mr. Davis explains that certain conditions must exist for the accused platform's infringing functionality to be invoked,[4] and (2) R2 does not have *direct* evidence that some of these conditions are satisfied. *See* Mot. at 11-14. But this misapplies the law. It is well established that R2 is entitled to make its direct infringement case based purely on circumstantial evidence. *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1326 (Fed. Cir. 2009) ("Direct infringement can be proven by circumstantial evidence."); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 13120 (Fed. Cir. 2009) (same). Such is not necessary, however. There is substantial evidence—direct and circumstantial—that the Databricks platform practices infringing methods. There is also substantial evidence that all method steps are "performed by or attributable to" Databricks (or, in the alternative, its customers). *Akamai*, 797 F.3d at 1022. Thus, there is a genuine issue of fact that precludes summary judgment.

## 1. The Databricks platform practices each element of the infringing methods.

[3] Notably, Databricks does not allege that users, as opposed to Databricks, perform any steps of the method claims, which is a tacit admission that the steps are performed entirely to Databricks.

[4] Databricks lists out "no less than half a dozen" conditions that are purportedly attributable to Mr. Davis's "concocted theory." Mot. at 11-12. This is misleading—many of the "conditions" are actually claim limitations.

████████████████████████████████████████

Mr. Davis explains that the "infringing functionality is evident from how the Databricks platform executes join operations between two different data groups which share a key in common when" (1) "[t]he underlying data is able to be partitioned…," (2) "[t]he keys involved in the join are of a data type that supports sorting…," and (3) "[b]oth input datasets are large enough so that neither qualifies for a broadcast join, which typically means that their sizes exceed…10MB." Davis Op., ¶ 130. Immediately thereafter, he explains, with citations to deposition testimony and documents, exactly why such conditions "are almost always met" and why "join functionality under [those] conditions is fundamental to any data analytics system." *Id*., ¶¶ 131-132. Indeed, as a few examples, customer witnesses testified that ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ Ex. 15 (Sirois Depo.), 22:1-9, 12:16-22:9; Ex. 16 (Viswanath Depo.), 16:11-20:25, 25:10-29:10; Ex. 17, ¶¶ 8-10. Databricks witnesses testified that █████████

████████████████████████████████████████

███████████████████████████. Ex. 18 (C. Davis Depo.), 62:22-67:5, 81:15-85:8, 114:6-20; Ex. 19 (Ramanathan Depo.), 26:9-27:17, 28:5-21, 32:2-13, 37:5-39:11; Ex. 4 (Rosen Depo.), 162:9-164:12; Ex. 5 (Xin Depo.), 288:13-19. Source code and documents demonstrate that the accused platform comes with an integrated capability to partition data and support sorting on key (i.e., Delta tables, *see* Davis Op., ¶¶ 79, 91), and "sorting on key has been quintessential functionality for many years" (Davis Op., ¶ 131).

Put simply, there is significant evidence that Databricks and/or its customers perform joins under each of the conditions set forth by Mr. Davis. There is also significant evidence that performing such joins infringes the claims, which Mr. Davis explains at length. Davis Op., ¶¶ 133-

███████████████████████████████████████

195. And, in fact, Databricks' non-infringement expert confirmed that this functionality is the *default strategy* for joins under the conditions identified by Mr. Davis, because customers have to provide a "hint" to utilize a different strategy under such conditions.[5] Ex. 20 (Weissman Reb. Op.), ¶ 65; *see also* Ex. 4 (Rosen Depo.), 215:16-23.

### 2.    Databricks itself performs each element of the infringing methods using the Databricks platform.

In addition to the significant evidence demonstrating that the Databricks platform is used to practice infringing methods, there is also substantial evidence that all steps of the methods are "performed by" Databricks itself. *Akamai*, 797 F.3d at 1022. As an initial matter, Mr. Davis explains that Databricks code, not user code, practices each and every method step. *See* Davis Op., ¶¶ 133-195. He further clarifies that Databricks uses this code to perform each method step in three instances. First, in serverless compute, Mr. Davis explains that "Databricks receives queries from customers and performs each of the steps of the method…on the customers' data using its own deployment of Databricks Runtime (running in Databricks' own cloud environments) to respond to such customer queries." Davis Op., ¶ 227; Ex. 4 (Rosen Depo.), 22:2-20; Ex. 5 (Xin Depo.), 237:18-238:12; Ex. 21. Second, he explains that "████████████████████████████

████████████████" Davis Op., ¶ 227; *see also* Ex. 4 (Rosen Depo.), 162:9-164:12; Ex. 5 (Xin Depo.), 288:13-294:13; Ex. 18 (C. Davis Depo.), 62:22-67:5, 81:15-85:8, 114:6-20. Finally, as to classic compute, Mr. Davis explains that Databricks directly infringes the method claims via

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

[5] To the extent Databricks would argue that Photon is the default, such is improper and should be stricken for the same reasons as discussed previously.

███████████████

████████████████████████████████

████████████████████████████████

████ Davis Op., ¶ 227; *see also* Ex. 4 (Rosen Depo.), 14:19-15:17, 58:8-64:10, 115:23-122:8; Ex. 5 (Xin Depo.), 171:11-17, 185:5-189:17; Ex. 7; Ex. 8 at Annex 1; Ex. 24 at 7 (confirming that Databricks is responsible for the Databricks platform software); Ex. 25 (Pohl Depo.), 123:5-13. In other words, there is evidence that Databricks controls the initiation and performance of the infringing methods. This is certainly sufficient to raise a fact question as to whether Databricks performs every step of the asserted method claims.

Moreover, to the extent that Databricks' customers practice any of the method steps (something Databricks does not argue), these same facts demonstrate that any such acts "are attributable to" Databricks such that Databricks is responsible. *Akamai*, 797 F.3d at 1022. Mr. Davis explains that for classic compute, █████████████████████████

████████████████████████████████

███████████████████████ t." Davis Op., ¶ 70. And for users to interact with the platform, *they go through Databricks*, █████████████████████

████████████████████████████████

Rosen Depo., 117:17-25. The Databricks platform ████████ then takes care of the processing. Ex. 16 (Viswanath Depo.), 31:24-32:6; *see also* Davis Op., ¶¶ 133-195. As Mr. Davis clarified in his deposition, many users would not even know whether the accused functionality is used or not, because "[a] lot of those details are obscure to many users" and "[i]t requires a level of sophistication to understand the mechanism that Spark is using to execute a query." Ex. 14 (Davis Depo. Day 1), 270:14-271:3; *see also* Ex. 16 (Viswanath Depo.), 31:24-33:9; Ex. 15 (Sirois Depo.), 32:2-33:17; Ex. 4 (Rosen Depo.), 215:16-23. Indeed, Mr. Davis explicitly opines that

Databricks "directs and controls" the Databricks platform running on customers' clouds in this manner. Davis Op., ¶ 227.

In summary, for all of Databricks' bluster that it does not perform the methods because "each Databricks user chooses how to implement the Databricks platform," this misstates the standard—the relevant question is *who* performs the steps. *See Akamai*, 797 F.3d at 1022. R2 has shown that Databricks does, and this alone renders summary judgment improper. In fact, Databricks cannot identify a single, actual method step allegedly performed by a customer, as opposed to itself.[6] Moreover, if Databricks does not actually perform each step, there is evidence that any such act is attributable to Databricks. There is, thus, at least a genuine issue of fact as to whether Databricks (and/or its customers) directly infringe the asserted method claims, and the Court should deny summary judgment on this issue.[7]

## C.    Fact Issues Exist Regarding Whether Databricks Directly Infringes Claims 17 and 21.

Databricks alleges that it does not make, use, or sell the systems outlined by claims 17 and 21 via classic compute.[8] This is wrong. Databricks does all three. It makes and sells infringing classic compute systems by deploying its platform to customers' cloud environments and charging customers for the platform. And it uses the infringing classic compute systems by directly controlling and invoking them via its "control plane" software. Specifically, for classic compute,

---

[6] For clarity, Databricks does not challenge R2's indirect infringement allegations. To the extent the Court finds that performance of the method steps are attributable to Databricks' customers, R2's allegations that Databricks induces its customers to infringe cannot be dismissed at this stage.

[7] Databricks' reliance on the *ACCO Brands* case is misplaced, because here, there is significant evidence of direct infringement beyond Mr. Davis's testing. *See ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007).

[8] Databricks does not challenge R2's allegation that Databricks infringes directly via making, using, and selling serverless compute.

users "request that Databricks deploy Databricks Runtime to their own cloud environments," which involves Databricks "configuring the Databricks workspace to connect with customers' AWS [or GCP] account." Davis Op., ¶ 70; Ex. 14 (Davis Depo. Day 1) at 260:24-261:5; Ex. 4 (Rosen Depo.), 14:19-15:17, 115:23-122:8; Ex. 7; Ex. 8 at Annex 1. All users must do is make some "high-level selections regarding some specifics of the cluster the deployment will reside on." Davis Op., ¶ 198, n.37. In other words, users just have to "select[] features to outline the parameters of how" they want their "cluster to look" and "select[] the version of Databricks Runtime." *Id.* As Mr. Davis explains, "[I]t is Databricks who deploys the resources, and it is Databricks software that causes the processors and memories of the cloud environments to be configured as outlined in claims 17 and 21." *Id.*; *see also* Ex. 4 (Rosen Depo.), 14:19-15:17, 115:23-122:8; Ex. 7; Ex. 8 at Annex 1. Databricks then charges the users for the system. *See, e.g.*, Ex. 10; Ex. 11; Ex. 22 (Winkenbach Depo.), 41:17-53:6; Ex. 23.

This is analogous to a customer bringing her own cup to Starbucks. The customer brings an empty cup (i.e., cloud environment) to Databricks and orders coffee with cream and sugar (i.e., the Databricks platform with certain features). Databricks makes the coffee per the customer's order, puts it into the customer's cup, and then charges her for a cup of coffee. Stated another way, while Databricks does not sell processors and memory (i.e., cups), it is Databricks who "combine[s] all of the claim elements" and "completes the system" via deployment of the accused platform, which creates the very system that is operable to perform each and every element outlined in the system claims. *Centillion Data Sys., LLC v. Qwest Communs. Int'l*, 631 F.3d 1279, 1288 (Fed. Cir. 2011). It is Databricks who "assemble[s] the infringing components together such that the combination is infringing" via deployment of the accused platform to cloud environments and charges the customer for the platform. *Garrett v. TP-Link Research Am. Corp.*, No. 20-cv-

03491-SI, 2020 U.S. Dist. LEXIS 221775, at *17 (N.D. Cal. Nov. 23, 2020) (citing *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1378 (Fed. Cir. 2017) (affirming that a defendant installing a seal onto an RV when "the resulting seal-RV combination infringed" could constitute infringement, as it is "consistent with our precedents holding that assembling the components of an invention is an infringing act of making the invention."); *see also CenTrak, Inc. v. Sonitor Techs., Inc.*, 915 F.3d 1360, 1372 (Fed. Cir. 2019) ("a final assembler can be liable for making an infringing combination…even if it does not make each individual component element"). Indeed, immediately after deployment, the Databricks platform is "configured to process data of a data set" in the manner outlined in the claims. *See* Davis Op., ¶¶ 185-195; ECF 1-2, cl. 17, 21; Ex. 16 (Viswanath Depo.), 31:24-33:9; Ex. 15 (Sirois Depo.), 32:2-33:17.

Databricks incorrectly alleges that after deployment, the processor and memory are not "operable to perform" the steps of the claims because the user must "provide data sets and data processing code," meaning that "it is the user that combines all of the claim elements." Mot. at 15. This is wrong and is tantamount to reading limitations into the claims. The claims do not require the processor and memory to be operable to "provide data sets" or "data processing code"—they only require that the processor and memory are "operable to perform" the partitioning, mapping, and reducing functionality on data, as outlined therein. *See* ECF 1-2, cl. 17, 21. And the processors and memory onto which the Databricks platform is deployed are certainly configured this way after deployment, which is evident from the fact that Mr. Davis cites Databricks code, not user code, for *each and every limitation*. *See* Davis Op., ¶¶ 133-195; *see also* Ex. 16 (Viswanath Depo.), 31:24-33:9; Ex. 15 (Sirois Depo.), 32:2-33:17. The only non-Databricks code Mr. Davis uses includes example data sets and an example query to demonstrate how the Databricks platform is configured to operate on data, and Mr. Davis's analysis demonstrates that the infringing system is

15

███████████████████████████████████

operable to do exactly what the claims say before a user does anything. *See id.*; *see also* Davis Op., ¶¶ 121-124. Put another way, a user writing a query to his own data does not change the configuration of the Databricks platform. *See id.* To the contrary, providing written queries, identifying data sets, and "click[ing] run now" is simply how a user *interacts* with the system (or, more accurately, instructs Databricks to interact with the system, as discussed above and below). Mot. at 15. Keeping with the coffee cup analogy, a customer may have to open the lid and lift the cup to her mouth to get a drink, but this does not mean that the customer *makes* the cup of coffee. But this is what Databricks argues, and it is wrong. And again, Databricks charges customers for the infringing systems.[9] *See, e.g.*, Ex. 10; Ex. 11; Ex. 22 (Winkenbach Depo.), 41:17-53:6; Ex. 23. At the very least, this makes clear that there are fact issues as to whether it is Databricks or the customer who "combines all the claim elements" and as to whether Databricks sells the inventions, which precludes summary judgment. *See Centillion*, 631 F.3d at 1288.

Finally, Databricks incorrectly argues that it does not "use" the infringing systems because it does not "put the invention into service, *i.e.*, control the system as a whole and obtain benefit from it." Mot. at 16 (citing *Centillion*, 631 F.3d at 1284). But this is belied by the evidence. Databricks exercises direct control over *every single deployment of the accused platform* via its "control plane" and generates beneficial revenue from use of the platform. *See, e.g.*, Ex. 4 (Rosen Depo.), 14:19-15:17, 115:23-122:8; Ex. 5 (Xin Depo.), 187:14-17; Ex. 7; Ex. 8 at Annex 1; Ex. 10; Ex. 11; Ex. 22 (Winkenbach Depo.), 41:17-53:6; Ex. 23. Indeed, the Databricks control plane

███████████████████████████████████

███████████████████████████████████

---

[9] Databricks argues that it cannot directly infringe because users pay cloud providers for server space. *See* Mot. at 15-16. But this is irrelevant, because users also pay Databricks for the infringing system, which is the complete invention.

███████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████ Ex. 4 (Rosen Depo.), 13:12-17:13, 38:14-19, 41:2-12 ████████

█████████████████████████████████████████

██████ ). And, as discussed above, Databricks is actually the entity that invokes infringing functionality in the compute plane of classic compute and thereby uses the accused platform— Databricks receives queries from users, packages them to be operable with the "compute planes" of the customers, and then invokes functionality in the customers' compute planes using the packaged queries. Ex. 4 (Rosen Depo.), 14:19-15:17, 58:8-64:10, 115:23-122:8; Ex. 5 (Xin Depo.), 171:11-17, 187:14-17; Ex. 7; Ex. 8 at Annex 1.

All of the foregoing is precisely within the "use" contemplated by *Centillion*. Databricks is "'using' every element of the system by transmitting a message" (i.e., the packaged query); it does not matter that Databricks does "not have physical control over" customers' cloud environments because Databricks makes "them work for their patented purpose, and thus ['uses'] every element of the system by putting every element collectively into service." *Centillion*, 631 F.3d at 1284. This is certainly sufficient to raise a fact question for the jury.

### D.    Fact Issues Exist Regarding Whether the Accused Instrumentalities Include "data groups."

The entirety of Databricks' "data groups" argument is based on a fallacy, namely, that "it is Mr. Davis's opinion that a 'Delta table' is the claimed 'data group' ███████████ ███████████████████████████████████████" Mot. at 17. Databricks uses that fallacy to then argue that the Delta tables cannot be "data groups" because ████████████ ████████████████████████████████████" *Id*. But Databricks pulls this argument out of thin air, because that is not Mr. Davis's opinion. *See, e.g.*, Ex. 14 (Davis

17



Depo. Day 1), at 209:7-13 (████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████").

In fact, Mr. Davis explains unequivocally that "[e]ach table processed by the Databricks platform is a group of data, and the 'mechanism for identifying data from that group' is the schema of the table itself." Davis Op., ¶ 137. He goes on to explain that ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ *Id.* at ¶¶ 138-139. He further clarifies that

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ *Id.* at ¶ 140. This demonstrates that Databricks mischaracterizes Mr. Davis's opinion. Mr. Davis is not saying that ██████████

████████████████████████████████████████████████████████

████████████████████████████████████. Mr. Davis reiterated this point in his deposition multiple times. *See* Ex. 14 (Davis Depo. Day 1), at 209:7-13; 271:11-16 ████████████████████████████████████████████████████████

████████████████████████████████████ Databricks cannot deny that the schemas of the tables exist prior to query execution, and this raises a fact issue.

E.    **Fact Issues Exist Regarding Whether the Accused Instrumentalities Include "mapping functions" That Are "selected for a partition based on the data group the partition originated from."**

Databricks argues that because the identified mapping function "does not check whether a partition comes from a particular Delta table," it cannot meet this limitation as construed by the

██████████████████████████████████████████████

Court.[10] Mot. at 19. But this is a distortion of the Court's construction and is not what it requires. The Court's construction requires that "each mapping function is selected for a partition based on the data group the partition originated from." ECF 71 at 24. Mr. Davis's report provides several paragraphs outlining exactly how the Databricks platform meets this limitation. For example, he explains that ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████" Davis Op., ¶ 147. █████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████ *Id.* at ¶ 148. He explains that this also happens for the second data group. *Id.* Then, he describes how ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████ *Id.* at ¶¶ 149-150. He goes on state that ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████ *Id.* at ¶ 151. Put simply, Mr.

---

[10] It bears mention here that Databricks is falling back on its fallacy regarding the "data group" limitation. Mr. Davis never limited "data group" to "Delta table" and instead just used a Delta table as an example in his report. Davis Op., ¶¶ 88 n.20 ("underlying data does not have to be stored in Delta Lake"); 137 ("a data set processed by the Databricks platform includes multiple data tables, such as Delta tables. Each table processed by the Databricks platform is a group of data, and the "mechanism for identifying data from that group" is the schema of the table itself.")

Davis explains that the mapping functions are selected for the partitions based on the original data groups at the outset, in the query planning stage, meaning that there is simply no need for a mapping function to "check" where its partition came from—it is preordained before the mapping function ever processes the data. In any event, this is clearly a fact question for the jury.

F.    **Fact Issues Exist Regarding Whether the Accused Instrumentalities Practice the Claimed "reducing" Limitation.**

Yet again, Databricks espouses an improper claim construction to manufacture a non-infringement position. Like with the mapping limitation, Databricks argues that R2 failed to show this limitation is met because "the accused 'reducing' does not consider the accused 'data group' during process."[11] Mot. at 20. But the Court's construction requires only that the "reducing" step "processes the intermediate data for each data group in a manner that is defined to correspond to the data group from which the intermediate data originated." ECF 71 at 30. Again, Mr. Davis's report is replete with evidence on this point.

Mr. Davis dedicates multiple paragraphs of his report to explaining exactly how the "reducing" step performed by the Databricks platform includes "processing the intermediate data for each data group in a manner that is defined to correspond to the data group from which the intermediate data originated." For example, he explains that "when executing join stages, the Databricks platform reduces the intermediate data, generated by ShuffleExchangeExec, using specialized physical operators like SortMergeJoinExec and evaluation helpers such as SortMergeJoinEvaluator." Davis Op., ¶ 168. He also explains that "[m]ore specifically, in the SortMergeJoinEvaluator, the join operation is optimized by creating two distinct iterators—one for the left (outer) data source and one for the right (inner) data source, corresponding to the two

---

[11] It again bears mention that Databricks reemphasizes its fallacy regarding the "data group" limitation.

data groups." *Id*. at ¶ 169. He also describes how the "processing is tailored and corresponds to each side: the left iterator (corresponding to one data group) is advanced row-by-row, providing the driving stream of records, and its values are used to determine when to 'release' the buffered right-side rows for matching. The right iterator (corresponding to the other data group), on the other hand, is buffered to allow repeated access to rows with the same join key for every corresponding left-side row." *Id*. at ¶ 170. Finally, he makes clear that "[i]n this manner, the Databricks platform reduces the intermediate data for the data groups to at least one output data group, including by processing the intermediate data for each data group in a manner that is defined to correspond to the data group from which the intermediate data originated…." *Id*. at ¶ 172.

It is simply irrelevant whether the "sort-merge join step considers or uses [D]elta tables," or whether the particular function "consider[s] whether the outputs of the sort step…come from a particular [D]elta table." Mot. at 20 (quoting Davis testimony). The Databricks platform nevertheless processes intermediate data in a manner that is defined to correspond to original data groups, because it uses data group specific iterators that accomplish processing that is "tailored and corresponds" to each of the data groups. Davis Op., ¶ 170. At the very least, Mr. Davis's opinions in this regard raise a fact issue, and the Court should deny summary judgment.

## V.    CONCLUSION

Myriad fact issues exist as to all issues raised by Databricks' motion, and the Court should decline to enter any summary judgment.

Dated: May 1, 2025                              Respectfully Submitted,


By: */s/ Carder W. Brooks*
Edward R. Nelson III
State Bar No. 00797142
Christopher G. Granaghan
State Bar No. 24078585
John P. Murphy
State Bar No. 24056024
Carder W. Brooks
State Bar No. 24105536
Nelson Bumgardner Conroy PC
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
817.377.9111
ed@nelbum.com
chris@nelbum.com
murphy@nelbum.com
carder@nelbum.com

COUNSEL FOR
PLAINTIFF R2 SOLUTIONS LLC


## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2025, a true and correct copy of the foregoing document

was served via electronic mail upon all counsel of record.

*/s/ Carder W. Brooks*


## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

I hereby certify that under local rule CV-5(a)(7), the foregoing document is filed under seal

pursuant to the Court's Protective Order entered in this matter.

*/s/ Carder W. Brooks*